**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

|  |  |
|---|---|
| EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS PHARMACY, INC.; ESI MAIL PHARMACY SERVICE, INC; EXPRESS SCRIPTS SPECIALTY DISTRIBUTION SERVICES, INC.; ACCREDO HEALTH GROUP, INC.; LYNNFIELD DRUG, INC. d/b/a FREEDOM FERTILITY PHARMACY; LYNNFIELD COMPOUNDING CENTER, INC. d/b/a FREEDOM FP FERTILITY PHARMACY; and VILLAGE FERTILITY PHARMACY, LLC, | |
| Plaintiffs, | Case No. 4:25-cv-520-BSM |
| v. | **Hearing Requested** |
| RODNEY RICHMOND, BRIAN JOLLY, DEBBIE MACK, LENORA NEWSOME, CLINT BOONE, WALTER LYN FRUCHEY, HAROLD H. SIMPSON, and BETH ANN DAVENPORT, in their official capacities as board members of the Arkansas State Board of Pharmacy; and JOHN C. KIRTLEY, in his official capacity as executive director of the Arkansas State Board of Pharmacy, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 4

    A.    PBM-Affiliated Pharmacies, Including Plaintiffs, Serve Hundreds Of
           Thousands Of Arkansans ..................................................................................... 4

    B.    The U.S. Department Of Defense Relies On Plaintiffs To Provide
           Military Health Benefits Through The Federal TRICARE Program ....................... 7

    C.    Act 624 Will Banish PBM-Affiliated Pharmacies, Including Plaintiffs,
           From Arkansas Mere Months From Now ............................................................. 9

    D.    The Express Purpose Of Act 624 Is To Protect Locally Owned
           Pharmacies From Competition From Out-Of-State PBMs .................................... 10

    E.    Arkansas Law Already Prohibits The "Anticompetitive" Conduct
           Act 624 Purports To Eliminate .......................................................................... 12

LEGAL STANDARD ...................................................................................................... 13

ARGUMENT ................................................................................................................. 13

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ....................................... 13

    A.    Act 624 Discriminates Against Out-Of-State Commerce And
           Out-Of-State Citizens In Violation Of The Dormant Commerce
           Clause And The Privileges And Immunities Clause ............................................ 13

           1.    Dormant Commerce Clause .................................................................... 13

           2.    Privileges And Immunities Clause ........................................................... 17

    B.    Act 624 Is A Bill Of Attainder ........................................................................... 18

    C.    TRICARE Preempts Act 624's Application To ESI-Affiliated
           Pharmacies ........................................................................................................ 21

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION ......................... 25

    A.    Constitutional Violations ................................................................................... 26

    B.    Unrecoverable Economic Loss ............................................................................ 26

        C.      Loss Of Patient Relationships ................................................................28

III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PRELIMINARY RELIEF ............31

CONCLUSION ...................................................................................................................35

# TABLE OF AUTHORITIES

Page(s)

## CASES

*American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046
(9th Cir. 2009)................................................................................................26

*Arizona v. United States*, 567 U.S. 387 (2012)................................................22

*Association of Community Organizations for Reform Now v. United States*,
692 F.Supp.2d 260 (E.D.N.Y. 2010) .............................................26

*Bergmann v. City of Lake Elmo*, 2010 WL 4123355 (D. Minn. Aug. 19, 2010).........................26

*Birchansky v. Clabaugh*, 421 F.Supp.3d 658 (S.D. Iowa 2018)................................16, 20

*Brandt by and through Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022)...................31

*Brandt v. Rutledge*, 551 F.Supp.3d 882 (E.D. Ark. 2021)................................31

*C&A Carbone, Inc. v. Town of Clarkstown*, 770 F.Supp.848 (S.D.N.Y. 1991)................26

*Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002) ................................16, 20

*Department of Revenue of Kentucky v. Davis*, 553 U.S. 328 (2008)........................2, 13

*Edwards v. Beck*, 946 F.Supp.2d 843 (E.D. Ark. 2013) ................................30

*Eggers v. Evnen*, 48 F.4th 561 (8th Cir. 2022) ................................13, 31

*Entergy, Arkansas, Inc. v. Nebraska*, 210 F.3d 887 (8th Cir. 2000)........................26, 27

*Gade v. National Solid Wastes Management Association*, 505 U.S. 88 (1992) ...................21

*Gartrell Construction, Inc. v. Aubry*, 940 F.2d 437 (9th Cir. 1991)........................25

*Harris v. Gadd*, 2007 WL 1106114 (E.D. Ark. Apr. 12, 2007)................................26

*Hicklin v. Orbeck*, 437 U.S. 518 (1978) ................................17

*IESI AR Corp. v. Northwest Arkansas Regional Solid Waste*, 433 F.3d 600
(8th Cir. 2006)................................................................................14, 16

*In re Aurora Dairy Corp.*, 621 F.3d 781 (8th Cir. 2010)................................21, 22, 25

*Iowa Utilities Board v. FCC*, 109 F.3d 418 (8th Cir. 1996)................................26, 29

*Kansas v. Garcia*, 589 U.S. 191 (2020)................................21

*Kaspersky Lab, Inc. v. U.S. Department of Homeland Security*, 909 F.3d 446
    (D.C. Cir. 2018) ................................................................................................20

*Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956) ..........................................24, 25

*LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018 (8th Cir. 2020) ..............14

*McBurney v. Young*, 569 U.S. 221 (2013) .......................................................3, 17, 18

*Medicine Shoppe International, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801
    (8th Cir. 2003)....................................................................................29, 30, 31

*Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008) ............................................16, 20

*Minnesota ex rel. Hatch v. Hoeven*, 456 F.3d 826 (8th Cir. 2006).............................18

*Missouri v. Trump*, 128 F.4th 979 (8th Cir. 2025).....................................................25

*Morehouse Enterprises, LLC v. ATF*, 78 F.4th 1011 (8th Cir. 2023)...........................26

*Murphy v. National Collegiate Athletic Association*, 584 U.S. 453 (2018)...................21

*National Pork Producers Council v. Ross*, 598 U.S. 356 (2023) .............................2, 13

*Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) ..............3, 18, 19, 20

*Palmer v. Clarke*, 408 F.3d 423 (8th Cir. 2005)........................................................18

*Phelps-Roper v. Nixon*, 509 F.3d 480 (8th Cir. 2007) ...............................................31

*Planned Parenthood Arkansas & Eastern Oklahoma v. Selig*, 2015 WL 13307030
    (E.D. Ark. Sept. 18, 2015) ...........................................................................32

*Powell v. Ryan*, 855 F.3d 899 (8th Cir. 2017) (en banc) ...........................................25

*Rogers Group, Inc. v. City of Fayetteville*, 629 F.3d 784 (8th Cir. 2010) ........28, 29, 30

*Selective Service System v. Minnesota Public Interest Research Group*,
    468 U.S. 841 (1984)...........................................................................18, 19, 21

*Sleep Number Corp. v. Young*, 33 F.4th 1012 (8th Cir. 2022)...............................25, 26

*Smithfield Foods, Inc. v. Miller*, 367 F.3d 1061 (8th Cir. 2004) .................................15

*Sperry v. Florida ex rel. Florida Bar*, 373 U.S. 379 (1963)........................................24

*St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013)..................................16, 20

*Streicher's, Inc. v. Hummel*, 2023 WL 3018680 (D. Minn. Apr. 20, 2023)..................30

*Student Loan Servicing Alliance v. District of Columbia*, 351 F.Supp.3d 26
    (D.D.C. 2018) ....................................................................................24

*Tennessee Wine & Spirits Retailers Association v. Thomas*, 588 U.S. 504 (2019) ................16, 17

*Toomer v. Witsell*, 334 U.S. 385 (1948) ....................................................18

*Trinity Behavior Health Care System, Inc. v. Arkansas Department of Human
    Services*, 2014 WL 5817095 (E.D. Ark. Nov. 7, 2014) ........................32

*Turtle Island Foods SPC v. Soman*, 424 F.Supp.3d 552 (E.D. Ark. 2019) ..................27

*United States v. Brown*, 381 U.S. 437 (1965) ..................................3, 18, 19

*United States v. Lovett*, 328 U.S. 303 (1946) ..................................18

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) ..................13

*WMX Technologies, Inc. v. Gasconade County*, 105 F.3d 1195 (8th Cir. 1997) ..................19, 20

## FEDERAL CONSTITUTIONAL PROVISIONS, STATUTES, AND REGULATIONS

U.S. Const.
    art. I, §8 ....................................................................................13
    art. I, §10, c.1 ..............................................................................18
    art. VI, cl.2 .................................................................................21

10 U.S.C.
    §1071 ....................................................................................7, 23
    §1073 ....................................................................................7, 23
    §1073a ..................................................................................7, 8, 24
    §1074g ..................................................................................7, 8, 23
    §1103 ....................................................................................22, 25

32 C.F.R.
    §199.17 ..................................................................................22
    §199.21 ..................................................................................7, 22, 24, 25

## STATE STATUTES

Ark. Code Ann.
    §17-92-407 ..............................................................................10
    §17-92-416 ..............................................................9, 10, 19, 22, 34
    §17-92-417 ..............................................................................10, 29
    §17-92-507 ..............................................................................12, 16, 20
    §23-92-503 ..............................................................................11
    §23-92-506 ..............................................................................12, 16, 20

Fla. Stat. Ann. §465.022 .................................................................................28

Mo. Stat. Ann. §338.075.1 .............................................................................28

63 Pa. Stat. §390-4.1 ......................................................................................28

## LEGISLATIVE MATERIALS

Act 624, 95th Gen. Assemb., Reg. Sess. (Ark. 2025) ............................................ *passim*

H.B. 1150 amend. H1, 95th Gen. Assemb., Reg. Sess. (Ark. 2025),
     https://arkleg.state.ar.us/Home/FTPDocument?path=%2FAMEND%2F20
     25R%2FPublic%2FHB1150-H1.pdf ...........................................................11, 16

H.B. 1150 amend. H2, 95th Gen. Assemb., Reg. Sess. (Ark. 2025),
     https://arkleg.state.ar.us/Home/FTPDocument?path=%2FAMEND%2F20
     25R%2FPublic%2FHB1150-H2.pdf ...........................................................11, 16

*Hearing on H.B. 1150 Before the Arkansas Senate Insurance and Commerce
     Committee* (Apr. 8, 2025), https://sg001-harmony.sliq.net/00284/
     Harmony/en/PowerBrowser/PowerBrowserV2/20250408/-1/31028?
     mediaStartTime=20250408102505#info ................................11, 12, 14, 15, 16, 17, 20, 25

Segal, *Purpose of Bill: HB 1150, Pricing Approach and Comments* (Mar. 17,
     2025), https://arkleg.state.ar.us/Home/FTPDocument?path=%
     2FAssembly%2F2025%2F2025R%2FFiscal+Impacts%2FHB1150-
     Other1.pdf .......................................................................................................12

U.S. Senate Report No. 100-57 (1987) ...........................................................22, 23

## OTHER AUTHORITIES

America's Health Rankings, *Rural Population in Arkansas*, https://
     www.americashealthrankings.org/explore/measures/pct_rural_b/AR ...............................5

Carlton, Dennis, et al., *PBMs and Prescription Drug Distribution: An Economic
     Consideration of Criticisms Levied Against Pharmacy Benefit Managers*,
     Compass Lexecon (Apr. 2025), https://carltonreport.org ...............................4, 5

Congressional Research Service, IN12053, *TRICARE's 5th Generation Pharmacy
     Contract: TPharm5* (Nov. 2022), https://www.congress.gov/
     crs_external_products/IN/PDF/IN12053/IN12053.2.pdf  ...............................7

FTC, Office of Policy Planning, *Pharmacy Benefit Managers: The Powerful
     Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*
     (July 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-
     benefit-managers-staff-report.pdf .......................................................................12

Mulligan, Casey B., *The Value of Pharmacy Benefit Management*, National
    Bureau of Economic Research Working Paper 30231 (2022), https://
    www.nber.org/papers/w30231 ...........................................................................................4

Press Release, Governor Sanders, Sanders Signs Legislation to Ban Anti-
    Competitive PBM Practices (Apr. 16, 2025), https://
    governor.arkansas.gov/news_post/sanders-signs-legislation-to-ban-anti-
    competitive-pbm-practices/...............................................................................................15

PUTTcast, *Arkansas HB 1150: Combatting PBM Anticompetitive Practices with
    State Legislation* at 2:27, YouTube (Feb. 5, 2025), https://
    www.youtube.com/watch?v=1T9p6VAMULI.....................................................10, 11, 14

**INTRODUCTION**

For over two decades, Plaintiffs – Express Scripts, Inc. ("ESI") and its affiliated pharmacies – have been trusted by tens of thousands of Arkansans to provide high-quality, safe, convenient, and affordable mail-order pharmacy services, including for many lifesaving medications that are available through only one or a few pharmacies.  Act 624 would banish these pharmacies from Arkansas – stripping them of licenses they have maintained in good standing for decades – simply because they are affiliated with ESI, a pharmacy benefits manager ("PBM") that, like all PBMs within the meaning of Act 624, is domiciled outside of Arkansas. Without a preliminary injunction, this unconstitutional statute will immediately and irreversibly harm Plaintiffs, and the tens of thousands of patients in Arkansas who rely on Plaintiffs for pharmacy services.

As soon as July 1 (less than a month from now), and no later than October 3, the Arkansas State Board of Pharmacy will be required by Act 624 to send Plaintiff pharmacies a letter notifying them that the statute will banish them from the state.  Act 624 will then require Plaintiffs, by November 2, to notify their patients in Arkansas that Plaintiffs will soon be legally unable to dispense medications to them.  And just two months after that, beginning on January 1, 2026, Act 624 will require that Plaintiffs' pharmacy permits be revoked.  These impending events are already imperiling the relationships Plaintiffs have developed over many years with patients, health plan sponsors, and drug manufacturers.  Plaintiffs' patients are now scrambling to find alternative pharmacies, and the shadow that Act 624 has cast has made Plaintiffs less competitive in maintaining and bidding for partnerships with plan sponsors and drug manufacturers, who expect their partner pharmacies to serve patients in every state.

Moreover, patients face serious imminent harm. They will suffer the disruption of losing their current pharmacy of choice. And as even Act 624's proponents admit, the law will create pharmacy "deserts," which will hit hardest the 40% of Arkansans in rural areas for whom Plaintiffs' mail-order pharmacy services are especially critical. Indeed, the law will dangerously limit patient choice and deny access to lifesaving drugs at affordable prices by high-quality pharmacy providers.

All this comes at the behest of the Arkansas-based "independent" pharmacies who spearheaded Act 624 to eliminate out-of-state competition. Act 624's text, context, and legislative history make clear that the statute's actual purpose and effect are naked local protectionism. The law's only other stated aim – to address "certain anticompetitive business tactics," Act 624 §1(b) – is plainly pretextual: No proponent of the legislation identified any potentially anticompetitive practice conceivably addressed by Act 624 that is not already prohibited under Arkansas law.

Act 624's illegitimate purpose and effect render it unconstitutional several times over – unconstitutionality that, given the irreparable harms just outlined, warrant a preliminary injunction. First, the U.S. Constitution's Commerce Clause, and in particular its negative component known as the dormant Commerce Clause, "prohibits the enforcement of state laws 'driven by economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (quoting *Department of Revenue of Kentucky v. Davis*, 553 U.S. 328, 337-338 (2008)). Act 624 is paradigmatic protectionist legislation that violates the dormant Commerce Clause.

Second, and relatedly, a state law violates the Constitution's Privileges and Immunities Clause if it is "enacted for the protectionist purpose of burdening out-of-state citizens" by depriving them of "the privilege of pursuing [their professional] calling." *McBurney v. Young*, 569 U.S. 221, 227 (2013). Act 624 does exactly that, burdening exclusively out-of-state PBMs with affiliated pharmacies by prohibiting them from practicing their trade in Arkansas.

Third, Act 624 accomplishes its protectionist purpose by singling out PBMs and PBM-affiliated pharmacies for punishment. Its legislative history reveals that the law was motivated by a desire to penalize the nation's three largest PBMs, including ESI. Act 624 thus violates the Constitution's prohibition on bills of attainder – that is, the prohibition on "legislative punishment … of specifically designated persons or groups," *United States v. Brown*, 381 U.S. 437, 447 (1965). That includes punishment in the form of "banishment" or "barring designated individuals or groups from participation in specified employments or vocations." *Nixon v. Administrator of General Services*, 433 U.S. 425, 474 (1977).

Finally, Act 624 is preempted as applied to Plaintiffs who deliver mail-order pharmacy benefits under the U.S. Defense Department's TRICARE program. TRICARE's enabling statute expressly exempts TRICARE contractors like ESI from state laws like Act 624 that are inconsistent with or impede the performance of a TRICARE contract. Under its TRICARE contract, ESI must provide mail-order pharmacy services to TRICARE beneficiaries nationwide, and it selected – and the federal government approved – certain Plaintiff pharmacies to provide those services. Act 624 would impermissibly obstruct ESI's TRICARE contract by prohibiting these Plaintiffs from performing the services that they are contractually required to perform.

The Court should enjoin Defendants from enforcing Act 624 against Plaintiffs to prevent these constitutional violations and the imminent irreparable harm the statute inflicts on Plaintiffs and the public.

## BACKGROUND

### A.    PBM-Affiliated Pharmacies, Including Plaintiffs, Serve Hundreds Of Thousands Of Arkansans

PBMs play an indispensable role in the provision of healthcare in Arkansas and across the nation.  They are the only entities in the prescription drug supply chain whose purpose is to help health plan sponsors – which include employers, labor unions, insurers, and government agencies – and their members pay less for prescription drugs, countering the trend of higher drug prices being set by pharmaceutical manufacturers.  Mulligan, *The Value of Pharmacy Benefit Management* 1, National Bureau of Economic Research Working Paper 30231 (2022).[1]  Health plan sponsors frequently contract with PBMs to help manage prescription drug benefits.  *Id.*  In addition to negotiating with drug manufacturers for lower costs for brand name prescription drugs, PBMs provide administrative services to improve the efficiency and quality of benefits, as well as secure rebates, discounts, and other savings that allow plan sponsors to reduce premiums and out-of-pocket costs for their members.  Peppers Decl. ¶5.

To enhance these efficiencies, some PBMs own or manage their own pharmacies.  For example, the nation's three largest PBMs (ESI, CVS Caremark, and OptumRx) all own mail-order and specialty pharmacies, while Caremark and OptumRx also have affiliated retail pharmacies.  Carlton et al., *PBMs and Prescription Drug Distribution: An Economic Consideration of Criticisms Levied Against Pharmacy Benefit Managers* 71 n.150, Compass

---

[1] Links to all sources available online are included in the table of authorities.

Lexecon (Apr. 2025) ("*Carlton Report*").  PBM-affiliated pharmacies offer simplified payment procedures, streamlined claims processing, superior information regarding drug safety and efficacy, and other efficiencies – all of which make access to prescription drugs more convenient and affordable.  Peppers Decl. ¶6.  Tens of millions of Americans and hundreds of thousands of Arkansans rely on PBM-affiliated pharmacies today.  *Id.*

Plaintiffs served more than 50,000 Arkansans last year, providing critical mail-order pharmacy services to patients across the state.  For example, Express Scripts Pharmacy, Inc. and ESI Mail Pharmacy Service, Inc. (collectively, "Express Scripts Pharmacy") delivered more than 700,000 prescriptions to over 45,000 Arkansans in 2024.  Peppers Decl. ¶16.  Express Scripts Pharmacy's convenient mail-order service is especially critical for the more than 40% of Arkansans who live in rural areas and thus may lack convenient access to a brick-and-mortar pharmacy.  *See* America's Health Rankings, *Rural Population in Arkansas*.  And the pharmacy's 24/7 live support and weather-resistant packaging enable Arkansans to safely obtain and administer their treatment without interruption.  Peppers Decl. ¶8.  Express Scripts Pharmacy has been licensed and in good standing to operate in Arkansas since 1997.  *Id.* ¶15.

Another Plaintiff pharmacy, Accredo Health Group, Inc. ("Accredo") serves Arkansans with complex and chronic conditions, including cancer, hepatitis C, HIV, rheumatoid arthritis, multiple sclerosis, and many other more rare diseases.  Peppers Decl. ¶9.  Last year, Accredo dispensed almost 70,000 medications to over 5,700 patients in Arkansas.  *Id.* ¶16.  Many of the medications Accredo offers are part of an exclusive or limited distribution channel, meaning that the drug's manufacturer has made it available only through a single specialty pharmacy (exclusive distribution) or a small number of specialty pharmacies (limited distribution) to ensure safety.  *Id.* ¶¶18-22.  Drug manufacturers select pharmacies such as Accredo to serve as

exclusive or limited distribution channels for particular medications because those pharmacies have the capacity and expertise to meet stringent storing and handling protocols and to provide specialized patient support, including side-effects monitoring and education on how to administer complex treatments. *Id.* ¶18. The process for selecting a limited or exclusive distribution pharmacy is months-long or even years-long, typically beginning 18 to 24 months before the drug manufacturer launches the medication. *Id.* ¶19.

In addition to convenient and affordable access to specialty medications and related items that may otherwise be hard to find (such as infusion pumps and other devices often needed to administer medications), Accredo provides personalized clinical counseling and therapeutic-care services from specially trained pharmacists, nurses, dieticians, and social workers, including in-home nursing care. Peppers Decl. ¶9. For instance, Accredo's specially trained nurses provided over 3,000 hours of care to Arkansan patients in their homes last year – and Accredo aims to assign patients the same nurse for each visit, fostering strong bonds between patients and caregivers, which can lead to better medication adherence and improved health outcomes. *Id.* ¶17. Accredo has been licensed and in good standing to operate in Arkansas since 2002. *Id.* ¶15.

Still other Plaintiff pharmacies serve hundreds of additional Arkansans with diverse medical needs. Last year, for instance, Express Scripts Specialty Distribution Services, Inc. ("ESSDS") – licensed and in good standing in the state since 2000 – dispensed more than 5,400 medications to hundreds of Arkansans suffering from complex sleep disorders. Peppers Decl. ¶¶11, 15-16. And Lynnfield Drug, Inc. and Lynnfield Compounding Center, Inc. (collectively, "Freedom Fertility") and Village Fertility Pharmacy – licensed and in good standing since 2003 and 2018, respectively – delivered more than a thousand prescriptions to hundreds of Arkansans

seeking to build their families with the help of in vitro fertilization and other fertility treatments. *Id.* ¶¶12-13, 15-16.

### B.    The U.S. Department Of Defense Relies On Plaintiffs To Provide Military Health Benefits Through The Federal TRICARE Program

Through the TRICARE program, the Department of Defense ("DoD") provides statutorily required healthcare entitlements to military service members, military retirees, and their families. *See* 10 U.S.C. §1071 *et seq.* TRICARE offers healthcare benefits – including pharmacy benefits – to approximately 9.6 million beneficiaries in all 50 states, the District of Columbia, and overseas. Congressional Research Service, IN12053, *TRICARE's 5th Generation Pharmacy Contract: TPharm5* at 1 (Nov. 2022). TRICARE beneficiaries may receive healthcare services at military treatment facilities, such as DoD-operated hospitals, clinics, and pharmacies, or via networks of participating civilian healthcare providers. *Id.*

TRICARE's enabling statute requires DoD to "establish an effective, efficient, [and] integrated pharmacy benefits program" as part of TRICARE. 10 U.S.C. §1074g. This program is known as the TRICARE Pharmacy Benefits Program. 32 C.F.R. §199.21. By statute, the pharmacy benefits program must satisfy a host of requirements. 10 U.S.C. §1074g. For example, the program must make prescription drugs available to TRICARE beneficiaries through DoD-operated pharmacies, a retail pharmacy network, and a national mail-order pharmacy program. *Id.* §1074g(a)(2)(E).

The Defense Health Agency ("DHA"), which administers TRICARE, does so by contracting with private health insurance and healthcare delivery companies. 10 U.S.C. §1074g(a)(2)(E). In awarding contracts, DHA must ensure that TRICARE "provide[s] a stable program of benefits," *id.* §1073(b), and it may award contracts only to "the offeror or offerors that will provide the best value to the United States to the maximum extent consistent with

furnishing high-quality health care in a manner that protects the fiscal and other interests of the United States," *id.* §1073a(a).

Since 2003, DHA has contracted with ESI for the delivery of pharmacy services to TRICARE beneficiaries.  Jenkins Decl. ¶7.  The current contract, known as TPharm5, requires ESI to provide nationwide mail-order pharmacy services to TRICARE beneficiaries.  *Id.* ¶10; Compl. Ex. B at C18 (TPharm5 §§C.6.1-C.6.1.1).  The contract provides that ESI's "mail order facilities shall dispense and deliver medications to TRICARE beneficiaries."  Compl. Ex. B at C18.  And ESI delivers those services to TRICARE beneficiaries through Express Scripts Pharmacy, which is ESI's "Mail Order Pharmacy" under the contract and dispensed more than 386,000 prescriptions to over 20,000 TRICARE beneficiaries in Arkansas last year alone.  Jenkins Decl. ¶¶10-12.  ESI informed DoD of its intent to use Express Scripts Pharmacy as TRICARE's mail-order pharmacy when ESI applied for its TRICARE contract, meaning that DoD contemplated and approved the involvement of Express Scripts Pharmacy when it granted the contract to ESI.  *Id.* ¶12.  Similarly, under section C.6.1.1 of the contract, ESI has "designated," and the government has "approved," Accredo and Freedom Fertility to "dispense specialty [pharmaceutical] agents … under a mail order" to TRICARE beneficiaries.  Compl. Ex. B at C18; *see also* Jenkins Decl. ¶13.  In 2024, Accredo and Freedom Fertility shipped more than 10,000 prescriptions to Arkansan TRICARE beneficiaries.  *Id*.

The TRICARE statute generally requires TRICARE beneficiaries "to refill non-generic prescription maintenance medications" – that is, long-term medications – "through military treatment facility pharmacies or the national mail-order pharmacy program."  10 U.S.C. §1074g(a)(9)(A).  In other words, Congress prohibits TRICARE beneficiaries from refilling

these medications at retail pharmacies, regardless of whether a retail pharmacy is part of the TRICARE network.

ESI's use of affiliated pharmacies eliminates transaction costs and other inefficiencies in administering mail-order pharmacy services for TRICARE beneficiaries. Jenkins Decl. ¶14. These cost savings are what enable ESI to "provide the best value" to TRICARE beneficiaries and the government in its administration of the Pharmacy Benefits Program, as required by statute. 10 U.S.C. §1073a(a); *see also* Jenkins Decl. ¶14.

### C.    Act 624 Will Banish PBM-Affiliated Pharmacies, Including Plaintiffs, From Arkansas Mere Months From Now

If it takes full effect, Act 624 will prohibit PBM-affiliated pharmacies, including Plaintiffs, from operating in Arkansas. The statute defines "[p]harmacy benefits manager" to include PBM-affiliated pharmacies, sweeping in any entity that is "managed by a [PBM] or is a subsidiary of a [PBM]" or "[h]as a direct or indirect ownership interest in a [PBM]." Act 624 §2(a)(2)(B), to be codified as Ark. Code Ann. §17-92-416(a)(2)(B). The statute then declares that PBMs (so defined) "shall not acquire direct or indirect interest in, or otherwise hold, directly or indirectly a permit … for the retail sale of drugs or medicines in this state," *id.* §2(b), to be codified as Ark. Code Ann. §17-92-416(b), including a "permit for a mail-order pharmacy," *id.* §2(a)(1)(B), to be codified as Ark. Code Ann. §17-92-416(a)(1)(B).

To enforce this prohibition, Act 624 requires the Arkansas State Board of Pharmacy to "either revoke or not renew a permit of" any PBM-affiliated pharmacy beginning on January 1, 2026. Act 624 §2(c), to be codified as Ark. Code Ann. §17-92-416(c). Unlike current Arkansas law, which permits the Board to revoke pharmacy licenses only for misconduct such as unauthorized practice, false representations, knowing violation of pharmacy laws, or public

endangerment, *see* Ark. Code Ann. §17-92-407, Act 624 requires the Board to revoke qualified pharmacies' licenses based solely on their affiliation with a PBM.

Act 624 provides for a series of steps leading up to license revocation on January 1, 2026. As soon as July 1 (mere weeks from now), and no later than October 3, the statute requires the State Board of Pharmacy to "send written notice to each pharmacy permit holder that the board reasonably believes will" trigger the statute's license-revocation requirement. Act 624 §2(a)(1), to be codified as Ark. Code Ann. §17-92-417(a)(1). And less than five months from now, the statute requires PBM-affiliated pharmacies to inform their patients that they are being banished from the state. Specifically, after receiving written notice from the Board, affected pharmacies must, by November 2, "provide written notice … to each patient and each patient's prescribing healthcare provider that has used the pharmacy within the previous twelve … months that the pharmacy can no longer dispense retail drugs to the patient on or after January 1, 2026." *Id.* §2(c)(1)(A), to be codified as Ark. Code Ann. §17-92-417(c)(1)(A).

The statute affords the Pharmacy Board discretion to issue temporary "limited use permit[s]" for certain rare drugs that may otherwise be unavailable. Act 624 §2(d)(1), to be codified at Ark. Code Ann. §17-92-416(d)(1). The statute, however, does not specify criteria for identifying drugs that qualify, and the provisions for limited-use permits expire on September 1, 2027. *Id.* §2(d)(2)(B), to be codified at Ark. Code Ann. §17-92-416(d)(2)(B).

### D.    The Express Purpose Of Act 624 Is To Protect Locally Owned Pharmacies From Competition From Out-Of-State PBMs

Act 624's preamble states that the law's purpose is to prevent "locally-operated pharmacies" from going "out of business." Act 624 §1(a)(2). Legislative history confirms that purpose. As the lead House sponsor explained, "supporting these independent neighborhood pharmacies is a really big part of why we're running H.B. 1150" (the bill that became Act 624).

The PUTTcast, *Arkansas HB 1150: Combatting PBM Anticompetitive Practices with State Legislation* at 2:27, YouTube (Feb. 5, 2025) ("*PUTTcast*") (statement of Rep. Moore). Statements from the Senate hearing on Act 624 likewise cast the legislation as an effort to protect "local pharmacies," *Hearing on H.B. 1150 Before the Arkansas Senate Insurance and Commerce Committee* (Apr. 8, 2025) ("*Senate Hearing*") at 10:40:06 AM (statement of John Vinson, CEO, Arkansas Pharmacists Association), based in Arkansans' "home communities," *id*. at 10:39:34 AM (statement of Brittany Sanders, President, Arkansas Pharmacists Association).

Act 624, moreover, was affirmatively tailored to achieve its end by denying permits only to out-of-state competitors. As originally drafted, the bill would also have affected in-state interests, barring permits not only to pharmacies affiliated with a PBM, but also to those affiliated with a "healthcare payor," which includes "[a]n entity that provides or administers a self-funded health benefit plan," Ark. Code Ann. §23-92-503(3)(D). Because it sponsors a self-funded plan, Walmart – which is domiciled in Arkansas – is a "healthcare payor" and thus would have lost its pharmacy permit under the law as originally drafted. The bill was amended, however, to remove the prohibition on pharmacies affiliated with a "healthcare payor." H.B. 1150 amend. H1, 95th Gen. Assemb., Reg. Sess. (Ark. 2025). And it was later amended again to specify that the permit ban "does not apply to a pharmacy employer" that administers its own pharmacy benefits when "[t]he pharmacy employer is the sole Arkansas client of the [PBM]" and "[e]xclusively services the employees and dependents of the pharmacy employer while utilizing the affiliated [PBM] in this state." H.B. 1150 amend. H2, 95th Gen. Assemb., Reg. Sess. (Ark. 2025). As a result of these amendments, the impact of Act 624 falls exclusively on out-of-state PBMs and their affiliated pharmacies.

Three specific out-of-state PBMs, including ESI, were mentioned often during the legislative process that produced Act 624. The law's preamble mentions a Federal Trade Commission report heavily targeting the "three largest PBMs" (ESI, CVS Caremark, and OptumRx). *See* FTC, Office of Policy Planning, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies* 1 (July 2024) ("*FTC Report*"). And during the Senate hearing, the bill's lead Senate sponsor named "CVS, Optum, and Express Scripts," *Senate Hearing* at 10:25:45 AM (statement of Sen. Hammer), while a supporter testified that legislators should not be worried about Act 624's anticompetitive effects because "we're talking about three of the biggest companies on earth," *id*. at 11:15:46 AM (statement of Greg Reybold).

### E. Arkansas Law Already Prohibits The "Anticompetitive" Conduct Act 624 Purports To Eliminate

Although Act 624 lists "eliminating certain anticompetitive business tactics" among its purposes, Act 624 §1(b), the tactics it purports to prevent are already illegal in Arkansas. Specifically, Act 624 states that it seeks to "minimize conflicts of interest by stopping the pharmacy benefits managers acting as a 'fox guarding the henhouse' by being both a price setter and price taker." *Id.* §1(a)(3). But the Arkansas Pharmacy Benefits Manager Licensure Act of 2018 directly addresses that concern, including by prohibiting PBMs from favoring unaffiliated pharmacies over affiliated pharmacies with respect to reimbursement, Ark. Code Ann. §23-92-506(b)(4)(A). In addition, since 2015, Arkansas law has required PBMs to reimburse Arkansas pharmacies at a price equal to or greater than what the pharmacy paid to buy the drug. *Id.* §17-92-507(c). Despite Act 624's stated aim to address anticompetitive practices, the fiscal-impact statement for the law makes clear that it will result in "less competition," not more. Segal, *Purpose of Bill: HB 1150* (Mar. 17, 2025).

12

## LEGAL STANDARD

A preliminary injunction should issue where (1) plaintiffs are "likely to succeed on the merits," (2) plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of the equities tips in [plaintiffs'] favor," and (4) "an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 21 (2008). The third and fourth factors merge where, as here, an injunction is sought against "state official[s] in [their] official capacity." *Eggers v. Evnen*, 48 F.4th 561, 564-565 (8th Cir. 2022).

## ARGUMENT

### I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

#### A.    Act 624 Discriminates Against Out-Of-State Commerce And Out-Of-State Citizens In Violation Of The Dormant Commerce Clause And The Privileges And Immunities Clause

Plaintiffs will likely succeed on their claims that Act 624 violates the Constitution's Commerce Clause and Privileges and Immunities Clause, because the statute's express purpose and inevitable effect is to protect in-state pharmacies by burdening out-of-state competitors.

#### 1.    Dormant Commerce Clause

The Commerce Clause vests Congress with the power to "regulate Commerce … among the several States." U.S. Const. art. I, §8, cl. 3. Within that clause, the Supreme Court has recognized a "dormant Commerce Clause," which "prohibits the enforcement of state laws 'driven by economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *National Pork*, 598 U.S. at 369 (quoting *Davis*, 553 U.S. at 337-338). This "antidiscrimination principle lies at the 'very core' of [the Supreme Court's] dormant Commerce Clause jurisprudence." *National Pork*, 598 U.S. at 369.

A law is discriminatory under the dormant Commerce Clause "if it benefits in-state economic interests while also inordinately burdening out-of-state economic interests." *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018, 1026 (8th Cir. 2020). That is so even if the law is facially neutral. *Id.* If a state law discriminates against interstate commerce "in purpose or in effect," it is invalid "unless the state can show, 'under rigorous scrutiny, that it has no other means to advance a legitimate local interest.'" *IESI AR Corp. v. Northwest Arkansas Regional Solid Waste*, 433 F.3d 600, 604 (8th Cir. 2006). Because Act 624 discriminates against interstate commerce in both purpose and effect and is not necessary to advance any legitimate local interest, Plaintiffs are likely to succeed on their dormant Commerce Clause claim.

*Purpose.* Act 624 was motivated by local protectionism. Its express purpose is to prevent "locally-operated pharmacies" from going "out of business." Act 624 §1(a)(2). And the law's sponsors and proponents repeatedly confirmed that purpose. For example, the lead sponsor in the House explained, as noted, that "a really big part" of the reason for Act 624 was to support "independent neighborhood pharmacies." *PUTTcast* at 2:27. The lead Senate sponsor similarly explained that he supported the bill because an "independent pharmacy in [his] county [had gone] out of business." *Id*. at 7:25 (statement of Sen. Hammer).

Testimony from the Senate hearing on Act 624 was similar. One supporter testified that the legislation was necessary to "safeguard the future of independent community pharmacies" because PBM-affiliated pharmacies "have made it nearly impossible for small pharmacies … to survive." *Senate Hearing* at 11:22:27 AM, 11:23:30 AM (statement of Brandi Chane, Pharmacists United for Truth and Transparency). Others lamented that "independent pharmacies continue to close," *id*. at 11:13:00 AM (statement of Greg Reybold, Vice President of HealthCare Policy and General Counsel, American Pharmacy Cooperative), and explained that

Act 624 would counteract PBMs that "take pharmacy services out of our local communities," *id*. at 10:32:24 AM (statement of John Vinson).  Still another witness asserted that the "problem" the bill would "take care of" is that "opportunity has not always been there for independent pharmacies."  *Id*. at 11:30:18 AM (statement of Jason Finley, Director of Pharmacy, Birch Tree Communities, Inc.).

To be clear, the problem purportedly solved by Act 624 is *not* that Arkansas needs more pharmacies.  Quite the opposite, the supposed problem the law seeks to rectify is, in the words of a senator who supported the bill, that Arkansas currently has "more pharmacies than we probably need."  *Senate Hearing* at 12:05:30 PM (statement of Sen. Boyd).  Act 624's solution to that purported problem is, as a senator opposed to the legislation explained, "to pick winners and losers" and, specifically, to benefit Arkansas-based independent pharmacies by "getting rid of [their out-of-state] competition."  *Id*. at 11:13:20 AM (statement of Sen. Irvin).

The press release Governor Sanders issued upon signing the bill confirmed Act 624's purpose to prevent out-of-state PBMs from "attacking our state."  Press Release, Governor Sanders, Sanders Signs Legislation to Ban Anti-Competitive PBM Practices (Apr. 16, 2025).  In the same press release, the Arkansas Attorney General lamented that PBM-affiliated pharmacies were "crushing independent pharmacies" in local markets.  *Id*.  The press release – which is full of celebratory quotes from local pharmacy owners – uses the word "local" 21 times, including in statements that Act 624 will cause patients to "get their medication locally" rather than from "an out of state mail order pharmacy."  *Id*.

These "statements by lawmakers" and "events leading up to the statute's adoption," *Smithfield Foods, Inc. v. Miller*, 367 F.3d 1061, 1065 (8th Cir. 2004), are strong evidence that Act 624 was adopted with a discriminatory purpose.

*Effect.*  The effect of Act 624 is likewise to bar only out-of-state entities from operating pharmacies in Arkansas.  While the legislative history is replete with references to specific out-of-state PBMs that will be ousted under the law, *e.g.*, *Senate Hearing* at 10:25:45 AM (lead Senate sponsor naming "CVS, Optum, and Express Scripts"), it contains not a single reference to any Arkansas-based pharmacy that will be precluded from operating.  Indeed, as noted, the legislature amended the statute so that it would deny permits to out-of-state competitors only – with carve outs that excluded all entities that otherwise would have been covered but do not operate PBMs (including Arkansas-domiciled pharmacies such as Walmart).  *See* Amendments 1 & 2 to House Bill 1150; *supra* p.11.  To Plaintiffs' knowledge, *all* PBM-affiliated pharmacies operating in Arkansas (as defined by Act 624, after amendments) are domiciled outside Arkansas, meaning that only out-of-state entities will be denied a permit under the law.

*Legitimate interest.*  The state cannot show "that it has no other means to advance a legitimate local interest," much less "under rigorous scrutiny," *IESI*, 433 F.3d at 604.  To start, economic protectionism is not a legitimate state interest.  *St. Joseph Abbey v. Castille*, 712 F.3d 215, 222 (5th Cir. 2013); *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002); *Merrifield v. Lockyer*, 547 F.3d 978, 991 n.15 (9th Cir. 2008); *Birchansky v. Clabaugh*, 421 F.Supp.3d 658, 678-679 (S.D. Iowa 2018).  And while Act 624 purports to address "certain anticompetitive business tactics," Act 624 §1(b), that claimed interest is entirely pretextual.  Indeed, no proponent of Act 624 has ever identified any anticompetitive practice addressed by the legislation that is not already illegal in Arkansas.  As noted, for example, Arkansas already prevents PBMs from paying affiliate pharmacies more than other pharmacies, Ark. Code Ann. §23-92-506(b)(4)(A), and from reimbursing unaffiliated pharmacies less than what the pharmacy paid to buy the drug, *id*. §17-92-507(c).  As the President of the Arkansas Chamber of

Commerce testified at the Senate hearing on Act 624, moreover, "according to the last audit by the Arkansas Insurance Department, the PBMs were complying" with "all of these laws."  *Senate Hearing* at 11:39:32 AM (statement of Randy Zook).  No evidence from the hearing suggests otherwise; tellingly, the lead witness in support of Act 624 cited findings from a Mississippi audit of PBM-affiliated pharmacies, not any evidence from Arkansas.  *Id*. at 10:55:20 AM (statement of Greg Reybold).

Act 624 is thus analogous to the pretextual liquor license requirements struck down in *Tennessee Wine & Spirits Retailers Association v. Thomas*, 588 U.S. 504 (2019).  There, Tennessee claimed that durational residency requirements for liquor licenses were necessary to provide the state an "opportunity to determine an applicant's fitness to sell alcohol."  *Id*. at 540.  The Supreme Court rejected that purpose as pretextual because state "law already call[ed] for criminal background checks on all applicants" for liquor licenses.  *Id*.  Similarly here, Act 624 purports to target conduct already prohibited by existing state law.  Like other "protectionist laws disguised as exercises of the police power," *id*. at 527, it also violates the dormant Commerce Clause.

### 2.    Privileges And Immunities Clause

Article IV, section 2, clause 1 of the Constitution provides that "[t]he Citizens of each State [are] entitled to all Privileges and Immunities of Citizens in the several States."  This clause protects the right of citizens to "ply their trade, practice their occupation, or pursue a common calling."  *Hicklin v. Orbeck*, 437 U.S. 518, 524 (1978).  A state law "violat[es] the privilege of pursuing a common calling" if it was "enacted for the protectionist purpose of burdening out-of-state citizens."  *McBurney*, 569 U.S. at 227.  For example, the Supreme Court has struck down a statute imposing unequal licensing restrictions on out-of-state entities where the purpose and

effect of the law was to exclude non-residents.  *See id.* at 227-228 (citing *Toomer v. Witsell*, 334 U.S. 385, 395 (1948)).  "Whether differential treatment of out-of-state residents violates [the Privileges and Immunities] Clause involves a two-part inquiry: (1) whether the state's law discriminates against out-of-state residents with regard to a privilege or immunity protected by the Clause, and (2) if so, whether sufficient justification exists for the discrimination." *Minnesota ex rel. Hatch v. Hoeven*, 456 F.3d 826, 834 (8th Cir. 2006).

For the reasons discussed with respect to the dormant Commerce Clause, Act 624 discriminates against out-of-state entities with regard to their ability to "ply their trade" of pharmacy operation, and there is no sufficient justification for this discrimination.  *See supra* pp.14-17.  Plaintiffs will thus likely succeed on their claim that Act 624 violates the Privileges and Immunities Clause.

### B.    Act 624 Is A Bill Of Attainder

Article I, section 10, clause 1 of the Constitution provides that "[n]o State shall … pass any Bill of Attainder."  This clause bars "'[l]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial.'"  *Brown*, 381 U.S. at 448-449 (quoting *United States v. Lovett*, 328 U.S. 303, 315 (1946)); *see also Nixon*, 433 U.S. at 468.  "In order to be termed a bill of attainder, a law must: (1) specify the affected persons; (2) impose punishment; and (3) lack a judicial trial."  *Palmer v. Clarke*, 408 F.3d 423, 433 (8th Cir. 2005).  Because Act 624 satisfies each requirement, Plaintiffs are likely to succeed on their claim that Act 624 is a bill of attainder.

The first element is satisfied because Act 624 "specif[ies]" the "persons" "affected" by its punishments.  *Palmer*, 408 F.3d 423.  Although "[h]istorically, bills of attainder generally named

the persons to be punished," such naming is not a requirement.  *Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, 847 (1984).  Rather, the affected person or group need only be "easily ascertainable," *Brown*, 381 U.S. at 448, or "identifiable," *Nixon*, 433 U.S. at 468.  That is the case here.  To start, Act 624 expressly identifies "[p]harmacy benefit manager[s]" as its target.  Act 624 §2, to be codified as Ark. Code Ann. §17-92-416(b).  And even within that ascertainable group, Act 624 singles out ESI and two other PBMs in particular:  The law's preamble highlights a Federal Trade Commission report that references the "Big 3" PBMs – ESI, CVS Caremark, and OptumRx – more than 40 times, and the legislative history is littered with references to those PBMs (and no others), *see supra* p.12.

The second element is satisfied because Act 624 imposes a "forbidden punishment," *WMX Technologies, Inc. v. Gasconade County*, 105 F.3d 1195, 1202 (8th Cir. 1997), on the PBMs and the affiliated pharmacies it targets.  Courts consider three inquiries to assess whether a law imposes forbidden legislative punishment: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a [legislative] intent to punish.'" *Selective Service*, 468 U.S. at 852 (quoting *Nixon*, 433 U.S. at 473, 475-476)).  The Eighth Circuit has referred to these inquiries as the "historical test," the "functional test," and the "motivational test."  *WMX*, 105 F.3d at 1202.  Act 624 imposes a forbidden punishment under each.

The Supreme Court has recognized that the historical categories of legislative punishment included "banishment" and "barring designated individuals or groups from participation in specified employments or vocations."  *Nixon*, 433 U.S. at 474.  Act 624 does both:  It

"banish[es]" PBM-affiliated pharmacies from Arkansas and "bar[s]" PBMs and their affiliated pharmacies "from participat[ing] in specified employments or vocations" – namely, their pharmacy practice.  The statute thus inflicts forbidden punishment under the historical test.

Act 624 also inflicts forbidden punishment under the functional test, as the statute's banishment of PBM-affiliated pharmacies from the state cannot "reasonably … be said to further nonpunitive legislative purposes," *Nixon*, 433 U.S. at 475.  As noted, Act 624 does not even superficially tie its requirement to revoke pharmacy permits to a pharmacy's professional incompetence or inability to safely provide pharmacy services; instead, it categorically bans pharmacies based solely on their organizational relationship to a PBM.  And as explained, the type of supposedly anticompetitive conduct that Act 624 purports to address is already illegal in Arkansas.  *See supra* p.12.  Act 624 is, accordingly, fatally "overbroad," *Kaspersky Lab, Inc. v. U.S. Department of Homeland Security*, 909 F.3d 446, 455 (D.C. Cir. 2018).  Moreover, to the extent Act 624 is motivated by local economic protectionism, *see supra* pp.14-17, that is not a legitimate government interest capable of surviving even rational-basis review, *St. Joseph*, 712 F.3d at 222; *Craigmiles*, 312 F.3d at 224; *Merrifield*, 547 F.3d at 991 n.15; *Birchansky*, 421 F.Supp.3d at 678-679.

As for the motivational test, Act 624 fails it because the law's text and legislative history are replete with evidence that the legislature "intended to punish," *WMX*, 105 F.3d at 1203, PBMs and their affiliated pharmacies for supposedly displacing local pharmacies.  As noted, Act 624's preamble cites a report criticizing the "Big 3" PBMs as motivation for the legislation.  And legislative history confirms that the statute was driven by a desire to punish PBMs for "tak[ing] pharmacy services out of our local communities," *Senate Hearing* at 10:32:24 AM (statement of John Vinson); *see also supra* pp.10-12.

Finally, the third element for a bill of attainder is satisfied because Act 624 punishes PBMs and PBM-affiliated pharmacies without a judicial trial. There is no question that Arkansas "has not provided a judicial trial to those affected by the statute." *Selective Service*, 468 U.S. at 847 n.3.

Because Act 624 singles out PBMs (and the three largest PBMs in particular) for forbidden punishment without a judicial trial, Plaintiffs are likely to succeed on their claim that the law is a bill of attainder.

### C.    TRICARE Preempts Act 624's Application To ESI-Affiliated Pharmacies

Plaintiffs will also likely succeed on their claim that the federal TRICARE statute and implementing regulations preempt Act 624's application to ESI, Express Scripts Pharmacy, Accredo, and Freedom Fertility, which as explained are contractually obligated to provide TRICARE services nationwide, including in Arkansas.

Under the Supremacy Clause, U.S. Const. art. VI, cl.2., "state law is preempted" whenever "federal law 'imposes restrictions or confers rights on private actors' and 'a state law confers rights or imposes restrictions that conflict with the federal law,'" *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (quoting *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, 477 (2018)). In particular, state law is "expressly preempted when a federal statute states the congressional intention to preempt state law." *In re Aurora Dairy Corp.*, 621 F.3d 781, 792 (8th Cir. 2010). State law may also be preempted by implication, including "where state law would pose an obstacle to the accomplishment of congressional objectives." *Id.*

Plaintiffs have a straightforward express-preemption case. TRICARE's enabling statute includes "explicit pre-emptive language," *Gade v. National Solid Wastes Management Association*, 505 U.S. 88, 98 (1992) (plurality), exempting TRICARE contractors from state laws

and regulations that interfere with their contractual obligations.  Specifically, the statute provides that state laws or regulations "relating to … health care delivery … shall not apply to any [TRICARE] contract" if the Secretary of Defense determines that (1) the state laws or regulations are "inconsistent with a specific provision of the contract or a regulation promulgated" to administer TRICARE, or (2) preemption is necessary to implement or administer the provisions of the contract or to achieve any other important federal interest."  10 U.S.C. §1103(a).  Under this authority, the Defense Secretary has "determined that" the "preemption of State and local laws relating to … health care delivery … is necessary to achieve important Federal interests, including but not limited to the assurance of uniform national health programs for military families and the operation of such programs at the lowest possible cost to the Department of Defense."  32 C.F.R. §§199.17(a)(7)(i), 199.21(o)(1).

These provisions of federal law preempt Act 624's application to ESI and its affiliated pharmacies that provide TRICARE services.  Act 624 "relat[es] to … health care delivery" because it prohibits certain healthcare providers (PBM-owned pharmacies) from delivering healthcare (namely, pharmacy services) to Arkansan patients.  *See* Act 624 §2, to be codified as Ark. Code Ann. §17-92-416(b).  As a result, Act 624 "does not apply in connection with TRICARE pharmacy contracts," "is without any force or effect," and "State or local governments have no legal authority to enforce them in relation to … TRICARE pharmacy contracts."  32 C.F.R. §199.21(o)(2); *see also id.* §199.17(a)(7)(ii).

In addition to being expressly preempted, Act 624 is implicitly preempted because it "pose[s] an obstacle to the accomplishment of congressional objectives" for the TRICARE pharmacy benefits program, *In re Aurora*, 621 F.3d at 794; *see also Arizona v. United States*, 567 U.S. 387, 399 (2012).  To avoid the "effects … of conflicting state … rules and other

regulations" on "multi-state [TRICARE] contracts," S. Rep. No. 100-57, at 151 (1987), Congress fashioned TRICARE to be a "*uniform* program of medical … care" for military personnel and their families nationwide, 10 U.S.C. §1071 (emphasis added).  That objective cannot be served if individual states are permitted to banish TRICARE contractors from operating within their borders, as Act 624 purports to do.

By precluding ESI and its affiliated pharmacies from fulfilling their contractual obligations to provide nationwide mail-order services to TRICARE beneficiaries, Act 624 poses several substantial obstacles to DoD's implementation of the TRICARE program in accordance with statutory directives.  For instance, replacing ESI-affiliated pharmacies as TRICARE's mail-order pharmacies only in Arkansas would run afoul of DoD's statutory obligations to maintain a national pharmacy program, *see* 10 U.S.C. §1074g(a)(2)(E)(iii), and ensure uniformity in the provision of health benefits to military personnel, *see id.* §1071.  Alternatively, replacing ESI-affiliated pharmacies nationwide would deprive the federal government of its preferred mail-order pharmacy, for reasons wholly unrelated to ESI-affiliated pharmacies' ability to safely and professionally deliver healthcare services.

Moreover, replacing Express Scripts Pharmacy, Accredo, and Freedom Fertility as TRICARE's mail-order pharmacies, either in Arkansas or nationwide, would be impractical.  Shifting TRICARE's entire nationwide mail-order relationship to a third-party mail-order pharmacy, or onboarding a new pharmacy only for Arkansas, would undermine TRICARE's stability, generate significant transition costs, and risk disrupting the supply of medications to TRICARE beneficiaries nationwide.  Jenkins Decl. ¶¶15-17.  Alternatively, selecting a different mail-order pharmacy only for deliveries in Arkansas would deprive the federal government of

the efficiency of a centralized operation with an integrated national pharmacy system that can quickly shift stock to where it is needed. *Id.* ¶18.

Finally, replacing ESI-affiliated pharmacies as TRICARE providers (in Arkansas or nationwide) would increase costs for the TRICARE pharmacy program because those pharmacies' status as ESI's in-house pharmacies eliminates transaction costs and other inefficiencies, *see* Jenkins Decl. ¶14, enabling them to "provide the best value to the United States," 10 U.S.C. §1073a(a). All this underscores why DoD determined that preemption was necessary in the context of the TRICARE pharmacy benefits program to assure "uniform national health programs for military families" at "the lowest possible cost to the Department," 32 C.F.R. §199.21(o)(2).

Case law confirms that Arkansas cannot wield its licensing authority in a manner that impedes the federal government's ability to contract. Indeed, "[c]ourts have consistently held that any … state licensing regime that effectively second guess[es] [the] United States' contracting decisions" is "preempted." *Student Loan Servicing Alliance v. District of Columbia*, 351 F.Supp.3d 26, 62 (D.D.C. 2018) (collecting cases). For instance, states "may not enforce licensing requirements which, though valid in the absence of federal regulation," impose extra "conditions not contemplated by Congress." *Sperry v. Florida ex rel. Florida Bar*, 373 U.S. 379, 385 (1963).

The Supreme Court's decision in *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956), which also involved licensing restrictions placed on DoD contractors by Arkansas, is particularly instructive. The Court held there that a federal contractor performing construction on an Air Force base was not required to first obtain a license from the State Contractor's Licensing Board, because such a requirement would impermissibly "give the State's licensing board a virtual

24

power of review" over DoD's contracting decisions. *Id.* at 190; *see also Gartrell Construction, Inc. v. Aubry*, 940 F.2d 437, 438-439 (9th Cir. 1991). So too here: Arkansas cannot, under the guise of exercising its licensing authority, veto federal determinations as to the appropriate pharmacy contractors to carry out a nationwide program. Yet that is what Act 624 purports to do. As one senator who supported the legislation explained, Act 624 represents an effort to "use state power to get … the federal government to do" "what [Arkansas] want[s]." *Senate Hearing* at 11:08:08 AM (statement of Sen. Boyd). In that senator's words, Act 624 purports to "tell the federal government" how to administer TRICARE in Arkansas. *Id.* at 11:08:15 AM. The Supremacy Clause forbids Arkansas from doing so.

Preempted state laws have "no effect." *In re Aurora*, 621 F.3d at 791. Act 624 thus "is without any force or effect" and "does not apply to" ESI and its pharmacy affiliates that provide TRICARE services. 32 C.F.R. §199.21(o)(2); *see* 10 U.S.C. §1103 (preempted state laws "shall not apply to any [TRICARE] contract"). Accordingly, ESI, Express Scripts Pharmacy, Accredo, and Freedom Fertility may not have their pharmacy licenses revoked under Act 624. In the alternative, federal law at least preempts any action taken by Arkansas to condition those Plaintiffs' provision of mail-order pharmacy services to TRICARE beneficiaries on their possession of an Arkansas pharmacy permit. *See Leslie Miller*, 352 U.S. at 190.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION

"Irreparable harm exists 'when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.'" *Missouri v. Trump*, 128 F.4th 979, 996 (8th Cir. 2025). A movant for a preliminary injunction "is not required to prove with certainty the threat of irreparable harm," but rather "that irreparable injury is likely in the absence of an injunction." *Sleep Number Corp. v. Young*, 33 F.4th 1012, 1018 (8th Cir. 2022)

(quotation marks omitted).  Here, Plaintiffs are suffering – and absent an injunction will continue to suffer – multiple irreparable harms as a result of Act 624.

### A.    Constitutional Violations

To begin with, Act 624 violates Plaintiffs' constitutional rights.  *Supra* Part I.  "In most instances, constitutional violations constitute irreparable harm."  *Morehouse Enterprises, LLC v. ATF*, 78 F.4th 1011, 1017 (8th Cir. 2023) (citing *Powell v. Ryan*, 855 F.3d 899, 904 (8th Cir. 2017) (en banc)).  Indeed, courts have found irreparable harm for violations of the dormant Commerce Clause, *e.g.*, *Bergmann v. City of Lake Elmo*, 2010 WL 4123355, at *8 (D. Minn. Aug. 19, 2010); the Privileges and Immunities Clause, *C&A Carbone, Inc. v. Town of Clarkstown*, 770 F.Supp.848, 854 (S.D.N.Y. 1991); the Bill of Attainder Clause, *Association of Community Organizations for Reform Now v. United States*, 692 F.Supp.2d 260, 280-281 (E.D.N.Y. 2010) (subsequent history omitted); and the Supremacy Clause, *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058-1059 (9th Cir. 2009).  The constitutional violations here also thus establish irreparable injury.

### B.    Unrecoverable Economic Loss

Were that not enough, Act 624 is also inflicting devastating impacts on Plaintiffs' business, causing economic loss that is unrecoverable because Defendants are likely immune from damages actions under the Eleventh Amendment, *see Harris v. Gadd*, 2007 WL 1106114, at *2 (E.D. Ark. Apr. 12, 2007).  As the Eighth Circuit has explained, "[t]he threat of unrecoverable economic loss" constitutes irreparable harm.  *Iowa Utilities Board v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996).  The "likely unavailability of money damages" due to "sovereign immunity" here means that the "importance of preliminary injunctive relief is heightened in this

case." *Entergy, Arkansas, Inc. v. Nebraska*, 210 F.3d 887, 900 (8th Cir. 2000); *see also Turtle Island Foods SPC v. Soman*, 424 F.Supp.3d 552, 577 (E.D. Ark. 2019).

Act 624 is already causing unrecoverable economic loss by disrupting Plaintiffs' relationships with health plan sponsors. In the short time since the law's enactment, plan sponsors have asked about Plaintiffs' continued ability to serve their beneficiaries. Peppers Decl. ¶29. Indeed, the sheer uncertainty engendered by Act 624 may cause plan sponsors to reconsider their inclusion of Plaintiff pharmacies in their networks. *Id.* These concerns have been raised by both current and prospective client plan sponsors. *Id.* And this damage to Plaintiffs' standing with their clients is not limited to Arkansas, as Plaintiffs compete with other PBMs and pharmacies in a national market. Under Act 624, national or multistate health plan sponsors who stick with Plaintiffs will have to supplement their prescription drug plans with an Arkansas-specific PBM and an Arkansas-specific pharmacy. Many will opt instead to select a PBM and pharmacy that can operate nationwide.

Act 624 also threatens Plaintiffs' business relationships with drug manufacturers. As explained, Plaintiffs are among a select few pharmacies with which drug manufacturers have partnered to dispense limited distribution specialty drugs, including more than 25 drugs that patients can obtain *only* through Plaintiffs. Peppers Decl. ¶¶20, 30. By eliminating Plaintiffs' ability to dispense these (or any) drugs in Arkansas, Act 624 precludes Plaintiffs from serving customers in the state who need access to the medications for which Plaintiffs are the exclusive or a limited distributor. In some cases, Act 624 will therefore interfere with Plaintiffs' ability to perform under their existing contracts with drug manufacturers, contracts that require Plaintiffs to dispense exclusive and limited distribution drugs nationwide, and that make no exception for a jurisdiction that has barred their operations. *Id.* ¶¶21-23, 30. Act 624 additionally creates the

imminent threat that, going forward, drug manufacturers will exclude Plaintiffs from exclusive and limited distribution networks nationwide.  *Id.* ¶30.  As discussed, drug manufacturers often spend over a year evaluating pharmacies before selecting them to serve as exclusive or limited distribution channels.  *Id.* ¶19.  Accordingly, manufacturers must *now* decide whether to consider Plaintiffs for opportunities extending well into the future.[2]

Act 624's disruption of Plaintiffs' business relationships will, as mentioned, likely reverberate beyond Arkansas's borders, and not just because of patients' or health plan sponsors' reactions to the statute.  Several states require pharmacies to report the revocation of a pharmacy permit by another jurisdiction, *e.g.*, Mo. Stat. Ann. §338.075.1(1); Fla. Stat. Ann. §465.022 (3)(c) – with at least one state even specifying that revocation by another jurisdiction justifies its own revocation of the pharmacy's license, 63 Pa. Stat. §390-4.1(g).  Act 624 thus will force Plaintiffs to report revocation of licenses to – and risk suspension by – other jurisdictions, irreparably harming Plaintiffs' business relationships nationwide.  Peppers Decl. ¶31.

As discussed, Plaintiffs likely will have no remedy at law for these devastating impacts on their businesses due to the state's sovereign immunity.

## C.    Loss Of Patient Relationships

Economic loss aside, Act 624 further inflicts irreparable harm on Plaintiffs not only by violating their constitutional rights and imposing economic loss but also by disrupting, and ultimately ending, their relationships with patients throughout Arkansas.  Under Eighth Circuit precedent, "a loss of goodwill among customers [is] sufficient to establish a threat of irreparable harm."  *Rogers Group, Inc. v. City of Fayetteville*, 629 F.3d 784, 789-790 (8th Cir. 2010).  More

---

[2] Another recently enacted bill – Act 630, slated to take effect in September 2026 – would further interfere with pharmacies' relationships with drug manufacturers by limiting manufacturers' ability to use limited distribution networks in Arkansas.

than 50,000 Arkansans rely on Plaintiffs for their pharmacy needs.  Plaintiffs' relationships with these patients are built on trust developed over many years – for example, trust between patients and pharmacists who ensure that patients experience no adverse effects, and trust between patients and the pharmacy-provided nurses who visit their homes to administer complex treatments such as infusions.  Peppers Decl. ¶¶25-26, 28; Harper Decl. ¶¶9, 11-12.  But under Act 624, Plaintiffs must take affirmative steps to *end* each of these patient relationships.  In particular, at least 60 days before the law takes full effect – so by November 2 – Act 624 requires that Plaintiffs send a written notice to each of their patients in Arkansas, and each patient's prescribing healthcare provider, stating that Plaintiffs "can no longer dispense retail drugs to the patient" as of January 1.  Act 624 §2(c)(1)(A), to be codified as Ark. Code Ann. §17-92-417(c)(1)(A).

Many of Plaintiffs' patients will likely, upon receiving such notice, shift to another pharmacy (assuming they can find one that can serve their needs).  That further establishes likely irreparable harm because the Eighth Circuit has repeatedly held that even the "*possibility* of permanent loss of customers to a competitor" satisfies the irreparable-harm standard.  *Iowa Utilities*, 109 F.3d at 426 (emphasis added).  For example, in *Rogers Group, Inc. v. City of Fayetteville*, a limestone quarry faced irreparable harm from a city ordinance that threatened to "limit [its] ability to bid on and meet larger customer orders" and thereby "hinder its competitiveness in the Northwest Arkansas market."  629 F.3d at 786.  The Eighth Circuit observed that "even if [the quarry] ultimately prevails" in its suit, "any customers [it] loses … would be unlikely to return once the Ordinance's restrictions are lifted."  *Id*. at 790.  Likewise, in *Medicine Shoppe International, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801 (8th Cir. 2003), the Eighth Circuit affirmed the district court's conclusion that the operator of a pharmacy network

would be irreparably harmed absent an injunction to stop a franchisee from changing its name and thus hiding its affiliation with the network, *id*. at 802-805. The court of appeals credited "testimony that [the] de-identification of the pharmacy creates consumer confusion and erodes consumer confidence in the [network]." *Id.* Such "[h]arm to reputation and goodwill" was irreparable because it was "difficult, if not impossible, to quantify in terms of dollars." *Id.* In light of the obvious impact on customer-base and goodwill, some courts have held that the revocation of an occupational license may *itself* constitute irreparable injury. *See Edwards v. Beck*, 946 F.Supp.2d 843, 850 (E.D. Ark. 2013); *Streicher's, Inc. v. Hummel*, 2023 WL 3018680, at *5-6 (D. Minn. Apr. 20, 2023).

Plaintiffs face an even more certain threat of irreparable harm than the movants in those cases. In *Rogers*, the harm finding rested on evidence that the quarry would "have difficulty restoring its customer base upon reopening" *if* the city closed the quarry through its enforcement of the challenged ordinance. 629 F.3d at 786-787. And in *Medicine Shoppe*, it sufficed that customers "may be *unsure* whether they can get their prescriptions filled" at a particular pharmacy and may "*wonder* whether other Medicine Shoppe franchises will continue to operate in the future," 336 F.3d at 805 (emphases added). By contrast, if Act 624 takes effect, it is *certain* that Plaintiffs' licenses will be revoked in Arkansas and that Plaintiffs' customers *must* take their business elsewhere. Even if Act 624 is later enjoined, moreover, many patients likely would choose not to return and put their trust in a pharmacy that the state has decided to banish – and even patients who do wish to return to Plaintiffs following an eventual injunction may find that they cannot, either because their health plans have excluded Plaintiffs from their networks or because drug manufacturers have excluded Plaintiffs from the distribution channels for certain specialty medications. Peppers Decl. ¶28. The loss of patient business and goodwill likely also

will not be contained to Arkansas, as patients in other states who learn of the disruptions experienced by patients in Arkansas may "wonder whether" Plaintiffs "will continue to operate," *Medicine Shoppe*, 336 F.3d at 805, in their states in the future.  Peppers Decl. ¶28.

These irreparable harms are neither remote nor hypothetical.  Plaintiffs may receive a notification of their impending banishment mere weeks from now, as early as July 1, *see supra* p.10, and the disruption to Plaintiffs' relationships with their customers in Arkansas has already begun:  Plaintiffs have received outreach from patients expressing concerns about their ability to access their medications once Plaintiffs can no longer serve them, Peppers Decl. ¶25; *see* Harper Decl. ¶15, and some have already begun looking for alternatives, *see* House Decl. ¶17.  Health plan sponsors, moreover, have raised concerns that Plaintiffs will no longer be able to dispense prescriptions to their beneficiaries in the state.  Peppers Decl. ¶29.  And Plaintiffs, faced with the certain loss of every one of their patients in the state, must undertake the work of transitioning those patients to new pharmacy providers – a task complicated by the fact that Plaintiffs are the exclusive providers of several specialty medications in the state.  *Id.* ¶26.  Plaintiffs will therefore lose customers and experience damage to their goodwill well before Act 624 requires license revocation beginning on January 1, 2026.

## III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PRELIMINARY RELIEF

The balance-of-equities and public-interest factors – which merge here because Plaintiffs seek to enjoin state action, *Eggers*, 48 F.4th at 564-565 – favor an injunction.  As an initial matter, "it is always in the public interest to protect constitutional rights," *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007); *accord Brandt by and through Brandt v. Rutledge*, 47 F.4th 661, 672 (8th Cir. 2022), and "[t]he 'State has no interest in enforcing laws that are unconstitutional,'" *Brandt v. Rutledge*, 551 F.Supp.3d 882, 892 (E.D. Ark. 2021).  Act 624 is

blatantly unconstitutional, *supra* Part I, so a preliminary injunction to enjoin its enforcement serves the public interest.

Courts have also recognized "the strong public interest in ensuring continued public access to crucial health services." *Planned Parenthood Arkansas & Eastern Oklahoma v. Selig*, 2015 WL 13307030, at *5 (E.D. Ark. Sept. 18, 2015). Accordingly, they have enjoined state conduct that would "cause [medical] services to halt, resulting in potentially devastating consequences" for "patients who may have nowhere else to go." *Trinity Behavior Health Care System, Inc. v. Arkansas Department of Human Services*, 2014 WL 5817095, at *5 (E.D. Ark. Nov. 7, 2014). Act 624 will imperil access to care for hundreds of thousands of Arkansans who rely on PBM-affiliated pharmacies, including those whose lives depend on access to specialty medications and military servicemembers and families who rely on the TRICARE program. Enjoining the law will protect the public by securing critical access to care for these patients.

Two of these patients' stories illustrate the devastation Act 624 will inflict. Irma Harper is an 83-year-old retired nurse with an immune deficiency disease. Harper Decl. ¶¶3, 7. To stave off the debilitating infections that she has suffered from all her life, Ms. Harper takes Hizentra, a limited distribution medication available through Accredo and administered every two weeks through an infusion. *Id.* ¶¶8-9. Accredo not only ships the medication and special infusion supplies to Ms. Harper's door each month, but also provides a dedicated nurse who carefully monitors each infusion to spot any adverse reactions. *Id.* ¶¶10-11. If Ms. Harper loses access to Hizentra, she would have to withdraw from her regular daily activities to avoid infections like pneumonia, to which she would be far more susceptible. *Id.* ¶14. So far as Ms. Harper understands, Hizentra is not available at any local pharmacy, and even if her regular pharmacy could procure it, that pharmacy would not provide her a nurse or all of the infusion

supplies she needs.  *Id.* ¶15.  Act 624 thus threatens the enormous progress Ms. Harper has made and the quality of life she has been able to enjoy in her later years.

Another patient that Act 624 threatens is Douglas House, a retired U.S. Army colonel, former member of the Arkansas legislature, and one of more than 20,000 TRICARE beneficiaries who receive pharmacy services in Arkansas from ESI-affiliated pharmacies.  House Decl. ¶¶3, 10, 12, 19.  Colonel House suffers from Crohn's Disease, a painful inflammatory bowel disease that has created profound difficulties for his life.  *Id.* ¶11.  In 2018, Colonel House's gastroenterologist prescribed him Stelara, a monthly biologic shot that he receives by mail from Accredo, through the TRICARE mail-order pharmacy program that ESI operates.  *Id.* ¶12.  Stelara has dramatically improved Colonel House's life, reducing his need for surgeries, keeping him out of the hospital, and enabling him to regain a sense of normalcy.  *Id.* ¶13. Colonel House fears he will lose access to Stelara if Accredo and Express Scripts Pharmacy are no longer able to operate in Arkansas.  *Id.* ¶17.  Because Stelara is an expensive treatment that is not commonly available, Colonel House has had difficulty acquiring it anywhere but TRICARE's mail-order pharmacy.  *Id.* ¶¶14-15.  A disruption in TRICARE's mail-order services would therefore seriously degrade Colonel House's health and quality of life.  *Id.* ¶¶13, 17.

Thousands of other Arkansans who likewise rely on ESI-affiliated pharmacies for access to critical treatments would similarly be harmed by those pharmacies' banishment from the state. For example, Accredo is one of just two pharmacies in the *country* authorized to distribute Remodulin and Veletri, specialty medications for treating pulmonary arterial hypertension ("PAH").  Peppers Decl. ¶21.  Patients with PAH must receive these medications through continuous, 24/7 infusions to survive.  *Id.*  Accredo provides specialty in-home nurses to administer the infusions and maintains a supply chain that enables delivery of the medications to

any PAH patient in the state within four hours. *Id.* Accredo is also the nation's exclusive

distributor of Lenmeldy, a one-time gene therapy for children with certain degenerative

conditions that became the world's most expensive drug upon FDA approval in 2024. *Id.* ¶22.

Lenmeldy's manufacturer selected Accredo to distribute the drug because of Accredo's

unmatched operational capabilities, which ensure seamless delivery from the manufacturer to the

patient under strict time conditions. *Id.* Another Plaintiff pharmacy, ESSDS, is the nation's

exclusive distributor of Xyrem and Xywav, which treat complex sleep disorders such as

narcolepsy. *Id.* ¶23. Both medications are schedule III controlled substances and dispensed to

patients under strict safety and monitoring protocols to ensure proper prescribing, storage, and

use as well as to mitigate side effects. *Id.* The manufacturer selected ESSDS to distribute these

drugs because ESSDS is uniquely positioned to handle these complex clinical requirements. *Id.*

Any disruption in the distribution of any of these medications would have serious health

consequences. *Id.*

Act 624's provisions granting the State Board of Pharmacy temporary discretion to issue

"limited use permit[s]" for certain "rare" or "limited distribution" drugs that the Board may deem

sufficiently hard to obtain, Act 624 §2(d), to be codified at Ark. Code Ann. §17-92-416(d), are

cold comfort for patients worried about losing access to lifesaving limited or exclusive

distribution medications. Peppers Decl. ¶27. Patients (and pharmacies) have no way of knowing

which drugs the Board will deem qualified for a limited use permit, as "rare" and "limited

distribution" are terms lacking any fixed or clear definition. *Id.* And even for drugs that do

qualify, the 90 days of assurance provided by the "limited use permit" provisions, along with

those provisions' expiration in September 2027, leave little runway for patients to make

alternative arrangements. *Id.* Moreover, by the time new pharmacies manage to obtain approval

to distribute exclusive or limited distribution drugs (a process that, as noted, may take years), Act 624's "limited use permit" provisions will have expired, meaning patients will experience a gap in access to lifesaving drugs.

In sum, absent an injunction, Act 624 will jeopardize tens of thousands of Arkansans' access to care.  It will threaten patients' continuous access to long-term maintenance medications; leave critically ill patients without personalized, life-sustaining care; unwind the relationships that field nurses have established with vulnerable patients; and deprive Arkansans suffering from rare or complex conditions of treatments that require the kind of clinical and operational expertise only Plaintiffs can provide.  These harms to the public, together with the constitutional, economic, reputational, and other harms Act 624 inflicts on Plaintiffs, warrant immediate injunctive relief.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be granted.

June 12, 2025                                        Respectfully submitted,

                                                    */s/ Jennifer Milici*
                                                    Jennifer Milici (*pro hac vice*)
                                                    Daniel S. Volchok (*pro hac vice*)
                                                    Kevin M. Lamb (*pro hac vice*)
                                                    Joseph M. Meyer (*pro hac vice*)
                                                    WILMER CUTLER PICKERING
                                                        HALE AND DORR LLP
                                                    2100 Pennsylvania Ave. NW
                                                    Washington, DC 20037
                                                    (202) 663-6000 (tel.)
                                                    (202) 663-6363 (fax)
                                                    jennifer.milici@wilmerhale.com
                                                    daniel.volchok@wilmerhale.com
                                                    kevin.lamb@wilmerhale.com
                                                    joseph.meyer@wilmerhale.com