## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

| | |
|---|---|
| EXPRESS SCRIPTS, INC. *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>RODNEY RICHMOND *et al.*,<br><br>*Defendants*. | Lead Case No. 4:25-cv-00520-BSM |
| OPTUM, INC. *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>RODNEY RICHMOND *et al.*,<br><br>*Defendants*. | Member Case No. 4:25-cv-00598-BSM |

**Plaintiffs' Brief In Support Of Motion For Preliminary Injunction**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ......................................................................................... 1

BACKGROUND ........................................................................................... 7

    I.     PBMs Provide Important Benefits To Patients And Plan Sponsors ...................... 7

    II.    PBMs And PBM-Affiliated Pharmacies Play A Critical Role In Plan
          Administration Under ERISA ................................................................ 8

    III.   PBMs and PBM-Affiliated Pharmacies Play A Vital Role In
          Administering The Medicare Part D And Medicare Advantage
          Prescription Drug Programs ................................................................ 10

    IV.   Optum Provides PBM And Pharmacy Services To Hundreds Of Arkansas
          Benefits Plans And Thousands Of Arkansas Patients............................. 11

    V.    Multiple Arkansas Laws Already Regulate PBM Conduct ................... 13

    VI.   The General Assembly Enacts New Restrictions To Protect Local
          Pharmacies From Out-Of-State Competition....................................... 14

    VII.  As Enacted, Act 624 Threatens To Destroy Optum's Services To Arkansas
          Plans And Beneficiaries ...................................................................... 18

ARGUMENT ............................................................................................... 19

    I.     Plaintiffs Are Likely To Succeed On The Merits ................................. 19

         A.    ERISA Preempts Act 624 ............................................................ 19

              1.    ERISA Broadly Preempts State Interference With The
                    Administration Of Employee-Benefit Plans ................................. 20

              2.    Act 624 Is Preempted Because It Severely Disrupts
                    Nationwide Uniformity In Plan Administration ......................... 21

              3.    Act 624 Is Preempted Because It Impermissibly Regulates
                    An Issue Central To Plan Administration .................................... 23

         B.    Medicare Statutes And Regulations Preempt Act 624............................ 24

              1.    The Medicare Modernization Act Broadly Preempts State
                    Laws Related to Medicare Part D and Medicare Advantage
                    Prescription Drug Plans ...................................................... 24

              2.    Act 624 Is Both Expressly and Impliedly Preempted By
                    Numerous Medicare Standards .................................................... 25

              3.    Act 624 Does Not Escape Preemption As A "State
                    Licensing Law".................................................................... 28

i

C.    Act 624 Violates The Dormant Commerce Clause .................................. 31

    1.    State Laws That Discriminate Against Out-Of-State Competitors Or Unduly Burden Interstate Commerce Are Invalid ............................................................................... 32

    2.    Given Its Discriminatory Text, Purpose, and Effects, Act 624 Triggers—And Fails—Strict Scrutiny ................................. 33

    3.    Act 624 Unduly Interferes With Interstate Commerce ................ 37

D.    Act 624 Effects An Uncompensated Taking Of Private Property ........... 39

    1.    Act 624 Effectively Requires Optum Rx To Divest From Its Pharmacies At A Loss ............................................................. 40

    2.    Act 624's Divestiture Requirement Effects A *Per Se* Taking ................................................................................... 41

    3.    Act 624's Divestiture Requirement Also Effects A Regulatory Taking ....................................................................... 42

    4.    Because Arkansas Provides No Adequate Mechanism For Just Compensation, Enjoining Enforcement Of Act 624 Is Necessary ........................................................................... 44

II.    Act 624 Will Irreparably Harm Plaintiffs ........................................... 45

III.    The Balance Of The Equities And Public Interest Support A Preliminary Injunction .............................................................................. 47

CONCLUSION .................................................................................... 48

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aetna Health Inc. v. Davila,*
  542 U.S. 200 (2004) .................................................................................20

*Austin v. Ark. State Highway Comm'n,*
  895 S.W.2d 941 (Ark. 1995) .............................................................44, 45

*Bacchus Imps., Ltd. v. Dias,*
  468 U.S. 263 (1984) .................................................................................34

*Becker v. City of Hillsboro,*
  125 F.4th 844 (8th Cir. 2025) ..................................................................43

*C&A Carbone, Inc. v. Town of Clarkstown,*
  511 U.S. 383 (1994) ...........................................................................32, 33

*Cedar Point Nursery v. Hassid,*
  594 U.S. 139 (2021) .................................................................................41

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) .................................................................................34

*Cienega Gardens v. United States,*
  331 F.3d 1319 (Fed. Cir. 2003). Act 624 .................................................42

*Cigna Corp. v. Bricker,*
  103 F.4th 1336 (8th Cir. 2024) ................................................................45

*CIGNA Healthplan of La., Inc. v. Lousiana ex rel. Ieyoub,*
  82 F.3d 642 (5th Cir. 1996) ......................................................................23

*Dennis v. Higgins,*
  498 U.S. 439 (1991) ...........................................................................31, 47

*Dubin v. United States,*
  599 U.S. 110 (2023) .................................................................................28

*Egelhoff v. Egelhoff ex rel. Breiner,*
  532 U.S. 141 (2001) ...........................................................................20, 22

*Eggers v. Evnen,*
  48 F.4th 561 (8th Cir. 2022) ...............................................................19, 47

*Express Scripts, Inc. v. Wenzel,*
  262 F.3d 829 (8th Cir. 2001) ...................................................................21

*Fischer v. United States,*
  603 U.S. 480 (2024) .................................................................................29

*FTC v. RAG-Stiftung*,
    436 F. Supp. 3d 278 (D.D.C. 2020) ...................................................................40, 41

*FTC v. Tempur Sealy Int'l, Inc.*,
    768 F. Supp. 3d 787 (S.D. Tex. 2025) .........................................................................40

*Gelco Corp. v. Coniston Partners*,
    811 F.2d 414 (8th Cir. 1987) .........................................................................................46

*Gobeille v. Liberty Mut. Ins. Co.*,
    577 U.S. 312 (2016) ................................................................................................3, 20

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989) .......................................................................................................33

*Heights Apartments, LLC v. Walz*,
    30 F.4th 720 (8th Cir. 2022) ...................................................................................42, 43

*Hobbs v. Jones*,
    412 S.W.3d 844 (Ark. 2012) .........................................................................................45

*IESI AR Corp. v Nw. Ark. Reg'l Solid Waste Mgmt. Dist.*,
    433 F.3d 600 (8th Cir. 2006) ...................................................................................33, 34

*Iowa Utils. Bd. v. FCC*,
    109 F.3d 418 (8th Cir. 1996) ...............................................................................5, 6, 46

*Knick v. Twp. of Scott*,
    588 U.S. 180 (2019) ................................................................................................39, 44

*Ky. Ass'n of Health Plans, Inc. v. Nichols*,
    227 F.3d 352 (6th Cir. 2000) .........................................................................................23

*Lockheed Corp. v. Spink*,
    517 U.S. 882 (1996) .........................................................................................................9

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) .......................................................................................................30

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982) .......................................................................................................41

*McGhee v. Ark. State Bd. of Collection Agencies*,
    289 S.W.3d 18 (Ark. 2008) ...........................................................................................45

*Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*,
    336 F.3d 801 (8th Cir. 2003) .........................................................................................46

*Metro. Life Ins. Co. v. Massachusetts*,
    471 U.S. 724 (1985) ................................................................................................20, 21

*Missouri v. Biden*,
    112 F.4th 531 (8th Cir. 2024) .......................................................................................19

*Missouri v. Trump*,
  128 F.4th 979 (8th Cir. 2025) .................................................................46, 47

*Morehouse Enters., LLC v. ATF*,
  78 F.4th 1011 (8th Cir. 2023) ...................................................................6, 47

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
  514 U.S. 645 (1995) .......................................................................................20

*Nachman Corp. v. Pension Benefit Guar. Corp.*,
  446 U.S. 359 (1980) .........................................................................................9

*Nat'l Pork Producers Council v. Ross*,
  598 U.S. 356 (2023).................................................................................32, 37

*Ng v. Bd. of Regents of Univ. of Minn.*,
  64 F.4th 992 (8th Cir. 2023) ........................................................................19

*Pa. Life & Health Ins. Guar. Ass'n v. Pa. Ins. Dep't*,
  218 A.3d 9 (Pa. Commw. Ct. 2019) ............................................................30

*PCMA v. Mulready*,
  78 F.4th 1183 (10th Cir. 2023) ....................................9, 10, 21, 23, 24, 28, 30

*PCMA v. Rowe*,
  2005 WL 757608 (D. Me. Feb. 2, 2005) ......................................................22

*PCMA v. Rutledge*,
  891 F.3d 1109 (8th Cir. 2018) ........................................................10, 24, 25

*PCMA v. Wehbi*,
  18 F.4th 956 (8th Cir. 2021) .............................................20, 21, 24, 25, 27

*Penn Cent. Transp. Co. v. City of New York*,
  438 U.S. 104 (1978).................................................................................39, 42

*Pharm. Rsch. & Mfrs. of Am. v. Williams*,
  64 F.4th 932 (8th Cir. 2023) .........................................................39, 43, 44, 45

*Phelps-Roper v. Nixon*,
  509 F.3d 480 (8th Cir. 2007) ........................................................................47

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970).................................................................................4, 33, 37

*Pilot Life Ins. Co. v. Dedeaux*,
  481 U.S. 41 (1987) .........................................................................................20

*Pioneer Military Lending, Inc. v. Manning*,
  2 F.3d 280 (8th Cir. 1993) ...........................................................................31

*Pugin v. Garland*,
  599 U.S. 600 (2023).......................................................................................30

*Reg'l R.R. Reorganization Act Cases*,
  419 U.S. 102 (1974) ........................................................................41, 42

*Rutledge v. PCMA*,
  592 U.S. 80 (2020) ...........................................9, 10, 13, 20, 21

*S.D. Farm Bureau, Inc. v. Hazeltine*,
  340 F.3d 583 (8th Cir. 2003). Act 624 ..................4, 34, 35, 36, 37

*SDDS, Inc. v. South Dakota*,
  47 F.3d 263 (8th Cir. 1995) ....................................32, 33, 34, 35

*Shaw v. Delta Air Lines, Inc.*,
  463 U.S. 85 (1983) .........................................................................19

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
  588 U.S. 504 (2019) .......................................................................32

*U & I Sanitation v. City of Columbus*,
  205 F.3d 1063 (8th Cir. 2000) ..................................33, 37, 38

*United States v. Kirchoff*,
  387 F.3d 748 (8th Cir. 2004) ....................................................30

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ....................................................................30

*Will v. Mich. Dep't of State Police*,
  491 U.S. 58 (1989) ......................................................................44

*Yee v. City of Escondido*,
  503 U.S. 519 (1992) .....................................................................41

## Constitutional Provisions

U.S. Const. art. VI, cl. 2 ...........................................................................19

Ark. Const. art. V, § 20 .............................................................................44

## Statutes

29 U.S.C. § 1001 .......................................................................................3

29 U.S.C. § 1001a(c)(2) ............................................................................9

29 U.S.C. § 1144(a) ................................................................................20

42 U.S.C. § 1395w-26 ...............................................................................3

42 U.S.C. § 1395w-26(b)(1) .........................................................24, 28, 29

42 U.S.C. § 1395w-26(b)(3) .........................................................24, 28, 29, 30

42 U.S.C. § 1395w-26(b)(3)(A) (2002) ...................................................30

42 U.S.C. § 1395w-26(b)(3)(B) (2002) .............................................................30

42 U.S.C. § 1395w-26(b)(4) ...................................................................26, 29

42 U.S.C. § 1395w-104(b)(1)(C) ...................................................................25

42 U.S.C. § 1395w-112(g) ...............................................................................24

Act 624 § 1(a)(2) .............................................................................2, 34, 37

Act 624 § 1(a)(3) ...........................................................................................37

Act 624 § 2(a)(1)(B) ......................................................................................34

Act 624 § 2(a)(1)(B)(2)(A)(B)(ii) ................................................................18

Act 624 § 2(b) ........................................................................................18, 27

Act 624 § 2(c)(1)(A) ......................................................................................18

Act 624 § 2(c)(1)(B) ......................................................................................18

Act 624 § 2(d)(1) ...........................................................................................19

Act 624 § 2(d)(2)(A)(i) ..................................................................................26

Act 624 § 2(d)(2)(A)(ii) .................................................................................18

Act 624 § 2(d)(2)(B) ......................................................................................19

Act 624 § 2(e) ................................................................................................18

Act 624 § 2(f)(1) .....................................................................................18, 34

Act 624 § 2(f)(2) .....................................................................................18, 34

Act 624 § 2(f)(3) .....................................................................................18, 34

Act 624 § 3(B)(ii) ..........................................................................................19

Ark. Code Ann. § 17-92-507(c)(4)(A)(i)(a) ..................................................14

Ark. Code Ann. § 17-92-507(c)(4)(A)(i)(b) ..................................................14

Ark. Code Ann. § 19-10-215 .........................................................................45

Ark. Code Ann. § 23-92-503(3)(D) ...............................................................16

Ark. Code Ann. § 23-92-506(b)(4)(A) ..........................................................14

Ark. Code Ann. § 23-92-506(b)(5)(A) ..........................................................14

Ark. Code Ann. § 25-44-215(b) .....................................................................44

## Regulations

42 C.F.R. § 422.116 .......................................................................................................11

42 C.F.R. § 423.100 .......................................................................................................28

42 C.F.R. § 423.120 .......................................................................................................24

42 C.F.R. § 423.120(a) ..................................................................................................25

42 C.F.R. § 423.120(a)(3) ..........................................................................................3, 26

42 C.F.R. § 423.120(a)(4) ..............................................................................................26

42 C.F.R. § 423.120(a)(7)(i) ..........................................................................................27

42 C.F.R. § 423.120(a)(8)(i) ..........................................................................................27

42 C.F.R. § 423.516 .......................................................................................................25

## Rulemakings

*Medicare Program; Establishment of the Medicare Advantage Program*, 70 Fed.
Reg. 4,588, 4,664/3 (Jan. 28, 2005) ....................................................29, 30, 31

## Other Authorities

*A 21st Century Pharmacy*, PCMA, tinyurl.com/57smaan4 .........................................7, 8

Amend. No. 1 to House Bill 1150 (Feb. 5, 2025), tinyurl.com/msbmasus...................16

Amend. No. 2 to House Bill 1150 (Mar. 14, 2025), tinyurl.com/2w2emzs3 .................16

*Arkansas Pharmacists Association Applauds Senate Committee Vote To Ban
PBMs From Owning Pharmacies in State*, Ark. Pharmacists Ass'n (Apr. 8,
2025), tinyurl.com/yhkxe554.........................................................................18

Arkansas Pharmacists Ass'n News Conference with Attorney General Tim Griffin
at 8:00-03, YouTube (Jan. 16, 2025), tinyurl.com/mwtb5dzp...........................14, 15

Casey B. Mulligan, *The Value of Pharmacy Benefit Management* at 8, Nat'l
Bureau of Econ. Rsch. (July 2022), tinyurl.com/2p9r57kr.......................................7

Dan Sullivan, *HB1150 puts pharmacy patients, quality care first*, Jonesboro Sun
(Mar. 15, 2025, updated Apr. 16, 2025), tinyurl.com/43wks52p .............................15

Elena V. Fernandez et al., *Examination of the Link Between Medication
Adherence and Use of Mail-Order Pharmacies in Chronic Disease States*, 22
J. Managed Care & Specialty Pharmacy 1247 (2016)............................................47

The Federalist No. 11 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ..................32

Greg Geary, *Small pharmacies in danger of closing if PBM bill doesn't pass, state representative says*, White County Citizen (Mar. 27, 2025), tinyurl.com/mpc8nd89 ...................................................................................15, 16, 34

@JeremiahMooreAR (Jan. 16, 2025 11:55 AM), tinyurl.com/2tp8w773 ....................................15

Mark Johnson, *Set the record straight on HB1150*, Arkansas Democrat Gazette (Mar. 2, 2025), tinyurl.com/5fnshhe6 ..................................................................15

Medicare Managed Care Manual § 30.1, CMS, tinyurl.com/cee65s2u .........................................29

Patricia M. Danzon, *Pharmacy Benefit Management:  Are Reporting Requirements Pro- or Anticompetitive?*, 22 Int'l J. Econ. Bus. 245 (2015) ........................7, 8

*Pharmacy benefit management (PBM)*, Optum, tinyurl.com/44r5fp8e ...........................................7

The PUTTcast, *Arkansas HB 1150:  Combatting PBM Anticompetitive Practices with State Legislation*, at 2:24-32 (Feb. 5, 2025), tinyurl.com/3dnpa5ce .........................15, 36

*Sanders Signs Legislation to Ban Anti-Competitive PBM Practices*, Arkansas.gov (Apr. 16, 2025), tinyurl.com/mwpts25m ....................................................17, 31, 43

Sarah Huckabee Sanders, *My State Is Taking On the Middlemen Who Inflate Drug Prices*, N.Y. Times (June 10, 2025), tinyurl.com/296332r9.....................................................22

Segal Financial Impact Statement (Mar. 17, 2025), tinyurl.com/4w6dxmpz. .............................38

*Specialty Pharmacies*, PCMA, tinyurl.com/mr3yt6ce ....................................................................8

## INTRODUCTION

In adopting Act 624, Arkansas became the only state in the nation to ban pharmacies affiliated with pharmacy-benefits managers ("PBMs") from obtaining state pharmacy permits. Plaintiff Optum, Inc. owns a PBM and must now either sell its pharmacies or halt their services to thousands of patients across Arkansas before Act 624 takes effect on January 1, 2026. Act 624 is a misguided attempt to shield local pharmacies from out-of-state competition. The law will reduce access to mail-order and specialty medications by seniors, residents of rural communities, and people with severe mental health and complex medical conditions—all while increasing the costs of prescription drugs for residents throughout the state. These irreparable harms to Optum, Inc., its PBM, its PBM-affiliated pharmacies (collectively, "Optum") and the Arkansas public should be halted in their tracks: Act 624 is preempted and unconstitutional several times over. Optum therefore respectfully requests that this Court preliminarily enjoin the Act's operation while the parties fully litigate Optum's challenge.[1]

The consequences of Act 624's unprecedented mandate are as predictable as they are disastrous. Optum's PBM, OptumRx, plays a critical role in providing prescription drugs to millions of Americans. It collectively negotiates on behalf of health plans to secure bulk prescription-drug discounts, and many are also affiliated with pharmacies that provide nationwide coverage, creating cost-saving economies of scale. Arkansans have relied on these pharmacies for decades, given that they can quickly deliver medications by mail to patients' doors at reasonable cost. Yet Act 624 strips away this patient option. It declares that patients now must exclusively use so-called "independent" pharmacies—no matter the consequences for access, affordability, and health.

Such an extraordinary restriction at the very least requires an extraordinary justification.

---

[1] Plaintiffs submitting this motion (*i.e.*, Optum) are the plaintiffs in Member Case No. 4:25-cv-598.

The General Assembly offered none.  Instead, its motive was blatant protectionism.  Legislators wrote their aim of protecting "locally-operated pharmacies" from out-of-state competition on the face of the law.  Act 624 § 1(a)(2).  And they widely praised that aim in press releases, news conferences, and legislative debates.  Act 624 achieves that declared purpose with crafted precision.  After objections that the original version of the bill would negatively affect the state's largest employer, the bill's House sponsor introduced a successful amendment to solve that problem.  The resulting Act is thus squarely aimed at out-of-state interests:  Plaintiffs know of *no* PBM-affiliated mail-order pharmacies in Arkansas, and the companies that Act 624 targets are uniformly based in other states.  The Governor's press release upon the law's signing aptly described it as a "win for local businesses."

To distract from those protectionist aims, the General Assembly sometimes asserted that PBMs engage in "anti-competitive" tactics—supposedly steering patients from local pharmacies to higher-priced affiliates.  But that alleged conduct is *already* illegal under Arkansas law, and legislators cited no state-specific evidence showing that it is nonetheless occurring.  Instead, testimony to the General Assembly confirmed that PBMs are complying with those restrictions.  The only anti-competitive conduct at issue here is thus Act 624 itself.  By design, the law insulates local pharmacies from *fair* out-of-state competition at the expense of patient choice, and in so doing will increase prices.  The state's own fiscal-impact statement assessing Act 624 admits that prices for key drugs will rise "as less competition would likely drive less favorable rates."

Preliminary injunctive relief is urgently needed—at a minimum by **September 15**—to stave off the impending harms Act 624 threatens.  Indeed, all the factors this Court considers in deciding whether to grant a preliminary injunction support one here.

For starters, Optum is likely to succeed on the merits under multiple federal statutes and

constitutional provisions, any one of which supports enjoining Act 624. *First*, Act 624 is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. ERISA was designed to ensure that administrators of employee-benefit plans may establish nationally uniform benefits and make decisions central to plan administration without "interference from laws of the several States," *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 326 (2016). ERISA broadly and expressly preempts state laws that interfere with how employers design and administer their benefit plans. Act 624 does just that. Health plans that offer prescription-drug benefits have partnered with PBMs and their affiliated pharmacies for decades to design pharmacy networks to secure competitively priced drugs for beneficiaries nationwide. They have signed countless contracts memorializing those relationships and set guaranteed prices on the assumption that PBM-affiliated pharmacies can remain active participants in those networks. Act 624 would upend that longstanding model. ERISA plans' existing pharmacy networks would now be illegal in Arkansas, and plans instead would have to invent a new, state-specific network built around independent pharmacies. That disruptive mandate will destroy nationally uniform benefits administration and wrest key decisions about benefits design from plan administrators.

*Second*, Act 624 is likewise preempted by the Medicare Modernization Act of 2003, 42 U.S.C. § 1395w-26, and associated regulations. Both Medicare Part D and the Medicare Advantage Prescription Drug program are designed to ensure uniform and reliable access to prescription drugs. The Medicare Modernization Act broadly preempts state laws that conflict with or frustrate the purpose of numerous federal Medicare regulations. Among other requirements, those regulations expressly contemplate that Medicare plans may contract with "pharmacies offering home delivery via mail-order," 42 C.F.R. § 423.120(a)(3), and in fact *must* admit willing pharmacies into their networks. In compliance with these laws, Medicare plans contract extensively with

PBM-affiliated pharmacies, including Optum's, to deliver cost-effective drugs. Yet Act 624 would dismantle that model and require plans to build new, Arkansas-specific networks stripped of PBM affiliates. Because Act 624 conflicts with and frustrates the goals of the federal Medicare scheme, it runs headlong into federal preemption.

*Third*, Act 624 openly defies the dormant Commerce Clause of the federal Constitution. Laws that discriminate against out-of-state competition in their text, purpose, or effect are "per se invali[d]" and subject to the "strictest scrutiny." *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 596-97 (8th Cir. 2003). Act 624 is just such a discriminatory enactment because it was designed to insulate local pharmacies from out-of-state competition. Laws likewise violate the dormant Commerce Clause—regardless of discrimination—when they impose burdens on interstate commerce "clearly excessive in relation to the[ir] putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Act 624's interstate burdens are severe, its principal putative benefit—protectionism—is impermissible, and any other benefits are illusory. The law will substantially *reduce* competition and patient choice while driving drug prices higher.

*Fourth*, Act 624 constitutes an uncompensated taking of Optum's eleven brick-and-mortar Genoa pharmacies throughout Arkansas. Optum must divest from those multimillion-dollar assets at breakneck speed before Act 624's January 1, 2026 effective date, lest those pharmacies cease as going concerns. But Optum cannot possibly recover full, fair-market value for those assets on such a compressed timeline, particularly given the leverage that Act 624's looming effective date provides to qualified buyers—assuming they can be found. In forced sales like these, the Supreme Court has made clear that the difference between sale price and true value constitutes a *per se* taking of private property. Act 624 also threatens a regulatory taking if those sales cannot be completed, as the value of those (former) pharmacies, absent their permits, would diminish toward

the vanishing point.  Yet sovereign immunity and Arkansas law together ensure that Optum cannot secure the compensation constitutionally required to remedy those impending economic injuries, thereby requiring injunctive relief.

Optum is also certain to suffer irreparable harms absent swift judicial intervention.  *First*, the irretrievable loss of the economic value of Optum's business at the State's hands constitutes irreparable harm.  Optum, Inc.'s affiliation with Optum Rx means that *all* of Optum's affiliated pharmacies are deemed to be "PBM-affiliated" under Act 624 and thus stand to lose their pharmacy permits absent divestiture.  Divesting from Optum's nationwide mail-order pharmacies is wildly impracticable and would cause Act 624's destructive effects to spread far beyond Arkansas.  Because they will thus remain PBM affiliates, Optum's mail-order pharmacies will lose their Arkansas permits and the corresponding ability to serve Arkansas patients.  Ceasing those operations will cost Optum in excess of $ 400 million.  Meanwhile, Optum will need to sell its eleven in-state pharmacies to a qualified buyer or shutter them altogether.  Sovereign immunity will prevent Optum from recovering against Arkansas for any of those impending economic injuries—a well-recognized basis for finding irreparable harm.  *See, e.g.*, *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996).

*Second*, Act 624 will irreparably harm Optum by destroying its established and longstanding relationships with its patients, who will be forced to find alternative, independent suppliers of needed medications.  While the law's divestiture mandate goes into effect on January 1, 2026, PBM-affiliated pharmacies must begin notifying patients sixty days beforehand (November 2, 2025), that they will imminently lose access to their pharmacy benefits and must look elsewhere to continue their treatments.  Those goodwill-destroying notifications will alienate Optum's customers and only compound Optum's unrecoverable economic losses.  That "potential loss of

consumer goodwill" also "qualifies as irreparable harm." *Iowa Utils. Bd.*, 109 F.3d at 426.

*Third*, Act 624's infringement of Optum's constitutional rights—to free trade among the states and just compensation for the fair value of its affected properties—likewise creates irreparable harm. Loss of constitutional rights for even a short period of time inherently "constitute[s] irreparable harm." *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1017 (8th Cir. 2023).

The balance of the equities and public interest also favor preliminary relief. Arkansas has no legitimate interest in enforcing an unlawful statute designed only to protect local pharmacies from wholly legitimate forms of competition. And the law will cause substantial disruption for thousands of Arkansans who must scramble to find alternative suppliers of needed medications before the law's effective date. Those medications may not be available, readily or at all. For seniors lacking access to transportation and individuals living in rural communities (or areas known as "pharmacy deserts"), mail-order pharmacies can be critical to ensuring timely access to needed medications. Further, substantial portions of Optum pharmacies' volume comprises specialty drugs—which always require significant patient management, often require specialized handling, and typically treat rare and chronic conditions. Optum's pharmacies have supplied these drugs to Arkansans precisely because local pharmacies are unequipped to do so. While claiming to protect patient choice, Act 624 will leave these patients with no good option.

This Court should therefore preliminarily enjoin enforcement of Act 624. Preliminary relief would merely—but crucially—preserve the status quo as this case works its way to final judgment. That relief would have no effect on Arkansas's ability to enforce its *other* laws that already prohibit the same conduct the General Assembly in Act 624 accused PBMs of perpetrating. But it would prevent Arkansas from forging ahead with this illegal mandate, and thus prevent irreparable harms to Optum and mass disruption in the lives of tens of thousands of Arkansans.

**BACKGROUND**

I.    **PBMs Provide Important Benefits To Patients And Plan Sponsors**

While presenting itself as a restriction on pharmacy permits, Act 624 is at its core a law about PBMs.  Generally speaking, PBMs are third-party administrators that help manage prescription-drug benefits for health plans, which are often provided by insurers, unions, Medicare plans, and government and private employers.  For decades, PBMs have offered a range of services to those plan clients, including negotiating with drug manufacturers to secure volume discounts, negotiating with pharmacies to control costs, and processing pharmacy claims.  *See, e.g.*, *Pharmacy benefit management (PBM)*, Optum, tinyurl.com/44r5fp8e.  PBMs also build and maintain networks of pharmacies to ensure that plan members have access to a wide range of needed medications.  Plans partner widely with PBMs because these services confer proven benefits to plans.  For example, a 2022 study published by the National Bureau of Economic Research described PBMs as "a procompetitive force in healthcare markets."  Casey B. Mulligan, *The Value of Pharmacy Benefit Management* at 8, Nat'l Bureau Econ. Rsch. (July 2022), tinyurl.com/2p9r57kr.  PBMs "increase competition" through "group purchasing and negotiated discounts," much like "Costco, Sam's Club, and other buyers' clubs obtain manufacturer discounts on behalf of their members."  *Id.*  PBMs in turn pass on those savings to plan clients and their members.

PBMs are also commonly affiliated with pharmacies as part of a parent corporation's broader corporate structure.  Mulligan, *supra*, at 16.  PBM-affiliated pharmacies can themselves reduce prescription-drug prices through bulk purchases from manufacturers and associated economies of scale.  Patricia M. Danzon, *Pharmacy Benefit Management:  Are Reporting Requirements Pro- or Anticompetitive?*, 22 Int'l J. Econ. Bus. 245, 249-50 (2015).

Many PBM-affiliated pharmacies are home-delivery pharmacies, which conveniently deliver prescription drugs directly to beneficiaries' doors.  *See A 21st Century Pharmacy*, PCMA,

tinyurl.com/57smaan4.  Because of their convenience, PBM-affiliated home-delivery pharmacies have become a preferred option for thousands of patients.  *Id.*  They are also a critical source of prescription drugs for residents of rural areas or elderly patients who cannot drive to local pharmacies.  *Id.*  Home delivery also creates significant cost savings for plans and plan members.  As one economist explained in a 2015 article, PBMs' mail-order operations permit them to "captur[e] … discounts."  Danzon, *supra*, at 250. PBMs "typically share with plan sponsors the savings realized on mail dispensing" and likewise "offer patients lower cost-sharing on drugs dispensed through the mail."  *Id.* at 254, 247.  Thus, while mail dispensing "[u]nsurprisingly … has been strongly opposed by retail pharmacies," evidence refutes "the allegation that PBMs' ownership of mail-order pharmac[ies] harms their customers," and in fact shows "that employers pay lower prices on mail order" prescriptions.  *Id.* at 250, 255.

PBMs are also commonly affiliated with specialty pharmacies, so titled because they distribute specialty drugs that may require special preparation and handling, be prohibitively expensive, or treat rare diseases.  *See Specialty Pharmacies*, PCMA, tinyurl.com/mr3yt6ce.  Some specialty pharmacies are also mail-order pharmacies that ship drugs directly to patients' doors, thus mitigating specialty drugs' unavailability at local pharmacies.  *See, e.g.*, Declaration of Christopher J. Stidman ("Stidman Decl."), ¶¶ 22, 24.   Affiliated specialty pharmacies also sometimes have a physical presence through brick-and-mortar stores, particularly when (as with Optum's Genoa pharmacies) they serve challenging patient populations that need close monitoring to ensure their medications are effective.  *Id.* ¶ 26.

## II.    PBMs And PBM-Affiliated Pharmacies Play A Critical Role In Plan Administration Under ERISA

PBMs like Plaintiff Optum Rx are also vital to health plans subject to ERISA.  Indeed, "it would be 'practically impossible' for an ERISA plan to manage its own pharmacy benefits and

avoid using a PBM 'because it would mean forgoing the economies of scale, purchasing leverage, and network of pharmacies only a PBM can offer.'" *PCMA v. Mulready*, 78 F.4th 1183, 1195 (10th Cir. 2023) (brackets omitted), *pet. for certiorari pending*, No. 23-1213 (U.S. May 15, 2024).

Congress enacted ERISA in 1974 after "almost a decade of studying the Nation's private pension plans." *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980). The statute is designed "'to ensure that plans and plan sponsors would be subject to a uniform body of benefits law,'" *Rutledge v. PCMA*, 592 U.S. 80, 86 (2020), and to "alleviate" burdens on employers that "discourage the maintenance and growth of … pension plans." 29 U.S.C. § 1001a(c)(2). "Nothing in ERISA requires employers to establish employee benefits plans." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). Instead, the statute leaves employers with wide discretion to decide what benefits to offer. To exercise that discretion, plan administrators partner with PBMs to make fundamental decisions about how those plans will structure their benefit schemes and the prices at which prescription drugs can be procured. PBMs negotiate with manufacturers and pharmacies to secure plan-wide deals, frequently resulting in savings for plans and their members.

PBMs also design pharmacy networks to provide prescription-drug benefits to plan beneficiaries. Determining which pharmacies may be within those networks is a key aspect of plan design. And PBM-affiliated pharmacies are typically attractive options. Because of those pharmacies' national operations, plan administrators can provide nationally uniform coverage to their beneficiaries, accurately predict prices based on contracts signed with those suppliers, and secure discounts as those affiliated pharmacies often procure prescription drugs in bulk. Plan administrators can also accurately understand and shape the benefits that their plans are situated to provide. For example, if plan administrators wish to offer mail-order delivery of prescriptions to their beneficiaries—a default expectation for many Americans—the plan can secure appropriate contracts

with PBM-affiliated mail-order pharmacies through the PBM's pharmacy network.  Or, if the plan anticipates needing to cover specialty drugs, it can contract with large, affiliated pharmacies to ensure cost-effective access to those rare drugs.  The ability to sign nationally uniform contracts with PBM-affiliated pharmacies substantially reduces the administrative burden otherwise associated with signing a series of ad hoc contracts with independent pharmacies, which may be unable to provide needed drugs or could do so only at higher and less predictable prices.  PBMs are thus key to achieving ERISA's goals.

### III.    PBMs and PBM-Affiliated Pharmacies Play A Vital Role In Administering The Medicare Part D And Medicare Advantage Prescription Drug Programs

PBMs also play "a little-known but important part" in securing access to affordable prescription drugs for millions of Medicare beneficiaries.  *Rutledge*, 592 U.S. at 83.  Many beneficiaries acquire prescription drugs through either Medicare Part D or the Medicare Advantage Prescription Drug ("MAPD") program, which was established through the Medicare Modernization Act of 2003.  That Act was intended to codify "a comprehensive statutory and regulatory scheme for prescription drugs, which aims to balance cost with access to those drugs." *PCMA v. Rutledge*, 891 F.3d 1109, 1113 (8th Cir. 2018), *rev'd on other grounds*, 592 U.S. 80.

As with ERISA plans, PBMs assist Medicare plans with designing pharmacy networks (which often include affiliated pharmacies) and delivering prescription-drug benefits.  "Because of the economic efficiencies and administrative savvy that PBMs afford, most [Medicare] plans choose to work with PBMs to manage their prescription-drug benefits."  *Mulready*, 78 F.4th at 1188.  PBMs, in turn, do the "heavy lifting" for plans, *id.* at 1189, negotiating discounts from pharmacies and then bundling them into networks capable of conferring plan-wide benefits.  PBMs thus play a key role in helping Medicare plans meet "network adequacy" standards established by the Centers for Medicare and Medicaid Services ("CMS"), which are designed to ensure

10

appropriate access to prescription drugs for enrollees, and which have specific requirements about the maximum times and distances involved in delivering those benefits. *See* 42 C.F.R. § 422.116.

## IV.    Optum Provides PBM And Pharmacy Services To Hundreds Of Arkansas Benefits Plans And Thousands Of Arkansas Patients

Optum helps implement the goals of ERISA and Medicare through its PBM services and its affiliated mail-order and specialty pharmacies—including through widespread operations to serve Arkansas beneficiaries.

*Optum Rx.*   Optum, Inc. owns Optum Rx, Inc. ("Optum Rx"), which is Optum's PBM. Stidman Decl. ¶¶ 6, 7.   Optum Rx administers prescription-drug benefits for millions of Americans, including nearly 440,000 Arkansans, and provides PBM services to hundreds of health plans with Arkansas plan members. *Id.* ¶¶ 7, 15.   Optum Rx assists these plans by negotiating with drug manufacturers, constructing networks of pharmacies to ensure that plan members can timely access safe and effective drugs, and helping process claims and reimbursements. *Id.* ¶¶ 10-12, 51. Optum Rx's pharmacy networks include affiliated pharmacies (those owned by Optum Rx's parent company, Optum, Inc.) as well as independent pharmacies and pharmacies affiliated with other PBMs. *Id.* ¶¶ 9, 17.   Some plan members who receive PBM services from Optum Rx may likewise receive drugs through Optum Rx-affiliated pharmacies. *Id.*   But some may not, as Optum Rx's networks also include other pharmacies (including those affiliated with other PBMs). *Id.*   And some patients have no relationship with Optum Rx, yet still receive prescriptions from Optum Rx-affiliated pharmacies—for example, through a health plan administered by another PBM. *Id.*

*Optum Rx Home Delivery.*   Optum Rx Home Delivery is a mail-order pharmacy service through which Optum distributes mail-order prescription drugs from several affiliated mail-order pharmacies located outside of Arkansas. Stidman Decl. ¶ 18.   Orders typically ship within two days and are subject to multiple quality-control measures, resulting in dispensing accuracy near

100%. *Id.* ¶ 20. The convenience associated with mail-order delivery substantially increases patients' medication adherence and is particularly crucial in Arkansas, where nearly 8% of the state's residents (including rural residents) live in "pharmacy deserts" without ready access to brick-and-mortar stores. *Id.* ¶ 19. Optum Rx Home Delivery is expected to dispense more than 550,000 prescriptions to Arkansans throughout 2025. *Id.* ¶ 20.

*Optum Rx divvyDOSE.* Optum Rx divvyDOSE is a program designed to assist patients taking on average nine or more medications (for whom medication adherence is particularly complex given the time and expense associated with filling multiple prescriptions). Stidman Decl. ¶ 21. divvyDOSE operates multi-dose mail-order pharmacies that bundle all medications into a single, convenient package and offer an auto-refill option for added convenience. *Id.* divvyDOSE is projected to deliver approximately 49,000 prescriptions to Arkansans in 2025. *Id.*

*Optum Rx Specialty Pharmacy.* Optum Rx Specialty Pharmacy is a mail-order service that helps fill prescriptions for specialty drugs, which require significant patient management, education, and monitoring; often require specialized handling; typically treat rare and chronic conditions (such as hemophilia, certain cancers, inflammatory diseases, and neurological conditions); and can be extraordinarily expensive, ranging from $10,000 to more than $1 million annually. Stidman Decl. ¶ 22. Optum Rx Specialty Pharmacy has access to more than 200 limited-distribution drugs, including drugs that are so rarely used that they are infrequently stocked—and sometimes never available—at local independent pharmacies. *Id.* Optum Rx Specialty Pharmacy is expected to deliver more than 27,000 prescriptions in Arkansas throughout 2025. *Id.*

*Optum Rx Frontier Therapies.* Optum provides access to even rarer drugs—so-called "ultra-limited drugs"—through Optum Rx Frontier Therapies, which operates specialty mail-order pharmacies based in Michigan and Nevada. Stidman Decl. ¶¶ 24, 45. Optum Rx Frontier

12

Therapies is dedicated to serving patients with rare diseases. *Id.* ¶ 24. Because these diseases affect few people, local independent pharmacies lack access to needed medications and lack the capabilities to handle them, as with ultra-cold chain cell and gene therapies. *Id.* Optum Rx Frontier Therapies will dispense approximately 264 prescriptions to Arkansans in 2025. *Id.*

*Optum Rx Infusion Pharmacy*. Through its Optum Rx Infusion Pharmacy service (and affiliated pharmacies outside of Arkansas), Optum provides access to drugs for infusion therapies. Stidman Decl. ¶ 25. These drugs are commonly prescribed for diseases such as rheumatoid arthritis, Crohn's disease, bleeding disorders, and multiple sclerosis. *Id.* Optum Rx Infusion Pharmacy is projected to dispense almost 1,500 infusion-related drugs to Arkansans in 2025. *Id.*

*Genoa Healthcare*. Through its wholly owned subsidiary, Genoa, Optum owns and operates eleven brick-and-mortar specialty pharmacies in Arkansas, employing 56 Arkansans. Stidman Decl. ¶ 26. Optum's Genoa pharmacies, which expect to dispense more than 317,000 prescriptions to Arkansans in 2025, fill critical gaps left by Arkansas's independent brick-and-mortar pharmacies. *Id.* They specialize in serving patients with severe mental illnesses, such as bipolar disorder, schizophrenia, and major depressive disorder, and its pharmacists are specially trained to help manage these at-risk populations. *Id.* Genoa currently provides care to thousands of Arkansas patients on an annual basis, of whom 77% are Medicare or Medicaid beneficiaries. *Id.*

## V.    Multiple Arkansas Laws Already Regulate PBM Conduct

Optum's operations occur in the context of an extensive and preexisting regulatory framework. Arkansas legislators in particular have previously focused on the concern that PBMs may reimburse affiliated pharmacies more favorably than local independents, placing those independents "at risk of losing money and closing." *Rutledge*, 592 U.S. at 84. Arkansas has instituted detailed restrictions on PBM activity over the past decade. In 2015, for example, Arkansas enacted Act 900. Act 900 requires PBMs to reimburse pharmacies at rates that are equal to or greater than

what it costs those pharmacies to acquire a drug. If a pharmacy believes it was undercompensated, it can initiate an administrative appeal to challenge reimbursement rates below the pharmacy's acquisition cost, Ark. Code Ann. § 17-92-507(c)(4)(A)(i)(b), and thus force PBMs to compensate the pharmacy to "at least the pharmacy acquisition cost," *id.* § 17-92-507(c)(4)(C)(i)(a)-(b). And in 2018, Arkansas enacted Act 1, which charges the Arkansas Insurance Commissioner with regulating PBMs and forbids PBMs from paying in-state pharmacies "less than the amount that the [PBM] reimburses a [PBM] affiliate for providing the same pharmacist services." Ark. Code Ann. § 23-92-506(b)(4)(A). The law likewise bars PBMs from paying those pharmacies "less than the national average drug acquisition cost or, if the national average drug acquisition cost is unavailable, the wholesale acquisition cost." *Id.* § 23-92-506(b)(5)(A). Under these provisions, PBMs operating in Arkansas cannot favor their own affiliates with more generous reimbursements than those offered to independents.

## VI.    The General Assembly Enacts New Restrictions To Protect Local Pharmacies From Out-Of-State Competition

Despite these existing regulations, Arkansas's local pharmacy lobby continued to insist that the state had not done enough to counteract competition from PBM affiliates. So, in January 2025, the Arkansas Pharmacists Association, along with Arkansas legislators and the Attorney General, gathered to announce support for a draconian option: eliminating PBM-affiliated pharmacies from Arkansas altogether. Their draft bill, H.B. 1150, proposed to do so through a new and unprecedented restriction on issuing pharmacy permits to PBM-affiliated pharmacies.

The need to protect the local economy from out-of-state competition quickly emerged as the law's central selling point. At the press conference announcing H.B. 1150, House sponsor Representative Jeremiah Moore warned that the measure was needed because "your neighborhood pharmacies are closing at a rapid pace." Arkansas Pharmacists Ass'n News Conference with

14

Attorney General Tim Griffin at 8:00-03, YouTube (Jan. 16, 2025), tinyurl.com/mwtb5dzp.  The same day, after formally submitting the bill, he retweeted a statement that H.B. 1150 would end the "Threat" to "Arkansas Businesses."  @JeremiahMooreAR (Jan. 16, 2025 11:55 AM), tinyurl.com/2tp8w773.  He reiterated concern for local businesses days later on a podcast with "Pharmacists United for Truth and Transparency," explaining that "supporting these independent neighborhood pharmacies is a really big part of why we're running House Bill 1150."  The PUTTcast, *Arkansas HB 1150:  Combatting PBM Anticompetitive Practices with State Legislation*, at 2:24-32 (Feb. 5, 2025), tinyurl.com/3dnpa5ce.

Other supporters embraced the same protectionist theme as they sought to drum up public support.  Senator Mark Johnson deemed the bill an "essential step" to "protecting local pharmacies."  Mark Johnson, *Set the record straight on HB1150*, Arkansas Democrat Gazette (Mar. 2, 2025), tinyurl.com/5fnshhe6. Senator Dan Sullivan explained that the new law would "protec[t] jobs" and "protec[t] local pharmacies" from PBM competition.  Dan Sullivan, *HB1150 puts pharmacy patients, quality care first*, Jonesboro Sun (Mar. 15, 2025, updated Apr. 16, 2025), tinyurl.com/43wks52p.  And Representative Jim Wooten praised Act 624 as a bill that "really pinpoints and identifies the troublemakers causing the problem for your local pharmacists," *i.e.*, PBMs.  Greg Geary, *Small pharmacies in danger of closing if PBM bill doesn't pass, state representative says*, White County Citizen (Mar. 27, 2025), tinyurl.com/mpc8nd89.  Crucially, most of these statements attacked the results of perfectly *fair* competition from out-of-state pharmacies that can deliver prescription drugs to Arkansas residents more quickly, more safely, and more affordably than local pharmacies.

Yet H.B. 1150 soon hit a roadblock.  As originally drafted, it would have barred permits not only to pharmacies directly or indirectly owned by PBMs, but also to pharmacies affiliated

with a "healthcare payor," defined under Arkansas law to include "[a]n entity that provides or administers a self-funded health benefit plan." Ark. Code Ann. § 23-92-503(3)(D). Legislators realized that the reference to a "healthcare payor" would disable the state's largest employer from owning pharmacies, and thus voiced objections. *See* Geary, *Small pharmacies in danger of closing if PBM bill doesn't pass, state representative says*, *supra*. In response, Representative Moore introduced an amendment to H.B. 1150 to remove the references to a "healthcare payor," thus insulating the state's largest employer from the new law's effects. Amend. No. 1 to House Bill 1150 (Feb. 5, 2025), tinyurl.com/msbmasus. Representative Moore later introduced a second amendment to specifically protect local pharmacies' ability to partner with PBMs, so long as the pharmacy is the "sole Arkansas client" of the PBM and "[e]xclusively" serves employees and dependents "in this state"—further shielding in-state interests from potential fallout. Amend. No. 2 to House Bill 1150 (Mar. 14, 2025), tinyurl.com/2w2emzs3.

With H.B. 1150 fully sanitized, its supporters resumed their celebration of the bill as a needed measure to protect local interests. At the House committee debate, Representative Moore invited John Vinson, CEO of the Arkansas Pharmacists Association, to testify in support. Vinson extensively described how "unfair competition" from "out-of-state mail-order pharmacies" had purportedly resulted in the closure of in-state pharmacies, and thus that a consequence of Act 624 would be to "grow the economy locally" by shutting off out-of-state competition. Exhibit A to the Declaration of Matthew S. Rozen ("Ex. A"), 19:8-20. Vinson also noted that the large state employer previously covered by the original draft would not be affected by—and in fact now supported—the bill as amended. *Id.* at 19:22-20:1. Representative Richard McGrew echoed those concerns for local pharmacies, asserting that competition from PBMs would "take them out of business." *Id.* at 28:14-15. Representative Robin Lundstrom warned that without Act 624, "the

small-town pharmacist … can't survive," and that Arkansas may have to "close all our brick and mortars" due to competition from "mail-in pharmacies." *Id.* at 43:7-20. The House passed the bill the next day.

As it moved on to the Senate, protectionism was again a focal point. Senate sponsor Kim Hammer introduced the bill by declaring that, "right now, pharmacy benefits managers, or PBMs, are steering patients to out-of-state mail-order pharmacies that they own or are affiliated with," undermining local independents. Exhibit B to the Declaration of Matthew S. Rozen ("Ex. B"), 3:21-4:1. Vinson, testifying again before the Senate, opined that Act 624 would combat "PBM owned pharmacies out of state" and keep pharmacy services in "our local communities." *Id.* at 9:18-10:2. Another witness named Brandy Chane (herself a pharmacy owner) implored the Senate to "safeguard the future of independent community pharmacies." *Id.* at 57:18-19. And Senator Mark Johnson accused a witness who testified in support of the bill, Randy Zook of the Arkansas Chamber of Commerce, of "lacking support [for] our local businesses." *Id.* at 75:8-15. The Senate passed the bill a day later.

When the Governor signed H.B. 1150 into law as Act 624, her accompanying press release included dozens of protectionist statements from bill supporters. Senator Justin Boyd praised the Governor for combatting PBMs' alleged efforts to steer prescription-drug fulfillment "away from Arkansas communities." *Sanders Signs Legislation to Ban Anti-Competitive PBM Practices*, Arkansas.gov (Apr. 16, 2025), tinyurl.com/mwpts25m. Representative Moore said the bill would achieve "justice" for "local pharmacies." *Id.* Vinson called the bill's enactment "a historic day" for "local pharmacies." *Id.* And an independent pharmacy owner deemed Act 624 "a win for local businesses." *Id.* Vinson and the Arkansas Pharmacists Association also issued a laudatory press release, explaining that Act 624 would ensure prescriptions are "delivered by trusted local

pharmacists, not dictated by out-of-state corporations." *Arkansas Pharmacists Association Applauds Senate Committee Vote To Ban PBMs From Owning Pharmacies in State*, Ark. Pharmacists Ass'n (Apr. 8, 2025), tinyurl.com/yhkxe554.

## VII.  As Enacted, Act 624 Threatens To Destroy Optum's Services To Arkansas Plans And Beneficiaries

Act 624 is broad in scope and severe in effect.  While Arkansas law previously defined "pharmacy benefits manager" consistently with ordinary meaning—a company that provides prescription-drug services for health plans—Act 624 broadens the term to include any company that has an *interest* in a PBM (no matter whether that parent company itself provides PBM services). Act 624 § 2(a)(1)(B)(2)(A)(B)(ii).  Under Act 624, therefore, Optum, Inc. is now itself a "PBM" by virtue of its affiliation with Optum Rx, and *all* of Optum's pharmacies are now deemed PBM-affiliated, even though they are not owned by Optum Rx itself.  As a result, Optum must either divest from its pharmacies or have them lose "a permit … for the retail sale of drugs or medicines" in Arkansas.  *Id* § 2(b).  And absent divestiture, Optum's pharmacies must notify their patients by November 2, 2025 that those pharmacies "can no longer dispense retail drugs … on or after January 1, 2026."  *Id*. § 2(c)(1)(A)-(B).  The only carveout from this stark regime arises from the amendment (described above) to exempt local interests:  Local pharmacies may retain *their* PBM affiliation, so long as the pharmacy is the PBM's "sole Arkansas client" and "[e]xclusively" serves pharmacy employees "in this state."  *Id*. § 2(f)(1)-(3).

Act 624 purports to mitigate at least some of its own effects through two exceptions—but in practice these exceptions will confer little relief.  One provides that pharmacies offering "same-day patient access for pharmacist services, a prescription for a controlled substance, mental health services, or other critical patient healthcare services" may briefly retain their retail pharmacy permits.  Act 624 § 2(e).  But such pharmacies may seek the exemption *only* "if there is a pending

18

sale of the pharmacy to an eligible buyer"—in other words, *after* the divestiture process has already begun. *Id.* The other exception explains that pharmacies providing access to "certain rare, orphan, or limited distribution drugs" "may request" temporary, limited-use permits to continue offering those drugs alone. *Id*. § 2(d)(1), (3)(B)(ii). But those permits must be renewed every 90 days, and the authority to grant them runs out in September 2027. *Id.* § 2(d)(2)(A)(ii), (B). Even if pharmacies can obtain such a permit, then, the Act threatens to embroil them in an uncertain and potentially burdensome license-renewal process every three months while the exception remains in effect, and then to force them out of business after the exception expires in 2027. *Id.* § 2(d)(2)(B).

## ARGUMENT

A preliminary injunction is warranted when (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm absent preliminary relief; (3) the balance of the equities favors the movant; and (4) an injunction is in the public interest. *Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024) (per curiam). Though no single factor is "dispositive," *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023), likelihood of success is "the most significant" factor, *Missouri*, 112 F.4th at 536. The balance of the equities and public interest "merge" when "a state official in his official capacity" is the nonmoving party. *Eggers v. Evnen*, 48 F.4th 561, 564-65 (8th Cir. 2022). Here, each factor supports a preliminary injunction.

## I.    Plaintiffs Are Likely To Succeed On The Merits

### A.    ERISA Preempts Act 624

Preliminary relief is warranted first because Act 624 is preempted by ERISA, and thus is invalid under the federal Constitution's Supremacy Clause. *See* U.S. Const. art. VI, cl. 2. It is "beyond dispute" that federal courts may "enjoin state officials" from enforcing state laws that are

"pre-empted by a federal statute."  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983).

### 1.    ERISA Broadly Preempts State Interference With The Administration Of Employee-Benefit Plans

ERISA was meticulously designed to shield benefits plans from the kind of state-level in-terference Act 624 clearly imposes.  ERISA's drafters sought "to ensure that plans and plan spon-sors would be subject to a uniform body of benefits law." *Rutledge*, 592 U.S. at 86 (quotation marks omitted).  "To this end, ERISA includes expansive preemption provisions," *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004), under which ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" governed by the statute, 29 U.S.C. § 1144(a).  That preemption clause has a "broad scope," *Metro. Life Ins. Co. v. Massa-chusetts*, 471 U.S. 724, 739 (1985), and "deliberately expansive" sweep, *Pilot Life Ins. Co. v. De-deaux*, 481 U.S. 41, 46 (1987).  "Congress's intent" in framing the provision was "to establish the regulation of employee welfare benefit plans 'as exclusively a federal concern'" by eliminating "a multiplicity of regulation," *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656-57 (1995), and "interference from laws of the several States," *Gobeille*, 577 U.S. at 326.

State laws impermissibly "relat[e] to" an ERISA plan, and therefore are preempted, when they have "'a *connection with* or reference to such a plan.'"  *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001) (emphasis added).  A state law can have an impermissible "connection" with an ERISA plan in at least two ways:  when "(1) it 'governs … a central matter of plan admin-istration,'" or "(2) it 'interferes with nationally uniform plan administration.'"  *PCMA v. Wehbi*, 18 F.4th 956, 968 (8th Cir. 2021).  State laws interfere with "nationally uniform plan administra-tion" when, among other things, they "requir[e] the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction," *Travelers*, 514 U.S. at 656-57 (citation omitted).  As

the Supreme Court has recognized, "[u]niformity is impossible … if plans are subject to different legal obligations in different States." *Egelhoff*, 532 U.S. at 148. And a law affects "a central matter of plan administration" when, among other things, it "forc[es] plans to adopt any particular scheme of substantive coverage," *Rutledge*, 592 U.S. at 87-88. That includes laws regulating the distribution of, and compensation for, pharmaceuticals. *See*, *e.g.*, *Mulready*, 78 F.4th at 1198 (invalidating pharmacy "network restrictions").

State laws are also preempted even if they cause these disruptive effects "indirectly." *Express Scripts, Inc. v. Wenzel*, 262 F.3d 829, 833 (8th Cir. 2001). "ERISA's broad pre-emption provision was intended to pre-empt any state law that 'relate[d] to' an employee-benefit plan, not merely those state laws that directly conflic[t] with a substantive provision in the federal statute." *Metro. Life Ins. Co.*, 471 U.S. at 737. So it is of no significance that Act 624 purports to regulate PBMs rather than ERISA plans as such. "Because PBMs manage benefits on behalf of plans, a regulation of PBMs 'function[s] as a regulation of an ERISA plan itself.'" *Wehbi*, 18 F.4th at 966.

## 2. Act 624 Is Preempted Because It Severely Disrupts Nationwide Uniformity In Plan Administration

If left standing, Act 624 will destroy the national uniformity ERISA was designed to protect. Because "most plans do not assemble their own pharmacy networks[,] they rely on PBMs," including Optum Rx, to negotiate the necessary "contract[s] with pharmacies to set prices and terms for beneficiary access." *Mulready*, 78 F.4th at 1189. Optum Rx typically contracts with pharmacies and manufacturers on a nationwide basis to ensure members are covered nationwide. The resulting pharmacy networks typically include Optum's affiliates and *other* PBM-affiliated pharmacies. Plans and beneficiaries expect to receive those pharmacies' convenient mail-order services and actively seek their cost-saving effects. These contracts ensure that PBM-affiliated

pharmacies can act as uniform sources for prescription drugs for plan beneficiaries nationwide.

Yet Act 624 would make this fundamental aspect of network design illegal in Arkansas. Plans and PBMs instead would be forced into a two-track process: For the rest of the United States, PBMs can negotiate contracts covering beneficiaries in all 49 states, offer mail-order pharmacy services from their own or other PBM-affiliated pharmacies, anticipate prices with respect to those sets of drugs and beneficiaries, and establish corresponding price guarantees. *See, e.g.*, *PCMA v. Rowe*, 2005 WL 757608, at *1 (D. Me. Feb. 2, 2005) (PBMs "permit the benefits provider customers to obtain drugs at established prices"). In Arkansas, by contrast, PBMs will have to negotiate special, good-for-one-state-only contracts that are limited to independent pharmacies alone. And the prices for drugs offered with respect to those Arkansas-specific plans will necessarily differ from prices established for the rest of the United States, as PBMs will have to account for the newfound lack of competition in Arkansas (and thus higher Arkansas drug prices). That special, Arkansas-specific negotiation process will result in continuous administrative inefficiencies for plan administrators, as they must constantly work to ensure that local, independent pharmacies are able to fill beneficiaries' prescriptions. Stidman Decl. ¶ 53. It will also result in acute disuniformity in plan benefits. *Id.* The same benefits offered and expected in the rest of the country would be legally forbidden in Arkansas alone. *Id.*

Moreover, if *Arkansas* may validly institute state-specific plan requirements through the guise of pharmacy-permitting restrictions, then there is no theoretical reason the disruption must stop there. In fact, Governor Sanders recently invited her "fellow governors" in other states to explore additional anti-PBM legislation. Sarah Huckabee Sanders, *My State Is Taking On the Middlemen Who Inflate Drug Prices*, N.Y. Times (June 10, 2025), tinyurl.com/296332r9. So even if PBMs and plans redesigned their networks to comply with Act 624 itself, another state could in

theory deploy permitting requirements as a roundabout method of plan regulation to impose some *other* obligations on plans.  Those "different legal obligations in different States" would destroy PBMs' longstanding nationwide models, rendering "[u]niformity … impossible."  *Egelhoff*, 532 U.S. at 148.  ERISA does not tolerate that result.

### 3.    Act 624 Is Preempted Because It Impermissibly Regulates An Issue Central To Plan Administration

Act 624 also impermissibly intrudes on a central matter of plan administration—how plans design their benefit structures.  "[A] pharmacy network's scope" implicates "key benefit designs for an ERISA plan." *Mulready*, 78 F.4th at 1198.  State laws are therefore preempted when they "limi[t]" plans "to using PBM networks of a certain structure." *Id.* (brackets omitted).  Laws that "mandate benefit structures" in this manner "have an impermissible connection with ERISA plans" and are preempted accordingly. *Id.*  Indeed, the settled understanding across the circuits is that state laws are preempted when they "effectively requir[e] ERISA plans to purchase benefits of a particular structure." *CIGNA Healthplan of La., Inc. v. Lousiana ex rel. Ieyoub*, 82 F.3d 642, 648 (5th Cir. 1996); *accord Ky. Ass'n of Health Plans, Inc. v. Nichols*, 227 F.3d 352, 362 (6th Cir. 2000) (same).  When it comes to benefits structure, in other words, ERISA answers the key question of "who decides":  plan administrators.

Act 624 defies that instruction by attempting to substitute in a new decisionmaker:  the Arkansas General Assembly.  For beneficiaries in Arkansas, plan administrators are now commanded to adopt particular network structures built around independent pharmacies.  Act 624 would thus radically upset entrenched aspects of plan administration.  Plan administrators commonly prefer contracts with PBM-affiliated pharmacies because of the associated cost-savings, the ability to set nationwide price guarantees, and the assurance that beneficiaries will be able to obtain prescription-drug coverage nationwide.  By contrast, plans would encounter

significant new administrative burdens from having to vet independent local pharmacies to ensure that those pharmacies can meet a plan's quality standards and then negotiate ad hoc contracts (likely at higher prices) with that collection of independents.  ERISA is supposed to prevent these inefficiencies by vesting plan administrators—not local legislators—with such decisions about network design.  Act 624 thus interferes with "'a central matter of plan administration'" and has "an impermissible connection with ERISA plans."  *Mulready*, 78 F.4th at 1198.

### B.    Medicare Statutes And Regulations Preempt Act 624

#### 1.    The Medicare Modernization Act Broadly Preempts State Laws Related to Medicare Part D and Medicare Advantage Prescription Drug Plans

Act 624 is also preempted by the Medicare Modernization Act and associated federal regulations.  As with ERISA, the Medicare Modernization Act has broad preemptive effect.  It provides that federal standards "established under" the Medicare Advantage Prescription Drug program (MAPD) "shall supersede *any* State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to" MAPD "plans which are offered by" plan sponsors.  42 U.S.C. § 1395w-26(b)(3) (emphasis added).  Section 1395w-112(g), in turn, extends that preemptive effect to regulations governing Medicare Part D.  Thus, not only do *statutory* standards preempt state laws, but standards "'establish[ed] by regulation'" do the same.  *Wehbi*, 18 F.4th at 971; *see also* 42 U.S.C. § 1395w-26(b)(1).  Pursuant to that directive, CMS has instituted numerous regulations intended to ensure plan compliance with the agency's network-adequacy standards.  *See*, *e.g.*, 42 C.F.R. § 423.120.

The Eighth Circuit has recognized the Medicare Modernization Act's broad preemptive effect and has framed the statute as codifying both "express" and "implied" preemption.  *Wehbi*, 18 F.4th at 971-72.  And as with ERISA, the Eighth Circuit has explained that state laws cannot "escape preemption" by regulating PBMs rather than plans as such, given PBMs' extensive role

in Medicare-plan administration.  *Id.* at 966-67.

*Express Preemption*.  The Medicare Modernization Act expressly preempts state law when "(1) Congress or [CMS] has established 'standards' in the area regulated by the state law; and (2) the state law acts 'with respect to' those standards."  *Rutledge*, 891 F.3d at 1113.  Put differently, state laws are expressly preempted as applied to Medicare Part D and MAPD plans if those laws "regulate the same subject matter" as a "statutory provision or a regulation" under Medicare Part D or MAPD, regardless whether the state and federal standards "conflict."  *Wehbi*, 18 F.4th at 971-72, 975.  "[I]nterfere[nce] with convenient access to prescription drug availability" is "more than is required for preemption."  *Rutledge*, 891 F.3d at 1114.

*Implied Preemption*.  Furthermore, state laws are impliedly preempted if they "frustrate the purpose of a federal Medicare Part D [or MAPD] standard."  *Wehbi*, 18 F.4th at 972.  State laws are thus still preempted even if they do not regulate "the same subject matter" as a federal regulation when those state laws frustrate the federal regulation's purpose.  *Id.*  The combined effect of these express and implied-preemption regimes is sweeping, "'preempt[ing] a broad swath of state laws.'"  *Id.* at 971.

### 2. Act 624 Is Both Expressly and Impliedly Preempted By Numerous Medicare Standards

Act 624 conflicts with, regulates the same subject matter as, and frustrates the purpose of numerous federal standards governing Medicare Part D and MAPD plans.  These standards broadly require that Medicare beneficiaries retain "convenient access" to a "sufficient" number of "network pharmacies."  42 U.S.C. § 1395w-104(b)(1)(C); 42 C.F.R. § 423.120(a).  Yet Act 624 openly defies a number of CMS's corresponding regulations:

*New, Significant Regulatory Requirements*.  At the outset, Act 624 seeks to transfer power from CMS to the Arkansas legislature about who may validly "impose new, significant regulatory

requirements on a PDP sponsor or a prescription drug plan." 42 C.F.R. § 423.516. Federal regulations unambiguously bestow that authority on CMS. Yet Act 624 would foist fundamental new restrictions on Medicare plans without CMS signoff. In so doing, the law defeats basic procedural protections for plans, such as the requirement that "CMS may not implement" major regulatory changes "other than at the beginning of a calendar year"—a provision designed to ensure orderly plan administration. *Id.*; *see also* 42 U.S.C. § 1395w-26(b)(4). Yet one of Act 624's salient features is its September 1, 2027 sunset provision for limited-use permits, after which PBM-affiliated pharmacies may no longer provide those needed drugs. *See* Act 624 § 2(d)(2)(A)(i). September 1 plainly is not the "beginning" of the calendar year. Act 624 therefore not only arrogates authority specifically reserved for CMS but, in so doing, disregards specific restrictions with which CMS itself would have to comply.

*Mail-Order Pharmacies.* Act 624 also specifically contradicts the regulations' instruction that plan sponsors may supplement their networks with mail-order pharmacies. *See* 42 C.F.R. § 423.120(a)(3) (a plan sponsor's "contracted pharmacy network may be supplemented by non-retail pharmacies, including pharmacies offering home delivery via mail-order"). That federal regulation obviously encompasses PBM-affiliated pharmacies, as most mail-order pharmacies are themselves PBM affiliates. Yet Act 624 newly announces that plan sponsors may *not* so supplement their networks with those pharmacies—defeating the point of the federal regulation.

*Home-Infusion Pharmacies.* Act 624 also specifically interferes with the regulations' treatment of home-infusion pharmacies. Plan sponsors must "provide adequate access to home infusion pharmacies," ensuring "that such network pharmacies" meet stringent criteria concerning "clinically appropriate" care, "short-term acute care and long-term chronic care therapies," "professional services and ancillary supplies necessary for home infusion therapy," and so on. 42

C.F.R. § 423.120(a)(4).  Plan sponsors have traditionally relied on PBM-affiliated infusion pharmacies, including Optum's, to meet these requirements.  But Act 624 conflicts with and frustrates that regulatory requirement by disallowing those PBM affiliates.

*Plan-Affiliated Pharmacies.*  Act 624 also cannot be squared with the federal regulations' express provision that "[a]n MA organization" may "provid[e] its enrollees with access to covered Part D drugs through pharmacies owned and operated by the MA organization."  42 C.F.R. § 423.120(a)(7)(i).  Act 624 defies this regulation because it *prohibits* any MA organization affiliated with a PBM—as is commonly the case—from providing drugs to Arkansas beneficiaries from the MA organization's own pharmacy.  In those circumstances, the PBM would hold a proscribed "indirect interest" in an Arkansas pharmacy permit.  Act 624 § 2(b).  Act 624 thus directly conflicts with Medicare regulations.  And at minimum, it regulates "the same subject matter" as those federal regulations:  which corporate structures are permissible for MA organizations—and, more broadly, the extent to which entities involved in the design and administration of MA plans may be affiliated with the pharmacies that serve those plans.  *Wehbi*, 18 F.4th at 971-72, 975.  While CMS has chosen to regulate one aspect of that structure (MA organizations' direct ownership of pharmacies), Act 624 sweeps more broadly by dictating when an MA organization may be *affiliated* with a pharmacy, even absent a direct ownership interest.  Because these regulations were "designed to be comprehensive," Arkansas may not "ad[d] to [the] federal regulatory scheme" with a more sweeping structural restriction.  *Id.* at 970.

*Any Willing Pharmacy*.  Act 624 also frustrates the purpose of additional Medicare regulations by attempting to circumvent them through the artifice of the law's new permitting requirement.  Medicare regulations require that a Part D sponsor's "contracted pharmacy network" "[m]ust contract with any pharmacy that meets the Part D sponsor's standard terms and

conditions." 42 C.F.R. § 423.120(a)(8)(i). A "[c]ontracted pharmacy network," in turn, refers to "licensed pharmacies, including retail, mail-order, and institutional pharmacies under contract with a Part D sponsor to provide covered Part D drugs at negotiated prices to Part D enrollees." *Id.* § 423.100. This provision unquestionably would prevent Arkansas from passing a law stating that Part D sponsors can decline to contract with pharmacies that otherwise meet the sponsor's requirements simply because of those pharmacies' corporate structure. But Act 624 achieves exactly the same effect by denying state permits to PBM-affiliated pharmacies—rendering them no longer "licensed pharmacies"—because of legislators' disagreement with how those affiliated pharmacies are structured. Act 624 circumvents the provision's basic goal of establishing broad pharmacy networks capable of readily satisfying beneficiaries' needs.

For those reasons, Act 624 conflicts with, regulates the same subject matter as, and frustrates federal Medicare standards, and is preempted accordingly.

### 3.    Act 624 Does Not Escape Preemption As A "State Licensing Law"

The preemption provision of the Medicare Modernization Act contains a "narrow exceptio[n]" for "State licensing laws," which are not themselves preempted. *Mulready*, 78 F.4th at 1206 n.22; 42 U.S.C. § 1395w-26(b)(3). Act 624 gestures toward that narrow exception (perhaps intentionally) by leveraging the state's pharmacy-permitting authority to enforce ostensibly unrelated requirements about pharmacies' corporate structure. But that unprecedented maneuver cannot plausibly be deemed a "State licensing law" as that phrase is used in the Medicare Modernization Act. That safe harbor merely applies to licensing of Medicare *plans*, and only permits generally applicable requirements to obtain a business license in the state (such as filing articles of incorporation). It does not permit states to directly or indirectly dictate plan decisions about substantive coverage by imposing novel licensing requirements on *pharmacies*.

Those points follow from Section 1395w-26(b)'s text and structure. Read "'literal[ly]" and

"in isolation," *Dubin v. United States*, 599 U.S. 110, 120 (2023), Section 1395w-26(b)(3) would seem to refer to any "State licensing laws" on any subject. But context "point[s] to a more targeted reading." *Id.* Subsection (b) of Section 1395w-26 applies to standards regulating *plans*. Section 1395w-26(b)(1), for example, delegates authority to establish standards for Medicare "organizations and plans." 42 U.S.C. § 1395w-26(b)(1). Section 1395w-26(b)(4) governs new regulatory requirements on a Medicare "organization or plan." *Id.* § 1395w-26(b)(4). And within Section 1395w-26(b)(3) itself, the law's reference to "State licensing laws" is accompanied by a reference to "State laws relating to plan solvency"—in other words, laws designed to ensure that *plans* remain solvent. *Id.* § 1395w-26(b)(3); *see Fischer v. United States*, 603 U.S. 480, 487 (2024) (words are "'given more precise content by … neighboring words'"). That surrounding text reflects that Section 1395w-26(b)(3) is not intended to encompass *all* "State licensing laws," but those that in particular license *plans*' operation.

CMS's longstanding construction of that text is in accord—and also illuminates other important limiting principles. Shortly after the Medicare Modernization Act was enacted in 2003, CMS promulgated comprehensive commentary explaining that "State licensing laws" include only those state laws "generally associated with licensure" to do business in the state. *Medicare Program; Establishment of the Medicare Advantage Program*, 70 Fed. Reg. 4,588, 4,664/3 (Jan. 28, 2005). Thus, for example, a state could enforce "reasonable licensure requirements" such as "the filing of articles of incorporation with the appropriate State agency," or "State governance requirements," *id.*, such as the requirement to be structured as a "non-profit" organization, *see* Medicare Managed Care Manual § 30.1, CMS, tinyurl.com/cee65s2u. But states could not go further to "impos[e]" on MA plans "State regulatory requirements that a state might impose on non MA health plans"—in other words, requirements beyond those generally associated with obtaining a

state business license, and more specifically associated with state regulation of other health plans. 70 Fed. Reg. at 4,665/1. That construction helps "ensur[e] that the MA program as a Federal program will operate under Federal rules," rather than state-specific coverage mandates. *Id.* at 4,664/1. While Section 1395w-26(b)'s meaning ultimately is a matter of this Court's "independent judgment," CMS's "'contemporaneous construction … is entitled to very great respect.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385-86 (2024).

CMS's narrowing construction also accords with broader principles of statutory interpretation. For instance, courts do "not lightly conclude that Congress enacted a self-defeating statute," *Pugin v. Garland*, 599 U.S. 600, 607 (2023) (citation omitted), and should avoid construing statutory exceptions to "swallow the rule," *United States v. Kirchoff*, 387 F.3d 748, 751 (8th Cir. 2004). A broad reading of "State licensing laws" would eviscerate the rule the Medicare Modernization Act sought to establish: preemption of virtually *all* state laws operating "with respect to MA plans." 42 U.S.C. § 1395w-26(b)(3). Prior to the Act's passage, Section 1856 of the Social Security Act preempted solely state laws that either were "inconsistent" with federal standards or that related to four specified areas. *Id.* § 1395w-26(b)(3)(A)-(B) (2002). But the Medicare Modernization Act reversed that presumption by preempting "*any* State law or regulation," subject to narrow carveouts. *Id.* § 1395w-26(b)(3) (emphasis added); *accord* 70 Fed. Reg. at 4,680/2 ("[T]he MMA changes the presumption[.]"). The Act thus would be dramatically self-defeating if states could simply cast any preferred restriction as a licensure requirement "as an indirect means to impose health plan regulations on MA plans." 70 Fed. Reg. at 4,664/2.

Indeed, such a sweeping interpretation of a "narrow exceptio[n]," *Mulready*, 78 F.4th at 1206 n.22, would mean states "could impose virtually any requirement they wished without it being preempted," *Pa. Life & Health Ins. Guar. Ass'n v. Pa. Ins. Dep't*, 218 A.3d 9, 21 (Pa.

Commw. Ct. 2019). But that would fundamentally alter the goal of uniform *federal* rules regulating substantive coverage. Section 1395w-26(b)(3) would be a very large elephant in a very small mousehole, "alter[ing] the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

So understood, Act 624 has nothing to do with Section 1395w-26(b)(3)'s narrow "State licensing laws" exemption. The law does not even purport to regulate the conditions under which Medicare *plans* may be licensed to do business in Arkansas; it instead dictates the terms on which *pharmacies* may be licensed to do business in the state. And its "first in the country" restriction cannot conceivably be described as a regulation "generally associated" with the operation of a business in Arkansas (or anywhere else). *See, e.g.*, *Sanders Signs Legislation to Ban Anti-Competitive PBM Practices*, *supra*. The Act thus falls outside the narrow exemption and runs headlong into Section 1395w-26(b)(3)'s preemptive effect: the law operates "with respect to MA plans" by dictating how Medicare plans may structure their substantive coverage. It effectively denies plans the ability to offer PBM-affiliated pharmacies in their networks—and thus is a striking example of the use of "indirect means to impose health plan regulations on MA plans." 70 Fed. Reg. at 4,664/2.

### C.     Act 624 Violates The Dormant Commerce Clause

Act 624 should also be enjoined in light of its blatant violations of the dormant Commerce Clause. *See Dennis v. Higgins*, 498 U.S. 439, 451 (1991); *accord Pioneer Military Lending, Inc. v. Manning*, 2 F.3d 280, 285 (8th Cir. 1993) ("[Dormant] Commerce Clause plaintiffs have a cause of action under § 1983."). Act 624 violates the dormant Commerce Clause in two distinct ways: (1) The law is undeniably protectionist in its text, purpose, and effects; and (2) will unduly burden

interstate commerce in clear excess of its (non-existent) local benefits.

> **1.  State Laws That Discriminate Against Out-Of-State Competitors Or Unduly Burden Interstate Commerce Are Invalid**

The framers of the Commerce Clause understood that the United States could not long survive if commerce were "fettered, interrupted, and narrowed by a multiplicity of causes."  The Federalist No. 11, at 90 (Alexander Hamilton) (Clinton Rossiter ed., 1961).  The Supreme Court thus has long recognized the Commerce Clause's "negative command," which "prevents the States from adopting protectionist measures" against interstate commerce, even if Congress has not legislated on the topic.  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023); *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 517 (2019).  State laws accordingly run afoul of the dormant Commerce Clause when they either discriminate against out-of-state competition or excessively burden interstate commerce.

*Discrimination*.  "[T]he 'very core'" of the dormant Commerce Clause is an "antidiscrimination principle":  the Clause "prohibits the enforcement of state laws 'driven by … "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.""'"  *Nat'l Pork Producers Council*, 598 U.S. at 369; *accord Tenn. Wine & Spirits Retailers Ass'n*, 588 U.S. at 517 (describing "the Commerce Clause as the primary safeguard against state protectionism").  That impermissible discrimination can manifest in three distinct ways.  A law violates the dormant Commerce Clause if it facially discriminates against out-of-state interests.  *SDDS, Inc. v. South Dakota*, 47 F.3d 263, 267 (8th Cir. 1995) (statute may "'artlessly disclose an avowed purpose to discriminate'").  And even a "facially neutral measure" may violate the dormant Commerce Clause if it has "discriminatory purpose" or "discriminatory effect."  *Id.*  Such a law discriminating "against interstate commerce in favor of local business or investment is *per se* invalid," unless the state can demonstrate, "under rigorous scrutiny, that it has

no other means to advance a legitimate local interest." *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994).

In assessing discrimination, courts must broadly consider relevant evidence. That evidence includes "statements by lawmakers," "the sequence of events preceding the [law's] adoption," and "the [law's] use of highly ineffective means to promote the legitimate interest asserted by the state." *IESI AR Corp. v Nw. Ark. Reg'l Solid Waste Mgmt. Dist.*, 433 F.3d 600, 604 (8th Cir. 2006). Legislative history is especially relevant to discerning a discriminatory purpose. *See, e.g.*, *SDDS, Inc.*, 47 F.3d at 268 (finding dormant Commerce Clause violation in part because "the legislative history of the referred measure" was "brimming with protectionist rhetoric").

*Excessive Burdens.* Discrimination aside, laws also violate the dormant Commerce Clause when "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. Burdens on interstate commerce are "not limited to the burdens suffered by the particular parties" in a suit, but must be assessed on an "aggregate" basis. *U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1069 (8th Cir. 2000). In other words, "[w]hen evaluating the [law's] impact upon interstate commerce," courts "must ascertain 'what effect would arise if not one, but many or every jurisdiction adopted similar legislation.'" *Id.* at 1071 (quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989)) (brackets omitted).

### 2. Given Its Discriminatory Text, Purpose, and Effects, Act 624 Triggers—And Fails—Strict Scrutiny

Act 624 is an unconstitutional triple threat, discriminating against out-of-state interests in its text, purpose, and effects. That trio of defects triggers a "rigorous" strict scrutiny analysis, which Act 624 cannot survive. *C&A Carbone, Inc.*, 511 U.S. at 392.

*Text.* Act 624 declares from the outset that it is designed to protect local interests. The law's statement of "findings and intent" admits that Act 624 seeks to protect "locally-operated

33

pharmacies" from being driven "out of business," Act 624 § 1(a)(2), and thus "'artlessly disclose[s]'" its impermissible purpose, *SDDS, Inc.*, 47 F.3d at 267.

Nor was that statement an idle comment. While Act 624's prohibition on PBM affiliation purports to be generally applicable, its subsequent text (and its associated drafting history) make plain that the law's provisions are designed as a "gerrymander" to ensnare solely out-of-state interests. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 537 (1993). The Act's definitional section, for example, specifically redefines a pharmacy "permit" under Arkansas law to "includ[e] a pharmacy permit for a mail-order pharmacy." Act 624 § 2(a)(1)(B). To Plaintiffs' knowledge, there are *no* mail-order pharmacies in Arkansas. That definitional modification thus makes clear that the law targets out-of-state businesses. Act 624 also codifies a special exemption for *Arkansas* pharmacies or "pharmacy employer[s]" affiliated with a PBM, so long as the pharmacy employer is the PBM's "sole Arkansas client" and exclusively serves employees and dependents "in this state." *Id.* § 2(f)(1)-(3). And legislators specifically *removed* language that would have likewise swept "healthcare payors" into Act 624's prohibitions after they realized that the term would disable the state's largest employer from owning pharmacies. *See* Geary, *Small pharmacies in danger of closing if PBM bill doesn't pass, state representative says*, *supra*. These "irregularities in the drafting process" betray the law's protectionist design, *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 594 (8th Cir. 2003), and the "exemption[s]" they produced "to foster the local industries" of Arkansas are flatly proscribed under dormant Commerce Clause jurisprudence. *Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 269 (1984).

*Purpose.* Act 624's surrounding context—including "the sequence of events preceding [its] adoption," "statements by lawmakers," and its legislative history—likewise puts its discriminatory purpose beyond debate. *IESI AR Corp.*, 433 F.3d at 604; *SDDS, Inc.*, 47 F.3d at 268. As

34

Optum detailed above, local interest groups, legislators, and the Governor emphasized the need to protect local pharmacies at every turn.  For example:

- Representative Moore, the bill's House sponsor, warned that "your neighborhood pharmacies are closing at a rapid pace," asserted that "supporting these independent pharmacies is a really big part of why we're running [Act 624]," said the bill would end the "Threat" to "Arkansas Businesses," and claimed upon the law's enactment that it would provide "justice" for "local pharmacies."  *Supra* 14-15, 17.

- Senator Kim Hammer, the bill's Senate sponsor, warned that patients were flowing "to out-of-state mail-order pharmacies" affiliated with PBMs and that Act 624 would shift patients back to "their local community pharmacy."  *Supra* 17; Ex. B 4:17.

- Senator Mark Johnson called Act 624 an "essential step" to "protecting local pharmacies" and criticized a witness testifying against the bill for his purported lack of "support [for] our local businesses."  *Supra* 15, 17.

- Senator Dan Sullivan boasted that Act 624 would "protec[t] jobs" and "protec[t] local pharmacies."  *Supra* 15.

- Representative Jim Wooten claimed that Act 624 "really pinpoints and identifies the troublemakers causing the problem for your local pharmacists."  *Supra* 15.

- Representative Robin Lundstrom asserted that "the small-town pharmacist … can't survive" without Act 624 and warned that Arkansas may have to "close all our brick and mortars" given competition from "mail-in pharmacies."  *Supra* 16.

- Representative Richard McGrew worried that local pharmacies would be taken "out of business" without Act 624.  *Supra* 16.

- CEO of the Arkansas Pharmacists Association John Vinson testified that Act 624 would "grow the economy locally" by eliminating competition from "out-of-state mail-order pharmacies" and would combat "PBM owned pharmacies out of state."  *Supra* 16, 17.

- Witness and pharmacy owner Brandy Chane called on the Senate to "safeguard the future of independent community pharmacies."  *Supra* 17.

- Governor Sanders issued a press release upon Act 624's signing suffused with commentary about how the law is "a win for local businesses," and herself criticized PBMs for purportedly "attacking our state."  *Supra* 17.

Act 624's "legislative history" is thus "brimming" with precisely the kind of rhetoric the Eighth Circuit has repeatedly held betrays an impermissible protectionist motive.  *SDDS, Inc.*, 47 F.3d at

268.  In fact, Act 624's legislative history far *exceeds* the statements the Eighth Circuit has previously found to be smoking guns.  In *South Dakota Farm Bureau, Inc.*, for instance, the Eighth Circuit found legislative history "brimming with protectionist rhetoric" based on a single statement that a law would keep profits in "local economies" and agriculture "in the hands of family farmers."  340 F.3d at 594.  The statements here surpass those by an order of magnitude.

*Effects.*  As a result of Act 624's gerrymandered text (and self-evident purpose), the law's harmful effects will fall exclusively on out-of-state interests.  To Plaintiffs' knowledge, there are no mail-order pharmacies (much less PBM-affiliated mail-order pharmacies) located within Arkansas.  Thus, the mail-order pharmacies that stand to lose their pharmacy permits are located exclusively out-of-state.  The so-called "Big 3" PBM-affiliated companies that bill supporters repeatedly accused of "sucking the economy out" of Arkansas—*i.e.*, CVS, Express Scripts, and Optum—likewise are all based outside of Arkansas.  *PUTTCast*, *supra*, 33:38-51.  And while Act 624 will result in the sale or closure of some of those entities' pharmacies in Arkansas, bill supporters frankly admitted that *that* in-state effect was simply an aspect of Act 624's broader mission to expel out-of-state interests in favor of local independents.  Senator Hammer explained that those pharmacies are not "investing in their communities" and are not "there for the long haul" (unlike "local independent pharmacies") because they would be "pulled out" by their national parent companies if their operations are not "profitable."  *Id.* at 33:15-51.  Thus, the closure of those in-state affiliated pharmacies is simply an aspect of Act 624's purge of out-of-state interests.

*Strict Scrutiny.*  Given Act 624's discriminatory text, purpose, and effects, the law is "*per se* invali[d]" unless it can survive under "the 'strictest scrutiny'" and the aims it purportedly advances cannot be achieved through any "reasonable non-discriminatory alternatives."  *S.D. Farm Bureau, Inc.*, 340 F.3d at 596-97.  The central aim legislators invoked was, of course,

protectionism—a constitutionally impermissible rationale. *Nat'l Pork Producers Council*, 598 U.S. at 372. Legislators alternatively paid lip service to the notion of combatting PBMs' "anti-competitive business tactics," *i.e.*, PBMs' supposed underpayments to independent pharmacies from their role as "both a price setter and price taker," which legislators claimed "inflat[es] drug prices." Act 624 § 1(a)(2)-(3). But that accusation was a pretextual makeweight. Those under-payments are *already* illegal under Arkansas law. *See supra* 13-14. An obvious "reasonable non-discriminatory alternativ[e]" would be to simply enforce those existing laws, *S.D. Farm Bureau, Inc.*, 340 F.3d at 597, to the extent such underpayments are occurring—a targeted process far less disruptive to interstate commerce than Act 624's flat ban. Legislators cited no state-specific evi-dence that those underpayments even *are* occurring, however, and in fact heard testimony that PBMs are in compliance with Arkansas law. Ex. A 47:19-21; Ex. B 38:4-14. That "lack of infor-mation serves as indirect evidence of the drafters' intent to create a law specifically targeting out-of-state businesses," *S.D. Farm Bureau, Inc.*, 340 F.3d at 595, and thus underscores how insub-stantial are Arkansas's interests in enforcing Act 624's discriminatory divestiture mandate. Act 624 fails strict scrutiny.

### 3.    Act 624 Unduly Interferes With Interstate Commerce

Setting aside Act 624's blatant protectionism, the law should also be enjoined because it fails *Pike* balancing. Under *Pike*, laws violate the dormant Commerce Clause when "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142. That standard describes Act 624 to a tee. Aside from the law's very real (yet plainly impermissible) windfall for in-state pharmacies, its "local benefits" are "illusory." *U & I Sanitation*, 205 F.3d at 1069-70. The price manipulation that Act 624's purported "find-ings" accused PBMs of perpetrating was not substantiated through any state-specific evidence. *See supra* 37. That is unsurprising. Studies have repeatedly confirmed that PBMs are "a

procompetitive force" that foster plan and beneficiary savings.  *See supra* 7.  And rather than enhancing patient choice, Act 624 will destroy it by proscribing widely used and preferred channels for patients to acquire medications—eliminating competition and invariably causing prices to rise.

Indeed, the state's own fiscal-impact statement on Act 624 admits that the law will reduce access to pharmacies and increase drug prices.  As the General Assembly was considering the Act, the state's consultants at Segal Group released an assessment pointing out its flaws.  Because of the need to "restructure ... pharmacy networks" solely toward independent pharmacies, they explained, Act 624 "may reduce pharmacy network access."  Segal Financial Impact Statement (Mar. 17, 2025), tinyurl.com/4w6dxmpz.  And Act 624 is likely to have a significant "cost impact" on specialty drugs, "as less competition would likely drive less favorable rates."  *Id.*  The General Assembly's view that it was advancing legitimate local interests rests on nothing.

Conversely, the collective impacts on interstate commerce will be substantial—and vastly in excess of Act 624's nonexistent local benefits.  In the "aggregate," *U & I Sanitation*, 205 F.3d at 1069, PBMs and their affiliated pharmacies, including Optum's, will lose hundreds of millions if not billions of dollars from a ban on their affiliated pharmacies' ability to serve Arkansas patients.  *See* Compl. ¶ 154, *CVS Pharmacy, Inc. v. Ark. State Bd. of Pharm.*, No. 4:25-cv-524 (E.D. Ark. May 29, 2025), ECF 1 (estimating that CVS will lose more than $100 million "from asset impairment and annual loss of income"); *accord* Compl. ¶ 100, *Express Scripts, Inc. v. Richmond*, No. 4:25-cv-520 (E.D. Ark. May 29, 2025), ECF 1 (Express Scripts noting that Act 624 will inflict "an enormous and unrecoverable loss of business and goodwill").  And ERISA and Medicare plans will have to confront unprecedented inefficiencies and increased administrative and pharmaceutical costs from Act 624's novel mandate.

Even if Arkansas's goals were legitimate, the state also plainly has "less burdensome alternative[s]" to achieve them than simply banning PBM-affiliated pharmacies. *U & I Sanitation*, 205 F.3d at 1070. If the state *does* uncover specific instances of PBM underpayments, then it can take appropriate action under its existing laws, which already forbid that very conduct, *see supra* 13-14, and which render Act 624's destructive and disproportionate response superfluous. Act 624 thus fails under *Pike* balancing as well.

### D.     Act 624 Effects An Uncompensated Taking Of Private Property

Finally, Act 624 should be enjoined because it threatens to effect a taking of Optum's private property—specifically, its eleven Genoa pharmacies within Arkansas—without just compensation by the state. The Fifth and Fourteenth Amendments forbid the government from forcing a property owner to sell its property at a loss, absent just compensation to ensure that the seller receives "the total value of the property when taken." *Knick v. Twp. of Scott*, 588 U.S. 180, 190 (2019). And they likewise forbid government regulations that severely impair the economic value of private property, despite investment-backed expectations to the contrary. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978).

Act 624 threatens precisely those harms. Lest Optum's eleven Genoa pharmacies lose their value entirely, Optum must rapidly divest to comply with Act 624's looming January 1 effective date. Depressed sale prices are practically guaranteed in these circumstances—if qualified buyers can even be found. And if Optum cannot arrange for those sales, then its Genoa pharmacies' economic value (absent their permits) will be diminished to virtually nothing. Because neither Act 624 nor any other provision of Arkansas law provides a remedy for these impending harms, injunctive relief is appropriate under clear Eighth Circuit precedent. *See Pharm. Rsch. & Mfrs. of Am. v. Williams*, 64 F.4th 932, 950 (8th Cir. 2023).

### 1.  Act 624 Effectively Requires Optum Rx To Divest From Its Pharmacies At A Loss

Act 624 gives Optum a Hobson's choice with respect to its eleven Genoa pharmacies.  On the one hand, Optum can retain ownership of its pharmacies and watch their value fall to nothing after they lose pharmacy permits on January 1.  Or it can attempt to divest from those multimillion-dollar assets in fire sales to qualified buyers (if they can be located) before the law takes effect.  Act 624 in practical terms thus forces Optum to divest.  Forcing divestment from PBM affiliates in fact was the General Assembly's central purpose in enacting Act 624.  As Senator Kim Hammer explained when introducing the law in the Senate, Act 624 would "requir[e] a [PBM] to divest its pharmacy business" if the pharmacy is to continue serving Arkansans.  Exhibit C to the Declaration of Matthew S. Rozen ("Ex. C"), 10:4-5.

Those forced divestitures will produce significant economic injuries to Optum.  Its Genoa pharmacies are multimillion-dollars assets with annual earnings from their Arkansas operations running into the millions.  Recovering the full, fair-market value of those assets in short-notice sales before January 1 likely will be impossible.  "[T]o state the obvious, a potential buyer of an asset … has enormous leverage over the seller" when the purchaser "knows the seller must divest [an] asset quickly"—leading to "purchase price[s] … far lower" than what could be recovered under ordinary market conditions.  *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 307 (D.D.C. 2020); *accord FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 800 (S.D. Tex. 2025) (same).  The depressed sale prices that Optum can obtain will produce losses far exceeding the *de minimis* compensation that Arkansas provides under its general claim-compensation statutes, *see infra* 43-45, and nothing in Act 624 purports to address this constitutional deficiency by providing additional just compensation.

### 2.      Act 624's Divestiture Requirement Effects A *Per Se* Taking

These forced sales at reduced prices will inflict *per se* takings—injuries to private property that categorically require just compensation.  *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021).  It is well-established that forcing a property owner to relinquish title to its property constitutes a *per se* taking.  When the government itself "takes title" to property, for example, it must provide just compensation for that property.  *Yee v. City of Escondido*, 503 U.S. 519, 522 (1992).  And the same rule applies when the government requires a property owner to surrender its property to "a third party."  *Cedar Point Nursery*, 594 U.S. at 148; *accord Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 n.9 (1982) (taking occurs when "authorized by state law … without regard to whether the State, or instead a party authorized by the State," receives the property).

The only remaining question in such cases is the appropriate measure of just compensation. In the *Regional Railroad Reorganization Act Cases*, 419 U.S. 102 (1974), the Supreme Court recognized that when the government forces a property owner to sell off property to a third party, the difference between the property's full, fair-market value and the sale price obtained in that forced sale is what must be compensated under the Fifth Amendment.  There, a statute required railroads to sell off their property to a private corporation for securities in corporation, which the railroads contended were of little value, rather than cash.  *Id.* at 118, 137.  The Supreme Court concluded that "any deficiency" between the railroads' total value and "the value of the limited compensation provided under the Act will indeed be a taking of private property for public use."  *Id.* at 154-55.

The same principles apply here.  Optum must sell off its properties (if possible) to qualified third-party buyers.  Economic losses will inevitably result.  Given the short timeframe for those sales and the "enormous leverage" potential purchasers will yield over Optum, *RAG-Stiftung*, 436 F. Supp. 3d at 307, it is practically certain that the properties' sale prices will not reflect their full,

fair-market value. That "deficiency" represents "a taking of private property for public use," and thus must be compensated for Act 624 to comply with the Fifth and Fourteenth Amendments. *Reg'l R.R. Reorganization Act Cases*, 419 U.S. at 154-55.

###### 3.    Act 624's Divestiture Requirement Also Effects A Regulatory Taking

Act 624 also threatens a regulatory taking as to those pharmacies, particularly if qualified buyers cannot be found. Optum's Genoa pharmacies would cease as going concerns, causing a profound diminution in their economic value. Laws imposing those effects may constitute regulatory takings when judged against "three factors: (1) the 'economic impact of the regulation on the claimant;' (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations;' and (3) 'the character of the governmental action.'" *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 734 (8th Cir. 2022) (quoting *Penn Cent. Transp. Co.*, 438 U.S. at 124). While "the first two factors are the main determinants" and the third simply "may be relevant," all three establish that Act 624 threatens a regulatory taking. *Id.*

*First*, the law's economic effects on Optum will be severe. Optum at minimum will lose the difference between its Genoa pharmacies' true value and their sale price, and if qualified buyers cannot be found, then their economic value will crater. Without pharmacy permits, Optum's Genoa pharmacies will be reduced to vacant rooms with some residual inventory. But they will be unable to continue serving the thousands of Arkansans who previously relied on those services, resulting in the total loss of that income stream to Optum. When a property owner is "deprived of its expected return on investment in the form of … income," that loss "give[s] rise to a Fifth Amendment takings claim." *Heights Apartments, LLC*, 30 F.4th at 735. And that is particularly the case when those losses fall "disproportionately on a few private property owners." *Cienega Gardens v. United States*, 331 F.3d 1319, 1338 (Fed. Cir. 2003). Act 624 inflicts those targeted losses by design. The law was meticulously crafted to excise PBM-affiliated pharmacies from

Arkansas, and in particular to disable the "Big 3" PBMs and their affiliates.

*Second*, Act 624 will severely interfere with Optum's investment-backed expectations. When Optum acquired its Genoa pharmacies in 2018, it obviously expected that those pharmacies could continue serving their thousands of Arkansas patients. That assumption affected those pharmacies' valuations, further investments in drug-production capacity to support the 317,000 prescriptions they annually issue to Arkansans, the expenditure of compliance costs to ensure that they remain in good standing with Arkansas regulatory authorities, projection of future revenue streams from their continued operations, and corresponding representations to investors. Optum could not have anticipated that, several years later, Arkansas would institute a radical new measure that would severely impair those pharmacies' values. Indeed, Arkansas itself has emphasized that it is "the first [State] in the country" to adopt such a law. *Sanders Signs Legislation to Ban Anti-Competitive PBM Practices*, *supra*. When "no [investor] could have reasonably expected regulations of the duration and extent" that later materialize, such a late-breaking restriction cuts strongly in favor of finding a regulatory taking. *Heights Apartments, LLC*, 30 F.4th at 734.

*Third*, the "character of the governmental action" also reinforces that Act 624 threatens a regulatory taking. While "[w]eighty public interests alone" cannot transform a regulatory taking into a "permissible regulation," *Becker v. City of Hillsboro*, 125 F.4th 844, 859 (8th Cir. 2025), some laws are "so publicly beneficial" that the Supreme Court has deemed them not to constitute takings, *Heights Apartments, LLC*, 30 F.4th at 734. But Act 624 cannot plausibly be described as such a law. It "directly benefit[s] only some," *id.* at 735—*i.e.*, local pharmacies—and does so only by ignoring a century of dormant Commerce Clause jurisprudence proscribing that local windfall. It also claims to benefit Arkansas patients who pay more because of PBM-affiliated pharmacies. But the General Assembly introduced no state-specific evidence to show that such patients exist,

43

broader studies have demonstrated that PBMs *reduce* prices through negotiation and bargaining power, *see supra* 7-8, and Act 624 will fail to achieve its purported cost-control objective. Basic economic reasoning dictates that eliminating competitors will *increase* prices, not reduce them, as the state's fiscal-impact statement already admits. *See supra* 37-38. Given that utter absence of benefits, all three factors support finding that Act 624 threatens a regulatory taking.

> ### 4.    Because Arkansas Provides No Adequate Mechanism For Just Compensation, Enjoining Enforcement Of Act 624 Is Necessary

Injunctive relief is the appropriate remedy for these threatened takings. While the default remedy for a takings claim is money damages, *Knick*, 588 U.S. at 202, injunctions are necessary when that legal remedy is inadequate or unavailable, *Williams*, 64 F.4th at 950. That is the case here: Arkansas has authorized only limited compensation for takings claims against the state—far short of the just compensation to which Optum would be entitled if Act 624 goes into effect. Accordingly, an injunction is appropriate to restrain Act 624's "'future violations of the Takings Clause.'" *Williams*, 64 F.4th at 950.

By default, sovereign immunity bars any money-damages claim against the Arkansas General Assembly or State Board of Pharmacy, at least absent an applicable waiver. Those entities are arms of the state, and thus enjoy Eleventh Amendment immunity from damages claims in federal court. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989); *accord Williams*, 64 F.4th at 949 n.13 (applying immunity to takings claims in federal court). Nor is there any money-damages remedy available in state court. Under Article 5, Section 20 of the Arkansas Constitution, the State of Arkansas has immunity from money-damages claims, and the Supreme Court of Arkansas has confirmed that this provision bars money damages for takings claims against state agencies. *See Austin v. Ark. State Highway Comm'n*, 895 S.W.2d 941, 944 (Ark. 1995).

The only apparent mechanism that Arkansas has established to vindicate takings claims

against the state is submission of a claim to the Arkansas Claims Commission. *See Austin*, 895 S.W.2d at 943. But such a claim is plainly inadequate under Eighth Circuit precedent. Awards before the Commission are capped at $15,000 unless the General Assembly both (1) approves a higher award and (2) enacts an appropriation to pay it. *See* Ark. Code Ann. § 19-10-215, to be recodified as Ark. Code Ann. § 25-44-215(b). Optum's economic damages will far surpass that paltry $15,000 sum, and there are serious questions about whether the same General Assembly that enacted Act 624 would codify an appropriation to confer substantial sums on a company it just sought to banish. In any event, seeking such an appropriation is obviously not as "practical," "efficient," or "prompt" a remedy as an injunction, and thus is inadequate under clear circuit precedent. *Williams*, 64 F.4th at 942-43. An injunction is appropriate to avert Act 624's future takings.

While Optum's takings claim focuses on its in-state pharmacies, any corresponding injunction should bar enforcement of Act 624 entirely, rather than merely with respect to those pharmacies. Act 624 was intended to accomplish "a single purpose"—barring PBM affiliates from serving Arkansas patients, whether located physically in the state or outside of it—and all of its provisions are "interrelated and dependent upon each other." *McGhee v. Ark. State Bd. of Collection Agencies*, 289 S.W.3d 18, 27 (Ark. 2008). Moreover, the law "does not contain an express severability clause," suggesting "that the legislative intent was to pass the act as a whole." *Hobbs v. Jones*, 412 S.W.3d 844, 856 (Ark. 2012). It thus would defy Arkansas jurisprudence to incongruously permit Act 624 to continue operating as to some pharmacies but not others. Act 624 therefore is invalid in its "entirety." *Id.*

## II.    Act 624 Will Irreparably Harm Plaintiffs

Optum will suffer multiple irreparable harms absent injunctive relief. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th

Cir. 2024).  Most obviously, Optum will be forced to cease its mail-order operations throughout Arkansas, given that divestiture from those operations to comply with Arkansas's idiosyncratic permitting requirement is infeasible.  Stidman Decl. ¶ 32.  As a result, Optum is projected to lose over $400 million in revenues it otherwise could have earned from serving Arkansans.  *Id.* ¶ 57.

Optum will suffer additional economic loss given the law's effect on its eleven Genoa pharmacies—either through a depressed sale price in forced divestitures, or the inability to sell those pharmacies and the consequent, radical diminution in their value.  *Id.* ¶ 40.  Those economic losses will not be recoverable from the State of Arkansas in light of sovereign immunity.  *See Missouri v. Trump*, 128 F.4th 979, 996 (8th Cir. 2025).  Such "unrecoverable economic loss[es]" are a classic basis for finding irreparable harm.  *Iowa Utils. Bd.*, 109 F.3d at 426.  And the Eighth Circuit has likewise recognized irreparable harm when "unlawful actions" would cause "ongoing business to terminate absent an injunction."  *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987).

Optum will also suffer devastating and irreversible injuries to its reputation with patients when it is forced to notify them, beginning on November 2, that it can no longer provide needed medications.  Stidman Decl. ¶¶ 27, 29, 32, 37, 41, 45, 50.  The "potential loss of consumer good-will qualifies as irreparable harm."  *Iowa Utils. Bd.*, 109 F.3d at 426.  "Harm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars," and thus provides another paradigmatic basis for finding "irreparable injury."  *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003).  And even if those losses were quantifiable, Optum would have no mechanism to secure monetary compensation in light of sovereign immunity.

Act 624 also infringes upon Optum's constitutional rights under the Commerce and Takings Clauses.  Infringement of constitutional rights inherently "constitute[s] irreparable harm."

*Morehouse Enters., LLC*, 78 F.4th at 1017.  Act 624 would impair Optum's constitutional right to its private property by inflicting unrecoverable economic losses on its operations and forcing Optum to divest at depressed prices from its eleven Genoa pharmacies.  The law also threatens Optum's right "to engage in interstate trade." *Dennis*, 498 U.S. at 448.  While the Commerce Clause is in part a "power-allocating provision" between Congress and the states, it embodies a corollary right against "restrictive state regulation" impeding interstate commerce. *Id.* at 447-48.  But Optum cannot exercise that right in light of Act 624's discriminatory and burdensome regime.

## III.    The Balance Of The Equities And Public Interest Support A Preliminary Injunction

The balance of the equities and public interest, which "merge" in suits against the government, also decisively favor preliminary relief. *Eggers*, 48 F.4th at 564-65.  At the outset, Arkansas has no legitimate interest in enforcing an unlawful enactment. *Missouri*, 128 F.4th at 997.  Conversely, "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007).

The devastating practical realities that Act 624 poses reinforce the public's interest in injunctive relief.  Optum's pharmacies supply nearly one million prescriptions to Arkansans every year.  Stidman Decl. ¶ 17.  Patients have come to rely on those convenient and cost-effective services.  Optum's mail-order services are especially critical to the nearly 8% of Arkansans who live in pharmacy deserts, without ready access to local pharmacies, as well as to elderly patients who can no longer drive. *Id.* ¶¶ 19, 35, 49.  These home-delivery services have substantially enhanced patients' medication adherence beyond that achieved when patients are forced to travel to a pharmacy to fill prescriptions. *Id.* ¶ 19; *accord* Elena V. Fernandez et al., *Examination of the Link Between Medication Adherence and Use of Mail-Order Pharmacies in Chronic Disease States*, 22 J. Managed Care & Specialty Pharmacy 1247, 1258 (2016) ("The existing research provides strong evidence that patients who use mail-order pharmacies are more adherent than those who use retail

pharmacies.").

Optum's specialty pharmacies, in particular, help the most vulnerable patients in the Arkansas population—those suffering from aggressive cancers, rare diseases, genetic disorders, and serious mental-health issues. Optum's Genoa pharmacies have achieved medication-adherence rates that far exceed what independent pharmacies typically achieve with comparable populations. Stidman Decl. ¶ 43. That heightened adherence rate has resulted in fewer hospitalizations and emergency-room visits. *Id.* Absent those services, these patients will have to scramble for alternative suppliers of life-saving medications. But those medications may be difficult to find or simply unavailable at local pharmacies, which is precisely why Optum's services have become a preferred option in the first place. This Court should take action to prevent Act 624 from inflicting these pointless and devastating harms on thousands of Arkansans.

## CONCLUSION

This Court should preliminarily enjoin Act 624—by **September 15** or sooner—to avert the devastating harms it threatens.

Dated:  June 27, 2025                   Respectfully submitted,

Peter Shults (Ark. Bar No. 2019021)
Amanda G. Orcutt (Ark. Bar No. 2019102)
SHULTS LAW FIRM LLP
200 West Capitol Avenue
Suite 1600
Little Rock, AR  72201
Telephone: (501)-375-2301
pshults@shultslaw.com
aorcutt@shults.law.com

Allyson N. Ho  (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
Telephone: (214) 698-3100
aho@gibsondunn.com

Geoffrey M. Sigler  (*pro hac vice* forthcoming)
Matthew S. Rozen  (*pro hac vice* forthcoming)
Clare F. Steinberg  (*pro hac vice* forthcoming)
M. Christian Talley  (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
gsigler@gibsondunn.com
mrozen@gibsondunn.com
csteinberg@gibsondunn.com
ctalley@gibsondunn.com

*Attorneys for Plaintiffs*