**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**EXPRESS SCRIPTS, INC.,** *et al.*                                    **PLAINTIFFS**

**v.**                                  **CASE NO. 4:25-CV-00520-BSM**
                                        **CASE NO. 4:25-CV-00524-BSM**
                                        **CASE NO. 4:25-CV-00561-BSM**
                                        **CASE NO. 4:25-CV-00598-BSM**

**RODNEY RICHMOND,** *et al.*                                    **DEFENDANTS**

**DEFENDANTS' CONSOLIDATED RESPONSE TO
PLAINTIFFS' PRELIMINARY INJUNCTION MOTIONS**

T<small>ABLE OF</small> C<small>ONTENTS</small>

Table of Contents ..................................................................................................... ii

Exhibits and Legislative Materials ............................................................................ iv

Table of Authorities ................................................................................................... v

Introduction ................................................................................................................ 1

Background ................................................................................................................. 3

    I.      The Text of Act 624 of 2025 ............................................................... 3

    II.     Legislative History .............................................................................. 3

          A.    April 2 Meeting of the House Insurance and Commerce Committee ............. 4

          B.    April 8 Meeting of the Senate Insurance and Commerce Committee .......... 10

          C.    April 9 Senate Floor Session............................................................. 12

          D.    Federal Trade Commission Reports ............................................................ 12

Preliminary Injunction Standard .............................................................................. 13

    I.      The applicable standard. ..................................................................... 13

    II.     CVS asks this Court to apply the wrong standard—one that is less rigorous than what binding precedent requires. ........................................................ 14

Argument .................................................................................................................. 15

    I.      Dormant Commerce Clause ............................................................... 15

          A.    The applicable dormant Commerce Clause standard.................................... 15

          B.    The Supreme Court's decision in *Exxon Corporation v. Governor of Maryland* is directly applicable here and shows that Act 624 does not unconstitutionally discriminate against out-of-state PBMs or pharmacies.. 17

          C.    Act 624 does not overtly discriminate against out-of-state PBMs or pharmacies in favor of in-state PBMs or pharmacies. ................................. 22

          D.    Act 624 satisfies the *Pike* balancing test because it does not impose a burden on interstate commerce that outweighs any benefits received..................... 24

          E.    Act 624 does not have an impermissible extraterritorial effect. .................. 25

    II.     Privileges and Immunities Clause........................................................ 26

    III.    Bill of Attainder Clause ..................................................................... 28

    IV.    Equal Protection Clause ...................................................................... 32

    V.     Takings Clause .................................................................................. 34

VI.     Act 624 is not preempted by ERISA................................................................ 41

    A.    ERISA preempts regulations of the benefits plans offer, not regulations of plan-provider relations or service providers themselves. ........................... 42

    B.    Under these standards, Act 624 is not preempted........................................ 47

    C.    Optum's and CVS's counterarguments fail. .................................................. 48

VII.    Act 624 is not preempted by Medicare Part D.................................................... 52

    A.    In the Eighth Circuit, Part D preempts a law if it regulates the same subject matter, defined narrowly, as a Part D provision or regulation..................... 53

    B.    Under the Eighth Circuit's test for Part D preemption, Act 624 is not preempted...................................................................................................... 55

    C.    CVS's and Optum's arguments that Act 624 falls outside the "state licensing law" exemption either fail or prove that pharmacy regulation is not a subject of Part D preemption in the first place......................................................... 60

VIII.   Act 624 is not preempted by TRICARE because it contains a limited-use exemption............................................................................................................. 62

IX.     CVS and PCMA ask this Court to enjoin the Arkansas State Board of Pharmacy—a state agency that cannot be sued in or enjoined by a federal court because it is immune from suit under the Eleventh Amendment. ........................ 64

X.      Each of the *Dataphase* factors disfavor a preliminary injunction. ...................... 66

Conclusion ......................................................................................................................... 66

EXHIBITS AND LEGISLATIVE MATERIALS

The following exhibits are attached to this brief and fully incorporated herein by reference.

Exhibit A:    Act 624 of 2025

Exhibit B:    Federal Trade Commission, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies* (July 2024).

Exhibit C:    Federal Trade Commission, *Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers* (Jan. 2025).

The following legislative materials consist of audio/video recordings of two committee meetings and a floor session in the Arkansas House and Senate relating to Act 624 of 2025. These materials are fully incorporated herein by reference. Additionally, because these materials are public records, the Court can and should take judicial notice of them. *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003).

Arkansas House Insurance and Commerce Committee Meeting (Apr. 2, 2025)

Arkansas Senate Insurance and Commerce Committee Meeting (Apr. 8, 2025)

Senate Floor Session (Apr. 9, 2025)

Audio/video recordings of these committee meetings and floor session are available on the Arkansas State Legislature's website at the following hyperlink:

https://arkleg.state.ar.us/Bills/Detail?id=hb1150&ddBienniumSession=2025%2F2025R

## TABLE OF AUTHORITIES

**Cases**                                                         **Page(s)**

*1-800-411-Pain Referral Serv., LLC v. Otto*,
   744 F.3d 1045 (8th Cir. 2014) ........................................................15

*Becker v. City of Hillsboro, Missouri*,
   125 F.4th 844 (8th Cir. 2025) ....................................................39, 40

*Breard v. Alexandria*,
   341 U.S. 622 ...............................................................................21

*Burk v. Beene*,
   948 F.2d 489 (8th Cir. 1991) ........................................................65

*Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*,
   519 U.S. 316 (1997)..........................................44, 45, 47, 50

*Cedar Point Nursery v. Hassid*,
   594 U.S. 139 (2021)..............................................................34, 38

*Cigna Corp. v. Bricker*,
   103 F.4th 1336 (8th Cir. 2024) .....................................................13

*Communist Party v. Subversive Activities Control Bd.*,
   367 U.S. 1 (1961)........................................................................29

*Conway v. Taylor's Ex'r*,
   66 U.S. 603 (1862).....................................................................15

*Cory v. White*,
   457 U.S. 85 (1982)......................................................................65

*Dahlen v. Shelter House*,
   598 F.3d 1007 (8th Cir. 2010) .....................................................40

*Daimler Chrysler Corp. v. Cuno*,
   547 U.S. 332 (2006)....................................................................63

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
   640 F.2d 109 (8th Cir. 1981) .....................................2, 13, 15, 66

*De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*,
   520 U.S. 806 (1997)....................................................................45

*Dean Milk Co. v. Madison*,
   340 U.S. 349 ...............................................................................19

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022)........................................................................................52

*Egelhoff v. Egelhoff*,
    532 U.S. 141 (2001)........................................................................................49

*Eggers v. Evnen*,
    48 F.4th 561 (8th Cir. 2022) ..............................................................14, 15, 33

*Exxon Corporation v. Governor of Maryland*,
    437 U.S. 117 (1978)................................................................................ *passim*

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993)................................................................................33, 34

*Grand River Enters. Six Nations, Ltd. v. Beebe*,
    574 F.3d 929 (8th Cir. 2009) ..............................................................16, 23, 24

*Guy v. Baltimore*,
    100 U.S. 434 (1880)........................................................................................17

*Hadley v. N. Ark. Cmty. Tech. Coll.*,
    76 F.3d 1437 (8th Cir. 1996) ..........................................................................65

*Minnesota ex rel. Hatch v. Hoeven*,
    456 F.3d 826 (8th Cir. 2006) ..........................................................................27

*Hawaii Hous. Auth. v. Midkiff*,
    467 U.S. 229 (1984)........................................................................................40

*Hawkeye Commodity Promotions, Inc. v. Vilsack*,
    486 F.3d 430 (8th Cir. 2007) ....................................................................35, 36

*Heights Apartments, LLC v. Walz*,
    30 F.4th 720 (8th Cir. 2022) ..........................................................................35

*Hughes v. Alexandria Scrap Corp.*,
    426 U.S. 794 ....................................................................................................21

*Hughes v. City of Cedar Rapids, Iowa*,
    840 F.3d 987 (8th Cir. 2016) ..........................................................................33

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979)............................................................................16, 17, 21

*Humana Inc. v. Forsyth*,
    525 U.S. 299 (1999)........................................................................................42

vi

*Hunt v. Washington Apple Advertising Comm'n.*,
    432 U.S. 333 ...............................................................................................19

*IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste Mgmt. Dist.*,
    433 F.3d 600 (8th Cir. 2006) ........................................................................3

*In Home Health, Inc. v. Prudential Ins. Co. of Am.*,
    101 F.3d 600 (8th Cir. 1996) ......................................................................45

*Ingersoll-Rand Co. v. McClendon*,
    498 U.S. 133 (1990)....................................................................................43

*Iowa League of Cities v. EPA*,
    711 F.3d 844 (8th Cir. 2013) ......................................................................63

*Kelo v. City of New London*,
    545 U.S. 469 (2005) (Kennedy, J., concurring)..........................................40

*Kentucky v. Graham*,
    473 U.S. 159 (1985).....................................................................................35

*Ky. Ass'n of Health Plans, Inc. v. Miller*,
    539 U.S. 329 (2003).....................................................................................44

*Lehnhausen v. Lake Shore Auto Parts Co.*,
    410 U.S. 356 (1973).....................................................................................34

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982).....................................................................................38

*Mackey v. Lanier Collection Agency & Serv., Inc.*,
    486 U.S. 825 (1988).....................................................................................44

*Maryland v. King*,
    567 U.S. 1301 (2012) (Roberts, C. J., in chambers) ...................................66

*Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*,
    904 F.2d 236 (5th Cir. 1990) ......................................................................45

*Metro. Life Ins. Co. v. Massachusetts*,
    471 U.S. 724 (1985)...........................................................................43, 46, 48

*Monroe v. Ark. State Univ.*,
    495 F.3d 591 (8th Cir. 2007) ......................................................................65

*Murr v. Wisconsin*,
    582 U.S. 383 (2017).....................................................................................39

*N. Ins. Co. of N.Y. v. Chatham Cnty., Ga.*,
  547 U.S. 189 (2006) ........................................................................................65

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
  514 U.S. 645 (1995) ..................................................................................... *passim*

*Nat'l Pork Producers Council v. Ross*,
  598 U.S. 356 (2023) ..................................................................................... *passim*

*Neb. Pub. Power Dist. v. MidAm. Energy Co.*,
  234 F.3d 1032 (8th Cir. 2000) .......................................................................63

*Nixon v. Adm'r of Gen. Servs.*,
  433 U.S. 425 (1977) ...........................................................................28, 29, 30

*Okla. Tax Comm'n v. Jefferson Lines, Inc.*,
  514 U.S. 175 (1995) ........................................................................................16

*Ore. Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Oregon*,
  511 U.S. 93 (1994) ..........................................................................................22

*Palmer v. Clarke*,
  408 F.3d 423 (8th Cir. 2005) ..................................................................29, 30

*Pegram v. Herdrich*,
  530 U.S. 211 (2000) ........................................................................................46

*Penn Cent. Transp. Co. v. City of New York*,
  438 U.S. 104 (1978) ........................................................................................39

*Pennhurst State Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984) ..........................................................................................65

*Pete's Brewing Co. v. Whitehead*,
  19 F. Supp. 2d 1004 (W.D. Mo. 1998) ..........................................................22

*Pharm. Care Mgmt. Ass'n v. Dist. of Columbia*,
  613 F.3d 179 (D.C. Cir. 2010) .......................................................................47

*Pharm. Care Mgmt. Ass'n v. Mulready*,
  78 F.4th 1183 (10th Cir. 2023) ......................................................................54

*Pharm. Care Mgmt. Ass'n v. Rutledge*,
  240 F. Supp. 3d 951 (E.D. Ark. 2017) ....................................................23, 41

*Pharmaceutical Care Management Association v. Wehbi*,
  18 F.4th 956 (8th Cir. 2021) ........................................................................ *passim*

*Pharmaceutical Research & Manufacturers of America v. Williams,*
    64 F.4th 932 (8th Cir. 2023) ........................................................................35, 37, 38, 41

*Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds,*
    530 F.3d 724 (8th Cir. 2008) (en banc) ....................................................13, 14, 15

*Pike v. Bruce Church, Inc.,*
    397 U.S. 137 (1970).................................................................................16, 17, 24, 25

*Religious Sisters of Mercy v. Becerra,*
    55 F.4th 583 (8th Cir. 2022) ...............................................................................64

*Reno v. Flores,*
    507 U.S. 292 (1993).................................................................................................33

*Ruckelshaus v. Monsanto Co.,*
    467 U.S. 986 (1984).................................................................................................39

*Rush Prudential HMO, Inc. v. Moran,*
    536 U.S. 355 (2002).................................................................................................44

*Rutledge v. Pharm. Care Mgmt. Ass'n,*
    592 U.S. 80 (2020)........................................................................................ *passim*

*Sarasota Wine Mkt., LLC v. Schmitt,*
    987 F.3d 1171 (8th Cir. 2021) ........................................................................26, 27

*Sch. of the Ozarks, Inc. v. Biden,*
    41 F.4th 992 (8th Cir. 2022) ...............................................................................64

*Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.,*
    468 U.S. 841 (1984).................................................................................28, 29, 30, 31

*Seminole Tribe of Fla. v. Florida,*
    517 U.S. 44 (1996)...................................................................................................64

*Shaw v. Delta Air Lines, Inc.,*
    463 U.S. 85 (1983)...................................................................................................43

*Styczinski v. Arnold,*
    46 F.4th 907 (8th Cir. 2022) ..........................................................................16, 17

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014).................................................................................................63

*Toomer v. Witsell,*
    334 U.S. 385 (1948).................................................................................................27

*Trump v. CASA, Inc.*,
  No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025) ........................................66

*Tumey v. Mycroft AI, Inc.*,
  27 F.4th 657 (8th Cir. 2022) ........................................................................13, 14

*Tyler v. Hennepin County*,
  598 U.S. 631 (2023) ..............................................................................................35

*United States v. Lovett*,
  328 U.S. 303 (1946) (Frankfurter, J., concurring) ..............................................28

*United States v. Skrmetti*,
  145 S. Ct. 1816 (2025) ..........................................................................................52

*Webb v. City of Maplewood*,
  889 F.3d 483 (8th Cir. 2018) ................................................................................65

*Will v. Mich. Dep't of State Police*,
  491 U.S. 58 ......................................................................................................35, 65

*Williamson v. Lee Optical*,
  348 U.S. 483 (1955) ..............................................................................................33

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..................................................................................................13

**Statutes**

29 U.S.C. § 1144(a) ....................................................................................................42

42 U.S.C. § 1395w-22(d)(1) ........................................................................................55

42 U.S.C. § 1395w-26(b)(3) ....................................................................53, 54, 60, 61

42 U.S.C. § 1395w-104(b)(1)(A)................................................................................55

42 U.S.C. § 1395w-112(g) ....................................................................................53, 61

42 U.S.C. § 1983 ..........................................................................................................65

Ark. Code Ann. § 17-92-307(a) ..................................................................................52

Ark. Code Ann. § 17-92-405 ......................................................................................31

Ark. Code Ann. § 23-92-506(b)(4)(a)..........................................................................18

Pub. L. No. 105-33, § 1856(b)(3)(A), 111 Stat. 251, 319 (1997)................................54

**Other Authorities**

42 C.F.R. § 423.100 ...........................................................................56, 57, 58, 59

42 C.F.R. § 423.120(a)(3) ...................................................................................57

42 C.F.R. § 423.120(a)(4) ...................................................................................57

42 C.F.R. § 423.120(a)(7)(i) ........................................................................58, 59

42 C.F.R. § 423.120(a)(8)(i) ...............................................................................55

42 C.F.R. § 423.153(c)(1) .............................................................................56, 62

42 C.F.R. § 423.516 ............................................................................................58

70 Fed. Reg. 4194, 4278 (Jan 28, 2005) ............................................................54

70 Fed. Reg. at 4278 ...........................................................................................62

70 Fed. Reg. at 4319 ...........................................................................................61

70 Fed. Reg. at 4320 ...........................................................................................56

70 Fed. Reg. 4558, 4664 (Jan. 28, 2005) ...........................................................60

70 Fed. Reg. 4588, 4614 (Jan. 28, 2005) ...........................................................55

Federal Trade Commission, *Pharmacy Benefit Managers: The Powerful
    Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies* (July
    2024) ...........................................................................................................13

Federal Trade Commission, *Specialty Generic Drugs: A Growing Profit Center
    for Vertically Integrated Pharmacy Benefit Managers* (Jan. 2025) .......................13

U.S. Const. amend. V...........................................................................................34

U.S. Const. amend. XI.........................................................................................65

U.S. Const. amend. XIV, § 1 ..............................................................................33

U.S. Const. art. I, § 8, cl. 3..................................................................................16

U.S. Const., art. IV, § 2, cl. 1..............................................................................26

**INTRODUCTION**

Having failed to persuade the legislature to vote against HB 1150, Plaintiffs now seek to vitiate by judicial decree what has now become Act 624 of 2025. Plaintiffs take a shotgun approach to Act 624. They assert claims under the dormant Commerce Clause, Privileges and Immunities Clause, Bill of Attainder Clause, and Takings Clause, and they further claim that Act 624 is preempted by ERISA, Medicare Part D, and TRICARE. And the one claim that is common to all Plaintiffs—the dormant Commerce Clause—fails out of the gate. In a squarely on-point case, the Supreme Court held that the dormant Commerce Clause does not protect the particular structure or methods of operation in a retail market. In other words, it does not protect Plaintiffs' preferred method of operating as a vertically integrated PBM and retail pharmacy. Plaintiffs' remaining claims fare no better. The Privileges and Immunities Clause applies only to natural persons, and none of the Plaintiffs in this case are natural persons. And the distinguishing characteristic of a bill of attainder is the substitution of legislative determination of guilt and legislative imposition of punishment for judicial finding and sentence; yet Act 624 makes no determination of guilt and imposes nothing viewed historically as punishment. The sole party that asserts a Takings claim—Optum—contends that Act 624 effects a taking of its eleven Genoa pharmacies within Arkansas. But Act 624 does nothing of the sort. It prohibits PBMs from holding or acquiring a retail pharmacy permit, leaving Optum with the choice of whether to continue its operations in the State as either a PBM or a pharmacy, but not both. Act 624 thus doesn't force a divestiture of Optum's pharmacies. But even if it did, a forced sale would not be an unconstitutional taking because Optum would still get compensation for the pharmacies it sold. Plaintiffs' preemption claims fare even worse. Their ERISA claim fails because Act 624 doesn't

1

regulate the benefits that plans offer or the pharmacies from which they offer benefits; rather it regulates who may operate a pharmacy in Arkansas in the first place. And their Medicare Part D claim fails for the same reason. Finally, Express Scripts' TRICARE claim fails because an exemption under Act 624 will allow Express Scripts to continue operating a pharmacy in Arkansas through September 2027, obviating the need for preliminary injunctive relief before a trial on the merits.

At bottom, Plaintiffs must as a threshold matter show that they are more likely than not to prevail on the merits of their claims before the Court can consider the other *Dataphase* factors and issue an injunction. Plaintiffs fail to make this showing. Their preliminary-injunction motions should thus be denied.

## BACKGROUND

### I.    The Text of Act 624 of 2025

This case concerns Act 624 of 2025, entitled "An Act to Prohibit a Pharmacy Benefits Manager from Obtaining Certain Pharmacy Permits; and for Other Purposes."  In relevant part, Act 624 provides that "a pharmacy benefits manager shall not acquire direct or indirect interest in, or otherwise hold, directly or indirectly," an Arkansas retail pharmacy permit.  Act 624, § 2(b).  It also provides a handful of exceptions, two of which are discussed here.

The first exception provides that the prohibition against a PBM holding a retail pharmacy permit does not apply to a pharmacy employer and a pharmacy that: (1) has an interest in a PBM, (2) the pharmacy employer is the "sole Arkansas client" of the PBM, and (3) "[e]xclusively services the employees and dependents of the pharmacy employer while utilizing the affiliated pharmacy benefits manager in this state."  *Id*. at § 2(f)(1)–(3).  The second exception provides that the Pharmacy Board "may issue a limited use permit for certain rare, orphan, or limited distribution drugs that are otherwise unavailable in the market to a patient or a pharmacy that would otherwise be prohibited under this section."  *Id*. at § 2(d)(1).  This second exception expires on September 1, 2027.  *Id*. at § 2(d)(2)(B).

The effective date of Act 624 is January 1, 2026.  *Id*. at § 3.

### II.    Legislative History

Act 624 started as House Bill 1150 and was sponsored (and written) by Arkansas State Representative Jeremiah Moore.  HB 1150 was cosponsored by Arkansas State Senator Kim Hammer.  Hearings regarding HB 1150 were held in March and April of 2025.  Because "statements by lawmakers" and "the sequence of events preceding the regulation's adoption" are two factors that courts may consider in determining whether a state law "has a discriminatory purpose" under the dormant Commerce Clause, *IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste*

3

*Mgmt. Dist.*, 433 F.3d 600, 604 (8th Cir. 2006), testimony from the hearings on HB 1150 is summarized below.

### A.    April 2 Meeting of the House Insurance and Commerce Committee

At an April 2 House Insurance and Commerce Committee meeting addressing HB 1150, Rep. Moore observed the clear conflict of interest that exists when pharmacy benefits managers, or PBMS, are in charge of reimbursing themselves via the pharmacies they own versus reimbursing their competitors, which consist of retail pharmacies not owned by a PBM.  He provided a poignant example of the harm posed by this conflict: Imagine if Tyson Foods could set the price of chicken for its competitors.  In doing so, it could set the price of its competitors' chicken at a lower cost (thus reducing profitability for its competitors) and set the price of its own chicken at a higher cost (thus increasing its own profitability).[1]   He explained that this is essentially what has occurred with PBM-owned pharmacies vis-à-vis non-PBM-owned pharmacies.  Rep. Moore noted that the Federal Trade Commission's reports about PBMs have been "damning."  In one instance that Rep. Moore cited, a PBM reimbursed independent pharmacies $97 for a specific drug, while reimbursing itself over $19,000 for the same drug.

Rep. Moore was joined at the hearing by John Vinson, the CEO of the Arkansas Pharmacists Association, and Brittany Sanders, Pharm. D., the president of the Arkansas Pharmacists Association and co-owner of The Pharmacy at Wellington.  Mr. Vinson explained that HB 1150 "does not force closures."  *Id*. at 11:17:30.  Instead, "it gives PBMs that own pharmacies the choice of whether they want to be a PBM or a pharmacy" *Id*.  Mr. Vinson noted the conflicts of interest that exist in the current PBM-pharmacy ownership structure, pointing to

---

[1] To be sure, in a free market, consumers would purchase the lower-cost chicken. But this is not necessarily the case in the pharmaceutical market where reimbursement programs affect the structure of the market and influence purchasing decisions.

reporting on this topic from The Wall Street Journal, The New York Times, and Axios, among other news outlets, along with two reports from the Federal Trade Commission issued within the prior six months. *Id*. at 11:18:00. These reports, Mr. Vinson explained, showed "the higher prices being paid at pharmacies owned by PBMs versus the lower prices in local access in Arkansas." HB 1150 "would stop that," Mr. Vinson observed, "and would require them [PBMs] to choose one or the other or to divest and sell that pharmacy to someone else to operate it." *Id*. And in total, Mr. Vinson anticipated that HB 1150 would affect up to 36 brick-and-mortar pharmacies in Arkansas. *Id*. at 11:19:00. On the other hand, more than 700 brick-and-mortar pharmacies in Arkansas would not be affected at all by the legislation. *Id*. And of the 670 mail-order pharmacies that operate in Arkansas, only about 100 of those would potentially be affected by HB 1150. *Id*.

In response to concerns that certain parts of the State might become "pharmacy deserts"— in other words, an area where residents lack access to a pharmacy—Rep. Moore explained that there "will be no pharmacy deserts" under HB 1150 because there is at least one non-PBM-owned pharmacy within two miles of every PBM-owned pharmacy in the State. *Id*. at 11:20:00.

Rep. Moore was also asked whether this kind of legislation would open the flood gates to state regulation of other vertically integrated businesses operating in Arkansas such as a sawmill that also owns a lumber company. And in response to this question, Rep. Moore again pointed out the stark difference between PBM-owned-pharmacies and virtually all other vertically integrated businesses. Most other companies, like a sawmill or a chicken company like Tyson, do not set the prices for their competitors and thus their vertically integrated business models do not present a clear conflict of interest that harms Arkansans. In contract, PBMs do set the reimbursement prices for their competitors. As Rep. Moore explained, HB 1150 "is against vertical integration regarding an industry in which they are responsible for setting the prices of their competitors." *Id*. at

11:26:00. Rep. Moore was also asked whether there are any other industries where a specific party controlled both "the purchase and the selling price" and thus "basically set the prices for the whole industry" or whether PBMs were unique in this regard. *Id*. at 11:28:45. Rep. Moore responded: "To answer that question quite bluntly, No." *Id*. at 11:29:00.

And in response to further questioning, Rep. Moore explained that "if you're going to operate as a PBM, you need to operate as a PBM. If you're going to operate as a pharmacy, you need to operate as a pharmacy. You shouldn't be in a position to where you can be such a bad actor and be in a position to where you can pay yourself higher than your competitor." *Id*. at 11:30:30.

And when Mr. Vinson was asked about the impetus behind HB 1150 and how it would potentially impact local communities and result in potential job losses, Mr. Vinson explained that residents are already losing their jobs because of PBMs. Specifically, he responded: "There have been a net loss of sixty-five pharmacies, and more than twenty in the last twelve months, because of unfair competition. That has eliminated thousands of jobs where pharmacies have lost their investment." *Id*. at 11:31:00.

Mr. Vinson further testified that there were many non-PBM-affiliated pharmacies that were supportive of HB 1150, like Walgreens, Walmart, and Harps. *Id*. at 11:32:00. Additionally, Mr. Vinson testified that there were many pharmacies that were not affiliated with PBMs that were permitted and operating in the State, including Walmart, Amazon, and Walgreens, and thus would not be affected by HB 1150. *Id*. at 11:36:40. And in response to questions about anticompetitive behavior engaged in throughout the drug industry, Mr. Vinson testified about certain coupons that drug manufacturers would only offer to PBMs: "There are coupons that the manufacturers provide that I'm hearing this week that they're now limiting to only PBM-owned pharmacies, which is

another example of an anticompetitive act that is anti-Arkansan and anti-patient access." *Id*. at 11:39:30.

In response to a question posed to Dr. Sanders about contracting with PBMs, she responded that independent pharmacies have limited or no bargaining power when entering contracts with PBMs: "I have not seen them accept any redlines to a contract. But it comes to a point where it's take it or leave it. There's no negotiation." *Id*. at 11:38:30.

When asked about what they foresaw happening if HB 1150 doesn't pass, Mr. Vinson noted that in Arkansas, there are approximately 350 independent pharmacies, and based on what has occurred in other states like Montana, he anticipated that we could expect approximately 10% of these independent pharmacies to close if HB 1150 didn't pass. *Id*. at 1:42:15. Indeed, six have already closed since the beginning of 2025. *Id*. He said that without HB 1150, the outlook is "bleak." *Id*. at 11:43:00.

Rep. Moore noted that this is not a bill about reimbursement—an issue that is or could perhaps be addressed by other legislation. *Id*. at 11:44:45.

Rep. Ladyman then proceeded into a discussion about the potential impact of HB 1150 in his district. *Id*. at 11:48:30. Rep. Ladyman noted that "we were the first State in the nation" to pass legislation that provided that pharmacies could not be forced to sell drugs at a loss. *Id*. at 11:49:30.[2] But Rep. Ladyman also noted that that particular piece of legislation was not a panacea, for it meant that although pharmacies were no longer selling their drugs at a loss, they also were not making any money. *Id*. at 11:49:45. Indeed, Rep. Ladyman pointed to a pharmacy in his

---

[2] This is a reference to Arkansas Act 900, which was challenged in this Court and in the Supreme Court, which held that Act 900 is not preempted by ERISA. *See Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80 (2020).

district that filled upwards of 100 prescriptions in a given day on which the pharmacy makes no money whatsoever—effectively driving down the pharmacy's profits. *Id*. at 11:50:00.

To be sure, there were also detractors of HB 1150 that spoke at the April 2 committee hearing. Among those were Randy Zook[3] and Mike Castleberry, the latter of whom spoke on behalf of self-funded employers in the State. *Id*. at 11:58:00. Mr. Zook spoke on the effect of HB 1150 on the overall business climate. *Id*. at 11:58:30. He observed that HB 1150 was a "simple bill," merely providing that a PBM cannot own a pharmacy. *Id*. at 11:59:00. He noted that Arkansas already has laws on the books that prohibit steering and other anti-competitive practices. *Id*. at 12:00:00. He also observed that, according to the latest reports, PBMs were complying with these laws. *Id*. at 12:00:45. And he stated his belief that the aim of HB 1150 was merely to remove competition from the market, and not patient protection or lowering costs. *Id*. at 12:01:00. Moreover, he noted that the Arkansas Insurance Department already has the authority "to throw out bad actors. So unless the State wants to get into the business of picking winners and losers in our economy, I see no reason to pass this bill." *Id*. at 12:02:00. Mr. Castleberry, in turn, testified that, in his view, the removal of pharmacies from the State will result in higher prices for consumers. *Id*. at 12:04:00. And he further noted his belief that manufacturers, rather than PBMs, set the prices for drugs. *Id*. at 12:04:30. On this point, Rep. Ladyman disagreed. *Id*. at 12:08:45. Rep. Ladyman noted that although manufacturers set the price initially, the PBM sets the price at which it will be sold to consumers. *Id*. at 12:09:30. Mr. Castleberry, in turn, clarified his position and ultimately agreed with Rep. Ladyman. *Id*. at 12:09:45.

---

[3] Mr. Zook did not identify or otherwise introduce himself at the hearing or state on whose behalf he was appearing. Based on publicly available information, it appears that Mr. Zook is the president and CEO of the Arkansas State Chamber of Commerce and was likely appearing on its behalf.

Rep. Eubanks then questioned Mr. Castleberry about an analogy he used regarding vertically integrated businesses, and noted how companies like Tyson do not set the prices for their competitors and must negotiate their sales prices with retail grocers. *Id*. at 12:13:00. Mr. Castleberry responded: "Maybe a better example would be Exxon or anybody in the gas business where they own some of the retail stores as well as supply the product wholesale to other dealers. They certainly don't set the market price. I was in that business. A total failure of common sense on my part, I bought a convenience store. That is the worst business model in the Western – maybe globally. There is no way for an independent to make a nickel in that business other than selling crackers and Cokes and now, THC-infused seltzer or whatever the heck it is they survive on these days. But that I think is more akin to what we're looking at here where you've got the supplier of the product in several different aspects or different channels in the marketplace." *Id*. at 12:13:30.

Adam Head, president and CEO of Carti Cancer Center, spoke in favor of HB 1150. *Id*. at 12:18:30. He noted that "a lot of cancer care . . . takes a lot of care coordination with the patient at the center," as well as coordination with various pharmacists that work hand-in-hand with the patients. *Id*. at 12:19:30. Mr. Head testified that he was in favor of HB 1150 because it would uncomplicate the delivery of health care in the State. *Id*. at 12:21:30.

Another person that offered testimony was Sharon Faust, chief pharmacy officer for Navitus. *Id*. at 12:38:00. Ms. Faust testified that that, by her estimate, approximately 60 pharmacies would go out of business under HB 1150—or approximately 1 in 20 pharmacies in the State. *Id*. at 12:41:30.

Rep. Moore closed out the hearing. *Id*. at 12:45:30. He testified that "the issue at hand is not vertical integration as it sits in normal, typical business. There's nothing wrong with vertical integration unless you have the opportunity to set the prices for your competitors." *Id*. at 12:46:15.

He then presented a list of 8,000 signatures collected from Arkansans asking the General Assembly to vote in favor of HB 1150. *Id*. at 12:46:30. He then pointed to a list of reimbursements from the previous day showing the disparity between PBM and non-PBM affiliated pharmacy reimbursements for three separate drugs. *Id*. at 12:46:45. "One drug, CVS was paid $13.04, the independent was paid $7.68." *Id*. at 12:47:00. "The next drug, CVS was paid $54.83, the independent was paid $21.00." *Id*. at 12:47:15. "The third drug, CVS was paid $50.64, and the independent was paid $24.80." *Id*. at 12:47:30. He noted that "these stats came from yesterday, April 1st." *Id*. at 12:47:30. "And if that doesn't disturb you, it should." *Id*. at 12:47:30.

Rep. Ladyman then provided a final brief comment. *Id*. at 12:48:15. He observed that the issue boils down to "monopolizing an industry, or a section of an industry. And I know we have to be very careful when we limit choices and we restrict businesses, and I am not for that. But we are the gatekeepers when it comes to monopolies." *Id*. at 12:48:30. He continued, "I am not saying this is a monopoly, but if it looks like a monopoly and it smells like a monopoly, it might actually be a monopoly." *Id*. at 12:48:45. "So that's why I will be voting for this bill." *Id*. at 12:49:00.

### B. April 8 Meeting of the Senate Insurance and Commerce Committee

A hearing on HB 1150 was next held on April 8 before the Senate Insurance and Commerce Committee. Mr. Vinson testified again in favor of HB 1150. *See Senate Meeting* at 10:29:30. He noted that he was empathetic to concerns about job losses that could occur as a result of HB 1150 but pointed out that the State has already experienced a net loss of 65 pharmacies, along with hundreds of lost jobs, as a result of anti-competitive acts carried out by PBM-owned pharmacies. *Id*. at 10:29:30. He noted that a pharmacy in Pine Bluff had been shuttered in the previous week. *Id*. at 10:30:00. And he pointed out that he was aware of hundreds of job openings for pharmacists and pharmacy employees in the State, and that employers that would not be affected by HB 1150

would help to absorb employees that might be displaced from their current jobs by the passage of the bill. *Id*. at 10:30:15.

Mr. Vinson noted that Genoa Pharmacy, which is owned by a PBM, provides mental health pharmacy services in a handful of locations across the State, and that other non-PBM-affiliated pharmacies stood ready to fill the gap. *Id*. at 10:30:30.

Mr. Vinson next responded to concerns that veterans would not be able to receive their medications through mail order pharmacies owned by Express Scripts, which he described as an exclusive relationship within the TRICARE benefit. *Id*. at 10:32:30. Mr. Vinson answered that military bases and Veterans Affairs centers throughout the State would be unaffected by HB 1150 and would provide an alternative location for veterans to fill prescriptions, along with Kroger, Walgreens, and Harps, each of which are in-network. *Id*. at 10:32:45. Mr. Vinson also noted that, in the event that the Department of Defense continued to restrict service members to a single mail-order pharmacy, Express Scripts, that the State Board of Pharmacy would be able to provide a limited-use permit to Express Scripts to ensure that veterans do not lose access to their prescriptions. *Id*. at 10:33:15.

The next person to testify at the hearing was Dawood Rassam, a pharmacist at the Centers for Youth and Families, a nonprofit that deals with mental health for adults and children, as well as primary care, counseling, and therapy. *Id*. at 10:44:00. He urged the General Assembly to vote "yes" on HB 1150. *Id*. at 10:44:30. He noted that the psychiatric relapse rate after the first episode is 30% within the first year, and 80% within five years, and the reason for that is lack of adherence to treatment. *Id*. at 10:44:30. "PBMs have engaged in predatory practices to steer patients to their own pharmacies in the name of saving taxpayer dollars, and specialty medications that require specialty handling." *Id*. at 10:44:15. He said that these justifications provided by the PBMs are

wrong. *Id.* at 10:45:00. He provided two examples. First, he noted that one of the most important medications in mental health are called long acting injectables. *Id.* at 10:45:00. One of those injectables is a shot that's given every three months, and costs $10,000. *Id.* at 10:45:15. He noted that he had run the numbers on the use of this medications, and that his pharmacy loses money every time it administers it. *Id.* at 10:45:30. And in his view, the PBMs are seeking to force him to stop administering these drugs so that they will instead be administered by a PBM-owned pharmacy. *Id.* at 10:45:45. Second, he noted that there are two medications that treat tardive dyskinesia, or TD. *Id.* at 10:45:45. TD, he said, is a movement disorder characterized by involuntary repetitive movements often caused by long-term use of antipsychotics. *Id.* at 10:46:00. The medications used to treat TD are considered specialty medications due to their cost and complexity of monitoring side effects and educating patients. *Id.* at 10:46:15. He noted that his pharmacy looked into whether it would be feasible to dispense these drugs but learned that it would lose hundreds of dollars per prescription if it dispensed them. *Id.* at 10:46:30. Numerous other witnesses spoke in favor of HB 1150, describing the harms that they hoped it would prevent. *See id.* at 10:48:45.

### C.    April 9 Senate Floor Session

A Senate Floor Session to debate HB 1150 was held on April 9, where senators spoke for and against the bill. As Senator Hammer explained at the session, "HB 1150 does not ban any pharmacy from operating in Arkansas. It simply prohibits PBMs from owning pharmacies, eliminating the built-in conflict of interest that drives up costs and limits consumer choice." *Senate Floor Session* at 3:27:30.

### D.    Federal Trade Commission Reports

The concerns expressed by members of the General Assembly and the public regarding the harms posed by vertical integration of PBMs and pharmacies are well-founded. Indeed, in the past

year alone, the Federal Trade Commission has issued two reports that fully support and vindicate the views expressed by these individuals. *See* Exhibit B, Federal Trade Commission, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies* (July 2024); Exhibit C, Federal Trade Commission, *Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers* (Jan. 2025).

PRELIMINARY INJUNCTION STANDARD

## I.    The applicable standard.

When analyzing a motion for a temporary restraining order or preliminary injunction, federal courts use a four-factor test. *See Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (the standard for analyzing a motion for temporary restraining order or preliminary injunction is the same). In the Eighth Circuit, this is known as the *Dataphase* test. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). A plaintiff seeking a preliminary injunction must establish: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest . . . ." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

Because the preliminary relief sought here would enjoin a duly enacted state statute, the Eighth Circuit's decision in *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds* mandates that the probability-of-success-on-the-merits factor only cuts in favor of Plaintiffs if Plaintiffs show that they are more likely than not to prevail on a particular claim. 530 F.3d 724, 731–32 (8th Cir. 2008) (en banc). "[W]here a preliminary injunction is sought to enjoin . . . government action based on presumptively reasoned democratic processes," the movant must show that he "is likely to prevail on the merits." *Id*. at 732–33. State and federal statutes are the

13

output of presumptively reasoned democratic processes. *Id*. at 732 & n.6; *Eggers v. Evnen*, 48 F.4th 561, 565 (8th Cir. 2022).

Under these circumstances, whether a plaintiff is more likely than not to prevail on the merits of a particular claim is a threshold determination. *Rounds*, 530 F.3d at 732. The result is that, even if the other three factors weigh heavily in favor of the plaintiff, the plaintiff *still* cannot justify preliminary relief if it cannot show that it is more likely than not to prevail on the merits of any particular claim. *Eggers*, 48 F.4th at 566. Indeed, a plaintiff's "failure to carry [its] burden on the likelihood-of-success factor is fatal to [its] case." *Id*.

Plaintiffs have argued that they deserve preliminary relief, but they are not likely to succeed on any of their claims.

## II.    CVS asks this Court to apply the wrong standard—one that is less rigorous than what binding precedent requires.

CVS proclaims that that it "do[es] not need to 'prove a greater than fifty per cent likelihood that [they] will prevail on the merits.'" CVS Br. 21–22.[4] "Instead," according to CVS, "a plaintiff need only 'show a fair chance of prevailing,'" which CVS describes as an "intentionally modest bar." *Id*.

While that is usually true, it is not true here. *Rounds* makes clear that "a party seeking a preliminary injunction of the implementation of a state statute must demonstrate *more* than just a 'fair chance' that it will succeed on the merits." 530 F.3d at 731–32 (emphasis added). The movant must show that it is "likely to prevail on the merits." *Id*. at 732. And "[t]he 'likely to prevail on the merits' standard requires a more rigorous threshold showing than this circuit's ordinary preliminary injunction test, which asks only whether a movant has demonstrated a 'fair

---

[4] Plaintiffs' briefs in support of their motions for preliminary injunction are referred to herein and cited as CVS Br. [p.], PCMA Br. [p.], Optum Br. [p.], and Express Scripts Br. [p.], with all page-number references made to the original numbering in the brief and not the ECF page numbering.

chance of prevailing' in the ultimate litigation and which does not require a strict probabilistic determination of the chances of a movant's success when other factors, for example irreparable harm, carry substantial weight." *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1054 (8th Cir. 2014) (citation modified). Hence the greater-than-fifty-percent likelihood that CVS eschews is in fact the showing that it is required to make before it can obtain a preliminary injunction.

Moreover, although CVS contends that "[n]o single factor is 'dispositive'" when assessing the preliminary injunction factors, CVS Br. 21, there is an important caveat to this statement. The first factor—likelihood of success on the merits—sometimes (and often) *is* dispositive. Under *Rounds*, Plaintiffs must "make[] a *threshold* showing that [they are] likely to prevail on the merits" *before* the Court can "then proceed to weigh the other *Dataphase* factors." 530 F.3d at 732 (emphasis added). This threshold showing is critical because Plaintiffs' "failure to carry [their] burden on the likelihood-of-success factor is fatal to [their] case." *Eggers*, 48 F.4th at 566.

**ARGUMENT**

## I.     Dormant Commerce Clause

### A.     The applicable dormant Commerce Clause standard.

Plaintiffs move to enjoin Act 624 on the grounds that it purportedly violates the dormant Commerce Clause. To prevail on this claim at this phase of litigation, Plaintiffs must show that it is more likely than not that Act 624 violates the dormant Commerce Clause. This is a high hurdle to clear. As an initial matter, "[e]xtreme caution is warranted before a court deploys [the dormant Commerce Clause's] implied authority." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 390 (2023) (cleaned up). "Preventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.'" *Id.* (quoting *Conway v. Taylor's Ex'r*, 66

U.S. 603 (1862)).  And here, there is no "infraction" at all.  Act 624 is neutral, applying to in-state and out-of-state PBMs and pharmacies alike, drawing no lines based on residency.  Moreover, whatever incidental burden Act 624 imposes on interstate commerce, Plaintiffs have failed to show that the burden clearly outweighs its presumed, local benefit.  And for that reason, Act 624 easily survives the *Pike* balancing test.

The Commerce Clause is a positive grant of power enumerated in the Constitution.  Specifically, it grants Congress the power to "[t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.  Conversely, the dormant Commerce Clause is not found in the text of the Constitution; it exists "between the Constitution's lines."  *Nat'l Pork Producers Council*, 598 U.S. at 368.  And unlike the Commerce Clause, the dormant Commerce Clause is a "'negative command,' one effectively forbidding the enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject.'"  *Id.* at 368 (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)).

The Eighth Circuit applies a three-pronged test to determine whether a challenged law violates the dormant Commerce Clause.  "A state statute violates the dormant Commerce Clause if it: (1) 'clearly discriminates against interstate commerce in favor of in-state commerce,' (2) 'imposes a burden on interstate commerce that outweighs any benefits received,' or (3) 'has the practical effect of extraterritorial control on interstate commerce.'"  *Styczinski v. Arnold*, 46 F.4th 907, 912 (8th Cir. 2022) (quoting *Grand River Enters. Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 942 (8th Cir. 2009)).  The Plaintiffs in this case have the burden to show "discrimination," as that term is understood in dormant Commerce Clause jurisprudence, because "[t]he burden to show discrimination rests on the party challenging the validity of the statute[.]"  *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979).  And "absent discrimination, 'a State may exclude from its territory, or

prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to' the interests of its citizens." *Nat'l Pork*, 598 U.S. at 369 (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)).  If discrimination is established, "the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hughes*, 441 U.S. at 336.

Hence the threshold question in assessing a dormant Commerce Clause claim is whether the challenged state law "clearly discriminates against" out-of-staters, or instead, whether it treats people the same regardless of residence. *Styczinski*, 46 F.4th at 912.  State laws that do not discriminate against out-of-staters are usually upheld and will be struck down only if the law "imposes a burden on interstate commerce that outweighs any benefits received"—a burden that is measured by the *Pike* balancing test—or if it "has the practical effect of extraterritorial control on interstate commerce." *Id*.  In their preliminary-injunction motions, Plaintiffs do not allege that Act 624 has the practical effect of extraterritorial control on interstate commerce.  Thus, it is only briefly addressed here.

> **B.    The Supreme Court's decision in *Exxon Corporation v. Governor of Maryland* is directly applicable here and shows that Act 624 does not unconstitutionally discriminate against out-of-state PBMs or pharmacies.**

Act 624 does not violate the dormant Commerce Clause.  That is clear from the Supreme Court's decision in *Exxon Corporation v. Governor of Maryland*, 437 U.S. 117 (1978), which involved a Maryland statute that is analogous to Act 624 in all material respects, and which provides the rule of decision in this case.

In *Exxon*, Maryland passed a law providing that "a producer or refiner of petroleum products (1) may not operate any retail service station within the State [the divestiture provision], and (2) must extend all 'voluntary allowances' uniformly to all service stations it supplies." *Id*. at 119–20.  "Although not defined in the statute, the term 'voluntary allowances' refers to temporary

price reductions granted by the oil companies to independent dealers who are injured by local competitive price reductions of competing retailers." *Id.* at 122–23.

Act 624 is like the Maryland statute's divestiture provision in that it provides that a pharmacy benefits manager may not acquire or hold a retail pharmacy permit, and thus, may not operate a retail pharmacy in the State of Arkansas. Act 624, §2(b). And like the Maryland statute's "voluntary allowances" provision, Arkansas law prohibits PBMs from reimbursing their affiliated pharmacies higher amounts than they pay non-affiliated pharmacies. *See* Ark. Code Ann. § 23-92-506(b)(4)(a). The law challenged in this case is thus strikingly similar to the law challenged in *Exxon*[5]—notwithstanding that the Plaintiffs here are not challenging the latter provision in this case.

The plaintiffs in *Exxon*—Exxon Corporation and several other oil companies—sued the Maryland Governor on multiple grounds, including that Maryland statute's divestiture provision violated the dormant Commerce Clause in three respects: "(1) by discriminating against interstate commerce; (2) by unduly burdening interstate commerce; and (3) by imposing controls on a commercial activity of such an essentially interstate character that it is not amenable to state regulation." 437 U.S. at 125.

In connection with the first argument—that the Maryland statute discriminated against interstate commerce—the plaintiffs "focus[ed] on the retail market arguing that the effect of the statute is to protect in-state independent dealers from out-of-state competition"—the same

---

[5] Indeed, even an opponent that spoke against HB 1150 noted the similarity between the current PBM-pharmacy ownership structure and the business structure employed by petroleum producers like Exxon. *See House Committee Meeting* at 12:13:30 ("Maybe a better example would be Exxon or anybody in the gas business where they own some of the retail stores as well as supply the product wholesale to other dealers. They certainly don't set the market price. . . . I think is more akin to what we're looking at here where you've got the supplier of the product in several different aspects or different channels in the marketplace.").

argument made by Plaintiffs in this case[6]—and in support of that argument, the *Exxon* plaintiffs pointed to "the fact that the burden of the divestiture requirements falls *solely* on interstate companies." *Id.* (emphasis added).  Notwithstanding that fact, the Court rejected the argument, reasoning that "this fact does not lead, either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce at the retail level." *Id.*  The Court further elaborated on this point, and because its reasoning is directly applicable to this case, it is reproduced here in full:

> As the record shows, there are several major interstate marketers of petroleum that own and operate their own retail gasoline stations.  These interstate dealers, who compete directly with the Maryland independent dealers, are not affected by the Act because they do not refine or produce gasoline.  In fact, the Act creates no barriers whatsoever against interstate independent dealers; it does not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market.  The absence of any of these factors fully distinguishes this case from those in which a State has been found to have discriminated against interstate commerce.  *See, e.g.*, *Hunt v. Washington Apple Advertising Comm'n.*, 432 U.S. 333; *Dean Milk Co. v. Madison*, 340 U.S. 349.  For instance, the Court in *Hunt* noted that the challenged state statute raised the cost of doing business for out-of-state dealers, and, in various other ways, favored the in-state dealer in the local market.  432 U.S., at 351–352.  No comparable claim can be made here.  While the refiners will no longer enjoy their same status in the Maryland market, in-state independent dealers will have no competitive advantage over out-of-state dealers.  The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce.

*Id.* at 125–26.

The Court's reasoning in *Exxon* squarely applies in this case.  First, Plaintiffs make the same arguments pressed by the *Exxon* plaintiffs: That Act 624 will "revoke permits of out-of-state companies *only*"; "[n]ot a single Arkansas-based company will lose a permit under Act 624"; and

---

[6] CVS, for instance, points to cases from the Eleventh Circuit and First Circuit and argues that "[t]he courts of appeals have . . . recognized that facially nondiscriminatory laws cannot survive the Dormant Commerce Clause's strictures if the law's practical effects disproportionately fall on out-of-state interests."  CVS Br. 27.  *Exxon* forecloses this argument.  And between out-of-circuit cases and an opinion of the Supreme Court, the latter controls.

"in-state pharmacies stand to benefit from the law's exclusive application to out-of-state companies."  PCMA Br. 15; *see* CVS Br. 25 (Act 624 "applies *only to pharmacies owned by out-of-state companies*"; "*no* in-state pharmacies will be affected"; Act 624 "generates a significant windfall for in-state pharmacies").  Yet these facts "do[] not lead, either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce at the retail level."  *Exxon*, 437 U.S. at 125.

Apart from locally owned retail pharmacies, there are several major interstate companies that own and operate retail pharmacies in Arkansas.  And many of these pharmacies, like Walgreens and Amazon, are not affected by Act 624 because they are not owned, directly or indirectly, by a PBM.  In other words, these pharmacies are independent of PBMs.  Like the Maryland statute in *Exxon*, Act 624 creates no barriers against non-PBM-owned interstate retail pharmacies; it does not prohibit the flow of interstate drugs, place added costs upon them, or distinguish between in-state and out-of-state pharmacies in the retail market.  While the Plaintiffs will no longer enjoy their same status in the Arkansas market, in-state independent retail pharmacies will have no competitive advantage over out-of-state independent retail pharmacies like Walgreens and Amazon.

To support their discrimination arguments, Plaintiffs argues that the carveout in Act 624, § 2(f), benefits Walmart and effectively discriminates between in-state and out-of-state pharmacies.  But this argument is unavailing because the exception (a) would also apply to any out-of-state pharmacy with an in-house PBM for its employees' plan, (b) is not designed just to help Walmart, but to make an exception in a case where there is no conflict of interest, because that PBM is only serving the pharmacy's employees and those employees are likely filling prescriptions at their employer's pharmacy.  *See* Act 624, § 2(f).

The *Exxon* plaintiffs next argued that because the burden of the Maryland statute fell on some interstate companies, the Maryland statute "impermissibly *burdens* interstate commerce." 437 U.S. at 127 (emphasis in original). They pointed to evidence, which they argued indicated that "because of the divestiture requirements, at least three refiners will stop selling in Maryland," and which they argued "support[ed] their claim that the elimination of company-operated stations will deprive the consumer of certain special services." *Id*. The Court once again rejected these arguments, reasoning that "[e]ven if we assume the truth of both assertions, neither warrants a finding that the statute impermissibly burdens interstate commerce." *Id*. The Court further elaborated on this point, and its reasoning is again reproduced in full below:

> Some refiners may choose to withdraw entirely from the Maryland market, but there is no reason to assume that their share of the entire supply will not be promptly replaced by other interstate refiners. The source of the consumers' supply may switch from company-operated stations to independent dealers, but interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another.
>
> The crux of appellants' claim is that, regardless of whether the State has interfered with the movement of goods in interstate commerce, it has interfered "with the natural functioning of the interstate market either through prohibition or through burdensome regulation." *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 806. Appellants then claim that the statute "will surely change the market structure by weakening the independent refiners . . .." We cannot, however, accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market. *See Breard v. Alexandria*, 341 U.S. 622. As indicated by the Court in *Hughes*, the Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations. It may be true that the consuming public will be injured by the loss of the high-volume, low-priced stations operated by the independent refiners, but again that argument relates to the wisdom of the statute, not to its burden on commerce.

*Id*. at 127–28.

And again, the Court's reasoning squarely applies here. While some Plaintiffs may lose their retail pharmacy permits and thus withdraw from the Arkansas market, there is no reason to assume that their share of the retail pharmacy market will not be replaced by other interstate retail

pharmacies like Walgreens and Amazon. The source of Arkansan's pharmaceutical supply may switch from PBM-operated interstate retail pharmacies to non-PBM-operated interstate retail pharmacies, "but interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another." *Exxon*, 437 U.S. at 127.

And finally, some of the closing points made in *Exxon* are crucial here. The dormant Commerce Clause does not protect "the particular structure or methods of operation in a retail market." 437 U.S. at 127. Thus, the dormant Commerce Clause does not protect the PBM-pharmacy ownership structure under which Plaintiffs operate. And here, there is no question that there are other interstate retail pharmacies (e.g., Walgreens and Amazon) that are not affected by Act 624 and that could fill the gap left by Plaintiffs' withdrawal from the market. And because the dormant Commerce Clause "protects the interstate market, *not particular interstate firms*, from prohibitive or burdensome regulations," *id*. (emphasis added), Plaintiffs are not likely to succeed on their claim that Act 624 violates the dormant Commerce Clause.

### C.    Act 624 does not overtly discriminate against out-of-state PBMs or pharmacies in favor of in-state PBMs or pharmacies.

Act 624 does not facially distinguish between in-state and out-of-state PBMs or pharmacies—a point that CVS concedes. CVS Br. 25 (Act 624 is "admittedly not the 'rare instance' of a facially discriminatory law"). Act 624 merely provides that "[a] pharmacy benefits manager shall not acquire direct or indirect interest in, or otherwise hold, directly or indirectly," an Arkansas retail pharmacy permit, regardless of the PBM's residency. Act 624, § 2(b).

A law discriminates against interstate commerce when it "favors in-state economic interests over their out-of-state counterparts." *Ore. Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Oregon*, 511 U.S. 93, 93 (1994); *Pete's Brewing Co. v. Whitehead*, 19 F. Supp. 2d 1004,

1010 (W.D. Mo. 1998) (dormant Commerce Clause prohibits "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors").  In deciding whether Act 624 discriminates against out-of-state PBMs or pharmacies in favor of their in-state counterparts, *Grand River Enterprises Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 942 (8th Cir. 2009), is instructive.  *Grand River* arose from the Master Settlement Agreement that was entered in the mid-1990s between major tobacco companies and States.  Under an MSA provision called the Allocable Share Amendment, Non-Participating Members (i.e., tobacco companies that did not sign the MSA) were required to make payments to Arkansas (and other states) based on nationwide sales of tobacco products, with such funds being held in escrow for the payment of future tobacco-related claims.  The plaintiff in *Grand River* sued Arkansas on the grounds that the Allocable Share Amendment discriminated against interstate commerce because it required NPMs to make payments to Arkansas based on nationwide sales.  The Eighth Circuit flatly rejected this argument. It held that: "The Allocable Share Amendment does not make any distinction between in-state and out-of-state NPMs. The Amendment grants no 'differential treatment' to in-state NPMs over out-of-state NPMs, thus avoiding violation of the dormant Commerce Clause." *Id*. at 942.

The logic of *Grand River* is applicable here.  Act 624 merely provides that a PBM may not acquire or hold an Arkansas retail pharmacy permit.  Act 624, §2(b).  It "does not make any distinction between in-state and out-of-state" PBMs or pharmacies. *Grand River*, 574 F.3d at 942. Or, to borrow from this Court's opinion in an earlier lawsuit brought by PBMs against the State, Act 624 "does not favor in-state PBMs over out-of-state PBMs or in-state pharmacies over out-of-state pharmacies." *Pharm. Care Mgmt. Ass'n v. Rutledge*, 240 F. Supp. 3d 951, 960 (E.D. Ark. 2017).

23

Plaintiffs also assert that Act 624 creates impermissible economic protectionism in favor of in-state pharmacies and against out-of-state pharmacies, but "[t]he fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon*, 437 U.S. at 126. The dormant Commerce Clause does not protect "the particular structure or methods of operation in a retail market." *Id*. at 127. And as noted above, the exception in Act 624 that purportedly favors Walmart's in-state pharmacies (a) would also apply to any out of state pharmacy with an in-house PBM for its employees' plan, (b) creates an exception where there is no conflict of interest, because that PBM is only serving the pharmacy's employees and those employees are likely filling prescriptions at their employer's pharmacy. *See* Act 624, § 2(f).

**D.    Act 624 satisfies the *Pike* balancing test because it does not impose a burden on interstate commerce that outweighs any benefits received.**

The next argument pressed by Plaintiffs is that Act 624 imposes a burden on interstate commerce that outweighs any benefits received. This weighing of benefits and burdens is known as the *Pike* balancing test. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). "State legislation is valid under the *Pike* balancing test if 'the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental.'" *Grand River*, 574 F.3d at 942 (quoting *Pike*, 397 U.S. at 142). "The statute will be upheld 'unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Id*. (quoting *Pike*, 397 U.S. at 142).

The legislative findings make the intended benefits of Act 624 readily apparent. The General Assembly found that: "(1) It is beneficial to the State of Arkansas to support patient access to prescription drugs and pharmacy services at fair prices in a market that supports optimal patient care; (2) The Federal Trade Commission and the United States House Committee on Oversight

and Government Reform have found evidence of anticompetitive business tactics that have driven locally-operated pharmacies out of business, limiting patient choices and inflating drug prices at pharmacies owned by pharmacy benefits managers; and (3) The State of Arkansas wishes to minimize conflicts of interest by stopping the pharmacy benefits managers acting as a 'fox guarding the henhouse' by being both a price setter and price taker." Act 624, § 1(a).  Accordingly, it was the "intent of the General Assembly that the State of Arkansas shall improve healthcare delivery in the pharmacy market for patients by eliminating certain anticompetitive business tactics as a basic tenet of this act." *Id*. § 1(b).  And the benefits of Act 624 are apparent. On the other hand, the burden posed by Act 624 is minimal.  It only prohibits PBMs from acquiring or holding a retail pharmacy permit in Arkansas.  As such, Plaintiffs will merely be required to make a choice—continue operating as a PBM or pharmacy, but not both.  Act 624 thus  satisfies the *Pike* balancing test.

### E.    Act 624 does not have an impermissible extraterritorial effect.

Plaintiffs do not contend that Act 624 has an impermissible extraterritorial effect, so Defendants only address it briefly.  As the Supreme Court just recently observed, "[i]n our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior."  *Nat'l Pork*, 598 U.S. at 374 (citation omitted).  And thus an "almost per se rule against laws that have the practical effect of controlling extraterritorial commerce would cast a shadow over laws long understood to represent valid exercises of the States' constitutionally reserved powers." *Id*. at 375 (cleaned up).  "It would provide neither courts nor litigants with meaningful guidance in how to resolve disputes over them." *Id*.  "Instead, it would invite endless litigation and inconsistent results."  *Id*.  *National Pork* applies here.  Any contention that Act 624 poses an impermissible extraterritorial effect would vitiate the kind of

laws—pharmacy permitting laws, specifically—that were "long understood to represent valid exercises of the States' constitutionally reserved powers." *Id*.

## II.    Privileges and Immunities Clause

Advancing the same arguments that they made in support of their dormant Commerce Clause claims, PCMA and Express Scripts further contend that Act 624 violates the Privileges and Immunities Clause.  This claim fails out of the gate.  "Natural persons, but not corporations, may invoke the protections of" the Privileges and Immunities Clause.  *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1179 (8th Cir. 2021).  Neither PCMA nor Express Scripts, nor any Plaintiff affiliated with them, is a natural person.  And thus Plaintiffs lack standing to assert this claim in the first place.  *See id*. (addressing the "natural persons" requirement as a component of standing).

Setting aside that PCMA and Express Scripts lack standing, they are unlikely to prevail on their claims under the Privileges and Immunities Clause.  This clause provides: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."  U.S. Const., art. IV, § 2, cl. 1.  And it "protects the right of citizens to ply their trade, practice their occupation, or pursue a common calling in another State on terms of substantial equality with the citizens of that State."  *Sarasota Wine*, 987 F.3d at 1184 (cleaned up).  "The Clause does not require that a State tailor its every action to avoid any incidental effect on out-of-state tradesmen." *Id*. (cleaned up).  "Nor does the Clause preclude discrimination against nonresidents where (i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objectives."  *Id*. (cleaned up). "The court has struck laws down as violating the privilege of pursuing a common calling only when those laws were enacted for the protectionist purpose of burdening out-of-state entities."  *Id*. at 1184–85 (cleaned up).

"Whether differential treatment of out-of-state residents violates this Clause involves a two-part inquiry: (1) whether the state's law discriminates against out-of-state residents with regard to a privilege or immunity protected by the Clause, and (2) if so, whether sufficient justification exists for the discrimination." *Minnesota ex rel. Hatch v. Hoeven*, 456 F.3d 826, 834 (8th Cir. 2006).

PCMA and Express Scripts fail on the first prong. As set forth above, Act 624 does not discriminate against out-of-state residents. Nowhere does Act 624 reference a PBM's residency. Unlike the law at issue in *Toomer v. Witsell*, 334 U.S. 385 (1948), which is a case that PCMA leans on heavily. There, the Supreme Court held that a South Carolina statute violated the Privileges and Immunities Clause where it made an express distinction between out-of-state residents and in-state residents—the statute imposed a $2,500 license fee on out-of-state shrimping boats but only a $25 fee on in-state shrimping boats. *Id.* at 395. Act 624 does not do that. It applies the same prohibition across the board regardless of a PBM's residency. Act 624 is thus more like the law that was recently upheld by the Eighth Circuit in *Sarasota Wine*, 987 F.3d 1171. There, the Eighth Circuit considered a challenge under the Privileges and Immunities Clause to a Missouri liquor-license law that required "all licensees, residents and nonresidents alike, to become a Missouri voter and taxpayer, in other words reside in Missouri, to engage in the privilege of practicing that calling" of selling liquor. *Id.* at 1185. The Court reasoned that it was "not impossible" for the plaintiff to comply with these requirements, he simply didn't want to. *Id.* And the same is true here. Act 624 does not discriminate based on residency. The same requirements apply to PCMA and Express Scripts and all other PBMs, regardless of where they reside. And it is also not impossible for PCMA and Express Scripts to comply with Act 624's requirements.

Under Act 624, PCMA and Express Scripts can continue to operate in Arkansas—they must simply choose to operate as either a PBM or a pharmacy, but not both.

Plaintiffs' claim necessarily fails on the second prong because there is no discrimination against out-of-state residents. And even if there were discrimination, there would be sufficient justification for it for the same reasons that sufficient justifications exist under the dormant Commerce Clause as set forth above.

## III.    Bill of Attainder Clause

PCMA and Express Scripts contend that Act 624 amounts to an unconstitutional bill of attainder. *See* PCMA Br. 25; Express Scripts Br. 18. A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.*, 468 U.S. 841, 846–47 (1984) (quoting *Nixon v. Adm'r. of Gen. Servs.*, 433 U.S. 425, 468 (1977)). "The distinguishing characteristic of a bill of attainder is the substitution of legislative determination of guilt and legislative imposition of punishment for judicial finding and sentence." *United States v. Lovett*, 328 U.S. 303, 321–22 (1946) (Frankfurter, J., concuring). "A bill of attainder, by the common law, as our fathers imported it from England and practiced it themselves, before the adoption of the Constitution, was an act of sovereign power in the form of a special statute by which a man was pronounced guilty or attainted of some crime, and punished by deprivation of his vested rights, without trial or judgment per legem terrae." *Id*. at 322 (cleaned up). "It was this very special, narrowly restricted, intervention by the legislature, in matters for which a decent regard for men's interests indicated a judicial trial, that the Constitution prohibited." *Id*. To qualify as a bill of attainder, Act 624 must satisfy three requirements: (1) "specification of the affected persons," (2) "punishment," and (3) "lack of judicial trial." *Selective Serv.*, 468 U.S. at 847.

1.       The first requirement—specification of the affected persons—fails because Act 624 does not target Plaintiffs in terms of past conduct in a manner that designates a particular person or group. Historically, bills of attainder identified targeted individuals by name. *Palmer v. Clarke*, 408 F.3d 423, 433 (8th Cir. 2005).  This requirement is met, however, if the law "describes the individual 'in terms of conduct, which, because it is past conduct, operates only as a designation of particular persons.'"  *Id*. (quoting *Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 86 (1961)).  Therefore, a law may be an attainder "when past activity serves as a point of reference for the ascertainment of particular persons ineluctably designated by the legislature for punishment."  *Id*. (quoting *Selective Serv.*, 468 U.S. at 847) (internal citations and quotations omitted).

On its face, Act 624 makes no reference to Plaintiffs, nor does it describe any person or group in terms of past conduct for the purpose of directing punishment.  PCMA contends, however, that it and the other Plaintiffs in this lawsuit are a "very narrow and readily ascertained group." PCMA Br. 26.  To be sure, the universe of PBMs that own pharmacies is perhaps a narrow one, but that merely demonstrates the monopolistic market power exercised by Plaintiffs.  And taken to its logical conclusion, under Plaintiffs' theory neither the States nor Congress would have the power to regulate PBMs that own pharmacies lest the law be invalidated.  The result would be that any legislation addressed at PBMs that own pharmacies would be invalid *per se*.  But the prohibition against bills of attainder "surely was not intended to serve as a variant of the equal protection doctrine, invalidating every Act of Congress or the States that legislatively burdens some persons or groups but not all other plausible individuals."  *Nixon*, 433 U.S. at 471.

PCMA further contends that PBMs are sufficiently identified in terms of their conduct in Act 624 because it deems PBMs to be a "fox guarding the henhouse."  PCMA Br. 26.  But the

quote to which PCMA is referring has no operative effect. *See* Act 624, § 1(a)(3). It is only part of the Act's legislative findings and reflects concerns about conflicts of interests in a way that is easy for the public to understand. Nothing in the operative text of the Act (section 2) identifies PCMA or any other Plaintiff in terms of past conduct. Thus, Plaintiffs' bill-of-attainder claim fails under the first prong of the analysis.

      2.     The second requirement—punishment—isn't satisfied either. Three inquiries are required to determine whether a law imposes punishment on a certain individual: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes; and (3) whether the legislative record evinces a [legislative] intent to punish." *Palmer*, 408 F.3d at 433–34 (quoting *Selective Serv.*, 468 U.S. at 852). Act 624 meets none of these tests.

      *First*, Act 624's prohibition of PBM-pharmacy ownership does not "equate to those deprivations historically viewed as punishment." *Palmer*, 408 F.3d at 434. Historically, "punishment" in the bill-of-attainder context consisted of the death penalty, along with other "pains and penalties" such as "imprisonment, banishment, and the punitive confiscation of property by the sovereign." *Nixon*, 433 U.S. at 474. Act 624, of course, does not inflict the death penalty, imprisonment, or banishment. Nor does it inflict the punitive confiscation of property by the sovereign. It merely prohibits PBMs from acquiring or holding a retail pharmacy permit.

      PCMA contends that Act 624 amounts to a prohibited punishment "because it bars the targeted companies from the profession of pharmacy." PCMA Br. 27. And in support of this argument, it points to language from the Supreme Court that "the list of punishments forbidden by the Bill of Attainder Clause has expanded to include legislative bars to participation by individuals

or groups in specific employments or professions." *Selective Serv.*, 468 U.S. at 852.  But a closer look at *Selective Service* reveals that these "bars to participation" that were deemed unconstitutional are quite different than the bar imposed by Act 624.  For instance, *Selective Service* points to a litany of cases "in which Communist Party members were barred from offices in labor unions; in which the law in question cut off salaries to three named Government employees; in which a priest was disqualified from practicing as a clergyman; and in which lawyers were barred from the practice of law." *Id*. at 852 n.9 (internal citations omitted).  Act 624, in turn, prohibits no one from engaging in specific employments or professions.  It merely prohibits PBMs from acquiring or holding a permit under Ark. Code Ann. § 17-92-405, which in turn provides for the issuance of "a permit to maintain a pharmacy or other facility" for the sale of retail drugs. *Id*., -405(a)(1).  Act 624 thus says nothing about the practice of a profession; it provides only that certain entities (PBMs) cannot hold a permit to maintain a particular type of facility.  And PCMA is flatly wrong when it states that PBMs' "employees, too, are barred from practicing pharmacy in the state, as are the employees of their affiliated retail, mail-order, and specialty pharmacies." PCMA Br. 27.  Not a single pharmacist will be prohibited from practicing pharmacy in Arkansas by virtue of Act 624—nothing in the text of Act 624 suggests otherwise.

Express Scripts also contends that Act 624 impermissibly banishes PBMs and their affiliated pharmacies from Arkansas. Express Scripts Br. 19–20.  But Act 624 does nothing of the sort: It provides only that a PBM cannot acquire or hold a retail pharmacy permit.  Act 624, § 2(b).  Express Scripts can thus continue to hold a retail pharmacy permit in Arkansas so long as it does not operate as a PBM.  Or Express Scripts can operate as a PBM in Arkansas so long as it does not hold a retail pharmacy permit.  As Senator Hammer explained at the Senate Floor Session, "HB 1150 does not ban any pharmacy from operating in Arkansas.  It simply prohibits PBMs from

owning pharmacies, eliminating the built-in conflict of interest that drives up costs and limits consumer choice." *Senate Floor Session* at 3:27:30.  Or as John Vinson explained at the April 2 meeting of the House Insurance and Commerce Committee, HB 1150 "does not force closures." *Id*. at 11:17:30.  Instead, "it gives PBMs that own pharmacies the choice of whether they want to be a PBM or a pharmacy." *Id*.  In either case, Express Scripts will not be "banished" from the State by virtue of Act 624.  Act 624 will simply prohibit companies from operating in the State under the particular business combination of a PBM and pharmacy, which is how Express Scripts and other PBM companies happen to currently operate.

*Second*, Act 624 is supported by non-punitive purposes.  Indeed, the legislative history of Act 624 demonstrates that it was designed to remove the current and inherent conflict of interest that arises when PBMs own pharmacies and thus are incentivized to favor their own pharmacies over others.  This is a valid non-punitive exercise of police power by the legislature.

*Third*, the legislative record does not demonstrate a legislative intent to punish Plaintiffs. As Rep. Moore explained at the April 2 meeting of the House Insurance and Commerce Committee, HB 1150 "is against vertical integration regarding an industry in which they are responsible for setting the prices of their competitors." *Id*. at 11:26:00.  Thus, Act 624 is aimed at preventing unfair competition—not punishment for past unfair practices.

**3.**    To be sure, Act 624 does not provide for a judicial trial.  But the decision as to who can hold a retail pharmacy permit and who cannot, as a categorical matter, is in any event a classic legislative determination.  Thus, the absence of a judicial trial is not surprising here, and it does not counsel in favor of a finding that Act 624 is a bill of attainder.

## IV.    Equal Protection Clause

CVS alone presses the theory that Act 624 violates the Equal Protection Clause.  CVS Br. 33.  And it bases this theory on the ground that Act 624 prohibits PBMs from owning pharmacies

while "exempting from that ban a PBM that only caters to its affiliated pharmacy's employee benefit plan." *Id*. at 34. CVS concedes, as it must, that Act 624 violates the Equal Protection Clause *only if* there is no rational basis for the difference in treatment. *See id*. This is a tall task for CVS. As set forth below, CVS fails to clear the bar.

The Equal Protection Clause of the Fourteenth Amendment, § 1, commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The first question in assessing an equal protection claim is the level of scrutiny that applies to the claim. "When no fundamental right or suspect class is at issue, a challenged law must pass the rational basis test." *Hughes v. City of Cedar Rapids, Iowa*, 840 F.3d 987, 996 (8th Cir. 2016) (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993)). CVS does not allege that it has a fundamental right to a retail pharmacy permit. Nor could it. "No right can qualify as 'fundamental' for purposes of equal-protection analysis unless it is guaranteed by the U.S. Constitution." *Eggers v. Evnen*, 48 F.4th 561, 565 (8th Cir. 2022). Plainly, a retail pharmacy permit granted under state law is not guaranteed by the U.S. Constitution, and thus no fundamental right is at stake in this case. CVS also does not allege that Act 624 treats people differently based on a suspect classification. Because no fundamental right or suspect class is at issue in this case, CVS's equal protection claim is subject only to rational basis review.

"In rational basis review, 'legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'" *Hughes*, 840 F.3d at 996 (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Id*. (quoting *Williamson v. Lee Optical*, 348 U.S. 483, 487–88 (1955)).

As the Supreme Court explained in *FCC v. Beach Communications, Inc.*, there is a "strong presumption of validity" attached to legislative enactments, and CVS has "the burden 'to negat[e] every conceivable basis which might support it.'"  508 U.S. at 313 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).  "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."  *Beach Commc'ns, Inc.*, 508 U.S. at 313–14 (internal citations omitted).  Instead, in "areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *Id.*

CVS comes nowhere close to negating every conceivable basis that might support Act 624.  Indeed, the distinction between PBMs and pharmacy employers is rational and readily apparent—while PBMs that own pharmacies set the prices for their own pharmacies as well as the pharmacies of their competitors, pharmacy employers do not.  Pharmacy employers, rather, set the prices only for their own pharmacies.  And pharmacy employers under the Act are entitled to the exemption only to the extent that they "[e]xclusively service[] the employees and dependents of the pharmacy employer while utilizing the affiliated pharmacy benefits manager in this state."  Act 624, § 2(f)(3).  Hence there is a reasonably conceivable state of facts that provides a rational basis for the difference in treatment between PBMs and pharmacy employers under Act 624.  As a result, CVS has no chance of succeeding on the merits of its Equal Protection claim.

## V.    Takings Clause

The Fifth Amendment's Takings Clause applies to the States by way of the Fourteenth Amendment.  *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021).  It prohibits the government from taking "private property . . . for public use, without just compensation."  U.S. Const. amend. V.  Optum alone alleges in its preliminary-injunction motion that Act 624 threatens

to effect a taking of its property—its eleven Genoa pharmacies within Arkansas, *see* Optum Br. 39—without just compensation. And it contends that an injunction is necessary because any "legal remedy is inadequate or unavailable." Optum Br. 44. Optum appears to disavow any claim for damages, pointing out that monetary damages cannot be recovered against the State or arms of the State in federal court by virtue of the Eleventh Amendment. *Id*. And that's certainly true—the Eleventh Amendment squarely applies here and bars any claim for monetary damages against Defendants. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985) ("the Eleventh Amendment bars a damages action against a State in federal court"); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 ("a suit against a state official in his or her official capacity . . . is no different from a suit against the State itself").

To state a takings claim, Optum must identify a property interest. *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 439 (8th Cir. 2007). Whether it has done so depends on "existing rules or understandings about property rights." *Tyler v. Hennepin County*, 598 U.S. 631, 638 (2023) (quotations omitted). Arkansas law is one, though not the only, data point for that analysis. *Id*. This Court must "also look to traditional property law principles," plus history and precedent. *Id*. (quotations omitted).

In many instances, the identification of the property interest that is taken is clear. For instance, in *Pharmaceutical Research & Manufacturers of America v. Williams*, 64 F.4th 932, 936 (8th Cir. 2023), a Minnesota law required drug manufacturers to "provide insulin for free to Minnesota residents who meet certain criteria." Thus, the property that was taken was insulin products. In *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 733 (8th Cir. 2022), the plaintiffs alleged that certain executive orders "effectuated physical takings because they forced landlords to accept the physical occupation of their property"—residential rental units—"regardless of

whether tenants provided compensation." Thus, the property that was taken was rental units. And in *Hawkeye Commodity Promotions, Inc.*, 486 F.3d at 439, where an Iowa law abolished the Touchplay video lottery game, the plaintiff alleged that it had a property interest in its gaming license, its Touchplay gaming machines, its Touchplay business, and the continued operation of its enterprise. Although the Court disagreed that each of these constituted a property interest under the Takings Clause, it nonetheless identified and distinguished the various claimed interests.

Here, Optum alleges that Act 624 "threatens to effect a taking of Optum's private property—specifically, its eleven Genoa pharmacies within Arkansas—without just compensation by the state." Optum Br. 39. But apart from oblique references to its "pharmacies" as "assets," Optum Br. 40, Optum offers little in the way of describing what property is made the basis of its takings claim, be that real estate, inventory, the continued operation of its business, or some other interest. And this poses a problem. To start, assume that Optum is alleging that it has a property interest in the continued operation of its business. The problem with such an allegation is that it can only continue the operation of its Genoa pharmacies if it has a retail pharmacy permit. And because it doesn't appear that Optum alleges a property interest in its retail pharmacy permit, it cannot establish a property interest in the continued operation of its business. *See Hawkeye*, 486 F.3d at 439–40 (rejecting a takings claim in the continued operation of a gaming business where the plaintiff lacked a property interest in its gaming license). Consider the Court's reasoning in *Hawkeye*. It reasoned that "[n]o doubt the machines are property under the Takings Clause." *Id.* at 439. And the Court seemingly accepted the district court's undisputed finding that the plaintiff had "'some property interest' in the business itself." *Id.* But as to the "continued operation of the business," the Court reasoned that the plaintiff's participation in Touchplay required a gaming license. *Id.* at 439–440. Looking to state law, the Court found that the plaintiff had no property

interest in its gaming license, and by extension, it did "not have a property right in the continuation of its TouchPlay business for Takings Clause purposes." *Id*. at 440.  That logic applies here. Because Optum does not allege or show a property interest in its pharmacy permit, it necessarily fails to show a property interest in the continued operation of its Genoa pharmacies for Takings Clause purposes.

Ultimately, Optum has the burden to identify a protected property interest and show that it is likely to prevail on the merits of its Takings claim.  Because Optum hasn't identified what property it claims an interest in, it fails to make that showing.

Despite the lack of clarity as to what property it claims will be taken, Optum argues that Act 624 effects both a *per se* taking and a regulatory taking.  The Takings Clause "provides protection . . . against a direct appropriation of property—personal or real, as well as against a regulatory taking—a restriction on the use of property that goes too far." *Williams*, 64 F.4th at 947 (cleaned up).  "A physical *appropriation* of property gives rise to a *per se* taking, without regard to other factors." *Id*. (cleaned up).  "By contrast, the test for determining whether a regulatory taking occurs requires an ad hoc factual inquiry." *Id*. (cleaned up).  "That inquiry requires considering factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Id*. (cleaned up). "Supreme Court precedent has stressed the longstanding distinction between government acquisitions of property and regulations." *Id*. (cleaned up).  Thus, "[t]he essential question in determining whether a taking is a regulatory taking or a physical taking is whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Id*. (cleaned up).  "Whenever a

regulation results in a physical appropriation of property, a per se taking has occurred." *Id.* (cleaned up).

In support of its *per se* takings argument, Optum contends that "forcing a property owner to relinquish title to its property constitutes a *per se* taking." Optum Br. 41. But Optum never identifies what "title" it will purportedly be relinquishing. Optum also argues that "the same rule applies when the government requires a property owner to surrender its property to 'a third party.'" *Id.* And in support of that proposition, it points to the Supreme Court's opinion in *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021), where the Court reasoned that, "[w]hen the government, rather than appropriating private property for itself or a third party, instead imposes regulations that restrict an owner's ability to use his own property, a different standard applies." Although the Court held that a *per se* taking had occurred in *Cedar Point Nursery*, the taking in that case was *physical*, which is undisputedly not the case here. Optum also points to another Supreme Court case to support its proposition that the government effects a *per se* taking when it requires a property owner to surrender its property to a third party. In that case, the Court reasoned that "[a] permanent physical occupation authorized by state law is a taking without regard to whether the State, or instead a party authorized by the State, is the occupant." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982). But *Loretto*, like *Cedar Point Nursery*, is again distinguishable because it related to a physical taking. *Loretto* is also distinguishable because Act 624 does not authorize a permanent physical occupation (or any physical occupation) of any Genoa pharmacy. Thus, Act 624 does not effect a *per se* taking of Optum's property.

Nor does Act 624 effect a regulatory taking. "Under *Penn Central*, courts consider three factors to determine whether a regulatory scheme constitutes a compensable taking: (1) the

regulation's economic impact, (2) the interference of the regulation with investment-backed expectations, and (3) the character of the government action." *Becker v. City of Hillsboro, Missouri*, 125 F.4th 844, 856 (8th Cir. 2025) (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)).

First, Optum's claim fails under the first *Penn Central* factor.  And here again, the lack of clarity in identifying the property interest at stake is a problem: "Because our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction.'" *Murr v. Wisconsin*, 582 U.S. 383, 395 (2017) (alteration in original) (citation omitted).  Optum thus fails to show that it is likely to prevail on its regulatory taking claim under the first *Penn Central* factor.  As the courts reasoned in *Becker* and *Murr*, to determine whether a regulatory taking has occurred, a court must know the value of the property that has been taken and compare it to the value that remains in the property. Yet Optum provides neither of these data points, making it impossible for this Court to engage in this analysis.

Second, Optum's claim fails under the second *Penn Central* factor.  A reasonable investment-backed expectation requires "more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (citation omitted).  "The reasonableness of an expectation may be shaped by 'the regulatory regime in place at the time the claimant acquires the property.'" *Becker*, 125 F.4th at 858 (quotation omitted).  And investment-backed "expectations are often 'informed by the law in force in the State in which the property is located.'" *Id.* (quotation omitted).  Optum contends that when it acquired its Genoa pharmacies in 2018, it expected that those pharmacies would continue to serve their Arkansas patients.  Optum Br. 43.

But Optum has not shown that this expectation was reasonable and investment-backed rather than unilateral. Indeed, as the Federal Trade Commission's reports demonstrate, the vertical integration of PBMs and pharmacies has been investigated and criticized for years. And it should have come as no surprise to Optum that Arkansas or another State would prohibit it.

Third, the character of the government action counsels against a finding of a regulatory taking. This factor includes inquiring into "whether it amounts to a physical invasion or instead merely affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good." *Becker*, 125 F.4th at 859 (cleaned up). Act 624 amounts to no physical invasion whatsoever. Instead, it is a classic example of a public program adjusting the benefits and burdens of public life to promote the common good. Recognizing the conflict of interest that exists when a PBM sets the prices for its own pharmacies as well as its competitors, the General Assembly acted to remove that conflict.

Because all three *Penn Central* factors counsel against a finding that Act 624 effects a regulatory taking, Optum is unlikely to prevail on its taking claim.

Finally, even if Optum could show a taking, it still cannot show entitlement to the extraordinary relief of a preliminary injunction. That is because, if Act 624 were a taking, then it would be justified under the Public Use Clause, and the only remedy available to Optum would be just compensation in a state forum. If the government takes private property without a public purpose, the taking is "void." *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 245 (1984). A taking satisfies the Public Use Clause if it is "rationally related to a conceivable public purpose." *Dahlen v. Shelter House*, 598 F.3d 1007, 1012 (8th Cir. 2010) (quotations omitted). "This deferential standard echoes the rational-basis test used to review economic regulation under the Due Process and Equal Protection Clauses." *Kelo v. City of New London*, 545 U.S. 469, 490 (2005) (Kennedy,

J., concurring).  Here, there is no question that Act 624 serves a valid public purpose: it protects consumers by removing the inherent conflict of interest that arises when a PBM sets the prices for its own pharmacies as well as its competitors.  Thus, the only remedy available to Optum is just compensation, which it cannot obtain from Defendants in federal court because the Eleventh Amendment prohibits it.

Nonetheless, Optum claims that "injunctive relief is appropriate under clear Eighth Circuit precedent," Optum Br. 39, and in support of that argument, it cites to the Eighth Circuit's opinion in *Williams*, 64 F.4th 932.  But *Williams* involved a taking of property that was continuous and ongoing. 64 F.4th at 949.  Specifically, the drug manufacturers in *Williams* would have been required to continue providing free insulin, and then seeking compensation from the State in an endless series of lawsuits, unless the law was enjoined.  *Id*. at 947–48.  Thus, the Eighth Circuit found that an injunction, rather than just compensation, was appropriate in that case because the manufacturers lacked an adequate legal remedy.  *Id*. at 949.  No similar claim can be made here. If Act 624 effects a taking at all, which it doesn't, then it will be a single occurrence.  And under these circumstances, Optum can file a claim for just compensation in the Arkansas Claims Commission.

## VI.    Act 624 is not preempted by ERISA.

Ten years ago, a trade association of PBMs challenged before this Court an Arkansas law that regulated PBMs' under-reimbursement of Arkansas pharmacies on behalf of employee benefit plans, claiming it was preempted by ERISA.  This Court initially decided to uphold the law but, bound by circuit precedent that issued while this Court was preparing its decision, it held Arkansas's law was preempted.  *Pharm. Care Mgmt. Ass'n v. Rutledge*, 240 F. Supp. 3d 951, 957–58 (E.D. Ark. 2017).  On appeal, the Supreme Court vindicated this Court's initial view and unanimously held ERISA did not preempt Arkansas's law.  *Rutledge v. Pharm. Care Mgmt. Ass'n*,

592 U.S. 80 (2020). A decade later, PBMs are again citing ERISA to challenge an Arkansas regulation of PBMs addressing the same evil. Yet this challenge has even less merit. Whereas the law in *Rutledge* at least regulated PBMs' reimbursements on behalf of employee benefit plans— and thus arguably impacted employee benefit plans themselves—this law doesn't regulate PBMs in their capacity as plan administrators. Instead, it regulates them in a very different capacity, that of would-be retail pharmacist. *See* Act 624, § 2(b) (prohibiting a PBM from holding a permit for the retail sale of drugs or medicines in Arkansas). In fact, the only thing Act 624 says, indirectly or directly, about employee benefit plans is that its prohibition *doesn't* apply where the PBM/pharmacy is the employer, thereby permitting pharmacy employer plans to use their own in-house PBM. *See id.* § 2(f). Yet that provision, which saves Act 624 from having any impact on plan design, is the one Plaintiffs protest most vociferously—confirming that their challenge isn't really about impacts on employee benefit plans at all.

### A.    ERISA preempts regulations of the benefits plans offer, not regulations of plan-provider relations or service providers themselves.

ERISA's preemption clause is often said to preempt "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" regulated by ERISA. 29 U.S.C. § 1144(a). In fact, the full preemption clause says that "the provisions of this subchapter and subchapter III [two of ERISA's three subchapters] shall supersede" such laws. *Id.* That language plainly suggests that a law relating to ERISA-regulated plans is only preempted if "a provision in [those subchapters of] ERISA governs the same matter as the disputed state law, and thus could replace it," as the word supersede means "replace." *Rutledge*, 592 U.S. at 93 (Thomas, J, concurring); *see Humana Inc. v. Forsyth*, 525 U.S. 299, 307 (1999) (reading "supersede" in a related context to mean "to displace (and thus render ineffective) while providing a substitute rule").

42

However, the Supreme Court has historically overlooked the first part of the preemption clause and read it as though it "mark[ed] for preemption 'all state laws insofar as they . . . relate to any employee benefit plan' covered by ERISA." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995). Overlooking the "supersede" language led to interpretive difficulties, as "pre-emption would never run its course" had courts read the "relate to" language literally by itself. *Id.* For not just any health law, but any tax or wage law, or generally applicable contract or tort law, has some relation to employee benefit plans. Accordingly, beginning in *Travelers*, the Court went "beyond the unhelpful text" and "look[ed] instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Id.* at 656; *see Rutledge*, 592 U.S. at 86. In doing so, it ended up where it would have had it applied the whole text. "Indeed, since *Travelers* every state law [the Supreme] Court has held pre-empted involved a matter explicitly addressed by ERISA provisions." *Id.* at 96 (Thomas, J., concurring).

The result of this approach has been a preemption jurisprudence that sharply distinguishes between laws that, on the one hand, regulate the relationships between plans and their beneficiaries, and, on the other, regulate the relationships between plans and the service providers plans contract with to provide benefits. ERISA "sought 'to ensure that plans and plan sponsors would be subject to a uniform body of benefits law,'" *Rutledge*, 592 U.S. at 86 (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990)), so the Supreme Court read ERISA's preemption clause to be "primarily concerned with pre-empting laws that require providers to structure benefit plans in particular ways," *id.* at 86–87. A State, for example, may not "requir[e] payment of specific benefits." *Id.* at 87 (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983)); *see Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 732 (1985) (holding preempted, but for

43

ERISA's insurance saving clause, a law mandating coverage of specified mental health benefits). Nor, absent satisfying the insurance saving clause, may a State mandate plans or their administrators to cover services from particular providers. *See Ky. Ass'n of Health Plans, Inc. v. Miller*, 539 U.S. 329, 334 (2003) ("To determine whether Kentucky's [any willing provider] statutes are saved from pre-emption, we must ascertain whether they are 'law[s] . . . which regulate insurance' under [ERISA's insurance saving clause]."). Nor (again absent satisfying the insurance saving clause) may a State make a plan or plan administrator submit its benefits denials to outside review. *See Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 365 (2002). All of which is to say, a State may not tell ERISA plans what to cover or how they decide whether to cover it.

But by contrast, while a State may not tell ERISA plans what benefits to provide or from whom, States may regulate the behind-the-scenes relations between plans and the providers who provide those benefits. States may regulate the rates at which plans reimburse providers. *See Rutledge*, 592 U.S. at 88 (upholding Arkansas's regulation of the rates at which PBMs reimbursed pharmacies on plans' behalf); *Travelers*, 514 U.S. at 668 (upholding regulation of the rates at which insurers reimbursed hospitals on plans' behalf). States may regulate the wages plans pay. *See Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 334 (1997). And States may entertain providers' "lawsuits against ERISA plans for run-of-the-mill state law claims" for breach of contract or torts, even though those suits "obviously affect[] and involv[e] ERISA plans." *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 833 (1988); *see id.* at 833 n.8 (collecting cases, including a defamation claim that a medical practice brought against a plan for defaming its services to its beneficiaries).

This isn't because such laws and claims don't affect the benefits plans choose to provide; regulating reimbursement rates obviously has that effect, and the Supreme Court has

acknowledged as much. *See Rutledge*, 592 U.S. at 91 (acknowledging plans might "decide to limit benefits or charge plan members higher rates as a result" of Arkansas's law); *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 816 (1997) ("Any . . . law, that increases the cost of providing benefits to covered employees will have some effect on the administration of ERISA plans."); *Travelers*, 514 U.S. at 660 (acknowledging the law there was "an influence that can affect a plan's shopping decisions"). Rather, it is because "ERISA has nothing to say" about the matters these laws regulate, and a "reading of [ERISA's preemption clause] resulting in the pre-emption of traditionally state-regulated substantive law in those areas where ERISA has nothing to say would be 'unsettling.'" *Dillingham*, 519 U.S. at 330 (quoting *Travelers*, 514 U.S. at 665). Unlike beneficiaries, ERISA does not give providers a cause of action, nor does it regulate how providers are compensated, so if it preempted state causes of action or regulation on that subject, plan-provider relations would be a law-free zone. *See In Home Health, Inc. v. Prudential Ins. Co. of Am.*, 101 F.3d 600, 606 (8th Cir. 1996) (noting that if ERISA preempted providers' claims against plans, "providers [would] have no recourse under either ERISA or state law") (quoting *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 247 (5th Cir. 1990)). That would "not serve, but rather directly defeat[]" ERISA's purposes; providers would be "understandably reluctant," to say the least, to deal with ERISA plans if plans were immune from any kind of regulation or suit for compensation. *Id.*

Yet if plans have at least tried—albeit invariably without success—to claim that ERISA preempts regulations of how they treat their providers, caselaw on ERISA preemption of regulations of service providers themselves is a barren wasteland. In the 50 years since ERISA was enacted, providers have not even tried—with one notable exception addressed below—to claim that ERISA preempts regulations of *them* because regulating what they sell affects what

plans can buy.  The Supreme Court has only ever alluded to such a theory to dismiss it as an absurd result of other readings of ERISA that proves those readings' error.  For example, in *Metropolitan Life*, one of the Supreme Court's first insurance saving clause cases, the insurers argued that only "state laws that directly regulate the insurer, and laws that regulate such matters as the way in which insurance may be sold," were saved by the saving clause, while regulations that dictated the benefits plans could offer through insurers were not.  471 U.S. at 741.  The Court said that would "read[] the saving clause out of ERISA entirely, because laws that regulate only the insurer, or the way in which it may sell insurance, do not 'relate to' benefit plans in the first instance.  Because they would not be preempted by § [1144](a), they do not need to be 'saved' by § [1144](b)(2)(A)." *Id.*  In fact, so reluctant has the Supreme Court been to deem service providers regulated by ERISA, or service-provider regulation preempted by it, that it has held that when a physician is employed by the plan administrator itself (as is the case of plan-administrator HMOs that employ physicians) and makes "mixed eligibility and treatment decisions," *Pegram v. Herdrich*, 530 U.S. 211, 229 (2000), those part-eligibility decisions by a plan-administrator employee can only be challenged in "a state-law malpractice claim," *id.* at 236, not a suit under ERISA.  Otherwise, the Court explained, ERISA would preempt state tort law about "health care, a traditional subject of state regulation."  *Id.* at 237.

Though claims that ERISA preempts mere service-provider regulations are extremely rare, there is one notable and nearly controlling exception in a suit brought in the Eighth Circuit by one of the plaintiffs in this case.  In *Pharmaceutical Care Management Association v. Wehbi*, 18 F.4th 956 (8th Cir. 2021), PCMA challenged a North Dakota regulation of PBMs under ERISA and Medicare Part D.  The bulk of the provisions it challenged regulated PBMs in their capacity as plan administrators, but one provision forbade PBMs from having an ownership interest in a mail

order pharmacy unless they agreed not to participate in transactions that benefited the PBM instead of another person owed a fiduciary duty. *See id.* at 965–66. The Eighth Circuit dismissed PCMA's challenge to this pharmacy-ownership restriction in a paragraph, reasoning that whatever impact on plan beneficiaries' access to drugs it might have would be PBMs' "responsibility . . . for refusing" to comply, not the law's. *Id.* at 969 (quoting *Rutledge*, 592 U.S. at 91).

CVS and Optum will likely say that holding is distinguishable because unlike under Arkansas's law, under North Dakota's a PBM could still own a pharmacy if it made certain promises to plans. But that fact made North Dakota's law more subject to ERISA challenge, not less, because by conditionally imposing fiduciary duties on PBMs in their capacity as plan administrators, it could arguably be said to regulate plan administration. *See Pharm. Care Mgmt. Ass'n v. Dist. of Columbia*, 613 F.3d 179, 185 (D.C. Cir. 2010) ("[B]y specifying the standard of conduct to which a PBM must adhere, i.e., that of a fiduciary, [D.C. laws] also regulate the administration of employee benefits. Indeed, the obvious purpose . . . is to prescribe the way PBMs decide which pharmaceuticals to provide to plan beneficiaries."). Not so of Arkansas's law, which solely regulates retail pharmacy ownership.

### B.     Under these standards, Act 624 is not preempted.

Act 624 is easily not preempted under this standard. To start, Act 624 regulates matters about which "ERISA has nothing to say," not even tangentially. *Dillingham*, 519 U.S. at 330. Act 624 is a ban on PBMs' owning retail pharmacy permits, for reasons of fair competition. It goes without saying that ERISA does not regulate retail pharmacy permitting, or anticompetitive practices in the retail pharmacy industry. If ERISA were read to preempt state regulation of those matters, the result wouldn't be that ERISA would regulate them, but that no government would. That result "would be 'unsettling'" to say the least. *Id.* (quoting *Travelers*, 514 U.S. at 665).

Second, and most fundamentally, Act 624 doesn't regulate plans or PBMs in their capacity as plan administrators. Instead, it regulates who can own a retail pharmacy—entities that, like doctors, lawyers or accountants, merely sell goods and services ERISA plans and others buy. *Cf. Wehbi*, 18 F.4th at 968 (holding that several provisions of North Dakota's PBM law were not preempted by ERISA because they "merely authorize pharmacies to do certain things," even though those provisions "prevent[ed] PBMs" in their capacity as plan administrators "from preventing pharmacies from engaging in those practices"). And though the prohibition falls on PBMs, which do sometimes act as plan administrators of prescription drug benefits, it doesn't regulate how they perform their plan-administrator services, but only their ownership of businesses that are outsiders to ERISA plans. So just as ERISA preempts laws that regulate how insurers administer plans but permits "laws that regulate only the insurer, or the way in which it may sell insurance," *Metro. Life*, 471 U.S. at 741, it permits Arkansas's law, which regulates only PBMs and whether they may sell drugs at retail. And in the one rare instance where its prohibition on PBM-pharmacy affiliation could have touched on plan administration—pharmacy employers that want to self-administer their own prescription drug benefit by creating an in-house PBM—the ban does not apply. *See* Act 624, § 2(f).

### C.    Optum's and CVS's counterarguments fail.

Optum and CVS offer two theories for why Act 624, though it only regulates who may obtain a retail pharmacy permit, is preempted. First, they theorize that Act 624 would interfere with nationally uniform plan administration by effectively requiring plans to design different pharmacy networks in different States: ones that, if they wish, include PBM-affiliated pharmacies outside Arkansas, but only include non-PBM-affiliated pharmacies in Arkansas—because there wouldn't be any PBM-affiliated pharmacies to include. Second, and relatedly, they claim Act 624 would regulate a central matter of plan administration, the composition of the plan's pharmacy

48

network: because there wouldn't be any PBM-affiliated pharmacies in Arkansas to include in the network, plans would be functionally prohibited from including them. Both of these arguments fail because, as even describing them suggests, they conflate regulating plan administration with regulating the market from which plans purchase benefits. A law that regulates who may own a pharmacy doesn't regulate which pharmacies a plan chooses to include in its network; it only regulates which pharmacies exist for plans to choose from.

Starting with uniformity, Optum relies heavily, Optum Br. 21, 23, on the Supreme Court's statement in *Egelhoff v. Egelhoff* that ERISA preempts laws that "interfere[] with nationally uniform plan administration," and that "[u]niformity is impossible . . . if plans are subject to different legal obligations in different states." 532 U.S. 141, 149 (2001). It then reasons that Act 624 would have that effect by "mak[ing]" pharmacy networks that include PBM-affiliated pharmacies "illegal in Arkansas" but not elsewhere. Optum Br. 22.

As explained immediately below, the language in *Egelhoff* must be read in context, which shows it only refers to differing legal obligations that impinge on "a central matter of plan administration," *Egelhoff*, 532 U.S. at 148, but even reading *Egelhoff* literally reveals that Act 624 doesn't create a uniformity problem. For Act 624 doesn't impose legal obligations on plans whatsoever. It is impossible for a plan, or even a PBM acting on a plan's behalf, to violate Act 624; Act 624 does not say plans or PBMs may not include PBM-affiliated pharmacies in their pharmacy networks. Instead, it says a PBM cannot own a retail pharmacy permit, with the result that in Arkansas PBM-affiliated pharmacies will not exist. What pharmacies a plan or PBM then chooses to include in a plan's pharmacy network from the pharmacies that remain—or if it even wants to have a pharmacy network or offer prescription drug benefits—is up to the plan and PBM. Likewise, if one State (say Arkansas) revoked a doctor's license while another (say Texas) did not,

one wouldn't say a plan operating in both States is subject to different legal obligations because in Texas it can include the doctor in its network and in Arkansas it can't; one would say that in one State the doctor is allowed to provide the plan services and in the other he is not.  How the plan structured its network in either State as a result would remain in its discretion.

Aside from the fact that Optum and CVS's claim of disuniformity fails even a literal reading of *Egelhoff*, "not every state law that affects an ERISA plan or causes some disuniformity in plan administration has an impermissible connection with an ERISA plan." *Rutledge*, 592 U.S. at 87.  Otherwise, unless States made their laws perfectly uniform, ERISA would preempt any state law that regulates plans. *Rutledge*, *Travelers*, *Dillingham*, and the fact that ERISA plans do not wield an ERISA immunity shield from state-law contract and tort suits all illustrate that isn't true.  Instead, courts look to whether the particular kind of uniformity a law frustrates was "an object of pre-emption." *Travelers*, 514 U.S. at 662.  For example, *Travelers* reasoned that "cost uniformity was almost certainly not an object of pre-emption," *id.*, because "rate differentials" were "common . . . even in the absence of state action," making it "unlikely that ERISA . . . was meant to bar" state-imposed ones. *Id.* at 660.  Likewise, in *Rutledge* the Supreme Court did not care that Arkansas's law "mandat[ed] a particular pricing methodology for pharmacy benefits" in Arkansas that wasn't mandated in other States, 592 U.S. at 90, because ERISA preemption wasn't enacted to nationally harmonize costs.

Under that logic, the question here is whether ERISA preemption was intended to ensure that plans would have a nationally uniform pharmacy market from which to shop, free from state interference with who could practice pharmacy in their State.  The answer is obviously no.  The drafters of ERISA could not have dreamed of creating a nationally uniform pharmacy market because—besides failing to create any federal scheme for licensing pharmacies to replace

50

prevailing state pharmacy licensing laws—which pharmacies operate in which States differs even absent state action.  Optum's affiliate pharmacy, for example, Genoa, operates in only 47 states, presumably not because Genoa has been unable to obtain a license in the other three.[7]  *See Partner with Genoa*, https://www.genoahealthcare.com/partner-with-genoa.html.  So where Optum warns that under Act 624 plans can form networks including Genoa "in all 49 states" but will be forced to design a Genoa-free network in Arkansas, Optum Br. 22, the reality is that by Optum's own choices plans that included Genoa already had to design different networks in three states than they did in the other 47.  Other large pharmacy chains are only regional, *see All Rite Aid locations*, https://www.riteaid.com/locations/ (1,141 pharmacies in 15 States), and of course many pharmacies operate in only one State.  So national pharmacy marketplace uniformity could not have been an object of ERISA preemption.

Optum and CVS's second theory of ERISA preemption is that Act 624 regulates plans' choices about which pharmacies to include in their networks, a central matter of plan administration.  Pharmacy network design *is* a central matter of plan administration, but Act 624 does not regulate it; it regulates who can own a pharmacy in the first place.  Therein lies all the difference, and if courts were to embrace Optum and CVS's conflation of the two, not just Act 624 but a whole body of pharmacy and health regulation would fall.  CVS, for example, reasons that "[b]y barring any PBM-affiliated pharmacies from operating in the State, the law denies plan sponsors the discretion to choose to offer this . . . option to their participants."  CVS Br. 38.  But the same could be said of *any* pharmacy-licensing decision: by denying a pharmacy a license, or revoking it, the decision denies plans the discretion to choose to include that pharmacy in its

---

[7] However, if that were the reason, the logic of Optum's claim would be that ERISA preempted the denial of the license, on whatever ground.

network.  So on CVS's logic, any generally applicable limit on who may obtain a pharmacy permit must fall; a pharmacy challenging the requirement that its pharmacists must intern in a retail pharmacy before seeking a license, Ark. Code Ann. § 17-92-307(a), or a hospital challenging the longstanding prohibition on in-house pharmacies, *id.* § 17-92-607, could claim ERISA preempts those laws because they deny ERISA plans the discretion to include pharmacies that fall afoul of them in their networks.  Likewise, a pharmacy whose license is being revoked for health and safety reasons could say ERISA preempts the revocation because ERISA plans should be allowed to decide whether to keep it in its network.

And the logic of CVS's position doesn't run out there.  It could be argued that when a State bans a medical procedure or treatment, it denies plans the discretion to choose to cover that procedure or treatment.  *Cf. United States v. Skrmetti*, 145 S. Ct. 1816 (2025) (upholding ban on prescribing hormones and puberty blockers to minors to treat gender dysphoria); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) (upholding ban on abortion).  So on CVS's logic, a doctor prohibited from performing abortions could claim ERISA preempts the prohibition as applied to ERISA-plan-insured patients because there are ERISA plans that may wish to cover abortions.  That is patently absurd, yet follows from CVS's argument that ERISA preempts denying it a license because ERISA plans may wish to cover drugs purchased at CVS.  And if that is the consequence of its reading of ERISA preemption, that means its reading is incorrect, for "[t]he bigger the package of regulation with indirect effects that would fall on [their] reading of § [1144], the less likely it is that federal regulation of benefit plans was intended to eliminate state regulation" of pharmacy licensure.  *Travelers*, 514 U.S. at 661.

## VII.    Act 624 is not preempted by Medicare Part D.

CVS and Optum also claim that Act 624 is preempted by Medicare Part D.  That claim fails for much the same reasons that their ERISA preemption claim does.  A state law is preempted

by Medicare Part D, the Eighth Circuit has held, if it regulates the same subject matter as a Medicare Part D statutory provision or regulation.  CVS and Optum point to a series of Part D standards that regulate the composition of Part D plan pharmacy networks and say Act 624 regulates the same subject matter because it prevents Part D plans in Arkansas from including PBM-affiliated pharmacies in their networks.  But as with their ERISA preemption challenge, this argument fails because Act 624 doesn't regulate pharmacy network composition; it regulates who may be a pharmacy in the first place, a distinction the very regulations that CVS and Optum rely on draw.  And if Act 624 were held to occupy the same field as Part D's network regulations, it is hard to see what pharmacy-licensing law would survive.

### A.    In the Eighth Circuit, Part D preempts a law if it regulates the same subject matter, defined narrowly, as a Part D provision or regulation.

Medicare Part D is a prescription drug benefit within Medicare.  It incorporates Medicare Part C's preemption provision by reference.  *See* 42 U.S.C. § 1395w-112(g) (providing that "[t]he provisions of sections 1395w-24(g) and 1395w-26(b)(3) of this title shall apply with respect to PDP [prescription drug plan] sponsors and prescription drug plans under this part in the same manner as such sections apply to MA [Medicare Advantage] organizations and MA plans under part C").  Part C's preemption provision, codified in § 1395w-26(b)(3), provides that "[t]he standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part."  42 U.S.C. § 1395w-26(b)(3).  So as incorporated by reference into Part D, the provision provides that "[t]he standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [prescription drug] plans which are offered by [PDP sponsors] under this part."

Because Congress repealed language from the Part C preemption clause that limited preemption to state law that "is inconsistent with [Part C] standards," *Wehbi*, 18 F.4th at 971 (quoting Pub. L. No. 105-33, § 1856(b)(3)(A), 111 Stat. 251, 319 (1997)), the Eighth Circuit held in *Wehbi* that Part D provides for "field preemption" rather than "conflict preemption," *id.*  But because "preemption occurs only when federal standards 'supersede' state law," *id.* (quoting 42 U.S.C. § 1395w-26(b)(3)), Part D doesn't "preempt *all* state laws as applied to Medicare Part D; rather, it preempts only those that occupy the same 'place'—that is, that regulate the same subject matter as—federal Medicare Part D standards," *id.*

As the Tenth Circuit has said in "disagree[ing] with [the Eighth Circuit's] . . . approach," the Eighth Circuit defines the subject matter a Part D standard regulates under this test "quite narrowly," even "fastidious[ly]."  *Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183, 1208 (10th Cir. 2023).[8]  For example, although Part D regulations prohibit Part D plans from placing "unreasonable or irrelevant conditions" on pharmacies' participation in Part D networks, *Wehbi*, 18 F.4th at 972, the Eighth Circuit held that this "highly general language . . . indicate[d] an intent to leave to the states the specifics of what plans and PBMs may or may not demand of pharmacies," *id.* at 973.  And, crucially, in choosing to draw that distinction between general and specific regulation of conditions on network participation, the Eighth Circuit reasoned that "the practice of pharmacy is an area traditionally left to state regulation," *id.* at 972, and that the very rule on which PCMA relied espoused a "general position of deferring to States for regulating the practice of pharmacy," *id.* (quoting 70 Fed. Reg. 4194, 4278 (Jan 28, 2005)).  In another instance of the Eighth

---

[8] Even though the Tenth Circuit expressly rejected *Wehbi*, CVS suggests this Court follow it, citing its broad declaration that "state law 'should not apply' because Part D 'is a federal program operated under federal rules.'"  CVS Br. 41 (quoting *Mulready*, 78 F.4th at 1206).  The Eighth Circuit has rejected this sort of categorical approach to Part D preemption.

Circuit's narrow application of its test, it held that a provision of North Dakota's law that "prevent[ed] PBMs from clawing back copayments from pharmacies" was not preempted by "federal regulations regarding copayments" because "PCMA ha[d] not identified a federal standard that governs who is entitled to keep a copayment." *Id.* at 976. Regulating on the general subject of copayments did not suffice to show that federal standards and North Dakota's law regulated the same subject matter. *See id.* (holding that federal PBM conflict-of-interest regulations did not preempt North Dakota provision that addressed PBM conflicts of interest because they "address[ed] different kinds of conflicts of interest").

### B. Under the Eighth Circuit's test for Part D preemption, Act 624 is not preempted.

Under this narrow test for deciding whether state laws encroach on a Part D-preempted field, none of the Part D standards CVS and Optum cite preempt Act 624.

Beginning with the subject of Part D plan discretion over network composition, CVS claims the Part D statute "guarantee[s] plan sponsors significant discretion to build and maintain pharmacy networks," CVS Br. 41, including assuring them "the prerogative to 'select the providers from whom the benefits under the plan are provided,'" *id.* (quoting 42 U.S.C. § 1395w-22(d)(1)). However, both the statute and the regulation it cites, *see id.* (citing 70 Fed. Reg. 4588, 4614 (Jan. 28, 2005)), concern Medicare Part *C*, the Medicare Advantage program, and CVS cites nothing indicating that either applies to Part D. When it comes to Part D, a very different rule applies, as Optum recognizes. *See* Optum Br. 27–28. There, under Part D's so-called any-willing-pharmacy rule, a Part D plan must "permit the participation of any pharmacy that meets the terms and conditions under the plan." 42 U.S.C. § 1395w-104(b)(1)(A); *see also* 42 C.F.R. § 423.120(a)(8)(i). And *Wehbi* holds both that the regulations implementing that requirement "authorize[] states to determine which conditions a PBM *must* place on pharmacies' participation

in its network," 18 F.4th at 972 (citing 42 C.F.R. § 423.153(c)(1)), and "leave to the states the specifics of what plans and PBMs may or may not demand of pharmacies," *id.* at 973.

In spite of the fact that the any-willing-pharmacy rule allows States to directly regulate what conditions Part D plans must place and may not place on inclusion in their networks, including "minimum standards for pharmacy practice as established by the States," 42 C.F.R. § 423.153(c)(1), Optum claims it precludes States from denying pharmacy licenses to PBM-affiliated pharmacies.  It reasons that Arkansas's law has the effect of ousting pharmacies from Part D plans' networks even when those pharmacies "otherwise meet the sponsor's requirements." Optum Br. 28.

In the first place, even a law that formally barred Part D networks from including PBM-affiliated pharmacies would not be preempted by this rule, as the rule "authorizes states" to place their own conditions on "pharmacies' participation in [a Part D] network," as *Wehbi* held.  18 F.4th at 972.  And *Wehbi* also held that states may regulate conflicts of interest between PBMs and pharmacies.  *See id.* at 976 (upholding North Dakota's conditional ban on PBMs' owning pharmacies).  But more fundamentally, Act 624 does not oust pharmacies from Part D plans' networks; it prevents certain pharmacies from being Arkansas pharmacies altogether.  And as Optum itself points out, Optum Br. 28, the any-willing-provider rule defines a network pharmacy as a "licensed pharmacy" under state law.  42 C.F.R. § 423.100.  So far from regulating the same subject matter as Act 624, the any-willing-provider rule bows to state licensing laws like Act 624, prohibiting plans from including pharmacies in their networks unless States license them.  Indeed, in writing the rule, the Centers for Medicare & Medicaid Services explained that "we do not think we have the authority to preempt State pharmacy licensing laws . . . and we do not intend to establish standards in this area."  70 Fed. Reg. at 4320.

Next, both CVS and Optum (CVS Br. 42, Optum Br. 26) point to a Part D rule that provides that Part D "contracted pharmacy network[s] *may* be supplemented by . . . mail-order" pharmacies." 42 C.F.R. § 423.120(a)(3) (emphasis added). Citing no evidence, they assert that "most" (Optum Br. 26) or "the vast majority" (CVS Br. 42) of mail-order pharmacies are PBM-affiliated and that banning PBM-affiliated pharmacies would "defeat[] the point" of the rule (Optum Br. 42). To the contrary, the General Assembly heard testimony that about 570 of the 670 mail-order pharmacies that operate in Arkansas are not PBM-affiliated. *Supra* at 10. And even if the numbers were closer to what CVS and Optum suggest, the rule would not preempt Arkansas's law for at least two reasons. First, a law that, contrary to fact, greatly reduced the number of mail-order pharmacies operating in Arkansas would not conflict with a rule that merely provides that plans may include mail-order pharmacies in their network; to rise to the level of even an arguable conflict, the law would have to ban mail-order pharmacies outright. Second, like the any-willing-provider rule, the rule bows to state licensing law. *See* 42 C.F.R. § 423.120(a)(3) (providing that a "contracted pharmacy network" may include mail-order pharmacies); *id.* § 423.100 ("Contracted pharmacy network means licensed pharmacies, including . . . mail-order . . . pharmacies under contract with a Part D sponsor"). A regulation can't preempt the very state law to which it defers. Optum's passing argument that Act 624 is preempted by the requirement that Part D pharmacy networks include "home infusion pharmacies," Optum Br. 26 (quoting 42 C.F.R. § 423.120(a)(4)), fails for much the same reasons. Optum cites nothing to show that plans have "traditionally relied on PBM-affiliated infusion pharmacies," *id.* at 27; Optum does not claim that plans rely exclusively on PBM-affiliated infusion pharmacies, or even that compliance would be frustrated absent PBM-affiliated infusion pharmacies; and the regulation on which it relies bows to state licensing law. *See* 42 C.F.R. § 423.120(a)(4) (requiring a "contracted pharmacy network" to

provide access to home infusion pharmacies); *id.* § 423.100 (defining contracted pharmacy network to mean licensed pharmacies).

Next, Optum argues that a regulation barring *CMS* from implementing mid-year regulations "that impose new, significant regulatory requirements on a PDP sponsor or prescription drug plan," 42 C.F.R. § 423.516, preempts Arkansas from imposing new regulations of PBMs mid-year.  Optum Br. 26.  This argument fails on multiple levels.  First, as the Eighth Circuit reasoned of a similar argument that provisions of North Dakota's PBM law were preempted by a Part D provision prohibiting the Secretary of Health and Human Services, but not States, from interfering with certain pharmacy-plan negotiations, "none of the challenged provisions purports to regulate what the HHS Secretary may do." *Wehbi*, 18 F.4th at 973.  Likewise, Arkansas's law obviously does not authorize CMS to impose mid-year regulatory requirements.  And if CMS had wanted to preempt States from imposing mid-year regulatory requirements instead of tying only its own hands, it could have.  Second, even if the regulation impliedly preempted state mid-year regulatory changes, Arkansas's law does not impose mid-year regulatory requirements on Part D plans or Part D plan sponsors—that is, the insurance companies that offer Part D plans—but on pharmacies and PBMs.

Last, Optum claims that Act 624 is preempted by 42 C.F.R. § 423.120(a)(7)(i).  Optum Br. 27.  That provision waives the Part D network rule's pharmacy access requirements regarding geographical proximity of beneficiaries to network pharmacies in cases where a Medicare Advantage organization provides its enrollees with access to Part D drugs through "pharmacies owned and operated by the [Medicare Advantage] organization."  Optum says Act 624 conflicts with this rule because it "is commonly the case" that Medicare Advantage organizations are affiliated with PBMs.  Optum Br. 27.  This argument fails for multiple reasons.

First, like every other provision about network composition Optum relies on, the rule only applies to pharmacies that have a license from the State in the first place; a Part D network pharmacy is by definition "a licensed pharmacy."  42 C.F.R. § 423.100.  Second, like Optum's other claims of conflict, Optum doesn't claim that Arkansas's law would extinguish the class of pharmacies federal regulations authorize, but only (sans evidence) that some unspecified fraction of those pharmacies are "commonly" PBM-affiliated.  If Medicare Advantage organization-owned pharmacies are permitted to exist so long as they are not also PBM-affiliated, it is difficult to see how there is any conflict.

Last, Optum claims that Arkansas's law and § 423.120(a)(7)(i) regulate the same subject matter, namely who may own or be affiliated with a pharmacy, but that is incorrect for two reasons. Section 423.120(a)(7)(i) does not authorize Medicare Advantage organizations to own pharmacies; rather, it only waives pharmacy access requirements for plans that use Medicare Advantage organization-owned pharmacies.  Even if state law prohibited Medicare Advantage organizations from owning pharmacies, the rule—which merely provides that to the extent Medicare Advantage organization-owned pharmacies exist in a State and a plan uses them, access requirements are waived—would not preempt that law.  But even if the rule were understood to regulate whether Medicare Advantage organizations may own a pharmacy, Act 624 regulates a different subject: whether *PBMs* may.  And *Wehbi* holds that when deciding whether a state law and a Part D standard regulate the same subject matter, the subject matter they regulate has to be defined at that level of specificity.  *See, e.g.*, *Wehbi*, 18 F.4th at 975 ("disclosures to federal agencies constitute a distinct subject matter from disclosures to pharmacies"); *id.* at 976 (state law not preempted because it and Part D regulations "address different kinds of conflicts of interest"); *id.* (state law prohibiting PBMs "from clawing back copayments" not preempted by "regulations

regarding copayments" because "PCMA ha[d] not identified a federal standard that governs who is entitled to keep a copayment").

### C. CVS's and Optum's arguments that Act 624 falls outside the "state licensing law" exemption either fail or prove that pharmacy regulation is not a subject of Part D preemption in the first place.

Medicare's Part C preemption clause, incorporated by reference into Part D, excepts "State licensing laws" from preemption. 42 U.S.C. § 1395w-26(b)(3). As Optum acknowledges, read literally this exemption "would seem to refer to any 'State licensing laws.'" Optum Br. 29. And Act 624, it agrees, is a licensing law; it "dictates the terms on which pharmacies may be licensed to do business in the state." *Id.* at 31 (emphasis omitted). Nevertheless, it and CVS both maintain that "Act 624 has nothing to do with" the licensing laws exemption. *Id.* Their arguments either fail, or, to the extent they have merit, only illustrate that pharmacy regulation is not a subject of Part D preemption in the first place—as the agency that wrote the regulations on which they rely said when writing them.

CVS's argument for escaping the licensing law exception, CVS Br. 42–43, echoed to a lesser extent by Optum, is that the licensing exception only excepts "traditional licensing standards," not "regulation of Medicare plans" that States "smuggle . . . into licensing regimes," CVS Br. 43. In support of this reading, CVS cites a passage of CMS's preamble to its rule on the Part C program, in which CMS said that the exemption is "limited to State requirements for becoming State licensed" and that under it States may not "impos[e] requirements not generally associated with licensure." 70 Fed. Reg. 4558, 4664 (Jan. 28, 2005). But CVS does not quote the whole passage; CMS's concern was that the exemption could not "be extended to other requirement [sic] that the State might impose *on licensed health plans* that absent Federal preemption must be met as a condition for keeping a State license." *Id.* (emphasis added). Likewise, in the more salient Part D rule, CMS explained that the exemption "did not mean that

States could condition licensure *on a sponsor* meeting requirements unrelated to what we would consider licensure requirements," 70 Fed. Reg. at 4319 (emphasis added), and that if the exemption were read to mean "the State could revoke *a health plan's license* for a failure to meet [any] requirement, this would mean that States could impose virtually any requirement they wished to impose without the requirement being preempted," *id.* (emphasis added).

CMS's reading of the exception, then, merely says that States may not regulate Part D *plans* in a way that Part D would preempt if imposed directly by making the regulation a condition of Part D *plan sponsors'* licensure. That limit on the exception doesn't apply to Act 624, because Act 624 neither regulates plans nor imposes any condition on plan sponsors' licenses. Rather, it regulates who may own a pharmacy, not anything plans do—such as which licensed pharmacies plans choose to include in their networks—and imposes a condition on obtaining a pharmacy license.

Optum offers a strikingly different argument—that the state licensing law exemption only applies to laws that "license *plans*' operation." Optum Br. 29. Its argument goes as follows. Section 1395w-26(b), in which the preemption clause is codified, "applies to standards regulating *plans*." *Id.* Paragraph (b)(1) authorizes the Secretary to establish standards for plans; paragraph (b)(4) addresses the timing of new regulatory requirements imposed on plans; and the preemption clause itself, paragraph (b)(3), contains an accompanying exception for "State laws relating to plan solvency." To this Optum might add that the preemption clause by its terms preempts state law only "with respect to . . . plans," 42 U.S.C. § 1395w-26(b)(3) or, as incorporated by reference into Part D, to "prescription drug plans," *id.* § 1395w-112(g). Given this plan-specific context, Optum argues that the licensing exception should be read as plan-specific too.

This reading of the licensing exception has some force, and Optum is right to point out that by its terms the whole of § 1395w-26(b) applies only to regulations of plans.  But it is also self-defeating.  For if it is true that the licensing exception to Part D preemption only applies to state *plan* licensing laws, not pharmacy licensing laws, because § 1395w-26(b) as a whole only "applies to standards regulating *plans*," Optum Br. 29, what follows is that the preemption clause preempts only state plan regulations, not pharmacy regulations.  This is not to say that Congress couldn't write a plan-specific exemption from a broader preemption clause; it could.  Rather, the problem with Optum's argument is that the basis for its conclusion that the exception is only about laws regulating plans is that the surrounding context shows the entire preemption clause is only about laws regulating plans.  So if the Court accepts Optum's reading of the licensing exception, it must reject its Part D preemption claim.  And were the Court to agree with Optum that § 1395w-26(b) has nothing to do with pharmacy regulation, it would be in good company.  For as has already been noted, CMS in adopting the Part D rules on which CVS and Optum rely said it would "defer[] to States for regulating the practice of pharmacy," 70 Fed. Reg. at 4278, that it lacked "the authority to preempt State pharmacy licensing laws," *id.* at 4320, and that, because it deferred to States' pharmacy regulations, it would affirmatively require plans to ensure that its pharmacies "comply with minimum standards for pharmacy practice established by the States," *id.* at 4278 (citing 42 C.F.R. § 423.153(c)(1)).

**VIII.   Act 624 is not preempted by TRICARE because it contains a limited-use exemption.**

Express Scripts, Inc. ("ESI") challenges Act 624 as preempted as applied to it and its affiliates who deliver pharmacy benefits to beneficiaries of the U.S. Department of Defense's ("DoD") TRICARE program.  This claim is narrow in two ways.  First, it is limited to only four of the Plaintiffs—ESI, Express Scripts Pharmacy, Accredo Specialty Pharmacy, and Freedom Fertility ("TRICARE Plaintiffs").  *See* Compl. ¶ 13.  Second, it is limited only to the mail-order

pharmacy services to TRICARE beneficiaries in Arkansas. *Id*. ¶ 14. In other words, this claim does not apply to any services provided by ESI affiliates in Arkansas outside of the TRICARE program.

As acknowledged by Express Scripts, Express Scripts Br. 10, Act 624 contains an exemption for a limited distribution network to obtain a limited use permit to a pharmacy that would otherwise be prohibited under the Act, *see* Act 624 § 2(d)(1), and here, the exception for "limited distribution drugs" would likely apply to Express Scripts in connection with its administration of the TRICARE Program. Limited use permits under the Act would not expire until September 1, 2027. *Id*. § 2(d)(2)(B). Plaintiffs have not applied for or been denied limited-use permits. Therefore, the TRICARE claim fails because an exemption under Act 624 will allow Express Scripts to continue operating a pharmacy in Arkansas through September 2027, obviating the need for preliminary-injunctive relief before a trial on the merits.

Alternatively, this Court should decline to resolve the TRICARE preemption claim because it is not yet ripe. "The doctrines of standing and ripeness 'originate' from the same Article III limitation." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014) (quoting *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006)). The difference is that "[r]ipeness is peculiarly a question of timing and is governed by the situation at the time of review, rather than the situation at the time of the events under review." *Iowa League of Cities v. EPA*, 711 F.3d 844, 867 (8th Cir. 2013) (citing *Neb. Pub. Power Dist. v. MidAm. Energy Co.*, 234 F.3d 1032, 1039 (8th Cir. 2000)). As expressed by the Eighth Circuit in *Missouri. ex rel. Missouri Highway and Transportation Commission v. Cuffley*:

> The basic rationale of the ripeness doctrine is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an

> administrative decision has been formalized and its effects felt in a
> concrete way by the challenging parties.

112 F.3d 1332, 1337 (8th Cir. 1997).  It is the Plaintiffs' burden to show their case is ripe for

review by showing "both 'the fitness of the issues for judicial decision and the hardship to the

parties of withholding court consideration.'"  *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583,

608 (8th Cir. 2022) (quoting *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 998 (8th Cir. 2022)).

A case is unfit for review if it "would . . . benefit from further factual development [or] poses a

purely legal question . . . contingent on future possibilities."  *Id*. (quoting *Sch. of the Ozarks*, 41

F.4th at 998).  In this case, the standing and ripeness issues "essentially 'boil down to the same

question,'" so the analysis collapses together.  *Religious Sisters*, 55 F.4th at 608 (quoting *Sch. of

the Ozarks*, 41 F.4th at 998).

Again, there has been no opportunity for the Defendants to make an administrative decision

as to any exemption that may apply to the TRICARE Plaintiffs under Act 624.  Moreover, the

limited-use permit granted under the extension lasts until September of 2027.  To that end,

Defendants should be allowed time to make an administrative decision so effects, if any, can be

challenged in a concrete way.  *See Cuffley*, *supra.*

**IX.    CVS and PCMA ask this Court to enjoin the Arkansas State Board of Pharmacy—a
state agency that cannot be sued in or enjoined by a federal court because it is immune
from suit under the Eleventh Amendment.**

CVS and PCMA ask the Court to enjoin the Arkansas State Board of Pharmacy from

enforcing Act 624.  Injunctive relief, however, is not available against the Pharmacy Board.[9]  The

Eleventh Amendment prohibits it.

The Eleventh Amendment bars suits brought against States in federal court.  *Seminole

Tribe of Fla. v. Florida*, 517 U.S. 44, 53 (1996).  The Eleventh Amendment states:

---

[9] A point that Optum recognizes. *See* Optum Br. 44.

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

"[T]he Eleventh Amendment by its terms clearly applies to a suit seeking an injunction, a remedy available only from equity." *Cory v. White*, 457 U.S. 85, 91 (1982). More broadly, Eleventh Amendment immunity applies "regardless of the nature of the relief sought." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). And the Eleventh Amendment applies to state agencies like the Arkansas State Board of Pharmacy. In the Eleventh Amendment context, state agencies are treated the same as states. *N. Ins. Co. of N.Y. v. Chatham Cnty., Ga.*, 547 U.S. 189, 193 (2006) (Eleventh Amendment immunity applies to the State and "arms of the State"); *Webb v. City of Maplewood*, 889 F.3d 483, 485 (8th Cir. 2018) (Eleventh Amendment immunity applies to the State and its "arms and instrumentalities"); *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007). Plaintiffs do not dispute that the Pharmacy Board is a state agency. *See* CVS Compl. 17 ¶ 61 ("The Arkansas State Board of Pharmacy (Board of Pharmacy) is an agency within the Arkansas Department of Health"); PCMA Compl. 7 ¶ 20 ("The Board of Pharmacy is an agency within the Arkansas Department of Health."); *see also* Optum Br. 44 (observing that the General Assembly and State Board of Pharmacy "are arms of the State"). Eleventh Amendment immunity therefore applies to the Pharmacy Board.

Moreover, 42 U.S.C. § 1983 does not abrogate that immunity because "clearly Congress did not abrogate constitutional sovereign immunity when enacting the law that was to become section 1983." *Burk v. Beene*, 948 F.2d 489, 493 (8th Cir. 1991). "Section 1983 does not override Eleventh Amendment immunity." *Hadley v. N. Ark. Cmty. Tech. Coll.*, 76 F.3d 1437, 1438 (8th Cir. 1996). Rather, § 1983 only authorizes suits against "persons" who act under the color of state law. States and state agencies are not "persons" subject to suit under Section 1983. *Will v. Mich.*

*Dep't of State Police*, 491 U.S. 58, 64 (1989).  Thus, there is no congressional abrogation that permits Plaintiffs to sue or obtain an injunction against the Pharmacy Board in federal court.

In sum, the Pharmacy Board is entitled to sovereign immunity under the Eleventh Amendment and thus cannot be sued in or enjoined by this Court.

## X.    Each of the *Dataphase* factors disfavor a preliminary injunction.

This Court's assessment of the *Dataphase* factors must begin with whether Plaintiffs have shown that they are more-likely-than-not to prevail on the merits of any of their claims.  And because they have not made that showing, *Rounds* teaches that that's where the Court's analysis must end.  Nonetheless, a review of the remaining *Dataphase* factors illustrates that Plaintiffs' bid for a preliminary injunction fails for additional, independent reasons.  To begin with, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury" *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631, at *15 (U.S. June 27, 2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C. J., in chambers)) (cleaned up).  Thus, the harm that will flow to Defendants if Act 624 is enjoined is *per se* irreparable.  On the other hand, the harm that will flow to Plaintiffs if Act 624 is not enjoined is not irreparable.  Act 624 does not go into effect until January 1, 2026.  And even when the law does go into effect, Plaintiffs can avail themselves of Act 624's exceptions in the interim, which would allow at least some of the Plaintiffs to continue operating as both a PBM and a pharmacy through 2027.  Moreover, any harm faced by Plaintiffs is not irreparable because Plaintiffs may be able to seek reinstatement of their retail pharmacy permits if they prevail at a trial on the merits.  Thus, the balance of equities counsels against awarding Plaintiffs preliminary relief.

### CONCLUSION

Plaintiffs' preliminary injunction motions should be denied.

Respectfully submitted,

TIM GRIFFIN
Attorney General

By:   Ryan Hale
      Ark. Bar No. 2024310
      Senior Assistant Attorney General

      Jordan Broyles
      Ark. Bar No. 2015156
      Senior Assistant Attorney General

      Arkansas Attorney General's Office
      101 West Capitol Avenue
      Little Rock, AR 72201
      (501) 295-7419
      (501) 682-2591 fax
      ryan.hale@arkansasag.gov
      jordan.broyles@arkansasag.gov

      *Attorneys for Defendants*