# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| Express Scripts, Inc., *et al.*,<br><br>                    *Plaintiffs*,<br><br>          v.<br><br>Rodney Richmond, *et al.*,<br><br>                    *Defendants*. | No. 4:25-cv-00520<br><br>No. 4:25-cv-00524<br><br>No. 4:25-cv-00561<br><br>No. 4:25-cv-00598 |

## BRIEF OF THE NATIONAL COMMUNITY PHARMACISTS ASSOCIATION AND THE ARKANSAS PHARMACISTS ASSOCIATION AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION

Kevin A. Crass
FRIDAY ELDREDGE & CLARK LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AK 72201
Tel.: 501-370-1592
Fax: 501-244-5370
crass@fridayfirm.com

Robert T. Smith[*]
Timothy H. Gray[*]
Neal S. Mehrotra[*]
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20006
Tel.: 202-625-3500
Fax: 202-298-7570
robert.smith1@katten.com
timothy.gray@katten.com
neal.mehrotra@katten.com

*Counsel for* Amici Curiae

---

[*] Motions pending for admission *pro hac vice*.

TABLE OF CONTENTS

Table of Authorities.................................................................................................... ii

Statement of Interest of *Amici Curiae*............................................................... 1

Argument....................................................................................................................... 1

I.      Arkansas had compelling reasons to enact Act 624........................................ 3

      A.      PBMs are not health plans, and they are not subject to regulation by the federal government. ................................................................................... 3

      B.      Vertically integrated PBMs are inherently conflicted and have exploited their market power in a variety of ways, and Arkansas's efforts to address PBMs' harms to plans, patients, and pharmacies have been unable to keep pace. ............ 4

II.     Properly understood, none of the PBMs' constitutional claims withstand scrutiny. ......... 7

      A.      Act 624 is a core exercise of the State's authority to license pharmacy, an area in which federal law neither regulates nor preempts............................................. 8

      B.      Act 624 treats in-state and out-of-state interests identically and does not violate the dormant Commerce or the Privileges and Immunities Clauses.......... 12

      C.      Act 624 is a prospective regulation of conflicts of interest and therefore does not constitute a retrospective bill of attainder. ................................................. 14

      D.      Act 624 is rationally focused on the conflicts of interests inherent in for-profit PBMs' vertically integrated business model and therefore does not violate the Equal Protection Clause. ................................................................................ 15

      E.      Act 624 is not an unconstitutional taking........................................................ 16

Conclusion................................................................................................................... 16

Certificate of Service................................................................................................ 18

TABLE OF AUTHORITIES

CASES:

*Becker v. City of Hillsboro*,
    125 F.4th 844 (8th Cir. 2025)........................................................................ 16

*Bickley v. Caremark Rx, Inc.*,
    361 F. Supp. 2d 1317 (N.D. Ala. 2004), *aff'd*, 461 F.3d 1325 (11th Cir. 2006) .............. 3

*Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*,
    519 U.S. 316 (1997)...................................................................................8-9

*Cedar Point Nursery v. Hassid*,
    594 U.S. 139 (2021).................................................................................. 16

*Cherokee Nation Businesses, LLC v. Arkansas*,
    No. 4:24-CV-969-DPM, 2025 WL 849181 (E.D. Ark. Mar. 18, 2025)......................... 16

*Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*,
    474 F.3d 463 (7th Cir. 2007)......................................................................... 3

*Communist Party of U.S. v. Subversive Activities Control Bd.*,
    367 U.S. 1 (1961)..................................................................................... 15

*Exxon Corp. v. Governor of Maryland*,
    437 U.S. 117 (1978)...............................................................................12-13

*Heller v. Doe*,
    509 U.S. 312 (1993).................................................................................. 15

*In re Express Scripts/Anthem ERISA Litig.*,
    285 F. Supp. 3d 655 (S.D.N.Y. 2018),
    *aff'd*, 837 F. App'x 44 (2d Cir. 2020), *cert. denied*, 142 S. Ct. 2867 (2022).................... 3

*Minnesota ex rel. Hatch v. Hoeven*,
    456 F.3d 826 (8th Cir. 2006)........................................................................ 14

*Minn. Senior Fed'n, Metro. Region v. United States*,
    273 F.3d 805 (8th Cir. 2001)........................................................................ 15

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023)...............................................................................12-13

*N.Y. Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995).............................................................................. 9, 11

*Nixon v. Administrator of Gen. Servs.*,
    433 U.S. 425 (1977).................................................................................. 14

*Pharm. Care Mgmt. Ass'n v. Rowe*,
    429 F.3d 294 (1st Cir. 2005), *cert. denied*, 547 U.S. 1179 (2006)............................. 3, 6

*Pharm. Care Mgmt. Ass'n v. Wehbi*,
    18 F.4th 956, 972 (8th Cir. 2021) ..................................................8, 10-11

*Pike v. Bruce Church Inc.*,
    397 U.S. 137 (1970) .......................................................................... 13

*Plaintiff A v. Park Hill Sch. Dist.*,
    97 F.4th 586 (8th Cir. 2024) ............................................................. 15

*Rutledge v. Pharm. Care Mgmt. Ass'n*,
    592 U.S. 80 (2020) .....................................................................2-4, 8-10

*Sarasota Wine Mkt., LLC v. Schmitt*,
    987 F.3d 1171 (8th Cir. 2021) ........................................................... 13

*WMX Techs., Inc. v. Gasconade Cnty.*,
    105 F.3d 1195 (8th Cir. 1997) ........................................................... 14

## FEDERAL STATUTES:

10 U.S.C. § 1071 ..................................................................................... 11

10 U.S.C. § 1074g(a)(2)(E)(iii) ............................................................... 11

29 U.S.C. § 1002(16)(A) ........................................................................... 3

29 U.S.C. § 1002(21)(A) ........................................................................... 3

29 U.S.C. § 1003 ........................................................................................ 3

32 C.F.R. § 199.21(*o*)(2) ........................................................................ 11

42 U.S.C. § 1395w-22(d)(1) ..................................................................... 10

Pub. L. 118–50, div. H, 138 Stat. 895, 955 (2024) ................................. 15

## FEDERAL REGULATIONS AND RULEMAKINGS:

29 C.F.R. § 2509.75-8(D-2) ....................................................................... 3

29 C.F.R. § 2509.75-8(D-3) ....................................................................... 3

42 C.F.R. § 423.120(a)(3) ........................................................................ 10

42 C.F.R. § 423.120(a)(4) ........................................................................ 10

42 C.F.R. § 423.120(a)(7)(i) ..................................................................... 10

42 C.F.R. § 423.120(a)(8)(i) ..................................................................... 10

42 C.F.R. § 423.120(a)(9) ........................................................................ 10

*Medicare Program; Contract Year 2019 Policy and Technical Changes*,
82 Fed. Reg. 56,336 (Nov. 28, 2017)...............................................................6


STATE STATUTES

Ark. Code Ann. § 17-92-416(b) ........................................................................8

Ark. Code Ann. § 17-92-507.............................................................................4

Ark. Code Ann. § 23-92-506.............................................................................5


STATE REGULATIONS

Code Ark. R. 007.39.4-04-00-0011 .................................................................16

Code Ark. R. 007.39.4-04-00-0012 .................................................................16


OTHER AUTHORITIES:

Reed Abelson & Rebecca Robbins, *The Powerful Companies Driving Local Drugstores
Out of Business*, N.Y. Times, June 21, 2024....................................................7

Fed. Trade Comm'n, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating
Drug Costs and Squeezing Main Street Pharmacies* (July 2024)........................1, 4, 6-7

Fed. Trade Comm'n, *Specialty Generic Drugs: A Growing Profit Center for Vertically
Integrated Pharmacy Benefit Managers* 2 (Jan. 2025)....................................5

Jenny S. Guadamuz, *et al.*, *More US Pharmacies Closed Than Opened in 2018–21;
Independent Pharmacies, Those in Black, Latinx Communities Most at Risk*,
43 Health Aff. 1703 (2024).............................................................................1

Marty Schladen, Report: *"Specialty" drugs are by far the most expensive, but
classification seems arbitrary*, Ohio Capital Journal, May 15, 2023 .............6

Walgreens, Walgreens Store Listings,
Store Listings by City....................................................................................12

Joseph Walker, *Generic Drugs Should Be Cheap, but Insurers Are Charging Thousands
of Dollars for Them*, Wall Street Journal, Sept. 11, 2023................................6

Walmart, *2025 Premium Standard Formulary*
Effective Jan. 1, 2025 ....................................................................................15

## STATEMENT OF INTEREST OF AMICI CURIAE[*]

*Amici curiae* represent the interests of independent community pharmacies. The National Community Pharmacists Association (NCPA) represents the interests of the owners, managers, and employees of more than 19,000 independent community pharmacies across the country. NCPA's members employ over 239,000 individuals on a full or part-time basis and dispense roughly 40% of the nation's retail prescriptions. The Arkansas Pharmacists Association (APA) was founded in 1882 and represents over 2,300 members consisting of pharmacists, pharmacy students, and other members of the industry located within Arkansas.

This litigation involves a challenge to Act 624, a provision of Arkansas law that seeks to address the inherent conflict of interest—and resulting harms to plans, patients, and pharmacies—arising when pharmacy benefit managers (PBMs) own and operate their own pharmacies. Because PBMs profoundly affect patient access to pharmacy care, and because Act 624 targets the root of this conflict of interest, NCPA and APA have a strong interest in the outcome of this case.

## ARGUMENT

States have faced a crisis of access to pharmacy care within their borders, and according to numerous independent studies, PBMs are the chief culprits. *See generally* Fed. Trade Comm'n, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies* (July 2024)[1]; Jenny S. Guadamuz, *et al.*, *More US Pharmacies Closed Than Opened in 2018–21; Independent Pharmacies, Those in Black, Latinx Communities Most at Risk*, 43 Health Aff. 1703, 1709-10 (2024). In the last few decades, the business practices of PBMs have

---

[*] Defendants consent to the filing of this brief. CVS, ESI, and Optum do not oppose. PCMA takes no position but reserves the right to file opposition. No counsel for any party authored this brief in whole or in part. No party, person, or entity—except NCPA, APA, and their members—made a monetary contribution specifically for the preparation or submission of this brief.

[1] https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf

shuttered countless pharmacies—including countless pharmacies in rural communities. *See, e.g.*, Abiodun Salako, *et al.*, *Update: Independently Owned Pharmacy Closures in Rural America, 2003-2018*, RUPRI Center for Rural Health Policy Analysis (July 2018).[2]

Most PBMs are under no obligation to act in the best interests of the plans and beneficiaries they purport to serve. For-profit PBMs owe fiduciary duties solely to their shareholders, not to plans or beneficiaries. When those PBMs are vertically integrated with pharmacies, they have powerful incentives to increase costs and favor their own pharmacies, regardless of externalities like increased drug costs, local and independent pharmacy closures, and decreased quality of care. PBMs have relentlessly acted on those incentives; ever-rising drug prices and boarded-up retail pharmacies in underserved communities speak for themselves. By contrast, for those benefit plans that have formed their own PBMs with affiliated pharmacies, the incentive is fundamentally different: the PBM has an obligation to keep costs down and act in the best interests of the plan.

The practice of pharmacy, including licensure and ownership, is an area of traditional state regulation. And so nearly all states have enacted laws regulating PBMs and their relationships with pharmacies—with Arkansas at the vanguard in policing their abuses. No lesser authority than the Supreme Court has already upheld some of Arkansas's earlier efforts. *See Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 84 (2020). But vertically integrated PBMs are large, powerful, and resourceful. They are duty-bound to maximize profit, and preventing their profit-maximizing but harmful business practices has proven to be the proverbial game of Whac-A-Mole. The Arkansas Legislature and Governor have an obligation to act in the best interests of the state, not PBMs' shareholders, and they ultimately concluded that PBM ownership of pharmacies was the root of the problem. Act 624 was enacted to solve it.

---

[2] https://rupri.org/wp-content/uploads/2018-Pharmacy-Closures.pdf.

I.    **Arkansas had compelling reasons to enact Act 624.**

    A.    **PBMs are not health plans, and they are not subject to regulation by the federal government.**

There is no federal law that regulates PBMs directly. PBMs, however, have consistently tried to piggyback on the Employee Retirement Insurance Security Act of 1974 (ERISA), under which the federal government regulates certain private-employer and union-sponsored benefit plans, 29 U.S.C. § 1003, to immunize themselves from state efforts to regulate them. But PBMs are not subject to regulation under ERISA. They are *not* benefit plans. Rather, benefit plans hire PBMs as service providers that sell plans access to prescription drugs. *See Rutledge*, 592 U.S. at 83-84. PBMs deliver this access by contracting separately with pharmacies to create networks through which plan beneficiaries can fill their prescriptions. *Id.*

Although ERISA regulates plan "administrators" and "fiduciaries," PBMs are neither. An ERISA administrator is a specifically designated fiduciary. 29 U.S.C. § 1002(16)(A); 29 C.F.R. § 2509.75-8(D-3). And as a general matter, an ERISA fiduciary must exercise "discretionary authority," "control," or "responsibility" over the management or administration of a plan or its assets. 29 U.S.C. § 1002(21)(A). But PBMs do none of these things, leading every court to consider the issue to hold PBMs are not fiduciaries (and hence, not administrators).[3] Rather, PBMs are service providers that "have no power to make any decisions as to plan policy, interpretations, practices or procedures." 29 C.F.R. § 2509.75-8(D-2). They are governed by state law—like every other service provider that sells goods or services to ERISA and non-ERISA plans.

---

[3] *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 473 (7th Cir. 2007) (holding that PBMs are not ERISA fiduciaries); *PCMA v. Rowe*, 429 F.3d 294, 300-01 (1st Cir. 2005) (same), *cert. denied*, 547 U.S. 1179 (2006); *accord In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 680 (S.D.N.Y. 2018), *aff'd*, 837 F. App'x 44 (2d Cir. 2020), *cert. denied*, 142 S.Ct. 2867 (2022); *Bickley v. Caremark Rx, Inc.*, 361 F. Supp. 2d 1317, 1332 (N.D. Ala. 2004), *aff'd*, 461 F.3d 1325 (11th Cir. 2006).

**B.    Vertically integrated PBMs are inherently conflicted and have exploited their market power in a variety of ways, and Arkansas's efforts to address PBMs' harms to plans, patients, and pharmacies have been unable to keep pace.**

Plaintiffs are the Pharmaceutical Care Management Association (PCMA) and the three largest PBMs, CVS Caremark (CVS), Express Scripts Inc. (ESI), and OptumRx (Optum), the latter of which cover nearly 80% of all U.S. patients. *See* Fed. Trade Comm'n, *supra* n.1, at 13. CVS, ESI, and Optum are vertically integrated; they own their own affiliated pharmacies, which are some of the largest in the United States. *Id.* at 15-18. The business model of these PBMs involves maximizing the difference between what they charge plans and what they pay pharmacies for access to prescription drugs. Known as a spread-pricing model, this incentivizes PBMs to engage in business practices that can harm plans, patients, and pharmacies. In the absence of federal regulation—and, until relatively recently, meaningful state regulation—PBMs have done just that.

Unsurprisingly, pharmacies are particularly hard-hit by PBMs' abuses. Given PBMs' colossal market power, independent pharmacies have little to no leverage when negotiating with them. It is an inherently lopsided bargain. Refusing to accept a PBM's contract could mean the inability to serve most patients in a pharmacy's community. As a result, PBM-pharmacy contracts have generally granted PBMs unilateral authority to dictate the amount of reimbursement paid to pharmacies, allowing PBMs to reimburse pharmacies less than any pharmacy can purchase drugs at wholesale. *See Rutledge*, 592 U.S. at 83-84; Fed. Trade Comm'n at 53-59, *supra* at n.1.

In 2015, responding to "concerns that the reimbursement rates set by PBMs were often too low to cover pharmacies' costs, and that many pharmacies, particularly rural and independent ones, were at risk of losing money and closing," Arkansas enacted Act 900. *Rutledge*, 592 U.S. at 84. Act 900 "requires PBMs to compensate pharmacies at or above their acquisition costs." *Id.* at 91; *see also* Ark. Code Ann. § 17-92-507. PCMA challenged that law as preempted by ERISA (an

argument only CVS and Optum pursue here in relation to Act 624). A unanimous Supreme Court rejected that challenge in *Rutledge*.

But direct rate regulation could not prevent PBMs from padding their profit margins through more pernicious practices. Vertically integrated PBMs have leveraged their market power to capture larger shares of the retail pharmacy market for themselves by giving preferential treatment to their own affiliated pharmacies. They have deliberately limited access to their pharmacy networks—not out of considerations of safety or costs to their prescription-benefit-plan clients, but to ensure patients use pharmacies that PBMs own and control. One tactic is to impose stringent accreditation requirements, above and beyond a state's, as a precondition for participating in PBM networks. And with restrictions like these imposed on the front end, PBMs have implemented higher reimbursement rates for their own pharmacies on the back end.

In 2018, Arkansas enacted additional legislation—the Arkansas Pharmacy Benefits Manager Licensure Act—to police these practices, too. *See* Ark. Code Ann. § 23-92-506 (barring, *inter alia*, elevated accreditation standards and reimbursing affiliated pharmacies at higher rates). But PBMs have found new ways to evade these efforts.

Through their vertically integrated structure, PBMs have continued to steer patients to PBM-affiliated pharmacies by offering lower copayments and other inducements—and this is particularly true for more-costly specialty medications. *See* Fed. Trade Comm'n, *Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers*, at 2 (Jan. 2025).[4] PBMs have accomplished this by prohibiting unaffiliated pharmacies from distributing "specialty drugs," which are typically higher-cost (and higher-margin) drugs that require special handling, and by simultaneously expanding the designation of "specialty drugs" to include non-

---

[4] https://www.ftc.gov/system/files/ftc_gov/pdf/PBM-6b-Second-Interim-Staff-Report.pdf.

specialty medications that have been on the market for a long time. *See, e.g.*, Marty Schladen, *Report: "Specialty" drugs are by far the most expensive, but classification seems arbitrary*, Ohio Capital Journal, May 15, 2023.[5] Some PBMs have then required patients to obtain these drugs through mail-order pharmacies owned by the PBMs. *See, e.g.*, Joseph Walker, *Generic Drugs Should Be Cheap, but Insurers Are Charging Thousands of Dollars for Them*, Wall Street Journal, Sept. 11, 2023[6]; *Medicare Program; Contract Year 2019 Policy and Technical Changes*, 82 Fed. Reg. 56,336, 56,410 (Nov. 28, 2017) (expressing concern that PBMs are using pharmacy contracts "in a way that inappropriately limits dispensing of specialty drugs to certain pharmacies").

PBMs' practices may cost beneficiaries less out of pocket in the form of lower copayments and coinsurance, but PBMs make up for this by charging plans substantially more. According to an interim staff report by the Federal Trade Commission, the three largest PBMs reimbursed their affiliated pharmacies more than 100 percent over their estimated acquisition cost on 63 percent of the specialty medications they dispensed, and 22 percent of the time those PBMs reimbursed their affiliated pharmacies at a markup of more than *1,000 percent*. Fed. Trade Comm'n at 2, *supra* at n.4; *see* Walker, *supra* at n.6. As the First Circuit recognized, "'[w]hether and how a PBM actually saves an individual benefits [plan] money with respect to the purchase of a particular prescription drug is largely a mystery to the benefits [plan].'" *Rowe*, 429 F.3d at 298 (citation omitted).

As Arkansas recognizes, though, costs to plans are only part of the picture. The harms to businesses and Arkansans from PBM practices are systemic and severe. Of particular concern are their effects on community pharmacies, which, for many Americans, are their most accessible form

---

[5]    https://ohiocapitaljournal.com/2023/05/15/report-specialty-drugs-are-by-the-most-expensive-but-classification-seems-arbitrary/.

[6]    https://www.wsj.com/health/healthcare/generic-drugs-should-be-cheap-but-insurers-are-charging-thousands-of-dollars-for-them-ef13d055.

of healthcare. *See* Reed Abelson & Rebecca Robbins, *The Powerful Companies Driving Local Drugstores Out of Business*, N.Y. Times, June 21, 2024.[7] "In some rural and medically underserved areas, local community pharmacies are the main healthcare option for Americans, who depend on them to get a flu shot, an EpiPen, or other lifesaving medicines." Fed. Trade Comm'n at 1, *supra* at n.1. PBMs do not care for Arkansas's communities because they have no obligation to do so. They tout the "efficiencies" of their business model, arguing they have every right to create pharmacy deserts, steamroll independent pharmacies, and lure patients into less beneficial forms of care. Independent pharmacies, they argue, must fail because they cannot realize the benefits of bigness—including leveraging that bigness to drive up costs across the board. But PBMs, no matter how massive, are not immune from traditional exercises of state power.

Arkansas legislators correctly determined that their piecemeal efforts to police abusive practices could not keep up with PBMs' strategies to maximize profit at the expense of Arkansas's priorities. Act 624 was their rational response. The continuing harms to pharmacies and patients, Arkansas concluded, are the inevitable consequences of how certain PBMs have chosen to structure and conduct their business. Their incentives run contrary to the interests and values of Arkansas and Arkansans. Instead of continuing to play Whac-A-Mole, Arkansas has pulled the plug on the game. Nothing in federal law or the Constitution prevents this.

## II.    Properly understood, none of the PBMs' constitutional claims withstand scrutiny.

Unsurprisingly, PBMs have mounted a last-ditch effort to preserve their profits. The entire industry has mobilized to try to invalidate Act 624 or relieve PBMs of its burdens. Plaintiffs in seek preliminary injunctive relief with a series of overlapping legal arguments that, if accepted,

---

[7] https://www.nytimes.com/2024/06/21/business/prescription-drug-costs-pbm.html.

would give PBMs *carte blanche* to run roughshod over state regulatory efforts. Most of those arguments are squarely foreclosed by precedent; all of them fail.

### A. Act 624 is a core exercise of the State's authority to license pharmacy, an area in which federal law neither regulates nor preempts.

Act 624 regulates pharmacy licensure. It prohibits certain entities—PBMs—from acquiring or holding interests in or otherwise holding a permit to sell drugs in Arkansas. Ark. Code Ann. § 17-92-416(b). "[T]he practice of pharmacy is an area traditionally left to state regulation," *PCMA v. Wehbi*, 18 F.4th 956, 972 (8th Cir. 2021)—a "historic police power[] of the States" that federal law is "assum[ed]" not to alter, *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 331 (1997) (cleaned up). Three plaintiffs—CVS, ESI, and Optum— nonetheless contend that federal law preempts this core exercise of state regulatory authority. CVS and Optum contend that ERISA and Medicare Part D laws preempt Act 624, while ESI argues that Act 624 is preempted by TRICARE. They are wrong in all respects.

1. <u>ERISA Preemption.</u> ERISA does not preempt state laws "in those areas where ERISA has nothing to say"—even if a state law happens to affect ERISA plans. *Dillingham*, 519 U.S. at 330. As relevant here, ERISA preempts state laws that "govern[] a central matter of plan administration," "interfere[] with nationally uniform plan administration," or if "acute, albeit indirect, economic effects of the law force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers." *Wehbi*, 18 F.4th at 968 (cleaned up). The touchstone is whether laws require employers to "structure benefit plans in particular ways"—*i.e.*, by "requiring payment of specific benefits" or "binding plan administrators to specific rules for determining beneficiary status." *Id.* (cleaned up). Laws that "merely increase costs or alter incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage," by contrast, are not preempted. *Rutledge*, 592 U.S. at 88.

8

ERISA has nothing to say about pharmacy ownership. It does not, and does not purport to, forbid states from enacting laws—such as "medical-care quality standards," *Dillingham*, 519 U.S. at 329—that affect *certain* third parties who, like PBMs, happen to provide services to ERISA plans. It does not, as CVS suggests, "restrict[] plan officials from 'structur[ing] benefit plans in particular ways.'" CVS Br. 37 (quoting *Rutledge*, 592 U.S. at 86-87); *see also* Optum Br. 23-24. Indeed, it does not act on plans at all; it does not forbid or command them to do anything. For example, Act 624 would not prevent a plan from using mail-order pharmacy services or prompt it to use more brick-and-mortar ones, as CVS speculates, CVS Br. 38; the plan may continue to use mail-order pharmacies as long as they are not vertically integrated with PBMs.

*Rutledge* forecloses CVS's argument that ERISA preempts Act 624 because plans may rely on vertically integrated business structures "to keep costs low." CVS Br. 38. In *Rutledge*, PCMA argued that "a plan might prefer that PBMs reimburse pharmacies using a MAC list constructed with an eye toward containing costs and ensuring predictability." 592 U.S. at 90. But the Supreme Court held that "[r]equiring PBMs to reimburse pharmacies at or above their acquisition costs does not require plans to provide any particular benefit to any particular beneficiary in any particular way." *Id.* So too here. Arkansas has decided that for-profit, PBM-affiliated pharmacies create inherent conflicts of interest and cause pervasive statewide harms. Forbidding this does not "forc[e] plans to adopt any particular *scheme of substantive coverage*," even if it might "increase costs" for plans—something far from proven. *Id.* at 88 (emphasis added). Thus, as the Supreme Court recognized in *New York Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, "an influence that can affect a plan's shopping decisions" but does not "bind plan administrators to any particular choice" is not preempted. 514 U.S. 645, 659-60 (1995).[8]

---

[8] CVS and Optum also invoke the specter of compromising "nationally uniform plan

2. <u>Medicare Part D Preemption.</u> Nor is Act 624 preempted by Medicare Part D or its implementing regulations. "[S]tate laws are preempted as applied to Medicare Part D plans if and only if they" "regulate the same subject matter" as a Medicare Part D standard. *Wehbi*, 18 F.4th at 971-72. The question is whether the state law and the federal standard concern the same "conduct." *See id.* (citing cases). CVS points to three relevant "standards": one allowing plans to "select the providers from whom the benefits under the plan are provided," 42 U.S.C. § 1395w-22(d)(1); another stating a "pharmacy network may be supplemented by . . . pharmacies offering home delivery via mail-order," 42 C.F.R. § 423.120(a)(3); and a third contemplating "preferred" versus "non-preferred" pharmacy networks. 42 C.F.R. § 423.120(a)(9). Optum invokes additional "standards" requiring plans to provide access to home-infusion pharmacies, 42 C.F.R. § 423.120(a)(4); an any-willing pharmacy requirement for Part D plans, *id.* § 423.120(a)(8)(i); and a provision allowing *plans* to be affiliated with pharmacies, *id.* § 423.120(a)(7)(i).

Their argument is wrong. Act 624 does not "regulate" with respect to the "subject matter" or "conduct" of provider choice, mail-order or home-infusion pharmacies, network composition, or the pharmacies with which a Part D plan may affiliate. Act 624 regulates—and limits—a PBM's ability to obtain a license and own an affiliated pharmacy. The law says nothing about what plans may do, and it does not stand as an obstacle to satisfying any of these Part D standards. Besides, if CVS and Optum are correct that Medicare Part D preempts any state law with *downstream* effects on these standards, then *any regulation* of healthcare providers, mail-order pharmacy, and pharmacy networks would be preempted. This is obviously incorrect. As *Wehbi* recognized, the

administration." CVS Br. 39; Optum Br. 21-23. But a law restricting pharmacy ownership does not govern a central matter of plan administration, and having to tailor plans in light of generally applicable state laws concerning the conditions under which providers may sell services to plans is inherent in a system of dual sovereignty. ERISA does not preempt all laws creating "some disuniformity in plan administration." *Rutledge*, 592 U.S. at 87.

"practice of pharmacy is an area traditionally left to state regulation." 18 F.4th at 972.

3. <u>TRICARE Preemption.</u> ESI argues that the TRICARE statute and enabling regulations preempt Act 624 as applied to its affiliated pharmacies because it has a federal contract to provide nationwide mail-order pharmacy services to TRICARE beneficiaries. ESI Br. 21-25. Under TRICARE, "any State or local law relating to . . . health care delivery . . . is preempted and does not apply in connection with TRICARE pharmacy contracts." 32 C.F.R. § 199.21(o)(2). As with CVS and Optum's preemption arguments, ESI over-reads federal law to intrude deep into an area of traditional state regulatory authority. ESI asserts in conclusory fashion that Act 624 "relates to" "health care delivery," ESI Br. 22; *cf. Travelers*, 514 U.S. at 655 (cautioning against overbroad interpretation of "relating to" language in preemption context), but the law says nothing about the means or methods for delivering health care. It merely regulates who may possess interests in Arkansas pharmacy licenses. Crediting ESI's broad interpretation would preempt state regulation of the medical credentials mail-order pharmacists must possess and state safety requirements for delivery of drugs, as these too would "relate to" "health care delivery." That cannot be right.

Nor would Act 624 interfere with the objectives of the TRICARE statute. *Contra* ESI Br. 22-24. Congress sought to create "a uniform program of medical and dental care," 10 U.S.C. § 1071, through, among other things, a "national mail-order pharmacy program," *id.* § 1074g(a)(2)(E)(iii). Act 624 is no obstacle to these goals. ESI remains free to contract with other, non-affiliated pharmacies to provide mail-order pharmacy services to Arkansas TRICARE beneficiaries. It can fulfill its contractual obligations while still complying with state and federal law; it just needs to use unaffiliated pharmacies. Thus, ESI may still provide uniform pharmaceutical benefit coverage through a nationwide mail-order program. TRICARE does not require the use of a single national network of affiliated mail-order *pharmacies*; it requires a

national mail-order pharmacy *program*. ESI confuses Act 624's (permissible) interference with ESI's preferred way of doing business for (impermissible) interference with the objectives and interests of TRICARE. In any event, TRICARE preemption would apply *only* to the enforcement of Act 624 with respect to mail-order services ESI provides to Arkansas TRICARE beneficiaries.

      **B.**      **Act 624 treats in-state and out-of-state interests identically and does not violate the dormant Commerce or Privileges and Immunities Clauses.**

Plaintiffs contend that Act 624 violates the dormant Commerce Clause. *See* CVS Br. 22-33; ESI Br. 13-18; Optum Br. 31-39; PCMA Br. 13-25. This argument fails because it does not apply the governing law faithfully to what Act 624 *actually does* and ignores contrary Supreme Court precedent—namely, *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978).

The dormant Commerce Clause embodies a fundamental "antidiscrimination principle": states may not pass laws discriminating against out-of-state businesses to benefit in-state ones. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 371 (2023). Act 624, however, does not discriminate against out-of-state pharmacies or PBMs. It regulates the ownership of all pharmacies that serve Arkansas patients, including mail-order ones, regardless of where those pharmacies are located. And in so doing, it applies identically to similarly situated in-state and out-of-state PBMs. If Caremark, ESI, Optum, or any other vertically integrated PBM were located in Arkansas, the law would not treat them any differently. The law, in short, has nothing to do with whether pharmacy-owning PBMs are in Arkansas; it has everything to do with the *corporate structure* of PBMs. Walgreens, for example, is headquartered in Illinois. It is an out-of-state owner of over 60 Arkansas pharmacies.[9] It offers mail-order pharmacy services from outside Arkansas. But Act 624 does not apply to Walgreens because it is not vertically integrated with a PBM and does not have

---

[9] https://www.walgreens.com/storelistings/storesbycity.jsp?requestType=locator&state=AR.

the same incentive to maximize profit by using abusive practices Arkansas has decided must end. Plainly, the Act does not discriminate against out-of-state businesses. It discriminates against the *structure* of certain businesses that happen to be located out of state.

Nor can Plaintiffs succeed under the so-called *Pike* balancing test. *See Nat'l Pork Producers*, 598 U.S. at 377 (citing *Pike v. Bruce Church Inc.*, 397 U.S. 137, 142 (1970)). Under *Pike*, the dormant Commerce Clause may still invalidate a state law if it imposes a "burden on interstate commerce" and those burdens "are clearly excessive in relation to the putative local benefits." 397 U.S. at 142. The problem for Plaintiffs is that Act 624 does not impose a "substantial burden on interstate commerce" in the first instance, which precludes invalidation under *Pike*. *Nat'l Pork Producers*, 598 U.S. at 383 (controlling plurality).[10] *Exxon*—discussed extensively in *National Pork Producers*—is squarely on point. In *Exxon*, Maryland had banned oil producers from owning retail gas stations, a law that "favored one business structure (independent gas station retailers) over another (vertically integrated production and retail firms)." *Id.* In practice, the law's burdens fell "'solely on interstate companies' and threatened to force some to 'withdraw entirely from the [state] market.'" *Id.* (quoting *Exxon*, 437 U.S. at 125-27). But the law was upheld: the dormant Commerce Clause "does not protect 'particular . . . firms' or 'particular structure[s] or methods of operation.'" *Id.* (quoting *Exxon*, 437 U.S. at 127-28). This case is no different. Act 624 applies only to PBMs with *certain business structures*, regardless of where they are located.

Finally, Plaintiffs do not have standing to raise a challenge under the Privileges and Immunities Clause. Only "[n]atural persons," "not corporations, may invoke [that Clause's] protections." *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1179 (8th Cir. 2021). No

---

[10] This understanding and application of *Pike* is "controlling precedent." *Nat'l Pork Producers*, 598 U.S. at 403 (Kavanaugh, J., concurring).

Plaintiff is a natural person. But Act 624 does not violate the Privileges and Immunities Clause in any event, because, as explained, it does not "discriminate[] against out-of-state residents." *Minnesota ex rel. Hatch v. Hoeven*, 456 F.3d 826, 834 (8th Cir. 2006).

### C.    Act 624 is a prospective regulation of conflicts of interest and therefore does not constitute a retrospective bill of attainder.

ESI and PCMA argue that Act 624 is an unconstitutional Bill of Attainder. *See* ESI Br. 18-21; PCMA Br. 25-29. The argument—that certain vertically integrated PBMs are being singled out and punished for *no* legitimate purpose, *only* for past conduct—is meritless. Act 624 is a generally applicable *prospective* regulation of who is qualified to hold a pharmacy license in Arkansas. On its face, it can "reasonably be said to further [the] nonpunitive legislative purposes," *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 475-76 (1977), of eliminating inherent conflicts of interests that give rise to pervasive harms and abuses. As discussed above, *supra* Section I.B, the problem Arkansas seeks to remedy is well documented.

At any rate, Act 624 *cannot* be a bill of attainder because it does not target any person or group by name or by reference to past conduct. The ownership restrictions apply to all PBMs that do not solely service a vertically integrated benefits plan, an open-ended class that encompasses any such PBMs that now or may exist. Act 624, in other words, "attaches to described activities in which an organization may or may not engage"; it "is not made an attainder" even if "the activity it regulates is described with such particularity that, in probability, few organizations will fall within its purview." *See WMX Techs., Inc. v. Gasconade Cnty.*, 105 F.3d 1195, 1202 (8th Cir. 1997) (regulation applicable to a single entity not a bill of attainder). This ends the inquiry.

But Act 624 also does not mete out "punishment" by "barring designated individuals or groups from participation in specified employments or vocations," either. *Nixon*, 433 U.S. at 471; *contra* ESI Br. 19-20; PCMA Br. 27-28. It does not "categorically ban pharmacies" or PBMs'

14

employees from practicing pharmacy, ESI Br. 20; it restricts *ownership* of Arkansas pharmacies by PBMs. PBMs, pharmacies, and pharmacists may "escape" the "punishment" of license revocation "by altering the course of their own present activities," *Communist Party of U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 88 (1961)—they may divest, sell, or seek employment elsewhere. Act 624 is thus no more a bill of attainder than Congress's TikTok "ban" was, *see* Pub. L. 118–50, div. H, 138 Stat. 895, 955 (2024); that statute, like this one, concerned the *ownership* of an entity that remained free to ply its trade if someone else owned it.

**D.     Act 624 is rationally focused on the conflicts of interests inherent in for-profit PBMs' vertically integrated business model and therefore does not violate the Equal Protection Clause.**

CVS contends that Act 624 violates the Equal Protection Clause because it includes a carveout for any PBM "that *only* caters to its affiliated pharmacy's employee benefit plan." CVS Br. 52 (emphasis added).[11] For one thing, the Equal Protection Clause applies only to persons "similarly situated in all relevant respects." *Plaintiff A v. Park Hill Sch. Dist.*, 97 F.4th 586, 592 (8th Cir. 2024) (quotation marks omitted). CVS is not a firm vertically integrated with, and solely servicing, its own pharmacies' benefit plan. Plaintiffs are for-profit entities that only owe fiduciary duties to their shareholders. In any event, CVS must show there is *no* "rational basis" for exempting PBMs vertically integrated with the benefit plan they serve, *Minn. Senior Fed'n, Metro. Region v. United States*, 273 F.3d 805, 808 (8th Cir. 2001), and "negate every conceivable basis which might support it." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (cleaned up). The rational basis here is obvious: the incentives for Plaintiffs and exempted PBMs are completely different. The PBM

---

[11] CVS suggests this was a sweetheart-deal carveout for Walmart. But Walmart appears to use Optum, not Walmart's own PBM, for its employee-benefit plan, *see* https://one.walmart.com/content/dam/themepage/pdfs/WF15692216-A_ORX_Walmart_Abridged_Perm_Standard_formulary_JAN25_v1.pdf, and the Equal Protection Clause would not apply regardless because there is a rational distinction between for-profit and plan-only PBMs.

Plaintiffs seek to maximize profits; they want to drive costs up to reimburse their affiliated pharmacies in higher amounts. Exempted PBMs, in contrast, serve only a single vertically integrated benefit plan; they want to keep costs down for their plan. Arkansas therefore had good reason to exempt such PBMs: they do not create the conflict of interest Act 624 exists to address.

### E.    Act 624 is not an unconstitutional taking.

Finally, Optum contends that Act 624 effects a "forced divestiture" of its eleven pharmacies in Arkansas and that this amounts to an unconstitutional taking. *See* Optum Br. 39-45. The argument is meritless. A *per se* taking looks to whether Act 624 "physically take[s] property for [Arkansas] or someone else—by whatever means." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021). Act 624 does not force a divestiture of any property. It would merely require Optum to cease operating as a PBM or prohibit it from using its eleven properties *as pharmacies*. The properties *qua* properties retain "substantial value following the regulation." *Becker v. City of Hillsboro*, 125 F.4th 844, 854 (8th Cir. 2025). Act 624 does not effect a "regulatory taking" either. Optum's argument on this point does not specify what "property" is being taken—it shifts from discussing its pharmacies to the value of properties "[w]ith[] pharmacy permits." Optum Br. 42-44. But Optum does not argue that its interest in a *permit* is takeable "property," and indeed it is not. Optum's permit is non-transferable. *See* Ark. Code R. § 007.39.4-04-00-0011; *cf. Cherokee Nation Businesses, LLC v. Arkansas*, No. 4:24-CV-969-DPM, 2025 WL 849181, at *2 (E.D. Ark. Mar. 18, 2025). In any event, Optum remains free to sell its property to *licensed pharmacists* who may continue to operate the property *as* a pharmacy. *See* Ark. Code R. § 007.39.4-04-00-0012.

### CONCLUSION

Each of Plaintiffs' claims fail. Neither the Constitution nor federal law prevents Arkansas from exercising its police power to decide who is eligible to receive a pharmacy license and thereby eradicate the conflict of interest that for-profit PBMs have in both setting and taking prices.

Dated: July 15, 2025

Respectfully submitted,

/s/ Kevin A. Crass
Kevin A. Crass
FRIDAY ELDREDGE & CLARK LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AK 72201
Tel.: 501-370-1592
Fax: 501-244-5370
crass@fridayfirm.com

Robert T. Smith[*]
Timothy H. Gray[*]
Neal S. Mehrotra[*]
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
Tel.: 202-625-3500
Fax: 202-298-7570
robert.smith1@katten.com
timothy.gray@katten.com
neal.mehrotra@katten.com

*Counsel for* Amici Curiae

---

[*] Motions pending for admission *pro hac vice*.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 15, 2025, I had the foregoing Brief of *Amici Curiae* served on all parties by filing it using the Court's CM/ECF system.

/s/ Kevin A. Crass
Kevin A. Crass
*Counsel for* Amici Curiae