# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

EXPRESS SCRIPTS, INC. et al.,

      Plaintiffs,

      v.

RODNEY RICHMOND et al.,

      Defendants.

Lead Case No. 4:25-cv-00520

CVS PHARMACY, INC. et al.,

      Plaintiffs,

      v.

ARKANSAS STATE BOARD OF
PHARMACY et al.,

      Defendants.

Member Case No. 4:25-cv-00524

## CVS'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

*Page*

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................2

I.    CVS IS LIKELY TO PREVAIL ON THE MERITS. ...................................3

    A.    HB 1150 Violates The Dormant Commerce Clause. .........................3

        1.    HB 1150 unlawfully discriminates against out-of-state commerce......4

        2.    HB 1150 fails *Pike* balancing..................................................14

    B.    HB 1150 Is Invalid Under The Equal Protection Clause. ..............15

    C.    HB 1150 Is Preempted By ERISA......................................17

    D.    HB 1150 Is Preempted By Medicare. .................................20

II.    THE OTHER FACTORS SUPPORT A PRELIMINARY INJUNCTION...........22

    A.    CVS Is Irreparably Harmed Absent An Injunction.......................23

    B.    The Public Interest Favors An Injunction. ...................................25

CONCLUSION ...........................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU* v. *Johnson*,
194 F.3d 1149 (10th Cir. 1999) ............................................................24

*Bacchus Imports, Ltd* v. *Dias*,
468 U.S. 263 (1984).........................................................................5, 15

*Bergmann* v. *City of Lake Elmo*,
2010 WL 4123355 (D. Minn. Aug. 19, 2010) ......................................24

*Brandt ex rel. Brandt* v. *Rutledge*,
47 F.4th 661 (8th Cir. 2022) ...............................................................25

*Cachia* v. *Islamorada*,
542 F.3d 839, 842-43 (11th Cir. 2008)................................................11

*C&A Carbone, Inc* v. *Town of Clarkston*,
511 U.S. 383 (1994)..............................................................................13

*C.I.R.* v. *Clark*,
489 U.S. 726 (1989)..............................................................................21

*Choreo, LLC* v. *Lors*,
2025 WL 973194 (S.D. Iowa Apr. 1, 2025) .........................................24

*City of Cleburne* v. *Cleburne Living Ctr., Inc.*,
473 U.S. 432 (1985)..............................................................................16

*Dataphase Systems, Inc.* v. *C L Systems, Inc.*,
640 F.2d 109 (8th Cir. 1981)..................................................................2

*Department of Commerce* v. *New York*,
588 U.S. 752 (2019)................................................................................5

*Exxon Corporation* v. *Governor of Maryland*,
437 U.S. 117 (1978)......................................................................*passim*

*Family Winemakers of California* v. *Jenkins*,
592 F.3d 1 (1st Cir. 2010) .............................................................11, 12

*Gobeille* v. *Liberty Mutual Insurance Co.*,
577 U.S. 312 (2016)..............................................................................19

*Grand River Enterprises Six Nations* v. *Beebe*,
   574 F.3d 929 (8th Cir. 2009) .................................................................................9

*Healy* v. *Beer Inst., Inc.*,
   491 U.S. 324 (1989) ..............................................................................................15

*Hunt* v. *Washington State Apple Advertising Commission*,
   432 U.S. 333 (1977) ................................................................................................9

*International Franchise Assocation, Inc.* v. *City of Seattle*,
   803 F.3d 389 (9th Cir. 2015) ...............................................................................24

*Iowa Utilities. Board.* v. *FCC*,
   109 F.3d 418 (8th Cir. 1996) ...............................................................................23

*Missouri* v. *Trump*,
   128 F.4th 979 (8th Cir. 2025)..........................................................................23, 25

*Morehouse Enters., LLC* v. *Bureau of Alcohol, Tobacco, Firearms, &*
   *Explosives*, 78 F.4th 1011 (8th Cir. 2023)............................................................24

*Nat'l Pork Producers Council* v. *Ross*,
   598 U.S. 356 (2023).................................................................................................11

*Ng* v. *Bd. of Regents*,
   64 F.4th 992 (8th Cir. 2023) ................................................................................24

*Nken* v. *Holder*,
   556 U.S. 418 (2009)................................................................................................25

*Paul's Indus. Garage, LLC* v. *City of Red Wing*,
   2006 WL 3804243 (D. Minn. Dec. 22, 2006).......................................................24

*PCMA* v. *Mulready*,
   78 F.4th 1183 (10th Cir. 2023).............................................................................19

*Pike* v. *Bruce Church*,
   397 U.S. 137 (1970)................................................................................................14

*Planned Parenthood Arkansas & Eastern Oklahoma* v. *Selig*,
   2015 WL 13307030 (E.D. Ark. Sept. 18, 2015)...................................................25

*Rutledge* v. *PCMA*,
   592 U.S. 80 (2020)..................................................................................................18

*South Dakota Farm Bureau* v. *Hazeltine*,
   340 F.3d 583 (8th Cir. 2003) .....................................................................4, 8, 13

*SDDS, Inc.* v. *State of South Dakota.*,
    47 F.3d 263 (8th Cir. 1995) ........................................................................7

*Smithfield Foods, Inc.* v. *Miller*,
    367 F.3d 1061 (8th Cir. 2004) ....................................................................9

*Trinity Behavior Health Care System, Inc.* v. *Arkansas Department of Human Services*,
    2014 WL 5817095 (E.D. Ark. Nov. 7, 2014)..........................................25

*United States* v. *Castleman*,
    572 U.S. 157 (2014) (Scalia, J., concurring in part and concurring in judgment) ...............................................................................................21

*UnitedHealthcare Ins. Co.* v. *AdvancePCS*,
    316 F.3d 737 (8th Cir. 2002) ....................................................................23

*Wehbi* v. *PCMA*,
    18 F.4th 956 (8th Cir. 2001) ................................................18, 19, 20, 21, 22

*W. Lynn Creamery, Inc.* v. *Healy*,
    512 U.S. 186 (1994)............................................................................11, 13

*Winter* v. *NRDC*,
    555 U.S. 7 (2008)......................................................................................3

## Statutes and Regulations

Act 624 .....................................................................................................4

42 C.F.R. 423.120 ...................................................................................20

42 C.F.R. 423.100 ...................................................................................21

29 U.S.C. § 1144 .....................................................................................17

Ark. Code Ann. 17-92-416 ........................................................................5

Ark. Code Ann. 17-92-507 ........................................................................6

Ark. Code Ann. 23-92-508 ........................................................................6

Ark. Code Ann. 23-92-512 ........................................................................6

**Other Authorities**

Concurring Statement of Comm'r Andrew N. Ferguson, *Pharmacy Benefits Mangers Interim Staff Report*, FTC File No. P221200 (July 9, 2024), https://tinyurl.com/yeyn8dr5 .................................................................................6

Dissenting Statement of Comm'r Melissa Holyoak, *Pharmacy Benefits Mangers Interim Staff Report*, FTC File No. P221200 (July 9, 2024), https://tinyurl.com/mr3s3y5z.................................................................................6

H.R. Rep. No. 108-391 (2003) ................................................................................22

Maggie Ryan, *Lawmakers Introduce Bill to Ban PBM-Owned Pharmacies*, Little Rock Pub. Radio (Jan. 17, 2025), https://tinyurl.com/5b7y2b3x .............................7

Pharmacists United for Truth & Transparency, *Arkansas HB 1150: Combatting PBM Anticompetitive Practices with State Legislation*, YouTube.com (Feb. 2, 2025), https://tinyurl.com/37pbd3c4 ...........................................................7, 16

Segal Financial Impact Statement (Mar. 17, 2025), tinyurl.com/4w6dxmpz ........................14

## INTRODUCTION

In a few short months, House Bill 1150 will upend the Arkansas pharmacy market, shuttering dozens of retail pharmacies. Many Arkansans will need to find new jobs, and hundreds of thousands will need to find a new place to fill millions of prescriptions—and some may be wholly unable to do so. In resisting a preliminary injunction that would put the law on hold while its legality is adjudicated, the State says not one word about those devastating and irreversible harms.

The State instead focuses on defending HB 1150 on the merits, but this is as clear a violation of the Dormant Commerce Clause as the Court is ever likely to see. The State says nothing about the extensive evidence that, from conception to adoption, HB 1150 was designed to shore up local pharmacies by kicking large out-of-state pharmacies out of Arkansas. In a press conference introducing the law, lawmakers touted HB 1150 as a state-sanctioned effort to shift business from out-of-state pharmacies to in-state pharmacies. The bill sped toward passage until state officials realized that using PBM affiliation as a proxy for banning out-of-state pharmacies like CVS would also ensnare major *in-state* entities, leading the State to gerrymander an exception for its largest private employer. As passed, the law's preamble declares that HB 1150 is meant to aid locally operated pharmacies. And it is precisely crafted to accomplish that goal: it will force major out-of-state competitors like CVS to leave the State altogether while leaving every single in-state pharmacy entirely unaffected. The State does not deny any of this, so its entire argument rests on an overreading of a single Supreme Court decision, *Exxon Corporation* v. *Governor of Maryland*, 437 U.S. 117 (1978), that is very different from this case.

1

The State does not fare any better in addressing HB 1150's other flaws. In defending the law's tailored exemption for Walmart, the largest in-state pharmacy chain, Arkansas does not explain why the evils supposedly addressed by the law—such as steering customers to affiliated pharmacies—are any less present when a PBM services only a single plan, rather than a variety of plans. The State cannot credibly ask this Court to take HB 1150's stated justifications seriously except as applied to the State's largest employer. And the State's refusal to engage with the legislative record likewise dooms the law on equal-protection grounds, because bare animus towards unpopular groups—like large out-of-state corporations with pharmacies in Arkansas—is never a permissible basis for legislation.

Finally, though the State spends nearly one-third of its brief arguing that HB 1150 is not preempted by ERISA or Medicare, it nowhere grapples with the severe constraints the law places on how plan sponsors subject to exclusive and comprehensive federal regulation must structure their networks for Arkansas participants. Arkansas's arguments to the contrary rest on a misunderstanding of how preemption works in the context of Medicare and ERISA plans.

## ARGUMENT

In light of the substantial irreparable harms that HB 1150 will inflict on CVS and hundreds of thousands of Arkansans, it is clear that the "balance of equities so favors" CVS and the other challengers and "that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Systems, Inc.* v. *C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *see id.* at 113 n.5 ("The controlling reason" courts enter preliminary injunctive relief is to prevent "irremediable" "change[s] in the relations and

conditions of persons and property" that might occur before "claims can be investigated and adjudicated."). The State's only response is to defend HB 1150 on the merits. But its defenses do not defeat the likelihood that HB 1150 is unlawful. Because all four preliminary-injunction factors weigh in favor of granting interim relief here, *see Winter* v. *NRDC*, 555 U.S. 7, 20 (2008), the Court should grant CVS's motion, preliminarily enjoin the law, and maintain the status quo pending the outcome of this litigation.

## I.    CVS IS LIKELY TO PREVAIL ON THE MERITS.

### A.    HB 1150 Violates The Dormant Commerce Clause.

In its opening brief (at 22-33), CVS showed that HB 1150 violates the Dormant Commerce Clause in numerous ways. In particular, lawmakers proclaimed that the law's goal was to shore up local pharmacies and kick out large out-of-state corporations; the law's preamble declares the same legislative purpose to protect locally owned pharmacies from competition; and, thanks to a surgical amendment that protects Walmart, the law successfully applies *only* to out-of-state pharmacies while affecting *zero* in-state pharmacies. In short, the law's text, legislative record, and real-life impact all point in the same direction: HB 1150 is a textbook example of unconstitutional economic protectionism.

Remarkably, the State's opposition engages with almost none of this. Ignoring the legislative record and findings, the State hangs its hat entirely on *Exxon Corporation* v. *Governor of Maryland*, 437 U.S. 117 (1978). That decision is not only distinguishable from this case, but it actually supports CVS's arguments here. Without *Exxon*, Arkansas has no other defense. As against the evidence of HB 1150's discriminatory purpose and effect, the State does not even try to show that it meets strict scrutiny. And for similar reasons, even if HB 1150 were not discriminatory, it would fail *Pike* balancing because it serves no

legitimate purpose that would outweigh the clearly excessive burdens on out-of-state companies and the hundreds of thousands of Arkansans who rely on these companies for their medical needs.

### 1. HB 1150 unlawfully discriminates against out-of-state commerce.

a.     The State acknowledges that HB 1150 violates the Dormant Commerce Clause if it discriminates against "out-of-staters" (Resp. 17) or "favors in-state economic interests over their out-of-state counterparts" (Resp. 22), but it largely refuses to engage with the extensive evidence of discriminatory purpose and effect that Plaintiffs have put forward.  The State contends (Resp. 22) that the law "does not *facially* distinguish between" in-state and out-of-state pharmacies or PBMs, but such facial distinctions are only one of three ways to show unlawful discrimination.  *See S. Dakota Farm Bureau* v. *Hazeltine*, 340 F.3d 583, 593 (8th Cir. 2003).  As CVS explained in its opening brief (at 24-25), even a facially neutral law unlawfully discriminates "where the evidence in the record demonstrates that the law has a discriminatory purpose," or where the law "could have a discriminatory effect."  *Hazeltine*, 340 F.3d at 593.  HB 1150 has both, and the State has offered a persuasive response to neither.

*Discriminatory purpose*.  HB 1150 is the rare law whose discriminatory purpose is evident from the text of the law itself.  First, the preamble recites the legislature's avowed goal to target companies "that have driven locally-operated pharmacies out of business."  Act 624 § 1(a)(2).  The message is clear:  Arkansas viewed HB 1150 as a means to reduce in-state competition from out-of-state companies.  Tellingly, the State barely mentions the preamble in its brief, much less tries to defend it.

4

Second, the law as enacted includes an exemption built for a single PBM-affiliated pharmacy: Walmart, the only in-state PBM-affiliated pharmacy chain (and the State's largest private employer). *See* Ark. Code Ann. § 17-92-416(f). This Court "need not guess at the legislature's motivation" when the law contains an exemption plainly designed to "aid [local] industry." *Bacchus Imports, Ltd* v. *Dias*, 468 U.S. 263, 271 (1984). The State waves its hand at this exemption, hypothesizing that it would also apply to any other "out of state pharmacy with an in-house PBM for its employees' plan." Resp. 24. This defies credulity. The legislative record makes clear that Arkansas was careful to avoid harming a company synonymous with the State itself. This Court is "not required to exhibit a naivete from which ordinary citizens are free." *Dep't of Comm.* v. *New York*, 588 U.S. 752, 785 (2019) (internal citations omitted).

The State also dismisses the relevance of the Walmart exemption by claiming that there is "no conflict of interest" when a "PBM is only serving the pharmacy's employees." Resp. 24. But Arkansas put forth no real evidence of the harms caused by this supposed conflict of interest in the legislative record adopting HB 1150, and the State points to none in its brief. And if Arkansas thinks that PBMs will steer patients towards affiliated pharmacies or that PBM affiliation disserves patients in some other way, then the State's carveout for Walmart—whose more than 60,000 employees are apparently steered only to Walmart's own pharmacies—is all the more inexplicable.

At most, the State pointed to two (deeply flawed) national studies authored by federal agency staff finding that PBMs engage in anticompetitive conduct.[1] Those national studies are irrelevant in *Arkansas*, where extensive state laws already prohibit PBMs from discriminating against unaffiliated pharmacies. In particular, SB 104 prohibits PBMs from steering patients towards an affiliated pharmacy, Ark. Code Ann. § 23-92-512; Act 900 prohibits PBMs from paying nonaffiliated pharmacies at a lower rate than its affiliates, *id.* § 17-92-507; and PBMs are subject to extensive supervision by the Arkansas Insurance Commissioner, which has the authority to revoke a PBM's license to operate in the State if violations are identified. *Id.* § 23-92-508. Neither the legislature nor the State in its brief has identified or explained how these existing laws are insufficient to address any perceived "conflict of interest" presented by PBM-affiliated pharmacies. If anything, HB 1150 threatens to stoke price inflation because it will force many pharmacies to leave the market and thus give those that remain greater leverage to increase prices.

In addition to its inability to dispute these textual indicators of discrimination, the State has nothing to say about the abundant evidence of discriminatory purpose in the legislative record of HB 1150. As CVS and the other plaintiffs have extensively inventoried,

---

[1]    Both interim FTC reports have been scrutinized by now-Chair Andrew Ferguson and Commissioner Melissa Holyoak. Among other criticisms, now-Chair Ferguson described the first report as "unusual" because it "relie[d] heavily on public comments," especially "anonymous submissions" whose veracity cannot be confirmed. Concurring Statement of Comm'r Andrew N. Ferguson at 2-3, *Pharmacy Benefits Mangers Interim Staff Report*, FTC File No. P221200 (July 9, 2024), https://tinyurl.com/yeyn8dr5. Commissioner Holyoak criticized the first report for, among other things, not providing "any empirical evidence to rebut" a "2005 [FTC] Report that PBMs, including vertically owned PBMs, generated cost savings for consumers." Dissenting Statement of Comm'r Melissa Holyoak, *Pharmacy Benefits Mangers Interim Staff Report*, FTC File No. P221200 (July 9, 2024), https://tinyurl.com/mr3s3y5z.

the record in this case—even before any discovery—is "brimming with protectionist rhetoric." *SDDS, Inc.* v. *State of South Dakota*, 47 F.3d 263, 268 (8th Cir. 1995); *see* Br. 11-19, 28-30. From the day HB 1150 was introduced, the public discourse surrounding the law was replete with remarks touting HB 1150 as a measure to prop up local pharmacies at the expense of out-of-state competitors. Arkansas has no answer for this record but simply offers cherry-picked quotes from a handful of lawmakers and advocates during three hearings and legislative sessions that referenced some constitutionally legitimate (though factually flawed) reasons for the bill. Resp. 3-12. Those stray remarks cannot inoculate a law whose legislative record is otherwise filled with discriminatory animus

In fact, even Representative Moore and Senator Hammer—the law's two principal sponsors on whom the State extensively relies—made discriminatory statements that the State ignores. Representative Moore described HB 1150 as sending a message to out-of-state PBM-affiliated pharmacies that they should "[l]eave the medication dispensing to the small businesses that actually care," and warned that "Arkansas patients would be forced to get their medications from either a mail-order pharmacy or a big box store such as CVS" if the law did not pass. Maggie Ryan, *Lawmakers Introduce Bill to Ban PBM-Owned Pharmacies*, Little Rock Pub. Radio (Jan. 17, 2025), https://tinyurl.com/5b7y2b3x. For his part, Senator Hammer contrasted "local independent pharmacies" that are "investing in their communities" and are "there for the long haul" with out-of-state national chains like CVS that do not have deep roots in the State and were quick to "pull[] out" based on financial considerations. Pharmacists United for Truth & Transparency, *Arkansas HB 1150: Combatting PBM Anticompetitive Practices with State Legislation,* YouTube.com,

at 34:29-35:07 (Feb. 2, 2025), https://tinyurl.com/37pbd3c4.  Companies like CVS, Senator

Hammer said, were "sucking the economy out" of Arkansas and "sending it somewhere

else."  *Id.* at 35:01-35:07.  The State does not defend these discriminatory statements,

because the statements are not defensible.  *See Hazeltine*, 340 F.3d at 596 (reasoning that

"evidence of the intent of individuals who drafted the amendment" is sufficient to establish

discriminatory intent); Resp. 3 (describing Representative Moore as the author of HB

1150).

This abundant evidence of HB 1150's discriminatory purpose puts this case on all

fours with the Eighth Circuit's decision in *Hazeltine*, which CVS cited in its opening brief

(at 3) but the State ignores.  In that case, based on a record with eerily strong echoes of the

record behind HB 1150, the Eighth Circuit struck down a South Dakota law prohibiting a

different type of vertical integration—the ownership of farmland by "a corporation or

syndicate."  *Hazeltine*, 340 F.3d at 587-88 (citation and quotation marks omitted).  The court

based its conclusion that the law violated the Dormant Commerce Clause on officials'

explicit attempts to justify the law on protectionist grounds.  The Secretary of State in

South Dakota, for instance, campaigned for the law by warning that "[d]esperately needed

profits" would otherwise "be skimmed out of local economies and into the pockets of distant

corporations."  *Id.* at 583 (citation and quotation marks omitted).  Another advocate

explained that the law would keep "control of our state's agriculture" "in the hands of family

farmers and ranchers" rather than "the grasp of a few, large corporations."  *Id.* at 594

(citation and quotation marks omitted).  And just like this case, *Hazeltine* noted that the

law's advocates had not bothered "to learn of the effects of current regulations" before

proposing new, onerous measures that disproportionately affected out-of-state corporations. *Id.* at 595. The court reasoned that "this lack of information serve[d] as indirect evidence of the drafters' intent to create a law specifically targeting out-of-state businesses." *Id.* Those same words could be used in this case to explain why HB 1150 violates the Dormant Commerce Clause by discriminating against interstate commerce.

*Discriminatory effects*. The State also fails to rebut HB 1150's discriminatory effects, which provide an independent basis for finding the law unlawfully discriminatory. Although Arkansas points to HB 1150's facial neutrality (Resp. 22), it is well settled that a law that has "the practical effect" of disfavoring interstate commerce is discriminatory under the Dormant Commerce Clause. *See Hunt* v. *Washington State Apple Advertising Commission*, 432 U.S. 333, 350 (1977); *Smithfield Foods, Inc.* v. *Miller*, 367 F.3d 1061, 1065 (8th Cir. 2004). The practical effect of HB 1150 is precise and categorical: its ban on PBM-affiliated pharmacies will apply *only* to out-of-state companies, while leaving the *only* in-state PBM-affiliated pharmacy chain free to continue operating.

b.  Rather than meaningfully respond to the abundant evidence of HB 1150's discriminatory purpose and effects, the State rests its defense on the Supreme Court's decision in *Exxon*, claiming that "[t]he Court's reasoning in *Exxon* squarely applies in this case." Resp. 17-22. But *Exxon* is far afield from this case, and the State's reliance on that decision does not save HB 1150 for at least four reasons.[2]

---

[2]    Arkansas also spends a brief paragraph discussing *Grand River Enterprises Six Nations* v. *Beebe*, but that decision is inapposite. 574 F.3d 929 (8th Cir. 2009). There, the plaintiffs argued that the State was regulating extraterritorial conduct, *see id.* at 942, but that is not the case here. HB 1150 does not reach beyond Arkansas's borders as much as it closes its door to many out-of-state pharmacies. And *Beebe* is not probative with respect to

First, the State ignores the critical last sentence of the full paragraph it "reproduce[s]" in its brief (Resp. 19): "The fact that the burden of a state regulation falls on some interstate companies does not, *by itself*, establish a claim of discrimination against interstate commerce." *Exxon*, 437 U.S. at 125-26 (emphasis added). Those two words make a world of difference here. CVS has not argued that a disparate burden on "some" interstate actors "by itself" shows that HB 1150 is discriminatory. CVS has pointed to every traditional measure that courts use to discern discriminatory intent, from HB 1150's text and legislative record to the multiple other tools the State had at its disposal to address any purported concerns about PBM favoritism.

Second, in *Exxon*, the court did not identify anything that revealed any intentional effort by Maryland lawmakers to favor an in-state business that might have been subject to the law. Indeed, the law at issue—which barred producers and refiners of petroleum products from operating retail service stations in Maryland—did not directly apply to any in-state entities because no petroleum producers or refiners were based in Maryland. The exact opposite scenario exists here. The record is replete with such evidence, because HB 1150 as originally drafted would have applied to Walmart, which is based in Arkansas. Arkansas lawmakers nonetheless amended HB 1150 to ensure that Walmart—the company that operates the most pharmacies in the State—would still be able to operate (and indeed thrive) while its biggest retail competitor (CVS) and many of its biggest mail-service competitors (CVS, Optum, Express Scripts) would be expelled from the State.

---

the *Pike* inquiry either because that analysis is inherently fact-intensive and must be conducted on a law-by-law basis.

Third, the "burden" of HB 1150 on out-of-state companies is substantially greater than the apparently marginal impact of the law at issue in *Exxon*. The law at issue in *Exxon* did not meaningfully affect the relative market share of out-of-state companies relative to in-state companies. The Court found it "salient" that the number of service stations affected by the Maryland law was "relatively small, representing about 5% of the total number of Maryland retailers." *Exxon*, 437 U.S. at 123. Under those circumstances, the Court found "no reason to assume that the [out-of-state] share of the entire supply will not be promptly replaced by other interstate refiners." *Id.* at 127; *see also Nat'l Pork Producers Council* v. *Ross*, 598 U.S. 356, 378 (2023) (discussing *Exxon* as finding no Dormant Commerce Clause violation where a law simply shifts market share from some out-of-state firms to others). Critically, the Court expressed that a "regulation may have a discriminatory effect" if it causes "local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market." *Exxon*, 437 U.S. at 126 n.16. That is also how other federal courts have understood *Exxon*. *See, e.g.*, *Family Winemakers of California* v. *Jenkins*, 592 F.3d 1, 13 (1st Cir. 2010) ("*Exxon* is not apposite where, as here, there is an in-state market and the law operates to its competitive benefit."); *see also Cachia* v. *Islamorada*, 542 F.3d 839, 842-43 (11th Cir. 2008).

This case presents that record. Here, CVS and the other out-of-state affected pharmacies possess a substantial share of the market. Under the commonsense "case-by-case analysis" of HB 1150's "purposes and effects," *see W. Lynn Creamery, Inc.* v. *Healy*, 512 U.S. 186, 201 (1994), the law will indisputably result in out-of-state pharmacies taking a smaller slice of the market and in-state pharmacies taking a larger slice. Indeed, in the

legislative hearings leading up to HB 1150's enactment, one leader of a local pharmacy trade association trumpeted that the law would help in-state pharmacies by placing billions of dollars in prescriptions up for grabs. ECF No. 46-1 at 19. And that's already happening: CVS has already seen many patients, who are concerned that their pharmacy will close, leave for in-state competitors such as Walmart or independent pharmacies.

The State notes in response that HB 1150 will not affect other out-of-state corporations such as Amazon and Walgreens, but there is nothing either in the record or in CVS's internal data that suggests either of those companies will gain anything close to the same relevant market share that Walmart stands to gain if CVS is expelled from the State. In any event, the fact that some out-of-state businesses may incidentally benefit from the impact of a law tailor-made to benefit in-state interests does nothing to suggest that the law is not discriminatory. That is why courts have recognized that benefits to some out-of-state firms "cannot be viewed separately from the much greater disadvantages that [a law] imposes on out-of-state [companies]." *Family Winemakers of California*, 592 F.3d at 13. What matters is the comparison of the aggregate market share of out-of-state companies before and after the law's enactment.

Fourth, the State contends that HB 1150 is simply regulating "the particular structure or methods of operation in a retail market," which it reads *Exxon* to insulate from Dormant Commerce Clause scrutiny. Resp. 22. That argument substantially overreads *Exxon*. The Court there recognized that regulating corporate structure *alone* does not necessarily give rise to Dormant Commerce Clause problems. But *Exxon* does not represent a blank check for States to use corporate structure as a means of discriminating

against interstate commerce.  *See W. Lynn Creamery, Inc.*, 512 U.S. at 201 ("Our Commerce Clause jurisprudence is not so rigid as to be controlled by the form by which a State erects barriers to commerce.").  Indeed, that argument cannot be squared with the Eighth Circuit's decision in *Hazeltine*, which struck down a law that prohibited corporations and syndicates—*i.e.*, a particular type of corporate structure—from owning farmland.  Like HB 1150, the law in that case targeted a certain corporate structure.  But there as here, because the law "was motivated by a discriminatory purpose," it "violate[d] the Dormant Commerce Clause."  *Hazeltine*, 340 F.3d at 596-97.  Arkansas's position is not merely irreconcilable with *Hazeltine*—which it does not address at all—but it is also at odds with the First Circuit's decision in *Family Winemakers* and the Eleventh Circuit's decision in *Cachia*, both of which the State dismissed as "out-of-circuit cases" in a footnote without any further explanation.  Resp. 19 n.6.

In short, *Exxon* does nothing to sustain HB 1150 in this case.  Having largely opted not to engage with CVS's actual evidence of discrimination, the State is left with nothing else to defend the law.

c.    Because HB 1150 discriminates in its purpose and in its effects, the law cannot survive unless the State can show "under rigorous scrutiny" that "it has no other means to advance a legitimate local interest."  *C&A Carbone, Inc* v. *Town of Clarkston*, 511 U.S. 383, 392 (1994).  The State correctly does not argue that it can meet that burden. As discussed, while HB 1150 is purportedly motivated by perceived anticompetitive practices by PBMs, Arkansas has already passed numerous laws targeting those practices. The State has not explained what gap remains in this regulatory scheme, or why that gap

could not be addressed by other, more tailored laws that do not result in the expulsion of out-of-state pharmacies from Arkansas.

### 2. HB 1150 fails *Pike* balancing.

In addition to discriminating in both purpose and effect, HB 1150 violates the Dormant Commerce Clause for the independent reason that the burden it "impose[s] on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike* v. *Bruce Church*, 397 U.S. 137, 142 (1970). The State's characterization of the law's burdens as "minimal" blinks reality. Resp. 25. As CVS showed and the State does not question, CVS will lose more than $100 million from asset impairment and annual loss of income and will have to close 23 retail locations and lay off 500 employees. Other major out-of-state entities like Cigna and UnitedHealth Group will incur similar burdens under the law. Indeed, some have estimated that HB 1150 may lead to the closure of over 50 pharmacies. *See* ECF No. 46-1 at 87. The State's own fiscal-impact statement on the law admitted that it will reduce patients' access to pharmacies and increase drug prices. The State's consultants pointed out in a report that the law would disrupt pharmacy networks and also have a significant "cost impact" on specialty drugs in particular because "less competition would likely drive less favorable rates." Segal Financial Impact Statement (Mar. 17, 2025), tinyurl.com/4w6dxmpz. The State blithely suggests that companies can simply "make a choice" to operate "as a PBM or pharmacy," (Resp. 25) but for vertically integrated companies like CVS that operate as both, the only "choice" is to unwind a company's entire business model. That is not a "choice" that Arkansas has the power to force companies to make for the sake of bolstering in-state pharmacies.

The State looks to pass the *Pike* balancing test by pointing to "legislative findings" that, in its view, "make the intended benefits of [HB 1150] readily apparent." Resp. 24. But those legislative findings are pretextual for the reasons already discussed, *see supra* at 4-9, and they fall drastically short of outweighing the seismic burdens that HB 1150 will impose on out-of-state companies and their hundreds of thousands of Arkansas patients. Once these flawed national studies are set aside, the State is left with nothing more than a transparent handout to its in-state pharmacies. To be sure, as predicted and intended, these benefits amount to a windfall because "somewhere between two billion and five billion dollars of prescriptions" will be up for grabs once HB 1150 goes into effect. ECF No. 46-1 at 19. But the spoils of economic protectionism do not count in the *Pike* balancing analysis. HB 1150 is not saved by the very thing that renders it unconstitutional. *See Bacchus Imports, Ltd.*, 468 U.S. at 270-73.

Worse still, the State's *Pike* analysis ignores the doctrinal requirement that the "practical effect of the statute" must also factor in considerations about what would happen "if not one, but many or every, State adopted similar legislation." *Healy* v. *Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). The State's silence on this point is understandable. The pharmacy landscape across the country would be upended and billions of dollars of value would evaporate overnight if every other State adopted laws like HB 1150. It would not only sharply disrupt the flow of interstate commerce, but it also would likely raise drug prices and harm consumers. The State offers no answer to any of this.

### B.    HB 1150 Is Invalid Under The Equal Protection Clause.

As CVS has explained in its opening brief (at 33-35), HB 1150's blanket ban on all PBM-affiliated pharmacies, with an exception that intentionally carves out Walmart, also

represents an arbitrary legislative classification under the Equal Protection Clause. The State responds that the Walmart carveout is permissible because "PBMs that own pharmacies set the prices for their own pharmacies as well as the pharmacies of their competitors," while "pharmacy employers do not." Resp. 34. That is wrong as a factual matter because PBMs negotiate contracts with pharmacies rather than unilaterally "set prices." But even if Arkansas was right on that score, that still would not explain the differential treatment. The whole professed theory behind the law is that PBMs are able to demand higher reimbursement for (and steer patients to) their affiliated pharmacies. Arkansas never explains why PBMs that cater to the pharmacy's employees are immune from those concerns, or why the State had no problem ignoring those same supposed harms if they are associated with the state's largest employer. And it again ignores that the State already possesses numerous tools sufficient to address purported concerns about price fixing by PBMs. *See supra* at 6.

Moreover, Arkansas fails to acknowledge that even a law that might be rational in the abstract can be invalidated if it evinces a "bare . . . desire to harm a politically unpopular group." *City of Cleburne* v. *Cleburne Living Ctr., Inc.*, 473 U.S. 432, 447 (1985). CVS has pointed to ample evidence of such animus against CVS and other large out-of-state corporations driving the enactment of HB 1150. *See supra* at 7-8; Br. 11-19. Representative Brandon Achor, for instance, said that he "love[d] that this [bill] is not really a negotiation" with the PBM-affiliated pharmacies because those companies "have no remorse." Pharmacists United for Truth & Transparency, *Arkansas HB 1150: Combatting PBM Anticompetitive Practices with State Legislation*, YouTube.com, at 14:33-14:44 (Feb. 2,

2025), https://tinyurl.com/37pbd3c4.   Again, the State does not even engage with CVS's evidence on this point.

### C.    HB 1150 Is Preempted By ERISA.

The State offers three reasons why HB 1150 is not preempted by ERISA, but each lacks merit.  At bottom, HB 1150 greatly interferes with a plan's ability to decide how to structure its network by imposing severe restrictions on the type of pharmacies that the plan can pick from.  Congress enacted ERISA's broad preemption provision, which reaches "any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan," 29 U.S.C. § 1144(a) (emphasis added), precisely to protect plan providers from navigating a patchwork regime of intrusive state regulations.

First, the State argues that ERISA does not cover laws like HB 1150 that regulate pharmacies rather than plans.  Resp. 42.  Although Arkansas concedes that "[p]harmacy network design *is* a central matter of plan administration," it claims that HB 1150 does not implicate network design because it only "regulates who can own a pharmacy."  Resp. 51. But there is no material distinction between laws that determine which pharmacies a plan can include in its network and laws that determine which pharmacies exist in the first place for plans to choose from.  HB 1150 itself proves this point.  By banning most PBM-affiliated pharmacies from operating in Arkansas, the law imposes stringent constraints on how a plan can design its network.  A plan that wished to rely, for instance, on the leading mail-order pharmacies (which are all PBM-affiliated) to cover its participants who live in remote parts of Arkansas will now have to include many more brick-and-mortar pharmacies instead to maintain adequate coverage.  By depriving plan providers of such latitude and the advantages that come from using PBM-affiliated pharmacies, HB 1150 also applies

17

impermissible economic pressure on ERISA plans to reshape their schemes of substantive coverage. Viewed in this light, the State has no answer to cases holding that such regulations are plainly preempted. *See Rutledge* v. *PCMA*, 592 U.S. 80, 87 (2020) ("A state law may also be subject to pre-emption if 'acute, albeit indirect, economic effects of the state law force an ERISA plan to adopt a certain scheme of substantive coverage.'") (citation omitted); *see also Wehbi* v. *PCMA*, 18 F.4th 956, 968 (8th Cir. 2021) (finding no preemption because the provision at issue regulated "a noncentral 'matter of plan administration' with *de minimis* economic effects") (citation omitted).

Second, Arkansas relies on *Wehbi*, *see* Resp. 46-47, but that decision does not control here because HB 1150 sweeps more broadly than the law at issue in that case. There, the Eighth Circuit confronted a North Dakota law that imposed a number of requirements on PBMs, including one that prohibited PBMs from possessing an ownership interest in a "patient assistance program and a mail order specialty pharmacy" unless the PBM "agree[d] to not participate in a transaction that benefits" the PBM "instead of another person owed a fiduciary duty." *Wehbi*, 18 F.4th at 965-66 (citation and quotations omitted). Although the Eighth Circuit eventually upheld that law over an ERISA preemption challenge, it reached that conclusion only after emphasizing that the law gave PBM-affiliated pharmacies the choice to comply with the fiduciary-duty requirement. HB 1150, by contrast, gives PBM-affiliated pharmacies no such chance because CVS's only alternative is to entirely uproot its business structure. That is no true choice at all, and HB 1150 therefore represents a blanket ban in practice. *Wehbi* thus had no occasion to analyze

such a categorical rule.[3]  The Tenth Circuit, however, did recognize in an analogous case that such laws *are* directly preempted by ERISA because the question of which pharmacies to include in a network is a "key benefit design[] for an ERISA plan."  *PCMA* v. *Mulready*, 78 F.4th 1183, 1198 (10th Cir. 2023).

Third, the State warns that "a whole body of pharmacy and health regulation would fall" if the Court holds that HB 1150 is preempted because of its substantial effect on ERISA plans' ability to design their pharmacy networks.  Resp. 51.  The concern is overblown.  Far from simply setting rules about who can obtain pharmacy licenses—which is a traditional state power—HB 1150 categorically bans (almost) all PBM-affiliated pharmacies from the State.  Removing an entire, well-established category of pharmacies from the Arkansas market substantially impacts network design in a way that revoking a few individual licenses plainly does not.  Moreover, as both *Wehbi* and Arkansas's existing body of PBM regulations show, States retain plenty of tools to regulate pharmacies or PBMs without running afoul of ERISA preemption, and there is no evidence that preemption has been a major obstacle to state innovation in this space.  HB 1150 is a first-of-its-kind law that openly discriminates against PBM-affiliated entities and categorically

---

[3]  *Wehbi* is separately distinguishable for the simple reason that HB 1150 disrupts ERISA's interest in national uniformity.  If HB 1150 goes into effect, then plans would have to design pharmacy networks for beneficiaries in a unique manner for Arkansas or rearrange in all other States to meet Arkansas's requirement.  *See Gobeille v. Liberty Mutual Insurance Co.*, 577 U.S. 312, 326 (2016) (laws that "impose[] duties" conflicting with "a single uniform national scheme for the administration of ERISA plans without interference from laws of the several States" are preempted).  That was not true for the provisions at issue in *Wehbi*, which imposed only "*de minimis* economic effects" on national plans.  18 F.4th at 968-69.

shuts them out of the State.  Saying that this novel, sweeping law is preempted hardly means the sky will fall.  It simply preserves the status quo.

**D.      HB 1150 Is Preempted By Medicare.**

Arkansas claims that HB 1150 is not preempted under the Medicare Modernization Act and its associated federal regulations because state laws that target PBMs and pharmacies rather than plans are not, under its view, covered by Medicare's broad preemption provision.  This argument, which recycles the argument Arkansas raises in the ERISA context, is flawed for the same reason.  *See supra* at 17-19.  Like in that context, state laws cannot evade preemption by regulating PBMs rather than plans given the integral role that PBMs play in Medicare-plan administration.  *See Wehbi*, 18 F.4th at 966-67.

Arkansas's fallback position is that HB 1150 does not "act[] with respect to" the Medicare statute or its accompanying regulations.  *See* Resp. 55-57.  But that is mistaken because CVS and the other challengers have identified at least three Medicare regulations that preempt the law.   First, federal regulations instruct that plan sponsors may supplement their networks with mail-order pharmacies.  *See* 42 C.F.R. 423.120(a)(3) (a plan sponsor's "contracted pharmacy network may be supplemented by non-retail pharmacies, including pharmacies offering home delivery via mail-order").  Second, federal regulations also require plan sponsors to "provide adequate access to home infusion pharmacies," and to ensure that such pharmacies are equipped with the "professional services and ancillary supplies" to provide home infusion therapy.  *See id.* 423.120(a)(4).  Third, Medicare requires a Part D sponsor's "contracted pharmacy network" to "contract with any pharmacy that meets the Part D sponsor's standard terms and conditions."  *id.* 423.120(a)(8)(i).  And this

requirement extends to cover any "licensed pharmacies, including retail, mail-order, and institutional pharmacies." *Id.* 423.100.  HB 1150 interferes with each of these regulations because plans cannot partner with PBM-affiliated pharmacies in Arkansas even if those pharmacies comply with all federal regulations.

Arkansas's two arguments to the contrary are unpersuasive.  For starters, the State contends that HB 1150 is not preempted because it does not knock out all home-infusion pharmacies or mail-order pharmacies.  Resp. 57.  But that argument misunderstands the preemption analysis, which is keyed to whether the state law occupies the same subject matter as the federal law rather than whether the state law has rendered compliance with federal law entirely impossible.  After all, as *Wehbi* recognizes, Congress supplied a preemption provision that is broader than a conflict-preemption framework.  18 F.4th at 971-72.  Second, the State argues that HB 1150 is immune from this analysis altogether because it is a licensing law.  Resp. 56-58, 61-62.  But States cannot exploit their licensing power to circumvent the Medicare laws.  After all, "Congress presumably does not enact useless laws," and it is therefore implausible that Congress crafted a broad preemption provision while also creating a self-defeating loophole that States can exploit by relabeling their laws as licensing requirements.  *United States* v. *Castleman*, 572 U.S. 157, 178 (2014) (Scalia, J., concurring in part and concurring in judgment); *see C.I.R.* v. *Clark*, 489 U.S. 726, 739 (1989) (courts must "read the exception narrowly in order to preserve the primary operation of the provision").  Thus, the licensing exception—as it is referenced in both the statute and the various federal regulations—must be read to encompass only the traditional objects of state licensing.

State laws are also impliedly preempted when they "otherwise frustrate the purpose of a federal Medicare Part D standard." *Wehbi*, 18 F.4th at 972. Congress intended for the Medicare Part D plans to be governed solely by uniform federal standards. *See* H.R. Rep. No. 108-391, at 557 (2003) (Conf. Rep.) ("MA program is a federal program operated under Federal rules. State laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency."); *Wehbi*, 18 F.4th at 971 (Congress extended Part C's preemption scheme to Part D). Thus, HB 1150 is impliedly preempted to the extent that it undermines Congress's purpose and obstructs the ability of plans to provide an administrable, standardized network across the country.

## II. THE OTHER FACTORS SUPPORT A PRELIMINARY INJUNCTION.

The State spends a mere paragraph discussing the other preliminary-injunction factors. Its skeletal treatment is an implicit concession that the other factors overwhelmingly tilt in CVS's favor. In addition to the Plaintiffs' obvious harms, numerous employees will lose their jobs, and hundreds of thousands of Arkansans—including service members and some of the sickest patients in the State who require the rare drugs available only through specialty-pharmacy operations—will risk losing convenient, reliable access to medicine. Without an injunction, there is no alternative route through conventional litigation that can redress the challengers' injuries. Monetary damages are unavailable under the doctrine of sovereign immunity, and CVS suffers other here-and-now injuries that cannot be easily repaired once the company must notify patients and doctors that it cannot continue supplying them with the necessary medication. Moreover, it is well settled that neither the public nor the State has any interest in the ongoing enforcement of an

22

unlawful statute.  Thus, CVS has satisfied each prong of the test for emergency relief, and this Court should therefore grant the injunction.

### A.    CVS Is Irreparably Harmed Absent An Injunction.

CVS has previously established that it will face at least three distinct species of irreparable harm as a result of HB 1150.  *See* Br. 43-46.  Each of these showings of irreparable harm would suffice on its own.  Together, they make clear that the irreparable-harm factor overwhelmingly cuts in CVS's favor.

First, HB 1150 forces CVS to shutter its Arkansas pharmacies and, in turn, lose over $100 million in unrecoverable damages (due to sovereign immunity).  Accordingly, there is irreparable harm.  *See Iowa Utils. Bd.* v. *FCC*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss, however, does qualify as irreparable harm."); *Missouri* v. *Trump*, 128 F.4th 979, 996 (8th Cir. 2025) ("[Plaintiff] cannot recoup that financial loss through a damages award because of sovereign immunity, so this constitutes an irreparable injury.").

Second, by forcing CVS to abruptly exit the market, HB 1150 jeopardizes CVS's long-term competitive advantage.  If CVS is forced to notify customers that it may not be able to continue supplying their drugs, then it will have lost significant, irreversible goodwill with them—many patients may leave and never come back because they will no longer be able to trust that CVS can reliably provide them with the necessary medical care.  Similarly, CVS will have greater difficult in the interim in hiring and retaining talent.  These competitive disadvantages represent archetypal examples of irreparable harm.  *See Iowa Utils. Bd.*, 109 F.3d at 426; *see also UnitedHealthcare Ins. Co.* v. *AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) ("Loss of intangible assets such as reputation and goodwill can

constitute irreparable injury."); *Int'l Franchise Association, Inc.* v. *City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015). The deterioration of customer relationships "sufficiently demonstrate[s] irreparable harm because it is extremely difficult to quantify the future economic losses resulting from client migration to competitors, let alone to quantify the value of the loss of confidence, goodwill, and reputation that may arise." *Choreo, LLC* v. *Lors*, 2025 WL 973194, at *12 (S.D. Iowa Apr. 1, 2025).

Third**,** HB 1150 violates CVS's constitutional rights. As the Eighth Circuit has previously recognized, "most instances" of constitutional violations constitute irreparable harm. *See Morehouse Enters., LLC* v. *Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023); *Ng* v. *Bd. of Regents*, 64 F.4th 992, 998 (8th Cir. 2023). Indeed, multiple courts, including within this Circuit, have found irreparable harm due to violations of the Dormant Commerce Clause and Commerce Clause. *See, e.g.*, *Paul's Indus. Garage, LLC* v. *City of Red Wing*, 2006 WL 3804243, at *8 (D. Minn. Dec. 22, 2006) (Dormant Commerce Clause); *Bergmann* v. *City of Lake Elmo*, 2010 WL 4123355, at *8 (D. Minn. Aug. 19, 2010) (Dormant Commerce Clause); *ACLU* v. *Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) (Commerce Clause).

In the face of these overwhelming harms, the State devotes only a handful of conclusory statements in response. Arkansas begins by arguing that it suffers a form of irreparable harm whenever a court enjoins its law. True enough, but that inquiry only is appropriate when the State is the *movant* seeking injunctive relief. Here, any injury that Arkansas suffers from the non-enforcement of HB 1150—a brand-new statute that aims to tackle problems that can be solved through the enforcement of other laws already on the

books—goes to the public-interest prong.  Next, Arkansas points to a statutory exception that allows some PBM-affiliated pharmacies to operate until 2027.  But that exception only covers a fraction of the challengers' injuries, and even there, the statute does not allow for the defendants to extend the deadline.  Finally, the State contends that CVS's harms are not irreparable because CVS "may be able to seek reinstatement of their retail pharmacy permits" if it "prevail[s] at a trial on the merits."  Resp. 66.  The reinstatement of its licenses after a final judgment would be cold comfort because in the interim CVS would lose customers, employees, and goodwill.

## B.    The Public Interest Favors An Injunction.

Because the government is the defendant, the remaining preliminary-injunction factors—"assessing the harm to the opposing party and weighing the public interest"— merge.  *Nken* v. *Holder*, 556 U.S. 418, 435 (2009).  And because HB 1150 is unlawful, both factors favor CVS.  *See Missouri* v. *Trump*, 128 F.4th at 997 (reasoning that the government has no interest in unlawful action); *Brandt ex rel. Brandt* v. *Rutledge*, 47 F.4th 661, 672 (8th Cir. 2022) (the public has an interest in ensuring government actors comply with the law).  The State does not say a single word about the public interest.  It has thus waived any argument on this prong.

In any event, the public interest militates in CVS's favor.  As this Court has already recognized, the public interest in "continued public access to crucial health services" is significant.  *Planned Parenthood Arkansas & Eastern Oklahoma* v. *Selig*, 2015 WL 13307030, at *5 (E.D. Ark. Sept. 18, 2015).  And that is doubly so if patients "may have nowhere else to go." *Trinity Behavior Health Care System, Inc.* v. *Arkansas Department of Human Services*, 2014 WL 5817095, at *5 (E.D. Ark. Nov. 7, 2014).  As detailed

extensively in CVS's opening brief, HB 1150 threatens to completely disrupt the Arkansas pharmacy market at great cost to the over 360,000 Arkansans who rely on CVS. *See* Br. 46-48. This harm will be especially acute for the most vulnerable patient populations who rely on CVS's specialty pharmaceuticals. Roughly 2,000 Arkansans received limited distribution drugs—drugs that are, by definition, available only at a handful of pharmacies—from CVS's specialty pharmacies last year for conditions such as cancer, multiple sclerosis, and hemophilia. And CVS is the *only* pharmacy chain that dispenses 12 exclusive distribution drugs for serious conditions such as renal disease and bladder cancer. No other pharmacy in the State currently has access to these drugs.

A widening of the lens to include the harms documented by the other challengers only confirms the point. Consider, for instance, a patient like Irma Harper, who suffers from a severe immune deficiency disease. Express Scripts Br. 32, ECF No. 17 (June 12, 2025). She relies on LDDs and a dedicated nurse provided through a PBM-affiliated pharmacy to obtain the medicine she needs. *Id.* Without it, she would have to avoid everyday activities due to the weakness of her immune system. *Id.* Or consider retired Army colonel Douglas House. Colonel House suffers from Crohn's disease and relies on a TRICARE mail-order pharmacy for his medication. *Id.* at 33. Colonel House cannot easily find his medication at any regular pharmacy and instead also relies on a PBM-affiliated mail-order pharmacy. *Id.* And CVS pharmacies serve many other patients like Ms. Harper or Colonel House whose lives will be severely disrupted if HB 1150 goes into effect. Accordingly, the public interest strongly favors the issuance of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, CVS respectfully requests that the Court issue an order preliminarily enjoining Defendants from enforcing HB 1150.

Dated: July 18, 2025

Respectfully submitted,

/s/ J. Carter Fairley
J. Carter Fairley, AR BIN 99068
Ben C. Hall, AR BIN 2010159
BARBER LAW FIRM PLLC
1 Allied Drive
Suite 1600
Little Rock, AR 72202
501-372-6175 / 888-412-3288 – facsimile
cfairley@barberlawfirm.com
bhall@barberlawfirm.com

SULLIVAN & CROMWELL LLP

Jeffrey B. Wall*
Judson O. Littleton*

SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
(202) 956-7500

*Attorneys for Plaintiffs*

*admitted *pro hac vice*

27