# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

| | |
|---|---|
| EXPRESS SCRIPTS, INC. *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>RODNEY RICHMOND *et al.*,<br><br>*Defendants*. | Lead Case No. 4:25-cv-00520-BSM |
| OPTUM, INC. *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>RODNEY RICHMOND *et al.*,<br><br>*Defendants*. | Member Case No. 4:25-cv-00598-BSM |

**Plaintiffs' Reply In Support Of Motion For Preliminary Injunction**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... iii

INTRODUCTION .......................................................................................................... 1

ARGUMENT .................................................................................................................. 2

    I.    ERISA Preempts Act 624 ..................................................................................2

        A.    The State Misstates The Relevant Legal Standards...................................... 2

        B.    Under The Correct Standard, ERISA Preempts Act 624............................ 3

            1.    Act 624 Governs A Central Matter Of Plan Administration .......... 4

            2.    Act 624 Interferes With National Uniformity................................. 9

    II.    Medicare Statutes And Regulations Preempt Act 624..........................................10

        A.    The State's Threshold Objections To Medicare Preemption Are
Meritless...................................................................................................... 10

        B.    Under The Correct Preemption Principles, Numerous Medicare
Standards Expressly And Impliedly Preempt Act 624 ............................. 11

        C.    The State Misreads The Medicare Statute's Reference To "State
Licensing Laws" ........................................................................................ 14

    III.    Act 624 Violates The Dormant Commerce Clause..............................................17

        A.    The State Ignores Act 624's Discriminatory Motive And
Understates Its Discriminatory Treatment Of Out-Of-State
Businesses .................................................................................................. 17

        B.    Act 624 Also Fails *Pike* Balancing .......................................................... 23

    IV.    Act 624 Effects An Uncompensated Taking Of Private Property ........................24

        A.    Optum Has Well-Recognized Property Interests In Its Genoa
Pharmacies ................................................................................................. 24

        B.    Act 624 Takes Optum's Private Property .................................................. 26

            1.    Act 624 Effects A Taking Under The *Regional Rail
Reorganization Act Cases*, Regardless Whether The Taking
Is *Per Se* Or Regulatory ................................................................ 26

            2.    Act 624 Inflicts A *Per Se* Taking.................................................. 27

            3.    Act 624 Also Inflicts A Regulatory Taking.................................... 29

        C.    Because Arkansas Undisputedly Provides Inadequate
Compensation For Act 624's Threatened Taking, An Injunction Is
Appropriate ................................................................................................ 31

V.    The Other Preliminary-Injunction Factors Also Favor Relief ..............................32

CONCLUSION........................................................................................................................ 33

# TABLE OF AUTHORITIES

## Cases

*Alamo Land & Cattle Co. v. Arizona*,
   424 U.S. 295 (1976)...........................................................................................................25

*Bacchus Imps., Ltd. v. Dias*,
   468 U.S. 263 (1984)...............................................................................................18, 21, 22

*Becker v. City of Hillsboro*,
   125 F.4th 844 (8th Cir. 2025) ..........................................................................................29

*Board of Regents v. Roth*,
   408 U.S. 564 (1972)...........................................................................................................25

*Cachia v. Islamorada*,
   542 F.3d 839 (11th Cir. 2008) .........................................................................................21

*Cal. Div. of Labor Standards Enf't v. Dillingham Constr., N.A., Inc.*,
   519 U.S. 316 (1997)........................................................................................................7, 8

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
   520 U.S. 564 (1997)....................................................................................................22, 23

*CIGNA Healthplan of La., Inc. v. Louisiana*,
   82 F.3d 642 (5th Cir. 1996) ...........................................................................................5, 7

*City of Texarkana v. Brachfield*,
   183 S.W.2d 304 (Ark. 1944).............................................................................................25

*Dakotans for Health v. Noem*,
   52 F.4th 381 (8th Cir. 2022) ............................................................................................12

*Egelhoff v. Egelhoff ex rel. Breiner*,
   532 U.S. 141 (2001)............................................................................................................9

*Express Scripts, Inc. v. Wenzel*,
   262 F.3d 829 (8th Cir. 2001) .........................................................................................3, 9

*Exxon Corp. v. Governor of Maryland*,
   437 U.S. 117 (1978)......................................................................................19, 20, 21, 24

*First English Evangelical Lutheran Church of Glendale v. Los Angeles County*,
   482 U.S. 304 (1987)..........................................................................................................31

*Gobeille v. Liberty Mut. Ins. Co.*,
   577 U.S. 312 (2016)............................................................................................................3

*Grand River Enters. Six Nations, Ltd. v. Beebe*,
   574 F.3d 929 (8th Cir. 2009) ...........................................................................................19

*Hawkeye Commodity Promotions, Inc. v. Vilsack*,
    486 F.3d 430 (8th Cir. 2007) ................................................................24

*Heights Apartments, LLC v. Walz*,
    30 F.4th 720 (8th Cir. 2022) .........................................................26, 30

*Horne v. Dep't of Agriculture*,
    576 U.S. 350 (2015).......................................................................28, 29

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979)...............................................................................23

*Ingersoll-Rand Co. v. McClendon*,
    498 U.S. 133 (1990)...........................................................................3, 9

*James v. Campbell*,
    104 U.S. 356 (1882)...............................................................................28

*Kimball Laundry Co. v. United States*,
    338 U.S. 1 (1949)...................................................................................25

*Kollman v. Hewitt Assocs., LLC*,
    487 F.3d 139 (3d Cir. 2007)....................................................................5

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013)...............................................................................28

*Ky. Ass'n of Health Plans, Inc. v. Miller*,
    539 U.S. 329 (2003).................................................................................3

*Ky. Ass'n of Health Plans, Inc. v. Nichols*,
    227 F.3d 352 (6th Cir. 2000) ...............................................................7, 9

*Lingle v. Chevron, U.S.A., Inc.*,
    533 U.S. 528 (2005)...............................................................................28

*Lockheed Corp. v. Spink*,
    517 U.S. 882 (1996).................................................................................3

*Mackey v. Lanier Collection Agency & Serv., Inc.*,
    486 U.S. 825 (1988).................................................................................8

*Metro. Life Ins. Co. v. Massachusetts*,
    471 U.S. 724 (1985)...........................................................................2, 9

*Missouri v. Trump*,
    128 F.4th 979 (8th Cir. 2025) ..............................................................32

*Morehouse Enters., LLC v. ATF*,
    78 F.4th 1011 (8th Cir. 2023) ..............................................................32

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 1011 (1995) ..................................................................7, 9

*PCMA v. District of Columbia*,
   613 F.3d 179 (D.C. Cir. 2010) ............................................................5

*PCMA v. Mulready*,
   78 F.4th 1183 (10th Cir. 2023) .........................................................5, 7

*PCMA v. Rutledge*,
   891 F.3d 1109 (8th Cir. 2018) ........................................................10, 11

*PCMA v. Wehbi*,
   18 F.4th 956 (8th Cir. 2021) ............................5, 8, 9, 10, 11, 12, 14

*Penn Central Transp. Co. v. City of New York*,
   438 U.S. 104 (1978) .......................................................................28, 29

*Penn. Coal v. Mahon*,
   260 U.S. 393 (1922) ............................................................................28

*Pharm. Rsch. & Mfrs. of Am. v. Williams*,
   64 F.4th 932 (8th Cir. 2023) ...............................................................31

*Phelps-Roper v. Nixon*,
   509 F.3d 480 (8th Cir. 2007) ..............................................................33

*Pike v. Bruce Church, Inc*,
   397 U.S. 137 (1970) ............................................................................23

*Pioneer Mil. Lending, Inc. v. Manning*,
   2 F.3d 280 (8th Cir. 1993) ..................................................................24

*Reg'l Rail Reorganization Act Cases*,
   419 U.S. 102 (1974) .......................................................................26, 27

*Rutledge v. PCMA*,
   592 U.S. 80 (2020)..............................................................2, 3, 7, 8, 9

*SDDS, Inc. v. South Dakota*,
   47 F.3d 263 (8th Cir. 1995) ................................................................18

*South Dakota Farm Bureau, Inc. v. Hazeltine*,
   340 F.3d 583 (8th Cir. 2003) ...........................................17, 18, 19, 21, 23

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023)..............................................................................2

*Thomas W. Garland, Inc. v. City of St. Louis*,
   596 F.2d 784 (8th Cir. 1979) ..............................................................30

*Trump v. CASA, Inc.*,
   2025 WL 1773631 (U.S. June 27, 2025) ......................................32, 33

*United States v. O'Hagan*,
   139 F.3d 641 (8th Cir. 1998) ..............................................................11

## Statutes

42 U.S.C. § 1395w-26(b)(3) ...............................................................................10, 14, 15, 16

Pub. L. No. 93-326 § 102(1), 87 Stat. 985 (1974) ...........................................................27

Act 624, § 1(a) .......................................................................................................................5

Act 624, § 2(a)(2)(A) .............................................................................................................6

Act 624, § 2(a)(2)(B)(i) .........................................................................................................6

Act 624, § 2(a)(2)(B)(ii) ........................................................................................................6

Act 624, § 2(b) .............................................................................................................11, 22

Act 624, § 2(f)(1) .................................................................................................................22

Act 624, § 2(f)(2) .................................................................................................................22

Act 624, § 2(f)(3) .................................................................................................................22

Ark. Code Ann. § 17-92-108(a)(4)(A)(iii) ........................................................................26

Ark. Code Ann. § 23-92-503 .................................................................................................6

## Regulations

42 C.F.R. § 423.120(a) ........................................................................................................11

42 C.F.R. § 423.120(a)(3) ...................................................................................................12

42 C.F.R. § 423.120(a)(4) ...................................................................................................12

42 C.F.R. § 423.120(a)(7)(i) ...............................................................................................13

42 C.F.R. § 423.120(a)(8)(i) ...............................................................................................14

42 C.F.R. § 423.153(c)(1) ...................................................................................................14

42 C.F.R. § 423.516 .............................................................................................................12

## Rulemakings

*Medicare Program; Medicare Prescription Drug Benefit*, 70 Fed. Reg. 4,194
   (Jan. 28, 2005) ................................................................................................................16

*Medicare Program; Establishment of the Medicare Advantage Program*, 70 Fed.
   Reg. 4,588 (Jan. 28, 2005) .............................................................................................16

**Other Authorities**

Juliette Cubanski & Anthony Damico, *Key Facts About Medicare Part D Enrollment & Costs in 2023*, Kaiser Family Found. (July 26, 2023), https://tinyurl.com/4mzwsafx ...............................................................13

*Sanders Signs Legislation to Ban Anti-Competitive PBM Practices*, Arkansas.gov (Apr. 16, 2025), tinyurl.com/mwpts25m ..........................................................4, 21

**INTRODUCTION**

The State hardly disputes that Act 624 will inflict irreparable harms on both Plaintiffs and the public. Act 624 will cause incalculable disruption for Arkansans and cause Optum to lose hundreds of millions of dollars in annual revenue—which the State admits (at 35) is unrecoverable due to sovereign immunity. Act 624 will also destroy goodwill with patients and manufacturers that Optum has worked for decades to develop. It will leave patients stranded in pharmacy deserts, or who need specialty drugs, without access to needed prescriptions. And it is unconstitutional several times over, which itself is a form of irreparable harm. This Court should reject Arkansas's efforts to force these irreversible injuries on Optum and the public before Optum can obtain a full decision on Act 624's legality.

The State also fails to overcome Optum's showing of likelihood of success on the merits. Act 624 is likely preempted by both ERISA and Medicare because it interferes with the ability of pharmacy benefit managers (PBMs) like Optum Rx to administer and design ERISA and Medicare Part D plans that offer access to PBM-affiliated pharmacies. Optum has also shown that Act 624 discriminates against out-of-state businesses on its face, in its purpose, and in its effects, all in violation of the dormant Commerce Clause. Indeed, the State does not even respond to the voluminous evidence of Act 624's illegal protectionist motives or the clear Eighth Circuit precedent recognizing that such evidence triggers strict scrutiny—a searching level of review the State never even attempts to overcome. The State also ignores the key Takings Clause decision, the *Regional Rail Reorganization Act Cases*, 419 U.S. 102 (1974), which holds that a forced sale of a business for less than fair market value effects a taking for which just compensation is required. And Arkansas law concededly precludes any avenue for Optum to obtain just compensation for the forced sale of its Genoa pharmacies in Arkansas. Each of these violations warrants preliminary injunctive relief.

**ARGUMENT**

**I.      ERISA Preempts Act 624**

**A.      The State Misstates The Relevant Legal Standards**

The State rests it answer to ERISA preemption on Justice Thomas's position—in a concurrence in *Rutledge*—that "a law relating to ERISA-regulated plans is only preempted if 'a provision in … ERISA governs the same matter.'" Opp. 42 (citing *Rutledge v. PCMA*, 592 U.S. 80, 93 (2020) (Thomas, J., concurring)).  But contrary to Justice Thomas's position, longstanding Supreme Court precedent holds that "ERISA's broad pre-emption provision was intended to pre-empt any state law that 'relate[d] to' an employee-benefit plan, *not merely those state laws that directly conflicted* with a substantive provision in the federal statute."  *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 737 (1985) (emphasis added).  *No other justice* joined Justice Thomas's concurrence.  And even Justice Thomas framed his concurrence as a *critique* of the Court's controlling jurisprudence, which he acknowledged had "veered" from his preferred position.  592 U.S. at 92, 95 (Thomas, J., concurring).

A solo concurrence "is generally not the best source of legal advice on how to comply with the majority opinion." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023).  And the *Rutledge* majority endorsed nothing like Justice Thomas's requirement of a direct overlap between ERISA and state law.  To the contrary, the majority reaffirmed that a state law "is pre-empted" by ERISA if it "'governs a central matter of plan administration or interferes with nationally uniform plan administration.'"  592 U.S. at 87.  That is the very standard that Justice Thomas—but only Justice Thomas—would have discarded.  *Id.* at 92, 95 (Thomas, J., concurring).

The State's own examples of preempted laws also undercut its reliance on Justice Thomas's concurrence to limit preemption to matters directly regulated by ERISA.  The State admits, for

2

example, that ERISA forbids laws that require "'providers to structure benefit plans in particular ways,'" "'requir[e] payment of specific benefits,'" or "mandate plans or their administrators to cover services from particular providers."  Opp. 42, 44 (quoting *Rutledge*, 592 U.S. at 86-87; *Ky. Ass'n of Health Plans, Inc. v. Miller*, 539 U.S. 329, 334 (2003)).  ERISA does so even though it does not expressly regulate these aspects of plan design.  Indeed, the whole point is that "ERISA 'leaves th[e] question' of the content of benefits 'to the private parties creating the plan,'" *Lockheed Corp. v. Spink*, 517 U.S. 882, 894 (1996), so it preempts state laws not merely through direct conflicts, but by clearing the field for plan administrators to exercise discretion to adopt multistate or national health plans free of state interference.  This ensures that "'private parties, not the Government, control the level of benefits.'"  *Id*.  Congress's decision *not* to regulate certain aspects of ERISA plans thus has the same preemptive effect as its decision *to* regulate others.

The State's suggestion (at 46) that ERISA preemption applies only when a state law "directly regulate[s]" a *plan* (as opposed to "service providers") is similarly baseless.  The central question is the law's *effect* on plans—whether it "'interferes with'" plan administration—not whether it directly regulates plans.  *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 323 (2016). Preemption applies "even if the law is not specifically designed to affect such plans, or the effect is only indirect."  *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990).  As the Eighth Circuit explained, "[s]tate laws that are not targeted at ERISA plans, but which indirectly force a plan administrator to make a particular decision or take a particular action may be held to 'relate to' employee benefit plans."  *Express Scripts, Inc. v. Wenzel*, 262 F.3d 829, 833 (8th Cir. 2001).

## B.    Under The Correct Standard, ERISA Preempts Act 624

The correct standard, which the State ignores, is that ERISA preempts any state law that "'governs a central matter of plan administration or interferes with nationally uniform plan administration.'"  *Rutledge*, 592 U.S. at 87.  Act 624 does both.

### 1.    Act 624 Governs A Central Matter Of Plan Administration

The State mainly seeks to avoid preemption by framing (at 47) Act 624 as a traditional "retail pharmacy permitting" regulation.  That is incorrect.  Though Act 624 operates by denying certain pharmacies a license, its clear ultimate target is PBMs and their relationship with pharmacies.  And PBMs' relationship with pharmacies—including their ability to offer in-house pharmacy access to the ERISA plans they administer—is a vital aspect of the design and administration of ERISA plans that offer pharmacy benefits.

**a.**  Act 624 bears no resemblance to the traditional healthcare laws the State says (at 46, 49, 52) have historically avoided preemption.  It does not regulate "'treatment decisions'" or "'malpractice'" liability.  *Id.* at 46.  Nor is it analogous to revoking a particular pharmacy's license "for health and safety reasons" or "ban[ning]" a particular "medical procedure or treatment" that a plan may cover.  *Id.* at 52.  Indeed, each pharmacy that would lose its license under Act 624 unquestionably is competent to provide pharmacy services and could continue to do so in the same manner, through the same facilities and employees, if sold to a new owner unaffiliated with any PBM.  The State has not questioned the quality of any affected pharmacy's services.  Instead, Act 624 openly targets the "vertical integration of PBMs and pharmacies," Opp. 12—that is, the relationship between PBMs and pharmacies—so the State's "'traditional'" authority to regulate "'health care,'" Opp. 46, is not implicated.  That is especially true because Act 624 is a *break* from tradition—a "'first in the country'" restriction in the Governor's own words.  *Sanders Signs Legislation to Ban Anti-Competitive PBM Practices*, Arkansas.gov (Apr. 16, 2025), tinyurl.com/mwpts25m.

Rather than targeting the practices or qualifications of any regulated pharmacy, Act 624 targets the PBMs that own them.  It is based on the perception that PBMs have engaged in "anticompetitive business tactics" and "monopolistic … practices" by "steering patients" towards

certain pharmacies over others, Act 624, § 1(a); ECF 46-2, at 3:21-4:1, 5:13. As the State admits (at 51), choosing which pharmacies to favor is a classic plan design decision. The law thus holds pharmacy permits hostage to force PBMs to alter their corporate structure and amend plan design.

Act 624's direct and intentional targeting of PBMs is fatal. PBMs are "third-party service providers that administer pharmaceutical benefits for" ERISA plans and others. *PCMA v. District of Columbia*, 613 F.3d 179, 188 (D.C. Cir. 2010). "Because PBMs manage benefits on behalf of plans, a regulation of PBMs 'function[s] as a regulation of an ERISA plan itself.'" *PCMA v. Wehbi*, 18 F.4th 956, 966 (8th Cir. 2021) (quoting *District of Columbia*, 613 F.3d at 188). ERISA preemption applies equally to regulations of plans and their "third party administrators," *CIGNA Healthplan of La., Inc. v. Louisiana*, 82 F.3d 642, 650 (5th Cir. 1996), and "the concerns underlying regulation of 'ERISA plan managers' are 'equally applicable to agents … who undertake and perform administrative duties for and on behalf of ERISA plans,'" *Wehbi*, 18 F.4th at 966-97 (quoting *Kollman v. Hewitt Assocs., LLC*, 487 F.3d 139, 148 (3d Cir. 2007)) (omission in original). Because "it would be 'practical[ly] impossib[le]' for an ERISA plan to manage its own pharmacy benefits and avoid using a PBM," *PCMA v. Mulready*, 78 F.4th 1183, 1195 (10th Cir. 2023), laws that "regulate PBMs" ordinarily do not "escape preemption." *Wehbi*, 18 F.4th at 966.

**b.** The State accepts that regulating PBMs "in their capacity as plan administrators" would run afoul of ERISA, so it argues that Act 624 regulates PBMs only in a "different capacity, that of would-be retail pharmacist." Opp. 42, 47. That is a distinction with a difference.

To start, PBMs' activities *as PBMs*—in administering prescription drug benefits—are precisely the activities that subject them to Act 624 and deprive them of the right to own and operate a pharmacy in Arkansas. Act 624 incorporates the preexisting statutory definition of PBMs as businesses that "provid[e] claims processing services or other prescription drug or device services,

or both, for health benefit plans." Act 624 § 2(a)(2)(A) (incorporating Ark. Code Ann. § 23-92-503). Act 624 effectively punishes any entity that administers prescription drug benefits on behalf of an ERISA plan by denying it the right to own and operate a pharmacy in Arkansas. Not only that, the prohibition extends equally to any health insurer or health plan administrator that is affiliated with a PBM. *Id.* § 2(a)(2)(B)(i)-(ii) (defining "[p]harmacy benefits manager" to include any entity that is a "subsidiary of" or has a "direct or indirect ownership interest in" a PBM). That includes UnitedHealthcare, CVS/Caremark, and CIGNA—the health insurer/health plan administrator affiliates of the three PBMs that are plaintiffs in this Court.

The prohibition on PBM ownership of Arkansas pharmacies also directly impacts the services that PBMs provide to health plans. For reasons of administrative convenience, cost-savings, and quality assurance, plans frequently contract with PBMs to design and administer pharmacy networks, which invariably include PBM-affiliated pharmacies (whether the PBM's own pharmacies or those affiliated with another PBM). *See* Stidman Decl. ¶¶ 9-10, 13. Act 624 renders that structure illegal in Arkansas. It forecloses plans' ability to use pharmacy networks with *any* PBM-affiliated pharmacy, and thus bears no resemblance to state action that merely removes a single pharmacy from a network but permits the plan to substitute in an identical provider. Instead, PBM-affiliated pharmacies are categorically off-limits. Accordingly, plans can no longer leverage any of the unique benefits—such as administrative convenience, cost savings, and nationally uniform distribution—that PBM-affiliated pharmacies are uniquely situated to provide.

That's why the State's concession (at 51) that "[p]harmacy network design *is* a central matter of plan administration" is dispositive. Because PBMs are inextricably involved in pharmacy-network design, Act 624 impedes an admittedly "central matter of plan administration." Courts have routinely held that constraining network design in this manner causes a state

regulation to impermissibly relate to ERISA plans.  *See, e.g.*, *Mulready*, 78 F.4th at 1199 ("Each network restriction winnows the PBM-network-design options for ERISA plans, thereby hindering those plans from structuring their benefits as they choose."); *Ky. Ass'n of Health Plans, Inc. v. Nichols*, 227 F.3d 352, 362 (6th Cir. 2000) ("'By specifically prohibiting health organizations from offering networks with limited chiropractic providers, the state mandates the plan's structure.'" (citation omitted)); *CIGNA Healthplan of La., Inc.*, 82 F.3d at 648 (statute that "limited" ERISA plans to "using PPOs of a certain structure" had unlawful "connect[ion] with ERISA plans").

**c.**  The State responds (at 43-44) that these debilitating effects on network design nonetheless escape preemption because Act 624 merely "regulate[s] the behind-the-scenes relations between plans and the providers who provide … benefits," rather than "the relationships between plans and their beneficiaries."  But none of the State's cited cases purports to draw that line.  Instead, each "sharply distinguishes," Opp. 43, between laws merely imposing incidental economic pressure on benefits design—which ERISA does not preempt—and laws that, like Act 624, effectively dictate plan choices.  Take the State's reliance on *Rutledge*.  The reimbursement requirements there "merely increase[d] costs," so plans could have reacted either by "limit[ing] benefits" or by charging more.  592 U.S. at 91.  But the law did not have effects "so acute that it w[ould] effectively *dictate* plan choices."  592 U.S. at 88 (emphasis added).  So too in *Travelers*.  A law made it cheaper to acquire insurance from one provider than others.  514 U.S. 645, 658-59 (1995).  That "indirect economic influence" did "not *bind* plan administrators to any particular choice"; at most, it established "rate differentials" among insurance companies that would exist "even in the absence of state action."  *Id.* at 659-60 (emphasis added).  And so too in *Dillingham*.  A state law regulating apprentices' wages did not "requir[e]" apprentices to be hired, and at most "alter[ed] the incentives, but d[id] not *dictate* the choices, facing ERISA plans."  *Cal. Div. of Labor*

*Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 334 (1997) (emphasis added).[1]

None of those cases purports to hold that *all* state regulation of plan service providers escapes preemption, no matter how severe the effects on plan design. To the contrary, each makes clear that state laws transgress ERISA when they effectively dictate plan choices—as Act 624 clearly does. As the State admits (at 49), "PBM-affiliated pharmacies will not exist … in Arkansas" if Act 624 goes into effect, and thus plans will be left to select alternative pharmacies from among those "that remain" after the law's effective date. That prohibition is not a matter of "incentives," *Dillingham*, 519 U.S. at 332, but a categorical bar on PBM-affiliated pharmacies that "effectively dictate[s]" their exclusion from plans' pharmacy networks, *Rutledge*, 592 U.S. at 88.

The State's reliance (at 47) on *Wehbi* fails for the same reasons. The North Dakota law at issue there *permitted* PBMs to own mail-order pharmacies so long as PBMs pledged to act in beneficiaries' best interests. *Wehbi*, 18 F.4th at 969. The Eighth Circuit thus concluded that subsequent drug shortages were "attributable to the independent actions of PBMs" in refusing to take the pledge "rather than to the law" itself, defeating preemption. *Id.* The State counters that this pledge option should have "made North Dakota's law more subject to ERISA challenge, not less." Opp. 47. But the Eighth Circuit disagreed, expressly relying on that feature of the North Dakota law in upholding it. Whatever the basis of *Wehbi*'s reasoning, it is plainly distinguishable from Act 624, which has no comparable mechanism for PBMs to retain their affiliation with pharmacies. Act 624's disruptive effects are directly "attributable … to the law" itself. *Wehbi*, 18 F.4th at 969. Preemption is thus clear here under *Wehbi*'s holding and reasoning.

---

[1] *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 833 (1988), is even further afield. *See* Opp. 44. *Mackey* held that state garnishment procedures are not preempted as to *plan* assets because a separate ERISA provision barred garnishment only of *benefits*. 486 U.S. at 836. The Court reasoned that if Congress also wished to preempt garnishment as to plans, it would have said so in the same provision. *Id.* That reasoning has no application here.

## 2.    Act 624 Interferes With National Uniformity

The State's responses on national uniformity are likewise deficient.  The State claims (at 49-50) that because one state could disqualify a particular service provider for health-and-safety violations that another state continues to license, Act 624 must likewise have no prohibited effect on national uniformity.  Not so.  Rather than disqualifying particular affiliates for individualized misconduct (a traditional state power), Act 624 *categorically* proscribes the use of any PBM affiliate, and thus prohibits an entire benefits structure.  As a result, plans must fundamentally alter how they provide pharmacy benefits in Arkansas by transitioning services to independents, while remaining free to rely on their existing pharmacy networks in every other state.  Mot. 22.  If other states followed Arkansas's lead, the results would only be compounded.

The State also contends (at 49) that Act 624 does not create uniformity problems because it "doesn't impose legal obligations on plans."  Preemption does not hinge, however, on that question, but on whether the law "effectively dictate[s] plan choices," *Rutledge*, 592 U.S. at 88, even if through "indirect" means, *Ingersoll-Rand Co.*, 498 U.S. at 139, and without "target[ing]" ERISA plans, *Express Scripts, Inc.*, 262 F.3d at 833, or "operat[ing] directly on" them, *Nichols*, 227 F.3d at 362.  Act 624 undoubtedly meets *that* controlling standard for preemption by forcing plans to select from independent pharmacies "that remain" after PBM-affiliated pharmacies have been expelled from Arkansas.  Opp. 49.

Alternatively, the State argues (at 50-51) that ERISA could not have been intended to create a "nationally uniform pharmacy market" because that market will naturally exhibit variation in pricing and providers.  Admittedly, ERISA was not designed to counter "differentials" that would exist "even in the absence of state action." *Travelers Ins. Co.*, 514 U.S. at 660.  But it *was* designed to prevent the imposition *through* state action of "different legal obligations in different States," *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 148 (2001).  Thus, it does not follow that

9

because *every* plan is not uniform in *every* way, states are free to disrupt national uniformity even where it *does* otherwise exist. For that reason, the State's discussion (at 51) of Optum's Genoa pharmacies is irrelevant. Optum's national-uniformity argument is premised on Optum Rx's mail-order services, *see* Mot. 21, not Genoa's brick-and-mortar locations, and the fact that some affected pharmacies do not operate nationwide is beside the point given Act 624's clear impact on those pharmacies that do. ERISA was designed to prohibit states from enacting those idiosyncratic legal barriers that dictate how plans "structure their benefit[s]." *Rutledge*, 592 U.S. at 89. Because Act 624 does just that, it is preempted.

## II.     Medicare Statutes And Regulations Preempt Act 624

### A.     The State's Threshold Objections To Medicare Preemption Are Meritless

As with ERISA preemption, the State mischaracterizes the standards governing Medicare preemption in the Eighth Circuit. Relying on a case from the *Tenth* Circuit, the State suggests (at 54) the Eighth Circuit views Medicare preemption "'quite narrowly,'" and criticizes (at 57, 58, 59) Optum for purportedly failing to identify "conflicts" between Act 624 and various Medicare regulations. But the Eighth Circuit has explained that Medicare's preemption provision, 42 U.S.C. § 1395w-26(b)(3), "'preempt[s] a broad swath of state laws,'" and has disclaimed that Medicare merely codifies "conflict preemption," *Wehbi*, 18 F.4th at 971. Indeed, *Wehbi* itself held preempted a state law that did "not conflict" with federal standards. *Id.* at 975. As that decision makes clear, state laws are preempted when they conflict with, *or* regulate the same subject matter as, *or* otherwise frustrate the purpose of, a federal Medicare standard. *Id.* at 972.

Just as problematic for the State, the Eighth Circuit has also made clear that state laws are preempted when they impede prescription-drug access. In *PCMA v. Rutledge*, 891 F.3d 1109 (8th Cir. 2018), *rev'd on other grounds* 592 U.S. 80 (2020), the Eighth Circuit held invalid an Arkansas law that permitted pharmacists to refuse to dispense prescriptions if they were not paid at least

acquisition cost. *Id.* at 1114.[2]  It concluded that the law acted "with respect to" Medicare Part D's Pharmacy Access Standard—including the same regulations that Optum invokes—because it could "interfere with convenient access to prescription drug availability" by "conceivably [leading] to a beneficiary being unable to fill a prescription," which was "more than is required for preemption." *Rutledge*, 891 F.3d at 1114 (citing 42 C.F.R. § 423.120(a)).  That aspect of *Rutledge* remains good law, and it forecloses the State's view that Act 624's effects on pharmacy access are of no concern for Medicare preemption.

The State also rehashes (at 52-53) the "same" argument it deployed against ERISA preemption: that Act 624 merely "regulates who may be a pharmacy in the first place," rather than "pharmacy network composition."  But that argument fails for the same reason as it did with ERISA preemption.  Act 624 expressly targets *PBMs*, prohibiting "[a] pharmacy benefits manager" from acquiring any "direct or indirect interest in" an Arkansas pharmacy permit, and thus forbids a PBM from turning to PBM-affiliated pharmacies when structuring pharmacy networks and administering pharmacy benefits for Medicare plans.  Act 624, § 2(b).  As *Wehbi* makes clear, Act 624 cannot "escape [Medicare] preemption" by "regulat[ing] PBMs rather than plans"; given that "PBMs manage benefits on behalf of plans," regulation of PBMs functionally regulates Medicare plans. 18 F.4th at 966.  The State's attempts (at 55) to cast Medicare preemption as a "narrow test," thus fail at the threshold.

### B.  Under The Correct Preemption Principles, Numerous Medicare Standards Expressly And Impliedly Preempt Act 624

Act 624 is preempted because it conflicts with, regulates the same subject matter as, or

---

[2] While the Supreme Court subsequently reversed *Rutledge*'s holdings as to ERISA preemption, it did not review the Eighth Circuit's holdings as to Medicare preemption.  Because that "portion of [the] prior opinion" was not reviewed by the Supreme Court, it was "left undisturbed" and "remain[s]" in effect. *United States v. O'Hagan*, 139 F.3d 641, 646 (8th Cir. 1998).

frustrates the purpose of five separate federal Medicare standards.

*New, Significant Regulatory Requirements*.  Act 624 is preempted, first, by 42 C.F.R. § 423.516, which bars midyear regulations of MA plans.  Mot. 25-26.  The State responds (at 58) that Act 624 does not conflict with § 423.516 because that provision merely regulates "'what the HHS Secretary may do,'" not what states may do.  But conflict is not required.  Instead, *Wehbi* expressly contemplated that "state laws doing what [a federal standard] prohibits the HHS Secretary from doing would frustrate [the federal standard's] express purpose." *Wehbi*, 18 F.4th at 973. That is the case here.  Section 423.516 was meant to prevent midyear changes to the rules governing MA plans, which interfere with the operation of existing plans after they have already been priced and sold.  Act 624 does just that by removing, at midyear, the pharmacy that some plans use for mail-in prescription drug services.

For the same reason, it is again irrelevant that Act 624's requirements fall "on pharmacies and PBMs."  Opp. 58.  Under *Wehbi*, laws "do not escape" "preemption to the extent that they regulate PBMs rather than plans."  18 F.4th at 966.

*Mail-Order* and *Home Infusion Pharmacies*.  The State also attempts to distort the governing preemption test in addressing 42 C.F.R. § 423.120(a)(3) and (a)(4), which, respectively, authorize "mail-order" pharmacies and require "adequate access to home infusion pharmacies."  The State claims (at 57) nothing in Act 624 "conflicts" with either provision, but (again) no conflict is required.  The point is that Act 624 frustrates both statutes' purposes by severely curtailing access to services that CMS's regulations permit and promote.  Mot. 26-27.  The State questions Optum's evidence that plans rely on PBM-affiliated pharmacies for home-infusion services, but Optum's uncontradicted declaration supporting this proposition, *see* Stidman Decl. ¶¶ 12, 25, suffices at the preliminary injunction stage to establish a likelihood of success.  *See, e.g.*, *Dakotans for Health v.*

*Noem*, 52 F.4th 381, 386-87 (8th Cir. 2022).

The State also suggests (at 47) that both provisions carve out state licensure of pharmacies from preemption by requiring MA plans to provide their mail-in and home infusion services through "licensed pharmacies."  But the fact that plan-covered pharmacies must be licensed does not mean states have free reign to restrict licenses in ways that frustrate Medicare's goals of enabling access to these services.

*Plan-Affiliated Pharmacies*.  Act 624 is further preempted because it addresses the affiliation that covered pharmacies may have with the entities that design and administer MA plans—the same subject regulated by 42 C.F.R. § 423.120(a)(7)(i).  Mot. 27.  Although Act 624 restricts affiliations with PBMs and § 423.120(a)(7)(i) authorizes affiliates with MA organizations, Opp. 59, the distinction is irrelevant.  Whether MA organizations "ow[n] and operat[e] pharmacies" directly or through PBMs that they likewise own and operate, Section 423.120(a)(7)(i) allows that arrangement.  Act 624, by contrast, prohibits any MA organization that owns a PBM from owning and operating a pharmacy.  Under Act 624, the MA organizations that offer more than half of all Medicare Part D plans can no longer operate pharmacies in Arkansas because they are affiliated with PBMs.  *See, e.g.*, Juliette Cubanski & Anthony Damico, *Key Facts About Medicare Part D Enrollment & Costs in 2023*, Kaiser Family Found. (July 26, 2023), https://tinyurl.com/4mzwsafx (reflecting that UnitedHealth, CVS Health, CIGNA, and Humana collectively cover 63% of all Part D enrollees).

The State further argues (at 59) that Section 423.120(a)(7)(i) does not "*authorize*" plans to own pharmacies, but simply waives certain requirements for plans that do.  But in doing so, CMS not only tolerates but also *promotes* pharmacy ownership by rewarding MA organizations for using their own pharmacies.  The State may not "ad[d] to [the] federal regulatory scheme" by cutting

13

out arrangements that CMS favors. *Wehbi*, 18 F.4th at 970.

*Any Willing Pharmacy*. The State again ignores governing preemption tests when attempting to address the any-willing-pharmacy standard, 42 C.F.R. § 423.120(a)(8)(i). While that standard *requires* admission of pharmacies to a plan's network so long as they meet "the Part D sponsor's standard terms and conditions," *id.*, Act 624 *prohibits* admission if a pharmacy meeting those same terms and conditions has a disapproved corporate structure. Citing *Wehbi*, the State counters that a separate regulation authorizes states to restrict pharmacy networks by establishing "minimum standards for pharmacy practice." Opp. 56 (quoting 42 C.F.R. § 423.153(c)(1)). But for the same reasons explained *supra* at 4-5, Act 624 does not regulate pharmacy "practice." *Id.* Each Optum pharmacy could continue to practice in the same manner in Arkansas if transferred to a new owner. Act 624 thus regulates PBMs and their *ownership* of pharmacies, not the pharmacies' practices. Nothing in § 423.153(c)(1) authorizes the State to remove pharmacies from an MA plan network for reasons unrelated to their practice, as Act 624 does. Act 624 is therefore preempted.

## C. The State Misreads The Medicare Statute's Reference To "State Licensing Laws"

The State argues (at 60-62) that Act 624 can be justified as a "state licensing law" under the Medicare statute's preemption exception, 42 U.S.C. § 1395w-26(b)(3), and thus escapes preemption even if it conflicts with or frustrates Medicare requirements. That argument fails out of the gate because the statute's reference to "State licensing laws" limits the scope of *express* preemption set forth in Section 1395w-26(b)(3). And Section 1395w-26(b)(3) is merely "a sufficient rather than a necessary condition for preemption." *Wehbi*, 18 F.4th at 972. Thus, regardless whether laws are expressly preempted, they are "impliedly preempted" whenever they "frustrate the purpose of a Medicare Part D standard." *Id.* So even if Act 624 *were* the type of "State licensing law" that Medicare exempts from express preemption, that would not immunize Act 624

14

from implied preemption.

In any event, Act 624 is also expressly preempted, as Act 624 falls outside the proper understanding of Section 1395w-26(b)(3)'s preemption exception.[3]  As Optum previously showed, statutory context makes clear that "State licensing laws" refers only to those laws "that in particular license *plans*' operation," not the operations of other entities like pharmacies.  Mot. 29.  Because Act 624 does not govern *plan* licensing, it is not a "State licensing law" in the relevant sense.

The State does not dispute Optum's argument, and in fact admits (at 62) its "force."  But it responds that if "State licensing laws" refers only to laws governing plan licensing, then the entire preemption clause likewise must focus exclusively on plans, and thus it "preempts only state plan regulations, not pharmacy regulations."  *Id.*  That does not follow.  As a matter of ordinary language, the same licensing law can be a "State law … with respect to MA plans" (because its effect is to regulate MA plans) without being a "State licensing law … with respect to MA plans" (because it does not govern the licensing of MA plans).  That dooms Act 624.  It operates "with respect to MA plans" because it dictates rules to plans about permissible network structure, but is not an exempted "State licensing law" because it regulates the licenses of pharmacies, not plans.

The State also finds no support in CMS's contemporaneous commentary.  The State asserts (at 60) that CMS disclaimed any and all "'authority to preempt State pharmacy licensing laws,'" but the cited quotation is taken out of context.  CMS told commenters that it believed it lacked "authority to preempt State pharmacy licensing laws *dealing with the practice of therapeutic substitution*" (*i.e.*, the practice of replacing a patient's drugs with chemically similar drugs), but advised in the next sentence that its "electronic prescription standards do have the potential to impact

---

[3] That provision states:  "The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part."  42 U.S.C. § 1395w-26(b)(3).

State pharmacy practices and such standards could preempt State pharmacy practice laws and regulations that conflict with them." *Medicare Program; Medicare Prescription Drug Benefit*, 70 Fed. Reg. 4,194, 4,320/1 (Jan. 28, 2005) (emphasis added). So CMS disclaimed the ability to preempt in only a narrow, inapposite area—not state pharmacy licensing laws altogether.

The State also makes much (at 62) of CMS's "*general position* of deferring to States for regulating the practice of pharmacy," 70 Fed. Reg. at 4,278/3 (emphasis added), but never explains why CMS believed it would be "deferring" on a law *like Act 624*—which is not a traditional health-and-safety measure but a novel and draconian attempt to dictate plans' pharmacy-network structures. Indeed, CMS made clear in a companion rulemaking on Medicare Part C "that States may *not* use licensure … requirements as an indirect means to impose health plan regulations on MA plans," and in its Part D rulemaking stressed that under the newly "broaden[ed]" preemption provision, the "Federal program will operate under *Federal* rules." *Medicare Program; Establishment of the Medicare Advantage Program*, 70 Fed. Reg. 4,588, 4,664/1, 4664/3 (Jan. 28, 2005) (emphases added); 70 Fed. Reg. 4,664/2.[4]

The State has little to say about those broader anti-circumvention concerns. It ignores that statutes must not be construed to be "'self-defeating,'" that courts must avoid construing statutory exceptions to "'swallow the rule,'" and that Congress does not hide elephants in mouseholes by "'alter[ing] the fundamental details of a regulatory scheme in vague terms or ancillary provisions.'" Mot. 30-31. The State's position violates each of those cardinal interpretive principles. Under its theory, States could rebrand any preferred restriction on Medicare plans as a licensing restriction on service providers and thereby destroy the Medicare statute's design. That cannot

---

[4] The State chides CVS for citing the Part C rulemaking, but the rulemakings were issued on the same day and concerned the same language in Section 1395w-26(b)(3).

be the law.

### III.    Act 624 Violates The Dormant Commerce Clause

#### A.    The State Ignores Act 624's Discriminatory Motive And Understates Its Discriminatory Treatment Of Out-Of-State Businesses

As to the dormant Commerce Clause, the State once again ignores the controlling legal standard.  The crux of its defense is that Act 624 "'does not make any distinction between in-state and out-of-state' PBMs or pharmacies," and thus does not discriminate "overtly" against out-of-state commerce.  Opp. 22-23.  But facial discrimination is not required.  In *South Dakota Farm Bureau*, for example, the Eighth Circuit invalidated a law on "discriminatory purpose" alone, and thus did "not consider" other "tests."  340 F.3d 583, 593 (8th Cir. 2003).  As that decision makes clear, a state may not avoid the dormant Commerce Clause by keeping its discriminatory motives covert (and, in any event, Act 624's sponsors were not subtle about their protectionist goals).

A state law triggers strict scrutiny under the dormant Commerce Clause when it either (1) "facially discriminate[s] against out-of-state interests," (2) "has a discriminatory purpose," or (3) has "a discriminatory effect."  *S.D. Farm Bureau, Inc.*, 340 F.3d at 593.  As Optum has explained, Act 624 fails all three tests.  Mot. 33-37.  It is therefore subject to the "'strictest scrutiny.'"  *S.D. Farm Bureau*, 340 F.3d at 597.  And because the State makes no attempt to survive that scrutiny, Act 624 fails and should be enjoined.

In arguing otherwise, the State makes three principal errors.

*First*, the State ignores Act 624's "discriminatory purpose."  *S.D. Farm Bureau*, 340 F.3d at 593.  The State does not even mention—much less rebut—the mountain of evidence demonstrating lawmakers' impermissible protectionist motives.  *E.g.*, Mot. 14-18, 35.  As that evidence shows, Act 624's House and Senate sponsors, numerous other lawmakers, and several local lobbyists all pitched Act 624 as an "'essential step' to 'protecting local pharmacies'" from out-of-

17

state competition.  *Id.* at 35.  In purporting (at 3) to summarize relevant "'statements by lawmak-ers,'" the State simply omits virtually all that evidence, including when discussing the merits of Plaintiffs' dormant Commerce Clause challenge.

Plaintiffs' unrebutted evidence easily establishes the General Assembly's protectionist mo-tives in enacting Act 624 and thus suffices to invalidate the law.  "A finding that state legislation constitutes 'economic protectionism' may be made on the basis of *either* discriminatory purpose or discriminatory effect."  *Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 270 (1984) (emphasis added).  In *South Dakota Farm Bureau*, for example, the Eighth Circuit found "direct evidence" that South Dakota "intended to discriminate against out-of-state businesses" based on a few examples of "'protectionist rhetoric'" by the statute's "drafters"—*e.g.*, about keeping agriculture "'in the hands of family farmers and ranchers'" and keeping "'distant corporations'" from "'skimm[ing]'" profits "'out of local economies.'"  340 F.3d at 593-4.  The Eighth Circuit held this "evidence … of a discriminatory purpose" sufficient to invalidate the law without even "consider[ing] the two other tests" (facial discrimination and discriminatory effect).  *Id.* at 593-94.  Similarly, in *SDDS, Inc. v. South Dakota*, the Eighth Circuit found "ample evidence of a discriminatory purpose to trigger strict scrutiny" based on a handful of comments in support of a measure to restrict the construction of an in-state dump that would handle primarily out-of-state waste.  47 F.3d 268, 268 (8th Cir. 1995).  Supporters criticized the project as an "'out-of-state dump'" and claimed that the measure would keep "'imported garbage out of South Dakota'"—statements that were alone sufficient.  *Id.*

Legislators' protectionist rhetoric here is far more extensive and extreme than in *South Dakota Farm Bureau* or *SDDS*.  *See* Mot. 14-18, 35.  Legislators repeatedly explained that Act 624 would halt the flow of business to "'out-of-state mail-order pharmacies,'" and thus would shift patients back to "'their local community pharmacy,'" "'support our local businesses,'" "'protec[t]

local pharmacies,'" "'protec[t] jobs,'" and "'grow the economy locally,'" among other protection-ist sentiments. *Id.* at 35. Because Act 624 was patently "motivated by a discriminatory purpose, [the court] must strike it down as unconstitutional unless" the law survives strict scrutiny, *S.D. Farm Bureau*, 340 F.3d at 596—a test the State does not even attempt to satisfy.

The State's principal (though oblique) response is that—clear precedent notwithstanding—*Exxon Corporation v. Governor of Maryland*, 437 U.S. 117 (1978), "forecloses" any dormant Commerce Clause challenge to "'facially nondiscriminatory laws.'" Opp. 19 n.6. But *Exxon* was a case about discriminatory effect, not discriminatory purpose. The challengers there argued that a Maryland law banning vertically integrated gas stations "discriminat[ed] against interstate commerce." 437 U.S. at 125. But they based that argument solely on the purported "*effect* of the statute," which they claimed was "to protect in-state independent dealers from out-of-state competition." *Id.* (emphasis added). The Supreme Court rejected that argument, concluding as a factual matter that the law at issue would have "no impact on the relative proportions of local and out-of-state goods sold in Maryland." *Id.* at 126 n.16. Instead it would merely "caus[e] some business to shift from one interstate supplier to another." *Id.* at 127.

Unlike in *South Dakota Farm Bureau*, *SDDS*, and this case, the challengers in *Exxon* did not marshal any "direct evidence" that the Maryland legislature "*intended* to discriminate against out-of-state businesses." *S.D. Farm Bureau, Inc.*, 340 F.3d at 593 (emphasis added). The Supreme Court nowhere discussed discriminatory purpose, and the Court accepted Maryland's representation that the law was enacted to combat supply shortages that occurred during the 1973 oil crisis. *Exxon*, 437 U.S. at 121. *Exxon* thus offers no answer to the numerous authorities that treat direct evidence of discrimination—like the ample evidence here—as an independent basis for strict

19

scrutiny under the dormant Commerce Clause.[5]

***Second***, in conflating this case's facts with those of *Exxon*, the State also understates Act 624's discriminatory *effects*. The State does not dispute that the law's effects "will fall exclusively on out-of-state interests," rather than local pharmacies. Mot. 36. Indeed, it agrees (at 20, 21, 24-25) that the law will force Plaintiffs to "withdraw from the Arkansas market," in turn forcing customers to "locally-operated pharmacies." Under *Exxon*, that is enough to trigger strict scrutiny.

The law in *Exxon*, by contrast, did *not* shift any business in-state. The Supreme Court reasoned that the law—which forbade oil producers and refiners from operating gas stations in Maryland—would have no effect on the "relative proportions" of goods supplied by in-state and out-of-state businesses. 437 U.S. at 126 n.16. While some out-of-state refiners "may … withdraw … from the Maryland market," the Court found "no reason to assume that their share of the entire supply w[ould] not be promptly replaced by other interstate refiners." *Id.* at 127. The law would thus simply "shift" business from one set of out-of-state firms (refiners that owned gas stations) "to another" (refiners that did not). *Id.* As for the retail (gas station) market, the Court likewise reasoned that "in-state independent dealers" would "have no competitive advantage over out-of-state dealers." *Id.* at 126. The statute would thus "ha[ve] no impact on the relative proportions of local and out-of-state goods sold in Maryland." *Id.* at 126 n.16.

The Supreme Court nonetheless made clear that "if the effect of a state regulation" in some other case *were* shown "to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market … the regulation may

---

[5] *Grand River Enterprises Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 942 (8th Cir. 2009), likewise does not require facial discrimination. *See* Opp. 23. The appellants there based their challenge on a settlement agreement's purportedly extraterritorial effects, *id.* at 941, not the discriminatory purpose of a law, so they had no occasion to present (and the Eighth Circuit had no chance to consider) extensive direct evidence of discriminatory purpose contained in legislative history.

have a discriminatory effect on interstate commerce" even if it is facially neutral. *Exxon*, 437 U.S. at 126 n.16. That is precisely the case here. Rather than merely shifting business from one set of out-of-state firms (PBM-affiliated mail-order pharmacies) to another (independent mail-order pharmacies), Act 624's supporters repeatedly acknowledged that the law would help *local* independent pharmacies to retain their local market share. They claimed Act 624 will "bring back access locally," ensure that prescriptions are "filled locally," and "giv[e] patients the option to fill prescriptions at their local community pharmacy." ECF 46-1 (House hearing transcript), 19:17, 44:6-7; ECF 46-2 (Senate hearing transcript), 16:17. Act 624 was therefore described (correctly) as "a win for local businesses"—not a win for out-of-state independent mail-order pharmacies. *Sanders Signs Legislation to Ban Anti-Competitive PBM Practices*, *supra*. And when a law that purportedly regulates only "methods of operation" in fact "serves to exclude … out-of-state interests," *Exxon* is inapplicable. *Cachia v. Islamorada*, 542 F.3d 839, 843 (11th Cir. 2008).

The State speculates (at 20, 22) that certain out-of-state independent mail-order pharmacies "could fill the gap left by Plaintiffs' withdrawal." But that unsupported factual assertion would disprove a discriminatory effect under *Exxon* only if *100%* of the prescriptions ("the entire supply") issued by Plaintiffs shifted to those out-of-state independents, rather than to local pharmacies. *Exxon*, 437 U.S. at 127. Speculating that all 900,000+ prescriptions issued by Optum pharmacies in Arkansas would perfectly transition to other out-of-state firms, rather than to at least some local independents, is absurd. Indeed, the notion that there is effectively "no competition" between Optum and local pharmacies "is belied by [the legislature's] purported justification" for Act 624: to "bring back" prescriptions to local pharmacies. *Bacchus Imps., Ltd.*, 468 U.S. at 269; ECF 46-1, 19:17. Under *Exxon* itself, that change in "the relative proportions of local and out-of-state goods" suffices to show discriminatory effect. 437 U.S. at 126 n.16.

*Third*, the State fails to grapple with Act 624's "facia[l] discriminat[ion]" against out-of-state interests. *S.D. Farm Bureau, Inc.*, 340 F.3d at 593. Largely ignoring Optum's arguments, the State focuses (at 22) on a single provision of the law: that "[a] pharmacy benefits manager shall not acquire direct or indirect interest in, or otherwise hold, directly or indirectly," an Arkansas pharmacy permit. Act 624, § 2(b). *That* language does not draw lines based on "residency." Opp. 22. But Act 624 contains a separate, express "carveout," *id.* at 20, for in-state interests: Act 624 "does not apply to a pharmacy employer and a pharmacy" that has an "interest in a pharmacy benefits manager" when "the pharmacy employer is the sole Arkansas client of the pharmacy benefits manager that the pharmacy employer as a direct or indirect interest in," "and exclusively services the employees and dependents of the pharmacy employer while utilizing the affiliated pharmacy benefits manager in this state." Act 624, § 2(f)(1)-(3). As a result, a pharmacy based in Texarkana, Arkansas *could* be affiliated with an in-house PBM to serve Arkansas beneficiaries. But a pharmacy based in Texarkana, Texas *cannot* be affiliated with an in-house PBM to serve Arkansas beneficiaries—simply because that pharmacy's headquarters is minutes away in Texas, and thus is not the PBM's "sole Arkansas client," *id.* § 2(f)(2).

Combining a purportedly neutral restriction with a special exemption for in-state businesses defeats facial neutrality. In *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564 (1997), for example, Maine imposed generally applicable property taxes, but created a "complete exemption" from those taxes for "'benevolent and charitable institutions incorporated' in the State" and that "'principally'" served Maine residents. *Id.* at 568. The Supreme Court found that it was "not necessary to look beyond the text of this statute to determine that it discriminates against interstate commerce," as "[t]he Maine law expressly distinguishe[d] between entities that serve a principally interstate clientele and those that primarily serve an intrastate market." *Id.* at

575-76; *accord Bacchus Imps., Ltd.*, 468 U.S. at 265, 268 (exemptions for locally produced liquor from a general excise tax rendered law "clearly … discriminat[ory] on its face"). So too with Act 624, which "expressly distinguishes," *Camps Newfound*, 520 U.S. at 576, between PBMs with a "sole Arkansas client" and those with clients from other states. Act 624 § 2(f)(1)-(3).

The State's two remaining responses are likewise meritless. First, the State argues (at 20) that this exemption "would also apply to any out-of-state pharmacy with an in-house PBM for its employees' plan." But that cannot be squared with Section 2(f)'s text. An out-of-state pharmacy by definition is not the "Arkansas client" of a PBM. Act 624, § 2(f). Second, the State claims (at 20) that the exemption "is not designed just to help [in-state businesses], but to make an exception in a case where there is no conflict of interest." But that is irrelevant, because "such facial dis-crimination invokes the strictest scrutiny" "regardless of the State's purpose." *Hughes v. Okla-homa*, 441 U.S. 322, 337 (1979).

In any event, the State ignores the broader "'gerrymander'" that Act 624's text effects. *See* Mot. 34. Aside from the exemption discussed above, lawmakers also redefined the term "permit" to expressly include permits "for a mail-order pharmacy" (which undisputedly do not exist in Ar-kansas), *id.*, deleted language about "healthcare payors" after they realized it would negatively affect the state's largest employer, *id.*, and "artlessly disclosed" in the law's statement of "intent" that these additions and deletions were designed to protect "locally-operated pharmacies" from being driven "out of business," *id.* at 33. The shelter for in-state interests that Act 624's drafters carefully constructed renders the law "'*per se* invalid.'" *S.D. Farm Bureau, Inc.*, 340 F.3d at 593.

## B.    Act 624 Also Fails *Pike* Balancing

The State also has no substantive response on *Pike* balancing, which proscribes laws that place a "burden on [interstate] commerce" that is "clearly excessive in relation to the[ir] putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 147 (1970). The State merely recites

(at 24-25) Act 624's statement of "findings and intent"—which the State elsewhere derides (at 30) as having "no operative effect," and which includes the legislature's confession that it sought to protect "locally-operated pharmacies"—and deems Act 624's "benefits" "apparent."  The State thus refuses to engage with Optum's argument (at 36-37) that the legislature's recitation of its ostensibly permissible goals was "pretext[t]," particularly given that existing laws already accomplish those same goals, for its proclaimed desire to protect local pharmacies from out-of-state competition.  Conversely, the State deems (at 16, 25) Act 624's burdens "incidental" and "minimal," but includes no supporting analysis for those unsustainable assertions.  As Optum has shown, it fills a "unique niche" in the Arkansas market, *Pioneer Mil. Lending, Inc. v. Manning*, 2 F.3d 280, 284 (8th Cir. 1993), whether through its proprietary packaging to enhance medication adherence, Stidman Decl. ¶ 36, special distribution agreements with manufacturers, *id.* ¶ 45, or access to rare drugs, *id.* ¶¶ 22, 24.  Unlike fungible gasoline, where "the entire supply" can be "promptly replaced by other sellers," *Exxon Corp.*, 437 U.S. at 127, state regulations that stamp out these "niche" services pose a "great" burden on interstate commerce, *Pioneer Mil. Lending, Inc*, 2 F.3d at 284-85.  Act 624 is therefore invalid under *Pike* balancing as well.

## IV.    Act 624 Effects An Uncompensated Taking Of Private Property

### A.    Optum Has Well-Recognized Property Interests In Its Genoa Pharmacies

The State's principal response to Optum's Takings claim is to feign ignorance (at 36) as to "what property" is at issue in the claim.  But Optum's motion is clear that Act 624 requires it to sell Genoa's "eleven in-state pharmacies" in full, Mot. 5, including every conceivable asset associated with those pharmacies.  That includes the following.

***First***, at a minimum, Optum would need to sell all real and personal property belonging to its Genoa pharmacies in Arkansas.  These assets "[n]o doubt are property under the Takings Clause." *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 439 (8th Cir. 2007).

The State clearly understood this, as its opposition refers directly to Genoa's local "real estate" and "inventories." Opp. 36. A specific listing of those assets is not necessary for this motion, but for the avoidance of doubt, they include: specialized equipment such as medical refrigerators, pill-automation systems, special air-conditioning systems mandated under state regulations, and generators, along with scores of other business furnishings such as computers, routers, check scanners, cash drawers, printers, and safes. Cobbs Decl. ¶¶ 13, 14. Across Optum's eleven Genoa pharmacies, that property is collectively worth over $1.35 million. *Id.* ¶ 15. Optum will also be forced to relinquish its special leases inside of health clinics, which substantially contribute to its Genoa pharmacies' value by providing an in-built customer base of clinic patients, *id.* ¶ 9, and which likewise constitute a well-established form of Fifth Amendment property, *Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 303 (1976) ("[T]he holder of an unexpired leasehold interest in land is entitled, under the Fifth Amendment, to just compensation.").

If Optum is forced to sell its Genoa pharmacies, that property necessarily must convey as well, as no reasonable purchaser would agree to acquire the pharmacies without the space and equipment needed to run them. And when a state takes the "land, plant, and equipment" used to operate an enterprise that has "value … as a going business," "'compensation must be made'" for the "'earning power'" of that business, not just its physical assets' "value as scrap" in a fire sale. *Kimball Laundry Co. v. United States*, 338 U.S. 1, 6-11 (1949).

**Second**, Act 624 deprives Optum of the "continued operation of its business." Opp. 36. "[P]roperty interests" protected by the Takings Clause "are defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). The relevant state law here—Arkansas law—recognizes that "[t]he right to carry on a lawful business is a property right." *City of Texarkana v. Brachfield*, 183 S.W.2d 304,

25

308 (Ark. 1944). And Genoa's Arkansas pharmacies are no doubt lawful businesses. They provide a lawful service (filling prescriptions), and their qualifications and competence to do so are not in question. Even under law Act 624, there is no question that the pharmacies could lawfully continue to operate in an identical manner if sold, so long as the new owner paid the paltry $150 fee to obtain a new pharmacy license. Ark. Code Ann. § 17-92-108(a)(4)(A)(iii). Forcing Optum to transfer its operations thus deprives it of a property interest recognized in Arkansas.

These facts distinguish this case from *Hawkeye*, where the Eighth Circuit held that a lottery game retailer lacked a property interest in the "continued operation" of its business leasing and selling lottery machines that had been "bann[ed]" by the state of Iowa. 486 F.3d at 440; *see* Opp. 36. Because the law *banned* the challenger's business outright, no subsequent purchaser could have picked up its operations, so those operations had no market value to be taken. Here, by contrast, Genoa's operations remain legal, there is no legal barrier to transferring them, and their value comes from their assets and employees—not the $150 license that a new buyer could easily replace. The pharmacy's continued operations thus remain a valuable property interest.

***Third***, Optum's motion identified a property interest in its pharmacies' annual "earnings." Mot. 40. Optum's eleven Genoa pharmacies in Arkansas "account for more than $73.5 million" in annual revenue. Stidman Decl. ¶ 58. When a property owner is "deprived of its expected return on investment in the form of … income," that loss "give[s] rise to a Fifth Amendment takings claim." *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 735 (8th Cir. 2022).

### B.    Act 624 Takes Optum's Private Property

#### 1.    Act 624 Effects A Taking Under The *Regional Rail Reorganization Act Cases*, Regardless Whether The Taking Is *Per Se* Or Regulatory

Requiring Optum to sell these property interests to a third party is a classic taking. The Supreme Court said so in the *Regional Rail Reorganization Act Cases*, 419 U.S. 102 (1974). The

State has no response to that decision.  It does not even mention it.

In *Regional Rail*, Congress mandated that distressed railroads convey "'all right, title, and interest'" in their "railroad properties"—defined broadly to include all "assets or rights owned, leased, or otherwise controlled by [the] railroad," Pub. L. No. 93-326 § 102(1), 87 Stat. 985, 987 (1974)—to a private corporation called Conrail.  419 U.S. at 115.  In exchange, the railroads received not cash, but Conrail securities that they contended were of little value.  *Id.* at 155.  The Supreme Court held that "any deficiency" between the properties' true value and "the value of the limited compensation provided under the Act" would "be a taking of private property for public use" that would therefore be compensable under the Tucker Act.  *Id.* at 155.

The State makes no attempt to distinguish the forced sale in *Regional Rail*, besides an oblique, conclusory assertion that Act 624 "doesn't force a divestiture."  Opp. 1.  But the State contradicts itself 16 pages later, in responding to Optum's dormant Commerce Clause arguments, by equating Act 624 with a "divestiture provision."  Opp. 17-18.  That is, the State describes the law in *Exxon*—which barred oil producers and refiners from vertically integrating with gas stations—as a "divestiture provision."  *Id.*  And it then argues that "Act 624 is like [that] divestiture provision."  *Id.*  As the State's brief recognizes, Act 624's proponents likewise understood that the statute would force PBMs to "divest and sell" their local pharmacies.  *Id.* at 5.  That is the obvious consequence of a law that bans a business from continuing to operate absent a change of ownership.  Whether that outcome is achieved by direct operation of law or the threat of shuttering the business if not transferred, the effect on property ownership is the same.

The takeaway is that under *Regional Rail*, it does not matter whether Act 624 is a "*per se*" taking or a "regulatory" taking—whichever standard applies, a forced divestiture is a taking.

### 2.    Act 624 Inflicts A *Per Se* Taking

To the extent the distinction between per se and regulatory takings is nonetheless relevant,

*Regional Rail* is best characterized as holding that forced divestiture is a *per se* taking of property. The decision dates from 1974—four years before the Supreme Court outlined the concept of a regulatory taking in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). It does not cite or rely on any of the prior jurisprudence that *Penn Central* did in establishing that concept. *Id.* at 123-19; *e.g.*, *Penn. Coal v. Mahon*, 260 U.S. 393 (1922). A forced sale effects a taking *per se* because it deprives the property owner "of 'the rights to possess, use and dispose of' the property." *Horne v. Dep't of Agriculture*, 576 U.S. 350, 360 (2015).

The State seeks to avoid that straightforward conclusion by limiting *per se* takings to "physical occupation" of real property. Opp. 38. But *per se* takings are not so limited. While the "physical invasion of property" may be the "paradigmatic taking," any "direct government appropriation" of private property qualifies as a taking *per se*, *Lingle v. Chevron, U.S.A., Inc.*, 533 U.S. 528, 537 (2005). The Takings Clause "protects 'private property' without any distinction between different types." *Horne*, 576 U.S. at 358. And the means of directly appropriating property varies with the nature of the property. Whereas "real property" can be physically "occupied," "personal property" is more often "taken away." *Id.* at 361. A *per se* taking thus may also occur where "title … passes" to another party. *Id.* And for intangible forms of property, *per se* takings may take other forms. A patent, for example, is taken when "'the patented invention'" is "'used by the government.'" *Id.* at 359 (quoting *James v. Campbell*, 104 U.S. 356, 358 (1882)). And a "bank account" is taken through "the relinquishment of funds." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 614 (2013). Forcing Optum to sell all of its Arkansas pharmacies' real and personal property and transfer all of their operations and revenues to a new buyer is no less a direct appropriation of those businesses and their assets.

The State's treatment (at 38) of *Cedar Point Nursery* and *Loretto* thus is mistaken. Those

cases establish that a physical occupation is a *sufficient* condition, but not a *necessary* condition, for a *per se* taking.  In any event, Optum cited those cases for the distinct proposition that a pro-scribed appropriation still occurs when the government forces property to be handed over to third parties rather than itself, Mot. 41, which the State apparently now does not dispute.

The State's spurious proposed "physical" taking requirement (at 38) also fails on its own terms.  Even if that were required, Act 624 would meet that test.  Optum's eleven Genoa locations are stocked with valuable physical, personal property needed to run their operations—which nec-essarily must convey in the sale of a pharmacy business.  So if Act 624 has its logical effect, another entity would physically occupy Genoa's pharmacies and physically possess its assts.  Act 624 thus effects a clear "appropriation of [that] personal property" for which the State "has a cat-egorical duty to pay just compensation."  *Horne*, 576 U.S. at 358.

### 3.    Act 624 Also Inflicts A Regulatory Taking

Even if the State's forced-divestiture law were not a *per se* taking, the three *Penn Central* factors establish a regulatory taking.

***First***, the State cannot meaningfully dispute Act 624's "'economic impact'" on Optum's Genoa pharmacies in Arkansas.  *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978).  The State instead merely rehashes its objection that Optum failed to identify property interests at stake.  But however the property is defined, *see supra* 24-26, the economic impact on the effected pharmacies could not be more significant:  They must cease operation in full or sell *all* of their assets in Arkansas to new ownership.  Mot. 40.

***Second***, the State does not dispute that Act 624 "interfered with" Optum's "expectations" when it purchased Genoa that Genoa's pharmacies in Arkansas would continue to operate.  *Penn Cent. Transp. Co.*, 438 U.S. at 124.  Instead, it denies those expectations were "reasonable."  Opp. 39-40.  But its own authorities refute that assertion.  As the State concedes, "[t]he reasonableness

of an expectation" is typically "shaped by the regulatory regime in place at the time the claimant acquires the property."  Opp. 39 (quoting *Becker v. City of Hillsboro*, 125 F.4th 844, 858 (8th Cir. 2025)).  When Optum purchased Genoa in 2018, *no state* had prohibited PBMs or their affiliates from owning pharmacies.  Again, as Governor Sanders explained, Act 624 is a "first in the country restriction."  *See supra* at 4.  Even assuming that PBMs purportedly have "been investigated and criticized for years," Opp. 40, no state responded by mandating divestiture.  Optum thus had no basis to anticipate Act 624 when it made its investment in Genoa.

*Third*, the State cannot avoid a taking based solely on the "'character of the governmental action.'"  Opp. 40.  As the Eighth Circuit has recognized, "the first two [*Penn Central*] factors are the main determinants" of a regulatory taking, and the third fact "may be relevant" primarily when "a regulation's effects are so publicly beneficial" as to excuse compensation.  *Heights Apartments*, 30 F.4th at 734 (quotation marks omitted).  The State does not attempt to make that showing, and it cannot, since the principal purported benefits of Act 624 are either illegitimate (local protectionism) or pretextual (particularly as a gratuitous overlay on existing laws).  *See supra* at 17-24.  At best, the law "directly benefit[s] only some," *Heights Apartments, LLC*, 30 F.4th at 735—namely, local pharmacies—and will harm others, including broad swaths of the public.

By the State's telling, the third factor nonetheless weighs against a regulatory taking when a law does not involve a "'physical invasion'" and merely "'adjust[s] the benefits and burdens of public life to promote the common good.'"  Opp. 40.  But the distinction between "'physical appropriation'" and other takings is the same line the State attempts to draw between *per se* and regulatory takings.  *Id.* at 37-38.  If a "physical" appropriation were both a *per se* taking and a necessary element of a regulatory taking, there would be no regulatory takings.  Instead, courts regularly find regulatory takings even where no "physical invasion" has occurred.  *See, e.g.*,

30

*Thomas W. Garland, Inc. v. City of St. Louis*, 596 F.2d 784, 787 (8th Cir. 1979) (rejecting argument "that physical invasion or appropriation of the property is essential to a claim of de facto condemnation"); *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 320-21 (1987) (temporary use restriction).

In any event, Arkansas's mandate that Optum sell its Genoa pharmacies—giving up all possession to the buyer—has more in common with a "'physical invasion'" of Optum's property than a regulation that merely "'adjust[s] the benefits and burdens of public life.'"  Opp. 40.

### C.    Because Arkansas Undisputedly Provides Inadequate Compensation For Act 624's Threatened Taking, An Injunction Is Appropriate

The State falls back on the theory that injunctive relief is categorically unavailable because the "only remedy" for takings for public use is "just compensation in a state forum."  Opp. 40.  But the State cites *no* authority for that proposition.  And *Pharmaceutical Research & Manufacturers of America v. Williams* holds the opposite:  "[I]njunctive relief" from a taking is available when state law "does not afford … an adequate remedy."  64 F.4th 932, 946 (8th Cir. 2023).

To be sure, the reason state remedies were inadequate in *Williams* differs from the reason they are inadequate here.  As the State notes, *Williams* involved "continuous and ongoing" takings, Opp. 41, so "repetitive lawsuits" against each violation would have been impractical.  64 F.3d at 946.  Here, by contrast, the inadequacy is different:  Though Optum could *bring* a claim for compensation before the Arkansas Claims Commission, Opp. 42, Arkansas law bars that Commission from granting just compensation because it caps relief at $15,000 per taking, regardless of the amount of compensation required by the Takings Clause.  Mot. 45.  Because the State does not dispute that the compensation due will exceed that cap, *see id.*, Arkansas's capped compensation remedy is not "as complete, practical and efficient" as injunctive relief.  *Williams*, 64 F.4th at 942.  Otherwise, Arkansas's compensation cap would open a loophole in the Takings

Clause—any state could avoid just compensation by refusing to provide it through its own compensation regime. As *Williams* confirms, injunctive relief is available (indeed, necessary) to close that loophole.

## V.     The Other Preliminary-Injunction Factors Also Favor Relief

The State's perfunctory discussion of the other preliminary-injunction factors only underscores why immediate relief is appropriate. "Act 624 is already causing serious damage to Optum's revenue, reputation, and goodwill," as customers have already begun to transition away from its services. Stidman Decl. ¶ 28. The State deems (at 66) those ongoing harms "not irreparable" because plaintiffs "may be able to seek reinstatement of their retail pharmacy permits" *at final judgment*, but never explains how Optum would be compensated for harms in the interim period. Indeed, the State elsewhere concedes (at 35) that "damages cannot be recovered against the State" given sovereign immunity. Meanwhile, the State says nothing about the well-established principles that "unrecoverable economic loss" and the "potential loss of consumer goodwill," not to mention threatened constitutional violations, all constitute irreparable harm. *Iowa Utils Bd.*, 109 F.3d at 426; *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1017 (8th Cir. 2023).

Conversely, the State makes no attempt to show why the extensive disruption Act 624 will cause is in the public interest. Any technical interest the State might be said to have in "'effectuating statutes enacted by representatives of its people,'" Opp. 66, warrants "minimal," if any, weight where the statutes have been shown to "exceed" the state's "authority." *Missouri v. Trump*, 128 F.4th 979, 996 (8th Cir. 2025). Nor does *Trump v. CASA, Inc.*, 2025 WL 1773631 (U.S. June 27, 2025), suggest otherwise. Instead, *CASA* simply holds that the "entry of injunctions that likely exceed the [court's] authority" satisfies the minimal showing of "irreparable harm" necessary to support a stay of those injunctions. The Court said nothing about the *weight* that abstract harm warrants when the action enjoined is itself unconstitutional, both because: (1) the Court *did not*

32

*decide* whether action at issue was constitutional, *id.* at *14; and (2) the parties whose injunction was stayed "remain[ed] protected" by separate injunctions that were not stayed, so there were no countervailing equities to weigh against the government's injury, *id.* at *15.  Nothing in *CASA* alters the principle that "it is always in the public interest to enforce constitutional rights," *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007)—at least where (as here, and unlike in *CASA*) the court has authority to do so.

At minimum, the legislature itself recognized that there was no need to "'effectuat[e]'" Act 624 *immediately*, since it chose to not put the law into effect until January 1, 2026—eight months after enactment.  As between ongoing, certain, and unrecoverable losses and the abstract harm of delaying Act 624's implementation a few months longer to permit a final adjudication of its constitutionality, the former must prevail.

## CONCLUSION

This Court should preliminarily enjoin enforcement of Act 624.

Dated:  July 18, 2025                Respectfully submitted,

Peter Shults  (Ark. Bar No. 2019021)
Amanda G. Orcutt  (Ark. Bar No. 2019102)
SHULTS LAW FIRM LLP
200 West Capitol Avenue
Suite 1600
Little Rock, AR  72201
Telephone: (501)-375-2301
pshults@shultslaw.com
aorcutt@shults.law.com

Allyson N. Ho  (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
Telephone: (214) 698-3100
aho@gibsondunn.com

Geoffrey M. Sigler  (*pro hac vice*)
Matthew S. Rozen  (*pro hac vice*)
Clare F. Steinberg  (*pro hac vice*)
M. Christian Talley  (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
gsigler@gibsondunn.com
mrozen@gibsondunn.com
csteinberg@gibsondunn.com
ctalley@gibsondunn.com

*Attorneys for Plaintiffs*